IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINJAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-371 (LPS) |
| | ) | |
| TRUSTWAVE HOLDINGS, INC. and | ) | **DEMAND FOR JURY TRIAL** |
| SINGAPORE TELECOMMUNICATIONS | ) | |
| LIMITED, | ) | REDACTED - PUBLIC VERSION |
| | ) | |
| Defendants. | ) | |

## DEFENDANT TRUSTWAVE HOLDINGS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES AND COUNTERCLAIM TO PLAINTIFF FINJAN, INC.'S COMPLAINT

Defendant Trustwave Holdings, Inc. ("Trustwave"), by and through its undersigned counsel, hereby submits its answer and affirmative defenses and counterclaim to Plaintiff Finjan, Inc.'s ("Finjan") March 16, 2020 complaint as follows. Trustwave denies all allegations and characterizations in Finjan's complaint unless expressly admitted in the following paragraphs.[1,2]

## NATURE OF THE ACTION[3]

1. Trustwave admits Finjan's complaint alleges a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 100 et seq., but Trustwave denies that it has committed any acts of infringement.

2. Trustwave admits that Exhibit A appears to be a copy of U.S. Patent No. 8,141,154 ("the '154 Patent"). Trustwave denies all remaining allegations in Paragraph 2.

---

[1] Finjan's complaint erroneously numbers the introductory paragraph as paragraph 1. Trustwave admits that Finjan's complaint alleges patent infringement and includes a jury demand, but Trustwave denies all remaining allegations in the introductory paragraph of Finjan's complaint.

[2] Trustwave's answers herein are on behalf of only Trustwave and in no way represent or bind Defendant Singapore Telecommunications Limited ("Singtel").

[3] Trustwave repeats the headings in Finjan's complaint only for the purpose of clarity and Trustwave denies all allegations in such headings.

3.      Trustwave denies that Finjan is entitled to any monetary damages or injunctive relief as Trustwave has not infringed, and is not infringing, any claim of the '154 Patent.  Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3 and, therefore, denies those allegations.

## PARTIES

4.      Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4 and, therefore, denies those allegations.

5.      Trustwave admits that it is a Delaware corporation with a principal place of business at 70 W. Madison St., Suite 600, Chicago, IL 60602.

6.      Trustwave admits that Defendant Singtel is a corporation existing under the laws of Singapore with a principal place of business at 31 Exeter Road, Comcentre, Singapore, 239732, Singapore.

## JURISDICTION AND VENUE

7.      Trustwave admits Finjan's complaint alleges a civil action arising under the Patent Act, 35 U.S.C. § 100 et seq., but Trustwave denies that it has committed any acts of infringement. Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 7 and, therefore, denies those allegations.

8.      Trustwave admits that this Court has jurisdiction over Trustwave as Trustwave is incorporated in the State of Delaware.  Trustwave denies all remaining allegations in Paragraph 8.

9.      Trustwave admits Exhibit B appears to be a copy of a December 4, 2018 Trustwave press release.  Trustwave denies all remaining allegations in Paragraph 9.

10.     Trustwave denies all allegations in Paragraph 10.

11.     Trustwave admits that venue for Finjan's action against Trustwave is proper but Trustwave denies that this is the most convenient forum for this dispute.  Trustwave denies all remaining allegations in Paragraph 11.

## FINJAN'S ALLEGED INVENTIONS

12.     Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 and, therefore, denies those allegations.

13.     Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 and, therefore, denies those allegations.

14.     Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 and, therefore, denies those allegations.

15.     Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 and, therefore, denies those allegations.

16.     Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 and, therefore, denies those allegations.

## IMPACT OF FINJAN'S TECHNOLOGY ON TRUSTWAVE'S SUCCESS

17.     Trustwave admits that M86 Security, Inc. ("M86 Security") entered an agreement with Finjan in 2009.  Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17 and, therefore, denies those allegations.

18.     Trustwave admits Exhibit C appears to be an article from www.chicagobusiness.com. Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18 and, therefore, denies those allegations.

19.     Trustwave admits that it acquired M86 in 2012 and admits Exhibits D and E appear to be press releases concerning Trustwave's acquisition of M86.  Trustwave lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19 and, therefore, denies those allegations.

20.    Trustwave admits that Trustwave and Finjan entered an Amended and Restated Patent License Agreement in 2012.  Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 20 and, therefore, denies those allegations.

21.    Trustwave admits Exhibit F appears to be a Reuters news article regarding Singtel's acquisition of Trustwave.  Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 21 and, therefore, denies those allegations.

## SINGTEL'S ACQUISITION AND INTEGRATION OF TRUSTWAVE

22.    Trustwave admits that Singtel acquired Trustwave on August 31, 2015 for approximately US $810 million.  Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 22 and, therefore, denies those allegations.

23.    Trustwave admits that Exhibit B contains the sentence: "Singtel today announced that it has pooled the cybersecurity capabilities, technologies and resources of Singtel, Trustwave and NCS into a single global corporate identity operating under the Trustwave brand."  Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 23 and, therefore, denies those allegations.

## FINJAN'S U.S. PATENT NO. 8,141,154

24.    Trustwave admits that the USPTO issued the '154 patent on March 20, 2012 to David Gruzman and Yuval Ben-Itzhak and the '154 patent is titled "SYSTEM AND METHOD FOR INSPECTING DYNAMICALLY GENERATED EXECUTABLE CODE."

25.    Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 and, therefore, denies those allegations.

26.    Trustwave denies that the '154 patent discloses and specifically claims inventive concepts that represent significant improvements over conventional network security technology that was available at the time of filing of the '154 patent and are more than just generic software components performing conventional activities.  Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 26 and, therefore, denies those allegations.

27.    Trustwave admits that the '154 patent was challenged in multiple *Inter Partes Review* ("IPR") filed before the USPTO's Patent Trial and Appeal Board ("PTAB").  Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 27 and, therefore, denies those allegations.

28.    Trustwave admits the '154 patent was at issue in *Finjan, Inc. v. Sophos Inc.*, Case No. 14-cv-1197-WHO, D.I. No. 407 (N.D. Cal. Oct. 31, 2016).  Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 28 and, therefore, denies those allegations.

29.    Trustwave admits that Judge Noreika's claim construction order in *Finjan, Inc. v. Rapid7, Inc. et al.*, Case No. 18-cv-1519-MN, D.I. No. 123 (D. Del. Feb. 5, 2020), appears to address some claim language of the '154 patent as do six other claim construction orders from the U.S. District Court for the Northern District of California and multiple other decisions interpreting the '154 patent's claims in proceedings before the United States Patent and Trademark Office's Patent Trial and Appeal Board, including one District Court order in *Finjan v. Juniper Networks*, 387 F.Supp.3d 1004 (N.D. Cal. May 29, 2019), that construed the term "content processor" in a

manner that was case dispositive for the accused infringer and is now on appeal at the Federal Circuit, fully briefed and awaiting oral argument (*see Finjan v. Juniper Networks*, Fed. Cir. Case No. 19-2405).  Trustwave lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 29 and, therefore, denies those allegations.

## ACTS GIVING RISE TO THIS ACTION

30.     Trustwave admits that it sells the Secure Web Gateway ("SWG") and Secure Email Gateway ("SEG") products (collectively "Accused Products").  Trustwave denies all remaining allegations in Paragraph 30.

31.     Trustwave denies all allegations in Paragraph 31.

32.     Trustwave admits that it received a letter from Finjan regarding the '154 patent on December 23, 2019.  Trustwave denies all remaining allegations in Paragraph 32.

## COUNT I: DIRECT INFRINGEMENT OF U.S. PATENT NO. 8,141,154

33.     Trustwave repeats the answers to the allegations in the preceding paragraphs.

34.     Trustwave denies all allegations in Paragraph 34.

35.     Trustwave denies all allegations in Paragraph 35.

36.     Trustwave denies all allegations in Paragraph 36.

37.     Trustwave denies all allegations in Paragraph 37.

38.     Trustwave denies all allegations in Paragraph 38.

39.     Trustwave admits Exhibit G contains the screenshots shown in Paragraph 39. Trustwave denies all remaining allegations in Paragraph 39.

40.     Trustwave admits Exhibit H contains the screenshot shown in Paragraph 40. Trustwave denies all remaining allegations in Paragraph 40.

41.    Trustwave admits Exhibit H contains the screenshots shown in Paragraph 41. Trustwave denies all remaining allegations in Paragraph 41.

42.    Trustwave admits Exhibit H contains the screenshots shown in Paragraph 42. Trustwave denies all remaining allegations in Paragraph 42.

43.    Trustwave denies all allegations in Paragraph 43.

44.    Trustwave denies all allegations in Paragraph 44.

45.    Trustwave denies all allegations in Paragraph 45.

### COUNT II: INDIRECT INFRINGEMENT OF U.S. PATENT NO. 8,141,154

46.    Trustwave repeats the answers to the allegations in the preceding paragraphs.

47.    Trustwave denies all allegations in Paragraph 47.

48.    Trustwave denies all allegations in Paragraph 48.

49.    Trustwave denies all allegations in Paragraph 49.

50.    Trustwave denies all allegations in Paragraph 50.

51.    Trustwave admits that it provides materials, such as Exhibit I and Exhibit J, on its website.  Trustwave denies all remaining allegations in Paragraph 51.

### AFFIRMATIVE AND OTHER DEFENSES

Further answering the complaint, Trustwave asserts the following defenses, undertaking the burden of proof on such defenses only to the extent required by law.  Trustwave reserves its right to amend its answer with additional defenses as more information is obtained.

### FIRST DEFENSE
**(Failure to State a Claim)**

Finjan's Complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE
### (Non-Infringement)

Trustwave is not infringing and has not infringed any valid and enforceable claim of the '154 patent, whether directly, literally, under the doctrine of equivalents, indirectly, contributorily, by inducement, or in any way.

## THIRD DEFENSE
### (Invalidity of the '154 Patent)

One or more claims of the '154 patent are invalid because they do not satisfy conditions of patentability specified in Title 35 of the United States Code, including, but not limited to, §§ 101 (patentability), 102 (anticipation), 103 (obviousness), and 112 (indefiniteness and failure to satisfy the written description and/or enablement requirements).  One or more claims of the '154 Patent are anticipated and/or rendered obvious alone or in combination by, *inter alia*, U.S. Patent Application Publication No. US 2007/0113282 A1 ("Ross");U.S. Patent Application Publication No. US 2002/0066022 A1 ("Calder"); Sirer et al., "Design and Implementation of a Distributed Virtual Machine for Networked Computers" (1999) ("Sirer"); Chander et al., "Mobile Code Security by Java Bytecode Instrumentation" (2001) ("Chander"); U.S. Patent No. 5,623,600 ("Ji"); U.S. Patent Application Publication No. 2005/0108562 A1 ("Khazan"); and U.S. Patent No. 7,487,540 ("Shipp").

## FOURTH AFFIRMATIVE DEFENSE
### (Government Sales Exception)

Finjan's claims are barred, in whole or in part, to the extent that Finjan accuses products or services that are provided by or for the United States of America, pursuant to 28 U.S.C. § 1498(a).

## FIFTH AFFIRMATIVE DEFENSE
### (Inequitable Conduct)

The '154 patent is unenforceable on the grounds of inequitable conduct.  On June 14, 2010, Finjan filed the non-provisional patent application that matured into the '154 patent. That non-provisional patent application did not make any claim of priority in its specification.  On March 20, 2012, the '154 patent issued without any claim of priority listed on the face of the patent nor any claim of priority found in the specification.  Approximately one and a half years after the '154 patent issued, on October 16, 2013, Dawn-Marie Bey, Finjan's patent attorney at the time, filed a "Petition To Accept Unintentionally Delayed Claim Of Priority Under 35 U.S.C. § 120 For The Benefit Of A Prior filed Application Filed Under 37 C.F.R. § 1.78(a)(3)." In this petition, Ms. Bey sought to claim priority to U.S. Patent No. 7,757,289 (the "'289 patent"), which was filed on December 12, 2005.  In this petition, Ms. Bey represented that "the entire delay between the date the priority claim was due and the date that this petition with priority claim added to the specification is filed was unintentional."

Upon information and belief, Finjan's representative, Ms. Bey, misrepresented a material fact to the USPTO and also violated her duty of candor to the USPTO when she represented that the delayed claim of priority in the '154 patent was "unintentional."  Ms. Bey's petition to the USPTO to accept a significantly delayed claim of priority on October 16, 2013 coincided with a new campaign by Finjan to assert the '154 patent.  Specifically, the petition was filed just a couple months after Finjan filed new litigation asserting the '154 patent against Websense, Inc. on September 23, 2013 (N.D. Cal. Case No. 5:13-cv-04398) and FireEye, Inc. on July 8, 2013 (N.D. Cal. Case No. 4:13-cv-03133-SBA), and shortly before Finjan instigated other litigation asserting the '154 patent against Proofpoint, Inc. on December 16, 2013 (N.D. Cal. Case No. 4:13-cv-05808-HSG) and Palo Alto Networks, Inc. on November 4, 2014 (N.D. Cal. Case No. 4:14-cv-04908-PJH).  Because claims

entitled to an earlier priority date also expire earlier Finjan was incentivized to properly claim priority only to the extent it believed it was necessary to overcome otherwise invalidating prior art. Upon information and belief, Finjan and Ms. Bey delayed claiming priority in order to attempt to maximize the value of the '154 patent during pre-suit licensing negotiations and only attempted to correct the claim of priority once it became clear that the '154 patent would be subject to serious invalidity attacks in litigation.

Upon information and belief, Ms. Bey's misrepresentation of a material fact to the USPTO in connection with the '154 patent is also a part of an overarching scheme that Finjan has deliberately planned and carefully executed to defraud the USPTO.  Finjan, through its representative, Ms. Bey, has an unusually frequent pattern of petitioning for allegedly "unintentionally" delayed claims of priority, particularly after the validity of one of Finjan's patents is challenged based on prior art that predates the filing of the patent but post-dates the belatedly claimed priority document.  Ms. Bey, acting on behalf of Finjan, has filed petitions for allegedly "unintentionally" delayed claims of priority for at least four other Finjan patents—U.S. Patent Nos. 6,154,844; 7,058,822; 7,647,633; and 8,079,086—and each time this "unintentional" error with the patent's priority claim was surreptitiously discovered many years after the patent issued from the USPTO and while the patent was facing a validity challenge in litigation or in a post-grant proceeding at the USPTO.  In other words, on multiple occasions Finjan waited to see if a patent would be granted or validated with a later priority date in order to benefit from a later expiration date, and only when it became clear that the patent would not be validated Finjan sought to "correct" its "unintentionally" delayed priority claim in order to try to moot the asserted prior art.  Because patents expire sooner if their priority is extended farther back in time, upon information and belief, Ms. Bey, acting on behalf of Finjan, intentionally delayed properly claiming priority in these patents so that they might benefit from a

deferred expiration date.  Finjan's overarching pattern of repeated misrepresentations to the USPTO regarding purportedly "unintentionally" delayed claims of priority constitutes affirmative egregious misconduct.

Finjan's misrepresentations were material to the validity of the '154 patent because they were designed to eliminate certain prior art that could invalidate the claims of the patent.

The foregoing facts constitute inequitable conduct that renders the '154 patent unenforceable, as summarized below:

- **Who:** Ms. Dawn-Marie Bey, patent attorney acting on behalf of Finjan.

- **What:** Ms. Bey's allegedly "unintentionally" delayed claim of priority.

- **Where:** Petition To Accept Unintentionally Delayed Claim Of Priority Under 35 U.S.C. § 120 For The Benefit Of A Prior-filed Application Filed Under 37 C.F.R. § 1.78(a)(3).

- **When:** October 16, 2013.

- **Why:** Ms. Bey delayed properly claiming priority in the '154 patent in order to defer the patent's expiration date, and she belatedly attempted to correct priority once the '154 patent was asserted in multiple litigations and subject to substantial invalidity challenges.

- **How:** Ms. Bey falsely represented that the entire delay in claiming priority from the '154 patent to the '289 patent was "unintentional." Such a false representation to the USPTO when viewed in the context of Finjan's overarching pattern of repeated misrepresentations to the USPTO regarding purportedly "unintentionally" delayed claims of priority constitutes affirmative egregious misconduct that is per se material.

11

## SIXTH AFFIRMATIVE DEFENSE
### (Limitation on Damages)

Finjan's recovery for alleged infringement of the '154 patent, if any, is limited to any alleged infringement committed no more than six years prior to the filing of its complaint, pursuant to 35 U.S.C. § 286.

## SEVENTH AFFIRMATIVE DEFENSE
### (Failure to Mark)

35 U.S.C. § 287 limits and/or precludes recovery of damages, if any, by Finjan. On information and belief, Finjan has made, offered for sale, sold, or imported articles embodying the purported inventions of the '154 patent, but Finjan did not mark such articles as required under Section 287.

On information and belief, Finjan has licensed the '154 patent to third parties that have made, offered for sale, sold, or imported articles embodying the purported invention of the '154 patent, including, but not limited to Fireeye, Inc.; Websense, Inc.; Proofpoint, Inc.; Armorize Technologies, Inc.; Sophos, Inc.; Symantec, Corp.; F5 Networks, Inc.; AVG technologies CZ, s.r.o. and related entities; Bitdefender, Inc. and related entities; and Carbon Black, Inc., but such third parties did not mark such articles as required by Section 287.

Furthermore, Finjan represented in multiple patent office proceedings that Trustwave is licensed to the '154 patent. For example, in Finjan's December 29, 2015 Patent Owner Preliminary Response in *Palo Alto Networks, Inc. v. Finjan, Inc.*, IPR2015-01979, an *Inter Partes* Review proceeding before the USPTO's Patent Trial and Appeal Board challenging the patentability of certain claims of the '154 patent, Finjan stated "licensing of Finjan's patent portfolio, including the '154 Patent, to several technology companies, including McAfee, Inc./Intel Corporation, Websense, Inc., Webroot Inc., **Trustwave Holdings, Inc., M86 Security** and Microsoft; copying by

12

competitors; and commercial success." *Palo Alto Networks, Inc. v. Finjan, Inc.*, IPR2015-01979, Paper No. 6 at p. 33 (emphasis added); *see also Palo Alto Networks, Inc. v. Finjan, Inc.*, IPR2016-00151, Paper No. 8 – Finjan's February 17, 2016 Patent Owner Preliminary Response at p. 32. Despite Finjan's representations to the USPTO that Trustwave was licensed to the '154 patent, representations made in an effort to preserve the alleged validity of the claims of the '154 patent, Finjan did not require that Trustwave mark the Accused Products and the 2012 Amended and Restated Patent License Agreement does not obligate Trustwave to mark such products.

## EIGHTH AFFIRMATIVE DEFENSE
### (Prosecution History Estoppel)

The asserted claims of the '154 patent are and were limited by amendment, the prior art, and/or by the statements made during their prosecution before the USPTO such that Finjan is now estopped and/or otherwise precluded from maintaining that such claims of the '154 patent are of sufficient scope to cover the accused products either literally or under the doctrine of equivalents.

For example, during the prosecution of the '154 patent, the applicants distinguished the '154 patent from prior art on the ground that "the claimed transmitter transmits the input in a call to a first function."

## NINTH AFFIRMATIVE DEFENSE
### (Equitable and Contractual Defenses)

Finjan's claims are barred, in whole or in part, by the principles and doctrines of acquiescence, equitable estoppel, accord and satisfaction, payment, and/or waiver.

## TENTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

Trustwave re-alleges and incorporates herein by reference the allegations contained in the foregoing paragraphs. Finjan's claims are barred, in whole or in part, by the doctrine of unclean hands. Finjan's claims based on the '154 patent are barred because one or more of Finjan, the named

inventors on those patents, their attorneys, representatives, predecessors in interest, and/or other persons with a duty of candor to the USPTO has unclean hands on account of violations of the duty of candor to the USPTO and misrepresentations of material fact to the USPTO.

First, Finjan has a history of petitioning for allegedly "unintentionally" delayed claims of priority, which generally do not arise until after the validity of Finjan's patent is in question based on prior art that predates the filing of the patent but post-dates the belatedly claimed priority document. In other words, on multiple occasions, Finjan has waited to see if a patent would be validated with a later priority date in order to gain the benefit of a later expiration date, and only when it becomes apparent that the patent would not be validated in view of particular prior art did Finjan seek to correct its delayed priority claim in order to moot the asserted prior art.

Finjan filed the patent application that issued as the '154 patent on June 14, 2010. That patent application did not make a claim of priority in its specification. On March 20, 2012, the '154 patent issued without any claim of priority on the face of the patent or in the specification. On October 16, 2013, Ms. Bey, on behalf of Finjan, filed a "Petition To Accept Unintentionally Delayed Claim of Priority Under 35 U.S.C. § 120 For the Benefit Of A Prior-filed Application Filed Under 37 C.F.R. § 1.78(a)(3)." With this petition, Ms. Bey, on behalf of Finjan, sought to claim priority to U.S. Patent No. 7,757,289, which was filed on December 12, 2005. In this petition, Ms. Bey, on behalf of Finjan, represented that "the entire delay between the date the priority claim was due and the date that this petition with priority claim added to the specification is filed was unintentional." On information and belief, Ms. Bey, on behalf of Finjan, misrepresented a material fact to the USPTO and thus violated her duty of candor to the USPTO when she represented that the delayed claim of priority for the '154 patent was "unintentional." Finjan's petition to the USPTO to accept the delayed claim of priority on October 16, 2013 coincided with Finjan's new campaign to assert the

'154 patent.  This petition was filed just a month after Finjan filed new litigation asserting the '154 patent against Websense, Inc. on September 23, 2013 (N.D. Cal. Case no. 5:13-cv-04398) and FireEye, Inc. on July 8, 2013 (N.D. Cal. Case No. 4:13-cv-03133-SBA), and shortly before Finjan instigated other litigation asserting the '154 patent against Proofpoint, Inc. on December 16, 2013 (N.D. Cal. Case No. 4:13-cv-05808-HSG) and Palo Alto Networks, Inc. on November 4, 2014 (N.D. Cal. Case No. 4:14-cv-04908-PJH).  On information and belief, Finjan and Ms. Bey delayed claiming priority to maximize the value of the '154 patent during pre-suit licensing negotiations and only attempted to correct the claim of priority once it became clear that the '154 patent would be subject to invalidity attacks during litigation.

Ms. Bey, acting on behalf of Finjan, has filed petitions for allegedly "unintentionally" delayed claims of priority for at least four other Finjan patents—U.S. Patent Nos. 6,154,844; 7,058,822; 7,647,633; and 8,079,086—and each time this "unintentional" error with the patent's priority claim was surreptitiously discovered many years after the patent issued from the USPTO and while the patent was facing a validity challenge in litigation or in a post-grant proceeding at the USPTO.  In other words, on multiple occasions it appears that Finjan has waited to see if a patent would be granted or validated with a later priority date in order to benefit from a later expiration date, and only when it becomes clear that the patent would not be granted or validated does Finjan seek to "correct" its "unintentionally" delayed priority claim in order to try to moot the asserted prior art.  Because patents expire sooner if their priority is extended farther back in time, upon information and belief, Ms. Bey, acting on behalf of Finjan, intentionally delayed properly claiming priority in these patents so that they might benefit from a deferred expiration date.  Finjan's repeated misrepresentations to the USPTO regarding its allegedly "unintentionally" delayed claims of priority

constitutes egregious misconduct. Thus, the '154 patent is unenforceable due to Finjan's unclean hands.

**ELEVENTH AFFIRMATIVE DEFENSE**
**(License)**

Trustwave re-alleges and incorporates herein by reference the allegations contained in the foregoing paragraphs. Finjan's infringement allegations concerning the accused SEG and SWG products are barred because Trustwave has a license for the SEG and SWG products. Trustwave is a licensee to Finjan patents under the parties' 2012 Amended and Restated Patent License Agreement. Finjan alleges that the SEG and SWG products are Licensed Products and Services under the parties' 2012 Amended and Restated Patent License Agreement. Furthermore, the SWG and SEG products qualify as a subset of Licensed Products and Services called Integrated Licensed Products and Services. Under the 2012 Amended and Restated Patent License Agreement Integrated Licensed Products and Services cannot trigger royalty obligations under the parties' agreement. The stated purpose of the parties' Agreement was "the Licensor [i.e., Finjan] and Licensee [i.e., Trustwave] desire to amend and restate the Original License [i.e., the Finjan-M86 2009 Patent License Agreement], on the terms and subject to the conditions set forth herein in order to allow Licensee to conduct, grow and expand the business acquired from the Parent [i.e., M86 products] on the terms and conditions set forth herein." This purpose is memorialized in the terms of the agreement:

> 1.5. "Integrated Licensed Products and Services" means products and services of Licensee and/or any Affiliate, and may include the Licensed Products and Services, in which Parent's Existing Products and Services have been integrated.

> 1.11. "Parent's Existing Products and Services" means all products and/or services branded under M86 Security, Inc.'s, M86 Americas, Inc.'s and/or their respective Affiliates' trademarks or brands as of the Closing Date, including without limitation the individual functionality, embodiments and/or components thereof, and modifications, updates and/or other changes thereto made after the Closing Date by Licensee and/or its Affiliates, and in each case, whose manufacture, use or sale would infringe, contribute to, or induce the infringement of at least one valid claim of

16

a Licensed Patent or which is manufactured using a Licensed Method or when used performs a Licensed Method.

Accordingly, the definition of Net Sales in Section 1.9 specifically excludes Integrated Licensed Products and Services from being able to trigger royalties:

> Notwithstanding anything in the definition of Net Sales or this Agreement to the contrary sales by Acquirer and its Affiliates licensed hereunder for Licensed Products and Services attributable to the Existing Business, and sales of Integrated Licensed Products and Services shall not be included in the definition of sales for purposes of calculating Net Sales and no payments are due on such sales.

Therefore, the parties' 2012 Amended and Restated Patent License Agreement grants Trustwave a fully-paid up product license that bars Finjan's allegations of infringement of the '154 patent.

Further supporting this defense are Finjan's statements in District Court litigation involving the '154 patent and proceedings at the USPTO involving the '154 patent.  Finjan has repeatedly represented that Trustwave is licensed to the '154 patent and Finjan has argued that the Trustwave products are evidence of commercial success of the invention allegedly covered by the claims of the '154 patent.  For example, in Finjan's December 29, 2015 Patent Owner Preliminary Response in *Palo Alto Networks, Inc. v. Finjan, Inc.*, IPR2015-01979, which was an *Inter Partes* Review proceeding before the USPTO's Patent Trial and Appeal Board challenging the patentability of certain claims of the '154 patent, Finjan states "licensing of Finjan's patent portfolio, including the '154 Patent, to several technology companies, including McAfee, Inc./Intel Corporation, Websense, Inc., Webroot Inc., **Trustwave Holdings, Inc., M86 Security** and Microsoft; copying by competitors; and commercial success." *Palo Alto Networks, Inc. v. Finjan, Inc.*, IPR2015-01979, Paper No. 6 at p. 33 (emphasis added); *see also Palo Alto Networks, Inc. v. Finjan, Inc.*, IPR2016-00151, Paper No. 8 – Finjan's February 17, 2016 Patent Owner Preliminary Response at p. 32.

Trustwave is free and clear to sell Integrated Licensed Products and Services under the parties' agreement, including SEG and SWG, and all infringement allegations by Finjan against Trustwave related to such products are barred.

**TWELFTH AFFIRMATIVE DEFENSE**
**(Legal Estoppel)**

Trustwave re-alleges and incorporates herein by reference the allegations contained in the foregoing paragraphs. Finjan's infringement allegations concerning the accused SEG and SWG products are barred based on legal estoppel. The parties' 2012 Amended and Restated Patent License Agreement bars Finjan's infringement allegations against Trustwave's SEG and SWG products. Finjan alleges that the SEG and SWG products are Licensed Products and Services under the parties' 2012 Amended and Restated Patent License Agreement. Furthermore, the SWG and SEG products qualify as a subset of Licensed Products and Services called Integrated Licensed Products and Services. Under the 2012 Amended and Restated Patent License Agreement, Integrated Licensed Products and Services cannot trigger royalty obligations under the parties' agreement. The stated purpose of the parties' Agreement was "the Licensor [i.e., Finjan] and Licensee [i.e., Trustwave] desire to amend and restate the Original License [i.e., the Finjan-M86 2009 Patent License Agreement], on the terms and subject to the conditions set forth herein in order to allow Licensee to conduct, grow and expand the business acquired from the Parent [i.e., M86 products] on the terms and conditions set forth herein." This purpose is memorialized in the terms of the agreement:

> 1.5. "Integrated Licensed Products and Services" means products and services of Licensee and/or any Affiliate, and may include the Licensed Products and Services, in which Parent's Existing Products and Services have been integrated.

> 1.11. "Parent's Existing Products and Services" means all products and/or services branded under M86 Security, Inc.'s, M86 Americas, Inc.'s and/or their respective Affiliates' trademarks or brands as of the Closing Date, including without limitation the individual functionality, embodiments and/or components thereof, and

18

> modifications, updates and/or other changes thereto made after the Closing Date by Licensee and/or its Affiliates, and in each case, whose manufacture, use or sale would infringe, contribute to, or induce the infringement of at least one valid claim of a Licensed Patent or which is manufactured using a Licensed Method or when used performs a Licensed Method.

Accordingly, the definition of Net Sales in Section 1.9 specifically excludes Integrated Licensed Products and Services from being able to trigger royalties:

> Notwithstanding anything in the definition of Net Sales or this Agreement to the contrary sales by Acquirer and its Affiliates licensed hereunder for Licensed Products and Services attributable to the Existing Business, and sales of Integrated Licensed Products and Services shall not be included in the definition of sales for purposes of calculating Net Sales and no payments are due on such sales.

Therefore, the parties' 2012 Amended and Restated Patent License Agreement grants Trustwave a fully-paid up product license that bars Finjan's allegations of infringement of the '154 patent.

Further supporting this defense are Finjan's statements in District Court litigation involving the '154 patent and proceedings at the USPTO involving the '154 patent. Finjan has repeatedly represented that Trustwave is licensed to the '154 patent and Finjan argued that the Trustwave products are evidence of commercial success of the invention allegedly covered by the claimsof the '154 patent. For example, in Finjan's December 29, 2015 Patent Owner Preliminary Response in *Palo Alto Networks, Inc. v. Finjan, Inc.*, IPR2015-01979, an *Inter Partes* Review proceeding before the USPTO's Patent Trial and Appeal Board challenging the patentability of certain claims of the '154 patent, Finjan states "licensing of Finjan's patent portfolio, including the '154 Patent, to several technology companies, including McAfee, Inc./Intel Corporation, Websense, Inc., Webroot Inc., **<u>Trustwave Holdings, Inc., M86 Security</u>** and Microsoft; copying by competitors; and commercial success." *Palo Alto Networks, Inc. v. Finjan, Inc.*, IPR2015-01979, Paper No. 6 at p. 33 (emphasis added); *see also Palo Alto Networks, Inc. v. Finjan, Inc.*, IPR2016-00151, Paper No. 8 – Finjan's February 17, 2016 Patent Owner Preliminary Response at p. 32.

19

Trustwave is free and clear to sell Integrated Licensed Products and Services under the parties' agreement, including SEG and SWG, and all infringement allegations by Finjan against Trustwave related to such products are barred.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Patent Exhaustion)

Trustwave re-alleges and incorporates herein by reference the allegations contained in the foregoing paragraphs.  Finjan's claims for relief are barred, in whole or in part, as a result of patent exhaustion and/or licenses to the '154 patent.  On information and belief, Finjan has patent licenses that permit licensees to sell licensed products to third parties and permits the licensee's customers to use and incorporate licensed products into the customer's own products.  In exchange for such licenses, Finjan claims that it "has generated more than US \$350 million in revenue from over 25 patent licenses covering Finjan's patented inventions to date."  To the extent Finjan claims that third party licensed products sold or incorporated by Trustwave practice the '154 patent, then these products are already licensed to the '154 patent and Finjan's patent rights to such third-party products are exhausted.

## OTHER DEFENSES

Trustwave specifically reserves the right to assert any and all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the patent laws of the United States, and any other defense, at law or equity, that may now exist or that may become available through information developed in discovery, at trial, or otherwise.

## DEFENDANT'S COUNTERCLAIM

Defendant Trustwave Holdings, Inc. ("Trustwave"), by and through its undersigned counsel, brings the following Counterclaim against Plaintiff Finjan, Inc. ("Finjan"):

## NATURE OF ACTION

1.      This is a Counterclaim for breach of contract, specifically Trustwave's and Finjan's March 2012 Amended and Restated Patent License Agreement (the "Agreement"), which is attached hereto as Exhibit A.

2.      Trustwave realleges and incorporates by reference each of the paragraphs in its June 5, 2020 Answer and Affirmative Defenses to Finjan's Complaint.

## PARTIES

3.      Trustwave Holdings, Inc. is a Delaware corporation with a principal place of business at 70 W. Madison St., Suite 600, Chicago, IL 60602.

4.      Finjan is a Delaware corporation with a principal place of business at 2000 University Avenue, Suite 600, Palo Alto, California, 94303.

5.      Finjan's sole purpose is to extract patent license fees from operating companies through litigation or the threat of litigation:

> Licensing and enforcement of the Company's cybersecurity patent portfolio is operated by its wholly-owned subsidiary Finjan, Inc. ("Finjan").
>
> Through Finjan, we generate revenues and related cash flows by granting intellectual property licenses for the use of patented technologies that we own. We actively license and enforce our patent rights against unauthorized use of our patented technologies (*i.e.* potential infringers). Many of our license agreements, whether entered into via negotiated transactions (*i.e.* licensing transactions) or through a settlement or court ordered judgment (*i.e.* litigation action) or otherwise, are structured on a fully paid-up basis (often referred to as a "global peace license").
>
> …
>
> We derive substantially all of our income from a relatively small number of patented technologies. As of December 31, 2017, our assets consisted primarily of Finjan's 29

21

U.S. and 38 international patents…. Finjan's current U.S. issued patents began expiring in 2017, and we currently have 2 U.S. patent applications and 1 international patent application pending as of the date of the filing of this Annual Report on Form 10-K. As new technological advances occur, many of the patented technologies we own through Finjan may become obsolete before they are completely monetized.

*See* Exhibit B (Finjan Holdings, Inc.'s 10-K for FY2017) at pp. 4-5 and 13.

## JURISDICTION AND VENUE

6.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Trustwave's claim as it arises out of the same transaction as Finjan's claim for infringement against Trustwave.  In fact, Finjan's claim for infringement caused Finjan's breach of the Agreement.

7.      The Court has personal jurisdiction over Finjan at least by virtue of Section 6.4.1 of the Agreement, which states that "[t]he parties hereto hereby irrevocably submit to the exclusive jurisdiction of any federal or state court located within the State of Delaware over any dispute arising out of or relating to this Agreement and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action proceeding related thereto may be heard and determined in such courts." This dispute arises of and relates to the Agreement by virtue of Trustwave's allegations that Finjan breached provisions of the Agreement as stated herein.

8.      The Court also has personal jurisdiction over Finjan because Trustwave's claims against each of them arises out of or relate to each of their purposeful contacts with Delaware, and the exercise of personal jurisdiction over each Finjan in this particular case would comport with principles of fair play and substantial justice.

9.      This Court also has personal jurisdiction over Finjan because it has engaged in systematic and continuous contacts with this State and this district by, *inter alia*, regularly conducting and soliciting business in this State and this district, and deriving substantial revenue

from products and/or services provided to persons in this State and this district. For example, and without limitation, as noted above, Finjan is a Delaware corporation.

10.     Venue is proper in this Court at least by virtue of Section 6.4.1 of the Agreement, which, in addition to stating that "[t]he parties hereto hereby irrevocably submit to the exclusive jurisdiction of any federal or state court located within the State of Delaware over any dispute arising out of or relating to this Agreement," further states that "[t]he parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute."

11.     Venue is further proper in this State because Finjan is incorporated here, and a substantial part of the events or omissions giving rise to the counterclaim alleged herein occurred in this district, and because Finjan is subject to this Court's personal jurisdiction with respect to the counterclaim alleged herein.

## THE MARCH 2012 AGREEMENT

12.     In March 2012, Trustwave and Finjan entered into the Agreement when Trustwave acquired M86. See Exhibit. A at first whereas clause. The original license between M86 and Finjan began in November 2009. *Id*.

13.     In the Agreement, Finjan—the Licensor—granted Trustwave—the Licensee—a "fully paid up, worldwide right and license" to the "Licensed Patents" owned by Finjan in exchange for shares of Trustwave. *Id*. at Section 2.1.1 and Fourth Whereas Clause ("Licensor has agreed to amend the Original License, *inter alia* to grant Licensee a fully paid up license to use the Licensed Patents pursuant to the terms and conditions set forth herein in consideration for issuance of 224,000

shares of Class A Voting Common Stock of Licensee."). Hence, in March 2012, Trustwave and Finjan negotiated a fully-paid up, royalty-free license.

14.     Finjan's shares in Trustwave were converted to approximately $20.5 million USD when Singapore Telecommunications Limited ("Singtel") acquired Trustwave on August 31, 2015.

15.     Finjan has alleged that the SEG and SWG products are Licensed Products and Services under the parties' 2012 Amended and Restated Patent License Agreement. *Id*. at Section 1.8. SWG and SEG products qualify as a subset of Licensed Products and Services called Integrated Licensed Products and Services. *Id*. at Section 1.5 and Section 1.11 (defining "Parent's Existing Products and Services," which is incorporated into the definition of "Integrated Licensed Products and Services."). Under the 2012 Amended and Restated Patent License Agreement, Integrated Licensed Products and Services cannot trigger royalty obligations under the parties' agreement. *Id*. at Section 1.9.

16.     The stated purpose of the parties' Agreement was "the Licensor [i.e., Finjan] and Licensee [i.e., Trustwave] desire to amend and restate the Original License [i.e., the Finjan-M86 2009 Patent License Agreement], on the terms and subject to the conditions set forth herein in order to allow Licensee to conduct, grow and expand the business acquired from the Parent [i.e., M86 products] on the terms and conditions set forth herein." *Id*. at Fifth Whereas Clause. This purpose is memorialized in the terms of the agreement:

> 1.5. "Integrated Licensed Products and Services" means products and services of Licensee and/or any Affiliate, and may include the Licensed Products and Services, in which Parent's Existing Products and Services have been integrated.
>
> 1.11. "Parent's Existing Products and Services" means all products and/or services branded under M86 Security, Inc.'s, M86 Americas, Inc.'s and/or their respective Affiliates' trademarks or brands as of the Closing Date, including without limitation the individual functionality, embodiments and/or components thereof, and modifications, updates and/or other changes thereto made after the Closing Date by Licensee and/or its Affiliates, and in each case, whose manufacture, use or sale

> would infringe, contribute to, or induce the infringement of at least one valid claim of a Licensed Patent or which is manufactured using a Licensed Method or when used performs a Licensed Method.

*Id*. at Section 1.5 and Section 1.11.

17.     Accordingly, the definition of Net Sales in Section 1.9 specifically excludes Integrated Licensed Products and Services from being able to trigger royalties:

> Notwithstanding anything in the definition of Net Sales or this Agreement to the contrary sales by Acquirer and its Affiliates licensed hereunder for Licensed Products and Services attributable to the Existing Business, and sales of Integrated Licensed Products and Services shall not be included in the definition of sales for purposes of calculating Net Sales and no payments are due on such sales.

*Id*. at Section 1.9.

18.     Therefore, the parties' Agreement grants Trustwave a fully-paid up product license that bars Finjan's allegations of infringement of the '154 patent.

## THE '154 PATENT

19.     The '154 patent was filed on June 14, 2010 as U.S. Application No. 12/814,584 (the "'584 application"), which is a divisional application claiming priority to U.S. Application No. 11/298,475, filed on December 12, 2005.  Therefore, all subject matter claimed in the '154 patent was allegedly first invented by at least December 12, 2005.

20.     The '584 application received a notice of allowance of all pending claims, claims 1-12, on November 2, 2011 and then a corrected notice of allowance on December 22, 2011.  Finjan paid the issue fee to the USPTO on February 8, 2012 and received a notification on February 29, 2012 that the '154 patent would issue on March 20, 2012.

21.     Finjan and Trustwave executed the Agreement on or before March 6, 2012.

**FINJAN'S ADMISSION THAT TRUSTWAVE IS FULLY LICENSED TO THE '154
PATENT UNDER THE PARTIES AGREEMENT**

22.     Finjan represented in open court during a 2016 jury trial involving the '154 patent that TW was licensed to the '154 patent.  *Finjan v. Sophos*, N.D. Cal. Case No. 3:14-cv-01197-WHO, Dkt. No. 361 - Trial Transcript Day 2 on September 7, 2016 at 191:20-203:2 and 208:22-210:16; Dkt. No. 364 - Trial Transcript Day 5 on September 12, 2016 at 821:21-853:24.   For example, Finjan's damages expert, Dr. Layne-Farrar, represented to the Court and jury that Trustwave received a license to Finjan's entire portfolio in 2012:

> Q. Did these agreements, these licenses, the ones that were not the jury verdicts, involve more than just the patents that we've just talked about?
>
> A. Right. So what's typical is you have a technology portfolio license, and both the licensor, the patent holder and the licensee want that. **For the licensee, it means freedom to operate. If I change my product next month or next year, I don't want to have to worry if I've got one more patent thrown in. Right? I want you to give me everything you've got at once.** And from the licensor's perspective, it's easier to manage. Right? I don't want to have to worry about complicated combinations of this patent and that product, and so enforcement is harder. They tend to negotiate portfolio licenses, but that pricing for those license agreements, it's not an A plus B plus C. Right? It's what economists like to refer to as non-linear. You generally have a detailed conversation about a handful of patents. You are to find your value on that handful, and then you get access to everything.
>
> …
>
> Q. And Trustwave, I'm going to come back and ask you some questions about that. But that was also a worldwide and whole portfolio?
>
> A. **Yes. This is Finjan's standard procedure, consistent with the industry.**

*Finjan v. Sophos*, N.D. Cal. Case No. 3:14-cv-01197-WHO, Dkt. No. 364 - Trial Transcript Day 5 on September 12, 2016 at 821:22-822:16 and 853:1-6 (emphasis added).

23.     Furthermore, Finjan has repeatedly represented that Trustwave is licensed to the '154 patent and Finjan argued that the Trustwave products are evidence of commercial success of the invention allegedly covered by the claims of the '154 patent.  For example, in Finjan's December 29,

2015 Patent Owner Preliminary Response in *Palo Alto Networks, Inc. v. Finjan, Inc.*, IPR2015-01979, an *Inter Partes* Review proceeding before the USPTO's Patent Trial and Appeal Board challenging the patentability of certain claims of the '154 patent, Finjan states "licensing of Finjan's patent portfolio, including the '154 Patent, to several technology companies, including McAfee, Inc./Intel Corporation, Websense, Inc., Webroot Inc., **Trustwave Holdings, Inc., M86 Security** and Microsoft; copying by competitors; and commercial success." *Palo Alto Networks, Inc. v. Finjan, Inc.*, IPR2015-01979, Paper No. 6 at p. 33 (emphasis added); *see also Palo Alto Networks, Inc. v. Finjan, Inc.*, IPR2016-00151, Paper No. 8 – Finjan's February 17, 2016 Patent Owner Preliminary Response at p. 32.

## COUNTERCLAIM
### (Breach of Contract)

24.     Trustwave incorporates paragraphs 1 through 23 herein by reference.

25.     Finjan and Trustwave entered into the Agreement, a valid, enforceable, and binding contract supported by offer, acceptance, and mutual consideration.

26.     Finjan has admitted and asserted that the Agreement is a valid contract.

27.     Trustwave is free and clear to sell Integrated Licensed Products and Services under the parties' agreement, including SEG and SWG, and all infringement allegations by Finjan against Trustwave related to such products are in breach of the parties' agreement.

28.     Finjan breached the parties' Agreement under Delaware Law.

29.     As a result of Finjan's breach, Trustwave has suffered direct and consequential damages, and is entitled to recover compensatory or actual damages, attorney fees, and other damages in law and equity in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Trustwave respectfully requests that this Court:

A.      Enter judgment against Finjan and in favor of Trustwave;

B.      Dismiss Finjan's Complaint with prejudice;

C.      Award Trustwave compensatory or actual damages related to Finjan's breach of the parties' Agreement, including its reasonable attorneys' fees incurred in defending Finjan's Complaint, and other damages in law and equity in an amount to be proved at trial;

D.      Award Trustwave its reasonable costs and expenses incurred in connection with this action; and,

E.      Grant Trustwave such other and further relief as this Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____
Jack B. Blumenfeld (#1014)
Alexandra M. Cumings (#6146)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
acumings@mnat.com

*Attorneys for Defendants*
*Trustwave Holdings, Inc.*

OF COUNSEL:

John S. Letchinger
BAKER & HOSTETLER LLP
191 North Wacker Drive, Suite 3100
Chicago, IL  60606-1901
(312) 416-6200

Jared A. Brandyberry
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, CO  80202
(303) 764-4072

June 5, 2020

# EXHIBIT A

## FULLY REDACTED

# EXHIBIT B

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
_____

**FORM 10-K**
_____

Mark One)

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For Fiscal Year Ended: December 31, 2017**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number: 001-33304**



**FINJAN HOLDINGS, INC.**
**(Exact name of registrant as specified in its charter)**
_____

| | |
|---|---|
| **Delaware** | **20-4075963** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **2000 University Avenue, Suite 600, East Palo Alto, CA** | **94303** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:  650-282-3228**

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to Section 12(g) of the Act: Common Stock, par value $0.0001 per share**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes   ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.   Yes   ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of the "large accelerated filer," "accelerated filer," "non-accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | (Do not check if a smaller reporting company) | Smaller reporting company | ☒ |
| | | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. o

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes   ☐   No ☒

As of June 30, 2017, there were 26,890,677 shares of the registrant's common stock, par value $0.0001 per share, issued and outstanding. Of these, 21,506,948 shares were held by non-affiliates of the registrant. The market value of securities held by non-affiliates was $70,542,789 as of June 30, 2017, based on the closing price of $3.28 for the registrant's common stock on  June 30, 2017.

As of March 7, 2018, there were 27,719,828 shares of the registrant's common stock, par value $0.0001 per share, issued and outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**
Portions of Finjan Holdings, Inc.'s Proxy Statement in connection with its Annual Meeting of Stockholders to be held in 2018 are incorporated by reference into Part III of this report.

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| **CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS** | | 3 |
| **PART I** | | |
| | | |
| ITEM 1. | BUSINESS | 4 |
| ITEM 1A. | RISK FACTORS | 13 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 24 |
| ITEM 2. | PROPERTIES | 24 |
| ITEM 3. | LEGAL PROCEEDINGS | 24 |
| ITEM 4. | MINE SAFETY DISCLOSURES | 24 |
| | | |
| **PART II** | | |
| | | |
| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 24 |
| ITEM 6. | SELECTED FINANCIAL DATA | 36 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 26 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 37 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 37 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 37 |
| ITEM 9A | CONTROLS AND PROCEDURES | |
| ITEM 9B. | OTHER INFORMATION | 38 |
| | | |
| **PART III** | | |
| | | |
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 38 |
| ITEM 11. | EXECUTIVE COMPENSATION | 38 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 38 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 38 |
| ITEM 14. | PRINCIPAL ACCOUNTING FEES AND SERVICES | 38 |
| | | |
| **PART IV** | | |
| | | |
| ITEM 15. | EXHIBITS, FINANCIAL STATEMENT SCHEDULES | 39 |
| ITEM 16. | FORM 10-K SUMMARY | 39 |
| | | |
| **SIGNATURES** | | 41 |

Table of Contents

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

The following discussion includes forward-looking statements about the Company's business, financial condition and results of operations, including discussions about management's expectations for the business. These statements include statements regarding our expectations, intentions, beliefs and projections about our future results, performance, prospects and opportunities. These statements can be identified by the fact that they do not relate strictly to historical or current facts or by the use of words such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "project," "potential," "should," "will," "will be," "would," and the negative of these terms and similar expressions, but this is not an exclusive way of identifying such statements. Readers are cautioned that forward-looking statements are not guarantees of future performance. Our actual results, performance and achievements may differ materially from those expressed in, or implied by, the forward-looking statements contained in this report as a result of various risks, uncertainties and other factors. Important factors that could cause our actual results to differ materially from our expectations include, without limitation, our ability to execute our business plan, the outcome of pending or future enforcement actions, our ability to expand our technology portfolio, the enforceability of our patents, our ability to raise additional capital on acceptable terms, our ability to continue to meet listing requirements of the NASDAQ Capital Market, the continued use of our technologies in the market, the development or continuation of a liquid trading market for our securities, regulatory developments and other factors described under Item 1A. "Risk Factors," as set forth in this Annual Report on Form 10-K, and any subsequent quarterly or current reports. The following discussion should also be read in conjunction with the audited and unaudited consolidated financial statements and notes thereto as set forth in this Annual Report on Form 10-K, and in any subsequent quarterly or current reports.

The Company will continue to file annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). Forward-looking statements speak only as of the dates specified in such filings. Except as expressly required under federal securities laws and the rules and regulations of the SEC, we do not undertake any obligation to update any forward-looking statements to reflect events or circumstances arising after any such date, whether as a result of new information or future events or otherwise. You should not place undue reliance on the forward-looking statements included in this report or that may be made elsewhere from time to time by us, or on our behalf. All forward-looking statements attributable to us are expressly qualified by these cautionary statements.

Table of Contents

PART I

**ITEM 1. BUSINESS.**

**Overview**

Finjan Holdings, Inc. (the "Company" or "Finjan Holdings") is a cybersecurity company focused in four business lines; intellectual property licensing and enforcement, mobile security application development, advisory services, and investing in cybersecurity technologies and intellectual property. Licensing and enforcement of the Company's cybersecurity patent portfolio is operated by its wholly-owned subsidiary Finjan, Inc. ("Finjan").

Finjan Holdings was incorporated in Delaware in January of 2006, with Finjan becoming a wholly owned subsidiary of Finjan Holdings in June of 2013 after a merger transaction resulting in the public trading of our common stock. Our common stock has been trading on the NASDAQ Capital Market ("NASDAQ") since May 2014.

Founded in 1997, Finjan developed software and hardware-based web and network security technologies capable of detecting previously unknown and emerging threats on a real-time, behavior-based, basis, in contrast to signature-based methods of intercepting only known threats to computers. The older, signature-based methods were standard in the web and network security industry during the 1990s. Finjan invested heavily in both research and development of its technologies and in protecting its innovations by securing patents covering them. As the web and endpoint security industries - known as cybersecurity - have transitioned to behavior-based detection of malicious code, we believe that our patented technologies continue to be widely used, without license, by third parties in a number of market segments.

During the years ended December 31, 2017, 2016 and 2015, we generated revenue from our cybersecurity business of approximately $50.5 million, $18.4 million and $4.7 million, respectively.

During the years ended December 31, 2017 and 2016 our net income was approximately $22.8 million and $0.3 million, respectively, compared to a net loss of $12.6 million during the year ended December 31, 2015.

As used in this Annual Report, references to the "Company," "we," "us," and "our" are used to refer collectively to Finjan Holdings, Inc. and it subsidiaries, unless otherwise indicated or the context requires.

***Finjan Holdings Corporate Operating History***

Finjan, Inc., our subsidiary, was founded in 1997 as a wholly-owned subsidiary of Finjan Software Ltd ("FSL"), an Israeli corporation, to cultivate proprietary technologies that focused on proactively detecting threats to web and network traffic by identifying patterns and behavior of web and network viruses and other malicious code, rather than relying on lists of threats known within the web and network security industry. These technologies proactively scan and repel the latest, and often unknown, threats to network, web, and endpoint devices on a real-time basis. Following the development of its patented technologies, FSL, together with its subsidiaries, provided secure web gateway solutions, including software and hardware, to the enterprise and endpoint markets both directly and through technology partners and original equipment manufacturers ("OEMs").

In 2002, FSL engaged in a reorganization in which Finjan Software, Inc. ("FSI"), a Delaware corporation, was formed to acquire and hold all of the capital stock of Finjan. Between 2002 and 2009, FSI focused its efforts on research and development and sales and marketing activities in an effort to bolster its position in the security industry and enhance its platform of web and network inspection technologies. Throughout that time period, FSI's activities were funded primarily by venture capital and private equity firms with experience providing capital and management expertise to software security firms, some with investment and operational experience within Israel's cybersecurity and technology sectors. Finjan also received financial backing from multi-national software and technology companies.

Between approximately 2002 and 2006, competitors in the web and network security industry began moving towards real-time, behavior-based, proactive threat detection, at times in violation of Finjan's patent rights. As a result, and beginning in 2005, Finjan commenced its licensing program around its patents. The first license, issued in 2005, was to Microsoft. In 2006, Finjan also initiated its first patent infringement litigation against a third party it believed was infringing its patents.

4

Table of Contents

In October 2009, FSI transferred its portfolio of intellectual property to Finjan (its wholly-owned subsidiary at the time). Thereafter, in November 2009, FSI sold certain assets, including certain of its operating subsidiaries, not including Finjan, and its sales and marketing assets to M86 Security ("M86"). Finjan also granted a fully-paid, non-exclusive patent license to M86, in consideration for which M86 issued shares of its common stock to Finjan and FSI. In connection with that transaction, and subsequent to November 2009, FSI and its remaining subsidiaries (including Finjan) ceased the development, manufacture, marketing and sale of its products, as well as research conducted through its Malicious Code Research Center as part of a confidential non-compete provision. Finjan retained ownership of its patents and all related rights. In March 2012, M86 merged with Trustwave Holdings, Inc. ("Trustwave") through which M86's license from Finjan was renewed with Trustwave to include an expanded scope and an extension of the aforementioned non-compete for the development of software and hardware security products. In September 2015, Trustwave was acquired by Singapore Telecom ("SingTel").

Following the M86 and related transactions, and during an intervening period between 2009 and 2013, Finjan's existing investors financed its activities, which consisted primarily of enforcing its intellectual property in the security sector while the non-compete provision with M86 and Trustwave was in place.

In April 2013, Finjan distributed all securities it held in two unaffiliated entities to FSI and made a payment of cash in an amount sufficient to repay and satisfy in full a pre-existing intercompany loan from FSI to Finjan. Following that distribution, the board of directors and stockholders of FSI approved the dissolution of, and a plan of liquidation for FSI that resulted in, among other things, the distribution of Finjan common stock to certain of FSI's stockholders.

Finjan Holdings was capitalized with more than $30 million from Finjan's shareholders who, at the time of the listing on NASDAQ, owned approximately 91.5% of the Company's public equity. Finjan's shareholders outlined a vision as a public company to continue the licensing and enforcement of Finjan's patented technologies as well as continuing to invest in new cybersecurity technologies and services.

In November 2013, Finjan Holdings made its first investment into an innovation fund focused on new cybersecurity technologies. The Company committed $5 million as a strategic limited partner to a fund managed by Jerusalem Venture Partners ("JVP"). JVP's newly created Cyber Strategic Partners Fund VII was co-invested by the Company and three other multi-national companies. To date, there are eleven portfolio investments made through the JVP fund and the Company has already received distributions from its investment with JVP as two of the portfolio companies exited through an acquisition in 2015 and 2016.

In March 2015, the non-compete and confidentiality provisions related to the M86 and Trustwave transactions expired. Within three months the Company had announced it was launching an advisory services business and entering mobile security development. Today the Company operates its advisory services business through its subsidiary CybeRisk Security Solutions, Ltd ("CybeRisk") and its mobile security business through its subsidiary Finjan Mobile, Inc. ("Finjan Mobile"). CybeRisk delivers global advanced cyber risk and cyber security advisory services. Finjan Mobile fortifies mobile devices against spies, phishing and malware attacks.

In August 2017, Finjan Holdings formed Finjan Blue, Inc. ("Finjan Blue") to support development and licensing efforts relating to the IBM Security Patents obtained by Finjan Blue through the Patent Assignment and Support Agreement with IBM. The Agreement, includes pathways for Finjan and IBM to consider development efforts in the future and provides for the sharing of pertinent institutional knowledge and resources by IBM to Finjan Blue.

### *Licensing and Enforcement – Licensing Best Practices*

Under U.S. patent law, a patent owner has the right to exclude others from making, selling or using the owner's patented technology without a license to do so. Through Finjan, we generate revenues and related cash flows by granting intellectual property licenses for the use of patented technologies that we own. We actively license and enforce our patent rights against unauthorized use of our patented technologies (*i.e.* potential infringers). Many of our license agreements, whether entered into via negotiated transactions (*i.e.* licensing transactions) or through a settlement or court ordered judgment (*i.e.* litigation action) or otherwise, are structured on a fully paid-up basis (often referred to as a "global peace license"). For such licenses, we generally agree to a lump sum license fee to be paid upon entering into the license or in accordance with a mutually agreed installment schedule. Some of our license agreements, however, provide for future royalty payments in the event the licensee achieves certain milestones specified in the applicable license agreement. Our license agreements largely contemplate recovery of fees for sales made prior to the effective date of the license, as well as for future sales through a defined termination date, in an amount related to the royalties we would have received had a license been in effect at the time of such sales.

How we conduct our licensing programs and enforcement actions is generally guided by our "Licensing Best Practices," which we adopted in March 2014 to demonstrate our commitment to ethical, transparent and consistent business practices for intellectual property licensing. These Licensing Best Practices are based on the Company's core values. In an effort to encourage meaningful

Table of Contents

discussion and drive real change in the licensing practices of entities that license (and may or may not directly manufacture or sell products) their respective patent portfolios, we called upon the IP industry to adopt similar initiatives that support technological advancements, investments in innovation and continued job creation, while preserving a strong patent system.  We continue to be involved in industry efforts in this area, we regularly receive feedback on our Licensing Best Practices, and we remain open to modifying our position based on potential adoption by broader industry groups.

Our Licensing Best Practices include seven actionable elements:

- Ensure focused licensing and enforcement programs pursue the provider of the patented technology and not its customers, consumers or end users.

- Conduct reasonable diligence to determine a patent's enforceability and use with respect to prospective licensees and make that information available to them.

- Respect procedural rights and judicial efficiency in the courts and in the prosecution and protection of IP behind the innovation.

- Be transparent with the intent in each discussion and articulate the cause and effect scenarios which would prompt a shift in communication and an escalation of each discussion.

- Provide useful facts to prospective licensees and defendants to foster productive business discussions early and often to aid in informed decision-making.

- Offer fair value licenses or settlements based on legitimate factors and considerations.

- Commit to keeping lines of communications open between the patent owner and prospective licensee to preserve a path for the parties to find an amicable solution or resolution for their respective businesses.

In some cases, notwithstanding our pursuit of negotiated license transactions based on our Licensing Best Practices, unlicensed users of our technologies may be unwilling, at least initially, to negotiate or pay reasonable royalties for their use (*i.e.* infringement) of our patented technologies and often dispute any allegations of patent infringement.  If we believe a party is infringing one or more of our patents and such party refuses to take a license, we may institute legal action against such party. In a patent infringement lawsuit, we typically seek damages for past infringement and an injunction against future infringement. We evaluate, on a case-by-case basis, whether to commence litigation to preserve our patent rights, the value of our portfolio and the value of the licenses to our existing licensees.  Even if litigation is commenced, however, we endeavor to keep the option for early resolution of the dispute between the parties available to the extent practicable.

*Licensing and Enforcement – Legacy Activities, Prior to 2013*

In June 24, 2005, Finjan's then parent, FSL, entered into a patent license agreement with Microsoft Corporation for $8 million in cash as well as other valuable financial and non-financial consideration.  The license grant includes, among other things, a worldwide, non-exclusive, nontransferable royalty-free license for Microsoft and its affiliates to make, have made, use, sell, offer for sale, import and distribute licensed products, among other rights.

In June 2006, Finjan, as successor to its parent FSI, filed a patent infringement lawsuit against Secure Computing Corp. ("Secure") and its subsidiaries in the United States District Court for the District of Delaware, resulting in a judgment of approximately $37.3 million, including interest and enhancements.  In September 2011, Finjan received proceeds of approximately $28.0 million, net of $9.3 million contingency legal fees, from Secure including $3.1 million of interest, in satisfaction of the judgment. In July 2010, Finjan filed a patent infringement lawsuit against five additional software and technology companies in the U.S. District Court of Delaware, which we refer to as the "2010 Litigation."  In April 2012, Finjan entered into a binding memorandum of understanding with one of the parties to the 2010 Litigation pursuant to which Finjan agreed to withdraw its claims against such party and grant it a license to use Finjan's patents in exchange for equity in such party and other consideration. The license is fully paid up unless the holder of the license has aggregate annual net sales to third-party distributors or re-sellers in excess of $10 million (which has not been achieved to date). In addition, Finjan signed a confidential settlement, release and license agreement with another party to the 2010 Litigation in November 2012.  Pursuant to such agreement, Finjan received $85 million in exchange for a one-time fully paid-up license, comprising a perpetual, non-exclusive worldwide license to Finjan's patent portfolio as of the date of such agreement and patents with a first effective priority date occurring at any time prior to November 2022 that Finjan or its affiliates may own or control after the date of such agreement.

Table of Contents

*Licensing and Enforcement – Current Activities, Post 2013*

Since completing the merger in June 2013, we have commenced preliminary discussions with numerous potential licensees and have filed a number of patent infringement lawsuits in the Northern District of California, where such lawsuits were warranted.  In each case, we endeavor to adhere to our high standards and stated Licensing Best Practices. For additional information regarding pending litigation, see "Item 3. Legal Proceedings."

On June 30, 2014, Finjan filed a patent infringement lawsuit against Symantec Corporation ("Symantec") in the United States District Court for the Northern District of California, asserting that Symantec is directly and indirectly infringing certain of Finjan's patents, which Complaint was amended on September 11, 2014.

On September 24, 2014, Finjan entered into a license agreement with a third party against whom Finjan had filed a patent infringement lawsuit in the Northern District of California, in settlement of such suit.  Pursuant to this agreement, the parties mutually agreed to dismiss the infringement litigation, and each party gave the other a general release for all claims that it might have against the other, known or unknown, based on the actions of either party on or before the date of the settlement.  Under the license agreement, a third party agreed to pay Finjan a license fee of $8 million payable in four installments.  The first installment of $3 million was paid upon execution of the agreement and filing of the dismissal with prejudice, the second installment of $2 million was paid on January 16, 2015, the third installment of $2 million was paid on January 14, 2016, and the fourth and final installment of $1 million was paid on January 13, 2017.

On April 7, 2015, Finjan entered into a Confidential Asset Purchase and Patent License Agreement, effective as of April 7, 2015, with F-Secure Corporation, a company incorporated in Finland ("F-Secure"). The agreement provides for F-Secure to pay Finjan the sum of $1.0 million in cash, of which $0.7 million was received and recognized as revenues in 2015 and the remaining balance of $0.3 million received and recorded as revenue on March 31, 2016, in accordance with the Company's revenue recognition policy, as described in Note 2 of our Financial Statements. The agreement also provided for the assignment by F-Secure to Finjan of two patents, U.S. Patent Nos. 8,474,048 and 7,769,991, including among other things, all progeny applications or patents, foreign counterparts and reissues (the "F-Secure Patents"). In exchange for the foregoing and other valuable consideration, Finjan agreed to, subject to certain restrictions, limits and other conditions, grant F-Secure a worldwide, fully-paid, non-exclusive field of use license to Finjan patents owned as of the effective date or acquired by Finjan or its affiliates within two years from the effective date, as well as to the F-Secure Patents.

On August 4, 2015, a jury in the Northern District of California returned a verdict that Blue Coat Systems, Inc. ("Blue Coat") infringed 5 Finjan patents and awarded Finjan approximately $39.5 million in damages. Prior to the conclusion of this lawsuit, Finjan filed a second separate action against Blue Coat alleging infringement of Finjan patents by new products and services sold by Blue Coat. On October 14, 2016, Finjan filed a third case against Blue Coat in Germany. The second case against Blue Coat went to trial in February 2018. On March 6, 2018, Blue Coat withdrew their nullity action in Germany.

On November 15, 2015, Finjan and Avast Software s.r.o., a company organized under the laws of the Czech Republic ("Avast") entered into a Confidential Patent License, Settlement and Release Agreement, under which Avast licenses from Finjan a worldwide, fully-paid up, non-exclusive, perpetual, irrevocable license under the identified Finjan patents and related patent rights to use, make, have made, sell, offer to sell, import, export, and/or otherwise distribute Avast covered products through multiple tiers of distribution. In consideration of the agreement, Avast agreed to pay Finjan $2.975 million in cash which was recorded as revenue in the fourth quarter of 2015 in accordance with the Company's revenue recognition policy, as described in Note 2 of our Financial Statements. On January 19, 2017, Finjan filed a complaint against Avast and AVG Technologies B.V. ("AVG") as Avast's acquisition of AVG triggered certain terms in the Patent License Agreement that excludes an acquired company's products as licensed. On March 24, 2017, Finjan and Avast entered into an amendment to the license agreement whereupon Finjan dismissed its breach of contract and patent infringement claims against Avast and AVG with prejudice in exchange for the payment by Avast to Finjan of $7.745 million, which was received on March 24, 2017 and was recorded as revenue in the first quarter of 2017, in accordance with the Company's revenue recognition policy, as described in Note 2 of our Financial Statements. Specific terms of the amendment to the agreement are confidential.

On December 30, 2015, Finjan and a U.S.-based network security company ("Licensee") entered into a Confidential Patent License, Settlement and Release Agreement under which Licensee received from Finjan a worldwide, non-exclusive, irrevocable license under the identified Finjan patents and related patent rights to use, make, have made, sell, offer to sell, import and otherwise dispose of any and all Licensee products or services, alone or in combination with other Licensee products and services. In consideration for the license, Licensee agreed to pay Finjan $3.65 million. A first payment of $1.0 million on December 31, 2015 was recorded as revenue in the fourth quarter of 2015 and the remaining $2.65 million was recorded as revenue in 2016, in accordance with the Company's revenue recognition policy, as described in Note 2 of our Financial Statements.

Table of Contents

On June 3, 2016, Finjan entered into a Confidential Patent License, Settlement and Release Agreement ("June 3, 2016 License") with Proofpoint, Inc. ("Proofpoint") and Armorize Technologies, Inc. As part of the June 3, 2016 License, Case No. 3:15-cv-5808-HSG, entitled Finjan, Inc. v. Proofpoint, Inc. and Armorize Technologies, Inc., pending before the Honorable Haywood S. Gilliam, Jr. in the U.S. District Court for the Northern District of California, was dismissed with prejudice on June 7, 2016. The June 3, 2016 License provides for Proofpoint to pay Finjan the sum of $10.9 million in cash, of which $4.3 million was received on June 6, 2016, $3.3 million was received on December 28, 2016, and $3.3 million was received on December 29, 2017. The Company recognized $7.6 million of the $10.9 million license as revenues as of December 31, 2016, as such amount was determined to be fixed and determinable, in accordance with the Company's revenue recognition policy as described in Note 2 of our Financial Statements. The remaining balance of $3.3 million under the terms of the June 3, 2016 License was recognized as revenues as of December 31, 2017. In exchange for the foregoing and other valuable consideration, Finjan agreed to, subject to certain restrictions, limits and other conditions, grant Proofpoint a worldwide, non-royalty bearing, fully paid-up (as of the final payment), nonexclusive, perpetual, irrevocable (except in the case of non-payment by Proofpoint or other material breach) license under Finjan's patents as specified in the June 3, 2016 License. Certain portions of the June 3, 2016 License are subject to Confidential Treatment pursuant to a Confidential Treatment request filed with the Securities and Exchange Commission ("SEC") on August 8, 2016 and Confidential Treatment Order granted by the SEC on September 26, 2016.

On June 30, 2016, Finjan entered into a Confidential Patent License Agreement (the "June 30, 2016 License") with a European cloud-based network security firm (the "2016 European Licensee"). The June 30, 2016 License provides for the 2016 European Licensee to pay Finjan $565,000 in cash, which was paid on or about the time of execution of the June 30, 2016 License. Finjan recognized all of the $565,000 license as revenue as of December 31, 2016, as such amount was determined to be fixed and determinable, in accordance with the Company's revenue recognition policy as described in Note 2 of our Financial Statements. In exchange for the foregoing and other valuable consideration, Finjan agreed to, subject to certain restrictions, limits and other conditions, grant the 2016 European Licensee a nonexclusive, term license in the United States under Finjan's U.S. patents as specified in the June 30, 2016 License.

On September 21, 2016, following a two-week trial, a Jury in the Northern District of California returned a verdict that all five Finjan Patents were found literally infringed by Sophos, Inc. ("Sophos"). The jury verdict, decided that Finjan was entitled to $15 million in damages for Sophos' infringement. On March 30, 2017, Finjan Holdings, Finjan and Finjan Mobile entered into a Confidential Master Agreement (the "Master Agreement") with Sophos and certain of its affiliated companies providing for full releases by the parties and covenants not to sue and a Confidential Patent License Agreement between Finjan and Sophos Limited where Sophos Limited and its affiliates obtained a fully paid up license to the Finjan patent portfolio and paid a license fee of $15.0 million in cash, which Finjan received on March 31, 2017. The Company recognized $15.0 million as revenues as of March 31, 2017, in accordance with the Company's revenue recognition policy as described in Note 2 of our Financial Statements. Finally, on March 30, 2017, Finjan Mobile entered into a Confidential Patent Cross License Agreement with Sophos Limited pursuant to which the parties granted patent cross licenses in exchange for the payment by Sophos Limited to Finjan Mobile of $2.5 million in cash to be paid as follows: (A) $1.25 million on or before March 31, 2018, and (B) $1.25 million on or before March 31, 2019, of which $1.25 million was recognized as revenues as of December 31, 2017, in accordance with the Company's revenue recognition policy as described in Note 2 of our Financial Statements.

On December 28, 2016, Finjan entered into a Confidential Patent License Agreement (the "December 2016 License") with F5 Networks, Inc. ("F5"). The December 2016 License provides for F5 to pay a license fee of $4.0 million in cash, which Finjan received on December 30, 2016. Finjan recognized all of the $4.0 million license as revenue as of December 31, 2016, as such amount was determined to be fixed and determinable, in accordance with the Company's revenue recognition policy as described in Note 2. In exchange for the foregoing and other valuable consideration, Finjan agreed to, subject to certain restrictions, limits and other conditions, grant F5 a nonexclusive, irrevocable (except in the case of non-payment by F5), worldwide paid-up license under Finjan's patents as specified in the December 2016 License.

On March 2, 2017, Finjan entered into a Confidential Patent License Agreement (the "Veracode Agreement") with Veracode, Inc., a Delaware corporation ("Veracode"). Pursuant to the Veracode Agreement, Veracode obtained a license to the Finjan patent portfolio and agreed to pay a license fee of $2.0 million in cash, which Finjan received on March 2, 2017 and was recorded as revenue in the first quarter of 2017, in accordance with the Company's revenue recognition policy, as described in Note 2 of our Financial Statements. Such license does not grant Veracode any right to transfer, sublicense or grant any rights under the Veracode Agreement to a third party except as specifically provided under the Veracode Agreement. Such license also has certain provisions relating to certain unlicensed products of any company that acquires Veracode, or is acquired by Veracode or its affiliates, in which case additional license fees may apply. The specific terms of the Veracode Agreement are confidential.

8

Table of Contents

On April 21, 2017, Finjan entered into a Confidential Patent License Agreement (the "EU Agreement") with a European corporation ("EU Licensee"). Pursuant to the EU Agreement, EU Licensee obtained a license to our patent portfolio and agreed to pay Finjan $4.9 million cash, in license fees, paid as follows: (i) $2.3 million to be paid within 10 days after the effective date of the EU Agreement, (ii) $1.3 million on or before January 31, 2018, and (iii) $1.3 million on or before January 31, 2019. Finjan recognized $2.3 million of the $4.9 million license as revenues as of June 30, 2017 and $1.3 million as revenues as of December 31, 2017, in accordance with the Company's revenue recognition policy as described in Note 2 of our Financial Statements. Such license does not grant EU Licensee any right to transfer, sublicense or grant any rights under the EU Agreement to a third party except as specifically provided under the EU Agreement. Such license also has certain provisions relating to certain unlicensed products of any company that acquires EU Licensee, or is acquired by EU Licensee or its affiliates, in which case additional license fees may apply. The specific terms of the EU Agreement are confidential.

On December 29, 2017, Finjan entered into a Confidential Patent License and Settlement Agreement (the "Finjan License") with FireEye, Inc. whereby the companies resolved all pending litigation matters and together with a contemporaneous license agreement from FireEye to Finjan and its affiliates (the "FireEye License" and collectively with the Finjan License, the "Agreements"), the parties granted each other cross-licenses going forward. Under the terms of the Finjan License, FireEye agreed to pay Finjan $17.5 million in license fees, as follows: (a) $12.5 million the Effective Date of the Finjan License, which amount was paid on December 29, 2017 and recognized as revenues as of December 31, 2017, in accordance with the Company's revenue recognition policy as described in Note 2, and (b) $5.0 million which was offset by $5 million in license fees from Finjan to FireEye under the FireEye License, granting a perpetual license for the use of FireEye's patents. The FireEye License was determined not to be an intangible asset since it had no defined future benefit.  Therefore, the FireEye License was expensed under SG&A.

Subsequent to December 31, 2017, Finjan Holdings, Inc. (the "Company"), including its wholly-owned subsidiary, Finjan, Inc. ("Finjan" and collectively with the Company and its affiliated companies, the "Finjan Parties"), announced on March 1, 2018 that the Finjan Parties and the Symantec Corporation ("Symantec") and its subsidiary, Blue Coat Systems, LLC ("Blue Coat") (collectively, the "Symantec Parties") entered into a Confidential Patent License and Settlement Agreement (the "License and Settlement Agreement") effective as of February 28, 2018 ("Effective Date"). Specifically, the Parties have resolved and settled all claims between them. As part of the settlement, the Symantec Parties will obtain a license to, among others, the Finjan patents and pay the Finjan Parties $65.0 million in cash within twenty (20) days of the Effective Date of the License and Settlement Agreement. Further, if Symantec acquires certain entities within four years from the Effective Date, the Symantec Parties will pay additional license fees of up to $45.0 million to the Finjan Parties, unless otherwise mutually agreed to by the Company and Symantec. The remaining terms of the License and Settlement Agreement are confidential.

**Future Growth Strategy**

Our mission, for the foreseeable future, is to build a diversified cybersecurity company benefiting from historical investments in technology and patents while expanding into new product and service offerings. We believe our patented technologies continue to hold significant value and we intend to vigorously protect our investment, the value of our existing licensees' investments, and the value that technology and intellectual property represents for our shareholders. We are pursuing and will continue to pursue our growth through the following strategies:

- *Develop and Expand Existing Patent Portfolio* - We have obtained and endeavor to continue to obtain new patents relating to security technologies through research and development and/or acquisition in the cybersecurity space. For example, on: January 24, 2017, our subsidiary, Finjan Mobile, Inc., was issued a U.S. Patent No. 9,554,279 titled "Authorized Areas of Authentication."

- *Expand our IP Assets through Acquisitions and Strategic Partnerships* - We intend to acquire and develop new patents, technologies or other business assets or companies and invest in intellectual property through strategic partnerships, acquisitions of technology-focused companies, IP portfolios or other assets and other initiatives. We endeavor to identify relevant security technologies and patents that have been, or are anticipated to be, widely adopted by third parties in connection with the manufacture or sale of products and services, and to which we can bring enforcement actions (i.e., licensing or litigation) and other expertise. We may also broaden our technology and patent holdings by working with inventors and universities, acquiring technology companies, investing in research laboratories, start-ups, and by creating strategic partnerships with companies, large and small, seeking to effectively and efficiently monetize their technology and patent assets. Our experience with monetizing both technologies and patents may be considered valuable by potential acquisition candidates and strategic partners who may lack resources or know-how to effectively and efficiently generate a return for those investments.

  Through Finjan Blue, we entered into a Patent Assignment and Support Agreement with IBM, effective August 24, 2017. Pursuant to the Patent Assignment Agreement, Finjan Blue acquired select IBM patents in the security sector

Table of Contents

in exchange for $8.5 million cash, payable as follows: (i) $2.0 million upon execution of the Patent Assignment Agreement and (ii) $6.5 million over the subsequent four years, final payment due August 24, 2021. IBM will support Finjan Blue in its development and licensing of the IBM Security Patents and provide assistance for such efforts as needed for the term of the Agreement and Finjan Blue will reimburse IBM for reasonable time and out of pocket costs for such assistance, however IBM will not receive further proceeds from such efforts. IBM has reservation of rights with respect to the IBM Security Patents for its current licensees and open source initiatives. Finjan Blue and IBM also agreed to explore further development and licensing opportunities.

- *Continue to Demonstrate Best Practices in Pursuing Licensing Relationships and Enforcing our Patent Rights* - In March 2014, we adopted Best Practices to demonstrate our commitment to ethical, transparent and consistent business practices for intellectual property licensing. We called upon and continue to promote industry-wide adoption of a set of best practices through leadership organizations such as the Licensing Executive Society (LES) and the Open Register of Patent Owners that support technological advancements, investments in innovation, and continued job creation while protected by a robust patent system. In February of 2017, the American National Standards Institute or ANSI had approved LES' application to receive accreditation to become a Standards Development Organization or SDO. With this new endorsement and governance from ANSI, Finjan is moving swiftly to build industry consensus for IP and patent related matters in a number of disciplines. We intend to continue pursuing a proactive campaign that adheres to our best practices guidelines while rigorously protecting our intellectual property rights. We have entered into preliminary discussions with numerous potential licensees in accordance with these Best Practices but acknowledge that it takes many discussions and many months for preliminary discussions to culminate in a license agreement, if at all. While it is our preference to resolve our patent-related disputes through amicable business solutions, protecting the value of our patented technology is paramount

- *Invest in Internal Research & Development through Finjan Mobile* - We continue to pursue internal research and development of security technologies that both relate to Finjan's existing patented inventions as well as new concepts to meet an ever-expanding market need. Since we do not yet have sufficient internal personnel to engage in large-scale research and development, we currently operate this business with limited internal staff focused on strategy and market development while software development is completed under contract with external developers. Products currently available include our Finjan Mobile Secure Browser and a Virtual Private Network (VPN) which can be used within the Finjan Browser or separately to encrypt data and keep consumers secure.

On September 6, 2017, Finjan Mobile released VitalSecurity™ Gen 4.0 Secure Mobile Browser (VitalSecurity 4.0). The patented VitalSecurity 4.0 is a fully functional browser as well as a VPN for use on Apple and Android platforms, and now available for Mac and Windows desktop applications. This VitalSecurity product builds upon the incorporation of Finjan, Inc.'s, core security patented technology.

VitalSecurity 4.0 is available for download on the IOS and Android platforms in the iTunes and Google Play stores and the VPN can be downloaded for Mac and Windows on FinjanMobile.com

The Company continues to explore inorganic growth and acquisition opportunities to complement the vision for Finjan Mobile.

- *Continue to Analyze Opportunities to Leverage Investment in CybeRisk* - CybeRisk provides services to enterprise customers on a wide variety of threats, current and future issues, and prevention. We intend to further analyze how best to leverage our investment in CybeRisk and our cybersecurity advisory services business.

Although we currently pursue growth initiatives through the above strategies, unforeseen market and industry conditions and new developments may necessitate changes in our strategies. We intend to remain resilient, flexible, and open to new opportunities that benefit our shareholders.

**Competition**

One of our strategic goals is to leverage the operational platform we have built to realize value inherent in not only our existing patent portfolio and cybersecurity technologies, but also technologies and other assets to be developed and acquired in the future. We expect, however, to encounter significant competition in the area of technology and intellectual property acquisitions given the highly competitive nature of the cybersecurity sector. In certain cases, we may partner with venture capital firms, strategic corporate buyers and various industry leaders to effectuate a technology acquisition or realize new licensing opportunities. In other situations, these same venture capital firms, corporate buyers and industry players may be our direct competitors for the technology and intellectual property assets.

Table of Contents

We also face competitive pressures in the sense that companies may develop competing technologies that offer better or less expensive alternatives to our patented technologies (*i.e.* "design arounds"). Technological advances or entirely different approaches developed by one or more of our competitors could render certain of the technologies owned or controlled by our operating subsidiaries obsolete and/or materially reduce their value.

**Patented Technologies**

Through Finjan and Finjan Blue, we currently have 29 and 24 U.S. patents, respectively and Finjan Mobile has 1 U.S. patent. Finjan's current U.S. issued patents began expiring in 2017. Finjan also has 2 U.S. patent applications pending and 38 international patents and one international patent application pending, Finjan Blue has 7 international patents and 4 international patents pending, as of the date of this report. Although we may, from time to time, focus on monetizing certain of these patents, we consider all of our patents to be "core" patents for our business.

The following table sets forth a brief description of issued and pending U.S. patents, including their respective titles:

### FINJAN'S ISSUED U.S. PATENTS

| U.S. Patent No. | Title |
|---|---|
| 6,092,194 * | System and Method for Protecting a Computer and a Network from Hostile Downloadables |
| 6,154,844 * | System and Method for Attaching a Downloadable Security Profile to a Downloadable |
| 6,804,780 * | System and Method for Protecting a Computer and a Network from Hostile Downloadables |
| 6,965,968 | Policy-Based Caching |
| 7,058,822 | Malicious Mobile Code Runtime Monitoring System and Methods |
| 7,418,731 | Method and System for Caching at Secure Gateways |
| 7,613,918 * | System and Method for Enforcing a Security Context on a Downloadable |
| 7,613,926 * | Method and System for Protecting a Computer and a Network from Hostile Downloadables |
| 7,647,633 | Malicious Mobile Code Runtime Monitoring System and Methods |
| 7,756,996 | Embedding Management Data Within HTTP Messages |
| 7,757,289 | System and Method for Inspecting Dynamically Generated Executable Code |
| 7,769,991 | Automatically Executing an Anti-Virus Application on a Mobile Communication Device |
| 7,930,299 | System and Method for Appending Security Information to Search Engine Results |
| 7,975,305 | Method and System for Adaptive Rule-Based Content Scanners for Desktop Computers |
| 8,015,182 | System and Method for Appending Security Information to Search Engine Results |
| 8,079,086 * | Malicious Mobile Code Runtime Monitoring System and Methods |
| 8,087,079 | Byte-Distribution Analysis of File Security |
| 8,141,154 | System and Method for Inspecting Dynamically Generated Executable Code |
| 8,225,408 | Method and System for Adaptive Rule-Based Content Scanners |
| 8,474,048 | Website Content Regulation |
| 8,566,580 | Splitting an SSL Connection Between Gateways |
| 8,677,494 * | Malicious Mobile Code Runtime Monitoring System and Methods |
| 9,141,786 * | Malicious Mobile Code Runtime Monitoring System and Methods |
| 9,189,621 * | Malicious Mobile Code Runtime Monitoring System and Methods |
| 9,219,755 * | Malicious Mobile Code Runtime Monitoring System and Methods |
| 9,294,493 | Computer Security Method and System with Input Parameter Validation |
| 9,444,844 | Malicious Mobile Code Runtime Monitoring System and Methods |
| 9,525,680 | Splitting an SSL Connection Between Gateways |
| 9,554,279 | Authorized Areas of Authentication |
| * Indicates that such patent expired in 2017. | |

11

Table of Contents

**FINJAN'S PENDING U.S. PATENT APPLICATIONS**

| Application No. | Title |
|---|---|
| 14/941,911 | Malicious Mobile Code Runtime Monitoring System and Methods |
| 15/383,641 | Splitting an SSL Connection Between Gateways |

**FINJAN BLUE'S ISSUED U.S. PATENTS**

| U.S. Patent No. | Title |
|---|---|
| 6,199,204 | Distribution of Software Updates via a Computer Network |
| 6,202,207 | Method and a Mechanism for Synchronized Updating of Interoperating Software |
| 6,314,428 | Method and Apparatus for Application Management in Computer Networks |
| 6,907,531 | Method and Systems for Identifying, Fixing and Updating Security Vulnerabilities |
| 7,346,929 | Method and Apparatus for Auditing Network Security |
| 7,770,225 | Method and Apparatus for Auditing Network Security |
| 8,381,242 | Static Analysis for Verification of Software Program Access to Secure Resources for Computer Systems |
| 8,495,357 | Data Security Policy Enforcement |
| 8,640,252 | Obfuscating Entry of Sensitive Information |
| 8,683,599 | Static Analysis for Verification of Software Program Access to Secure Resources for Computer Systems |
| 8,694,786 | Virtual Machine Images Encryption Using Trusted Computing Group Sealing |
| 8,782,351 | Protecting Memory of a Virtual Guest |
| 8,788,763 | Protecting Memory of a Virtual Guest |
| 8,793,800 | Static Analysis for Verification of Software Program Access to Secure Resources for Computer Systems |
| 8,935,794 | Verifying Applications Security Vulnerabilities |
| 9,003,480 | Classifying Files on a Mobile Computer Device |
| 9,160,756 | Method and Apparatus for Protecting Markup Language Document Against Cross-Site Scripting Attack |
| 9,160,762 | Verifying Applications Security Vulnerabilities |
| 9,172,717 | Security-Aware Admission Control of Requests in a Distributed System |
| 9,189,625 | Data Management of Potentially Malicious Content |
| 9,231,970 | Security-Aware Admission Control of Requests in a Distributed System |
| 9,271,146 | Mobile Privacy Information Proxy |
| 9,317,697 | Processing of Restricted Access Data |
| 9,536,085 | Data Management of Potentially Malicious Content |
| 9,679,159 | Mobile Privacy Information Proxy |

**Employees**

As of December 31, 2017, we had 10 full-time employees, on a consolidated basis and across all of our business lines.  We have budgeted to hire additional full-time employees (not including additional consultants or independent contractors) in the near future to expand our licensing and enforcement, mobile security and advisory services businesses. Personnel in our licensing and enforcement business are responsible for the execution of our licensing and enforcement strategy, including analyzing licensing opportunities and enforcement requirements, making tactical decisions related to our strategy, identifying new applications for our existing technologies and pursuing opportunities to invest in new technologies through strategic partnerships and acquisitions. Although our management dictates and controls our overall litigation strategy for each case we litigate (or settle), we use outside legal counsel to execute certain aspects of our strategies. We also use consultants, including Finjan's founder and former Chief Technology Officer, Shlomo Touboul, to assess opportunities related to our technologies and additional technologies we may pursue in the future. We also expect to hire additional full-time employees into Finjan Blue to support our development and licensing efforts of the patents obtained through our Patent Assignment Agreement, our mobile security business, operated

through our subsidiary Finjan Mobile and our advisory services business, operated through our subsidiary CyberRisk. We do not expect to hire any full-time employees to manage our investment in the JVP innovation fund.

Neither we nor any of our subsidiaries is a party to any collective bargaining agreement. We consider our employee relations to be good.

**Corporate Information**

Our principal executive offices are located at 2000 University Avenue, Suite 600, East Palo Alto, CA 94303. Our telephone number is (650) 282-3228 and our web address is www.finjan.com. Financial and other information can be accessed on the "Investors" section of our website. We make available through our website, free of charge, copies of our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act as soon as reasonably practicable after filing such material electronically or otherwise furnishing it to the Securities and Exchange Commission (the "SEC"). Also posted on our website are certain corporate governance documents, including our Code of Business Conduct and Ethics. The reference to our website is textual in reference only, and the information included or referred to on, or accessible through, our website does not constitute part of, and is not incorporated by reference into, this report or any other filing.

We also file periodic reports, proxy statements and other information with the SEC. Such reports may be obtained by visiting the Public Reference Room of the SEC at 100 F Street, NE, Washington, D.C. 20549. Information on the operation of the Public Reference Room can be obtained by calling the SEC at (800) SEC-0330. In addition, the SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information.

**ITEM 1A. RISK FACTORS.**

*Investing in our common stock involves a high degree of risk. You should consider carefully the risks, uncertainties and other factors described below, in addition to the other information set forth in this Form 10-K, before making an investment decision. Any of these risks, uncertainties and other factors could materially and adversely affect our business, financial condition, results of operations, cash flows or prospects. In that case, the market price of our common stock could decline, and you may lose all or part of your investment in our common stock. See also "Cautionary Statement Regarding Forward-Looking Statements."*

**Risks Related to Our Cybersecurity Business**

***We are presently substantially reliant on a limited number of patented technologies that we own through Finjan that have begun to expire.***

We derive substantially all of our income from a relatively small number of patented technologies. As of December 31, 2017, our assets consisted primarily of Finjan's 29 U.S. and 38 international patents, and Finjan Blue's 24 patents acquired from IBM with additional pending applications we are processing in patent offices around the world. Finjan's current U.S. issued patents began expiring in 2017, and we currently have 2 U.S. patent applications and 1 international patent application pending as of the date of the filing of this Annual Report on Form 10-K. As new technological advances occur, many of the patented technologies we own through Finjan may become obsolete before they are completely monetized. The monetization of our patented technologies through Finjan Blue has been limited to date. There can be no certainty that we will be able to monetize our Finjan Blue patents sufficiently to recoup the cost of acquiring such patents. If we are unable to monetize our current patent assets for any reason, including obsolescence of our technologies, the expiration of our patents, or challenges to the enforceability of our patents through patent office *ex parte* re-examination or *Inter Partes* Reviews ("IPRs") or any other reason, our business and prospects would be materially harmed.

***We have a history of significant legal expense and this may increase in the future.***

We reported net income from operations of $22.8 million and $0.3 million for the years ended December 31, 2017 and 2016 respectively and a net loss of $12.6 million for the year ended December 31, 2015. As of December 31, 2017, we had approximately $41.2 million in cash and cash equivalents and short-term investments and working capital of $36.3 million. Although we reported net income from operations for the years ended December 31, 2017 and 2016, we expect to continue incurring significant legal and other selling, general and administrative expenses in connection with our operations. We believe, however, that our existing revenue opportunities, balances of cash and cash equivalents and investments will be sufficient to finance our anticipated capital and operating requirements for the next twelve months from the date of filing this annual report. Such belief is based on current forecasts and assumptions regarding licensing of our technology, which are currently at various stages of negotiation (which may not be successfully completed), our emerging business, as well as other financing and revenue sources. We may not be successful

13

Table of Contents

in finalizing such licensing efforts and even if successful, may need to raise additional capital in order to provide sufficient funds to support and grow our business.

***Any failure to protect or enforce our patents or other intellectual property rights could materially impair our business.***

Our ability to successfully operate our business depends largely on the validity and enforceability of our patents and the relevance of our patent rights to commercially viable products or services. Third parties have challenged, and we expect will continue to challenge, the infringement, validity and enforceability of certain of our patents. In some instances, our patent claims could be substantially narrowed or declared invalid, unenforceable, not essential, not infringed or a combination of the foregoing. We cannot assure you that the validity and enforceability of our patents will be maintained or that our patent claims will be applicable to any particular product or service. In addition, the U.S. Patent and Trademark Office (the "USPTO") could invalidate or render unenforceable our patents or materially narrow the scope of the patent claims during the course of USPTO post-grant proceedings such as, for example, re-examinations or IPRs. Any significant adverse finding by the USPTO or adverse verdict of a court as to the validity, enforceability or scope of certain of our patents and/or any successful design around certain of our patents could materially and adversely affect our ability to secure future settlements or licenses on favorable terms, if at all, and otherwise harm our business.

Under the American Invents Act ("AIA"), patents previously granted by the USPTO may be reviewed through post-patent grant proceedings such as reexaminations or IPRs. The basic characteristics of *Ex Parte* reexamination are: the patent owner or a third party may request the USPTO to reexamine an issued U.S. patent based on patents and printed publications that the requester submits for the USPTO's consideration. The requester must establish that the submitted prior art establishes a substantial and new question of patentability, and if the requester meets such burden, the USPTO will grant the request and order reexamination of the patent at issue. Unless the requester of the reexamination is the patent owner, the requester's participation terminates following such reexamination order and only the patent owner may proceed. The patent owner can appeal the final decision of the Central Reexamination Unit ("CRU") of the USPTO to the Patent Trial and Appeal Board ("PTAB") and may further appeal a negative decision to the Court of Appeals for the Federal Circuit ("CAFC").

Generally, the grounds on which a petition for IPR is granted is whether the claimed invention is patentable strictly in light of prior art consisting of patents or printed publications. The petitioner must demonstrate that there is a reasonable likelihood that he/she/it will prevail as to at least one of the patent claims challenged to trigger the IPR. The PTAB decides on petitions and can reject them if the prior art is the same or substantially the same prior art or arguments previously presented to the USPTO. If the petition is granted, an IPR is statutorily required to be completed within one year of institution, which is extendable for up to six months for good cause. Unlike reexaminations, the third party petitioner may stay involved in the proceedings. IPRs are handled at the outset by the PTAB and do not go through the CRU of the USPTO. Final decisions of the PTAB are immediately appealable to the CAFC, either by the patent owner or the third party. It is becoming a trend, if not a practice, for accused infringers to petition for reexaminations or IPRs of asserted patents as these proceedings may give the petitioner "two bites at the apple". Parties to our enforcement actions may initiate IPRs with respect to our patents in the future. Although we believe our patents are patentable in light of prior art, these proceedings are relatively new and unpredictable. The outcome of the proceedings can range from decisions favorable to the patent holder, favorable to both parties, or favorable to the petitioner. If the outcome is the latter, the value of the challenged patent can be materially reduced or extinguished.

***Our licensing cycle is lengthy and costly, and our licensing efforts may be unsuccessful.***

The process of engaging a potential licensee to adopt a license can be lengthy and may not always result in a license agreement. It may take many months or longer to identify potential licensees, prepare marketing, technical or other materials, educate potential licensees on the benefits of entering into a license and agree, if at all, to licensing terms, conditions and price. Even after expending significant time and resources into licensing efforts, we may be unsuccessful in entering into a licensing agreement with a potential licensee. As such, we may incur significant losses in any particular period before any associated revenue stream begins, if at all.

***We currently are, and expect to continue to be involved in costly, time-consuming and uncertain litigation and administrative actions to enforce our patents, which may adversely affect our financial condition and our ability to operate our business.***

If we believe a third party is infringing one or more of our patents and refuses to obtain a license to use our patented technologies, we may be compelled to commence legal or administrative action against those third parties. For example, due to the breakdown in licensing discussions, we initiated patent infringement litigation against Juniper Networks, Bitdefender, and Zscaler in the second half of 2017. Patent litigation is inherently uncertain and we cannot predict the outcome of any litigation or administrative action. Moreover, many of the parties we believe infringe our patents are large and well-funded companies with substantially greater resources than we have and may devote substantial resources toward avoiding or limiting liability and the amount of associated damages for infringing our patents. We could also face counterclaims that challenge the essential nature, validity,

14

Table of Contents

enforceability or infringement of our patents. Regardless of whether legal action is successful, legal and expert fees and other costs associated with enforcement action are significant.

***Our cash flows can be unpredictable, and this may harm our financial condition or the market price for our common stock.***

The amount and timing of cash flows from our licensing and enforcement activities are subject to uncertainties stemming primarily from uncertainties regarding the rates of adoption of our patented technologies, our lengthy license negotiation cycles, the growth rates of our licensees, the outcome of enforcement actions and certain other factors. As such, our income and cash flows may vary significantly from period to period, which could make our business difficult to manage, adversely affect our business and operating results, cause our annual or quarterly results to fall below market expectations and adversely affect the market price of our common stock.

***Our cash flows and income have been derived from a limited number of sources.***

Our net income in recent years has been derived from a limited number of license agreements and settlements, and we expect that, in the near term, any income that we generate will be derived from a limited number of sources. In 2017, we derived approximately $50.4 million of income from license agreements with six licensees. In 2016, we derived approximately $18.4 million of income from license agreements with six licensees. In 2015, we derived approximately $4.7 million of income from license agreements with three licensees. If we are unable to reach settlements and license agreements with a sufficient number of identified third parties who use our technologies, our future income and cash flow could be adversely affected.

***We may raise additional capital to support our present business plan and our anticipated business growth and such capital may not be available on acceptable terms, or at all, which would adversely affect our ability to operate.***

During 2017, we raised net proceeds of $14.4 million through the issuance of Series A-1 Preferred Stock and net proceeds of $12.0 million through the public offering and sale of our common stock. Based on our current operating plans (which includes our expectation of signing additional license agreements in 2018, which may not occur), our current resources are expected to be sufficient to fund our planned operations for the coming twelve months. We nonetheless may raise additional financing to fund licensing and enforcement actions, planned research and development activities and to better solidify our financial position. We may also need to raise additional funds in connection with any acquisitions of technology or intellectual property assets that we pursue. Such additional capital may not be available on acceptable terms, or at all, which would adversely affect our operations. If we raise additional funds by issuing equity securities, our stockholders may experience dilution. Debt financing, if available, may involve covenants restricting our operations or our ability to incur additional debt. Any debt or additional equity financing that we raise may contain terms that are not favorable to us or our stockholders.

Further, if we are unable to obtain additional funding on a timely basis, we may be required to curtail or terminate some or all of our business plans, which would harm our operating results.

***Any debt we incur in the future in capital raising efforts may limit our flexibility to obtain further financing and to pursue other business opportunities.***

If our anticipated capital raising efforts involve debt financing, we will have limitations on our ability to raise additional debt financing or incur liens, as well as other limitations. Such limitations may limit our flexibility to pursue other business opportunities. Additionally, our future level of indebtedness could have important consequences to us, including the following:

- our ability to obtain additional financing, if necessary, for working capital, or other purposes may be impaired or such financing may not be available on favorable terms;

- our funds available for operations, future business opportunities and distributions to stockholders will be reduced by that portion of our cash flow required to make future interest payments on any debt incurred; and

- we may be more vulnerable to competitive pressures or a downturn in our business or the economy generally.

Our ability to service any debt raised in the future will depend upon, among other things, our successful monetization of our patents, which will be affected by prevailing economic conditions and financial, business, and other factors, some of which are beyond our control.

Table of Contents

***If we are unable to successfully commercialize our new business or identify additional sources of revenue, our financial condition and operations may be materially adversely impacted.***

We generate substantially all of our revenue from license and settlement agreements related to our patented technologies. In 2015, we launched our new cybersecurity advisory business, CybeRisk, and our mobile security business, Finjan Mobile. In 2017 Finjan Blue was founded to support our development and licensing efforts of the IBM Security Patents obtained by Finjan Blue through the Patent Assignment and Support Agreement with IBM. The Agreement, the terms of which are confidential, includes pathways for Finjan and IBM to consider development efforts in the future and provides for the sharing of pertinent institutional knowledge and resources by IBM to Finjan Blue. Since such businesses are relatively new and unproven, they may not yield any viable new revenue, inventions or technology, which would lead to a loss of our investment in such activities. Such activities could also distract our management team from its present business initiatives, which could have a material and adverse effect on our business. If we are unable to generate sufficient revenue from such businesses or invent or acquire new technologies or products, our financial condition and operations may be materially impacted.

***If we suffer a cyber-security event, we may lose Finjan Mobile customer data and incur liabilities, any of which would harm our business and operating results.***

As cyber-security threats develop and evolve, it may be necessary to make further investments to protect data and infrastructure. A security breach or unauthorized access or loss of data could result in a disruption to our Finjan Mobile service, litigation, the triggering of indemnification and other contractual obligations, regulatory investigations, government fines and penalties, reputational damage, loss of sales and customers, mitigation and remediation expenses among other liabilities. At this time, such a cyber-security event would be immaterial, however as we continue to grow our Finjan Mobile business, such an event could result in significant liability.

***We may have to invest more resources in research and development than anticipated, which could increase our operating expenses and negatively impact our operating results.***

If new competitors, technological advances by existing competitors, and/or development of new technologies or other competitive factors require us to invest significantly greater resources than anticipated in our research and development efforts, our operating expenses could increase significantly. If we are required to invest significantly greater resources than anticipated in research and development efforts without an increase in revenue, our operating results would decline. We expect research and development expenses to increase in the foreseeable future as our technology development efforts continue.

***We may be unable to achieve the financial or other goals intended at the time of any potential acquisition.***

Our growth strategy includes the potential acquisition of patent, technology or other business assets or companies to further diversify our assets and business operations.  We may not be successful in identifying or funding acquisitions that are consistent with our strategy or in completing such acquisitions.  Acquisitions of patent, technology or other business assets or companies are subject to numerous potential risks, including the following:

- our inability to enter into a definitive agreement with respect to any potential acquisition, or if we are able to enter into such agreement, our inability to consummate the potential acquisition;

- our inability to achieve the anticipated financial and other benefits of a specific acquisition;

- our inability to obtain the necessary financing, on favorable terms or at all, to finance any or all of our potential acquisitions;

- risks of entering markets in which we have no or limited direct prior experience and where competitors in such markets have stronger market positions;

- our inability to retain key personnel from an acquired company, if necessary;

- difficulty in maintaining controls, procedures and policies during the transition and integration process;

- our inability to integrate the target company's technologies, products or businesses with ours;

- diversion of our management's attention from other business concerns; and

Table of Contents

- failure of our due diligence processes to identify significant issues, including issues with respect to patented technologies and patent portfolios, and other legal and financial contingencies.

If we are unable to manage these risks effectively as part of any acquisition, our business and prospects could be adversely affected. Depending upon the nature and structure of future acquisitions, our stockholders may not have the ability to vote on, or consent to, the consummation of any such acquisition.

***Technologies we acquire in the future, if any, may not be commercially successful.***

We may acquire patents and technologies that are in the early stages of adoption in the commercial and consumer markets. Demand for some of these technologies may be untested and subject to fluctuation based upon the rate at which such patents and technologies are adopted in products and services. These technologies may require long development cycles and a substantial investment before we can determine their commercial viability. As a result, there can be no assurance as to whether technologies we acquire will have value that can be timely monetized, if at all. Through Finjan Blue, we entered into a Patent Assignment and Support Agreement with IBM, effective August 24, 2017. Under the Patent Assignment Agreement, IBM is to support Finjan Blue in its development and licensing of the IBM Security Patents. However, there can be no assurance that we will be successful in our efforts to develop and license the IBM Security Patents or that we will recoup our investment in the IBM Security Patents.

***Failures in our due diligence and/or inaccuracies of representations and warranties made by third parties may expose us to material liabilities, write-downs or write-offs in the future.***

We expect to conduct due diligence investigations of the patent technology or other intellectual property assets of companies we seek to acquire in the future. Due diligence is time consuming and expensive and at times, we may also rely on opinions or representations or warranties of third parties to supplement, replace or support our own independent due diligence. Even if we conduct extensive due diligence on particular patent technology or other intellectual property assets or companies, this diligence may not reveal all material issues that affect the acquisition. If our diligence fails to identify issues related to the applicable patent, technology or other intellectual property assets or companies or industry to which they relate, or opinions, representations or warranties prove to be inaccurate, we may be forced to later write-down or write-off assets or incur impairment or other charges that could result in our reporting losses. Even though these charges may be non-cash items and not have an immediate impact on our liquidity, the fact that we report charges of this nature could contribute to negative market perceptions about us or our common stock. In addition, we may acquire patent technologies or other intellectual property assets or companies from a seller who does not have proper title to those assets. In those cases, we could lose part or all of our investment in the assets.

***Our acquisitions of patents, technology and other assets or companies may be time consuming, complex and costly, which could adversely affect our operating results.***

Acquisitions of patent, technology or other intellectual property assets or companies may be time consuming, complex and costly to consummate. As a result, we expect to incur significant operating expenses and use a substantial portion of our cash resources.
We may incur significant costs to organize and negotiate a structured acquisition that does not ultimately result in an acquisition of any patent, technology or other intellectual property assets or companies or, if consummated, proves to be unprofitable for us. These costs could adversely affect our operating results, and if we incur losses, the value of our securities could decline.

***Our acquisitions of patents, technology or other assets or companies may involve issuing capital that would be dilutive to our stockholders, cause our stock price to drop, or involve raising capital on unfavorable terms, if available.***

Acquisitions of patent, technology or other intellectual property assets or companies may require us to raise capital during the negotiations even if the acquisition is ultimately not consummated. If we raise additional funds through the issuance of equity, equity-linked or debt securities, including those pursuant to a registered offering, those securities may have rights, preferences, or privileges senior to the rights of our common stock, and our existing stockholders may experience dilution. Sales of a substantial number of shares of our common stock in the public market, the perception that these sales or other financings might occur, could depress the market price of our common stock and could also impair our ability to raise capital through the sale of additional equity securities. If we issue debt securities or incur indebtedness, the incurrence of indebtedness would result in increased fixed payment obligations and could also result in restrictive covenants, such as limitations on our ability to incur additional debt, limitations on our ability to acquire, sell or license patents, technology or other intellectual property assets or companies and other operating restrictions that could adversely impact our ability to conduct our business. If we are unable to obtain additional capital, or are unable to obtain additional capital on satisfactory terms, our ability to continue to support our business growth or to respond to business opportunities, challenges, or other circumstances could be adversely affected, and our business may be harmed.

Table of Contents

***It may be difficult for us to verify royalty amounts that we are owed under licensing agreements, and this may cause us to lose revenues.***

We anticipate that the terms of future license agreements may require licensees to document their use of our technologies and report related data to us on a periodic basis. Although license terms may give us the right to audit books and records of licensees to verify this information, audits can be expensive and time consuming, and may not be cost-effective based on our understanding of a licensee's business. Furthermore, any license compliance program that we establish to audit certain licensees in order to review the accuracy of the information contained in their royalty reports may not be effective to ensure that we receive royalties to which we are entitled.

***We depend on key senior management, engineering, patent and licensing resources.***

Our future success depends largely upon the continued contributions of our directors, executive officers and other key management and technical personnel. Our success also depends on our ability to continue to attract, retain and motivate qualified personnel with specialized patent, licensing, and other skills (particularly in the cybersecurity field). The loss of members of our management or key personnel could adversely affect our business. The market for such talent in our industry is extremely competitive, especially in Silicon Valley. In particular, competition exists for qualified individuals with expertise in patents and in licensing and the ability to identify and acquire technologies and patent assets. The failure to attract and retain such persons with relevant and appropriate experience could interfere with our ability to enter into new license agreements, acquire new technologies or otherwise meet our strategic objectives.

***The success of our cybersecurity business depends in part upon our ability to retain the best legal counsel to represent us in patent litigation and our ability to manage the costs of such services.***

The success of our licensing and enforcement business depends upon our ability to retain the best legal counsel to advise us and manage our enforcement and litigation activities and our ability to manage the costs of such services. As our licensing and enforcement actions increase, it may become more difficult to find the best legal counsel to handle our active litigation cases, as conflicts may prevent them from representing us. Also, since the cost of litigation can be very uncertain, we may underestimate the cost of legal counsel and related activities, in relation to the value of the enforcement activity.

***Federal courts are becoming more crowded, and as a result, patent enforcement litigation is taking longer and becoming more costly.***

Since patent disputes involving infringement, validity, and enforceability are governed by federal law, our patent enforcement actions are decided within the federal court system. The federal court calendars are often congested with other civil and criminal proceedings, giving rise to the risk of delays in our patent enforcement actions. Such delays may have a negative impact on resolution of our disputes, adversely affect the timing of our cash flow projections and therefore, have a negative impact on our business. Further, lengthening of the litigation process increases the cost of litigation thereby harming our business.

***Any reductions in the funding of the USPTO could have an adverse impact on the cost of processing pending patent applications and the value of those pending patent applications.***

Our business plan includes the possible acquisition of patent applications pending before the USPTO. The value of any patent application we acquire will be dependent upon the issuance of patents in a timely manner, and any reductions in the funding of the USPTO could materially delay the process by which the USPTO issues patents and consequently any income that may be derived for the technologies claimed in the patent application. Further, reductions in funding from Congress could result in higher patent application filing and maintenance fees charged by the USPTO, causing an unexpected increase in our expenses.

***Competition for patent rights and patent portfolios is intense.***

We expect to encounter significant competition in the areas of cybersecurity technology and intellectual property acquisitions. This includes a growing number of competitors seeking to acquire the same companies or similar patents and technologies that we may seek to acquire. We also compete with venture capital firms, strategic corporate buyers and various industry leaders for technology acquisitions and licensing opportunities.

18

Table of Contents

***The markets served by our cybersecurity technologies are subject to rapid technological change, and if we are unable to acquire new technologies and patents, our ability to generate income could be substantially impaired.***

The markets served by our cybersecurity technologies and our licensees frequently undergo transitions in which products rapidly incorporate new features and performance standards on an industry-wide basis. Cybersecurity products are based on continually evolving consumer demands. This will require continued efforts and success in acquiring new patent portfolios with licensing and enforcement opportunities. If we are unable to acquire new patented technologies and patent portfolios, or to identify and ensure compliance with evolving industry standards, our ability to generate income could be substantially impaired and our business and financial condition could be materially harmed.

***Our public company disclosure obligations may have unintended adverse consequences on our licensing and patent enforcement strategy.***

As a public company, we are subject to the disclosure and reporting requirements under the Securities Exchange Act of 1934, as amended, and other applicable U.S. securities laws, as well as the rules and regulations of the SEC and NASDAQ. In order to comply with such laws, rules and regulations, we may be required to disclose certain information that may be detrimental to our current or future licensing and enforcement programs. In addition, our disclosure obligations may adversely affect our ability to enter into license or settlement agreements with third parties who are reluctant to have the monetary value and terms of such agreements publicly disclosed. In such instances, we may seek confidential treatment of certain information reflected in our license or settlement agreements, which requests may be denied by the SEC or limited to a greater extent than requested, which would harm our relationship with current and future licensees. Also, we may incur additional costs and expenses seeking confidential treatment of certain information reflected in such license or settlement agreements, which would negatively impact our operations.

***We are obligated to maintain proper and effective internal control over financial reporting. We may not complete our analysis of our internal control over financial reporting in a timely manner, or this internal control may not be determined to be effective, which may adversely affect investor confidence in our company and, as a result, the value of our common stock.***

While we were able to determine in our management's report for fiscal 2017 that our internal control over financial reporting is effective, we may not be able to complete our evaluation, testing, and any required remediation in a timely fashion, may be unable to assert that our internal controls are effective in the future. In the event that our chief executive officer, chief financial officer, or independent registered public accounting firm determines in the future that our internal control over financial reporting is not effective as defined under Section 404, we could be subject to one or more investigations or enforcement actions by state or federal regulatory agencies, stockholder lawsuits or other adverse actions requiring us to incur defense costs, pay fines, settlements or judgments and causing investor perceptions to be adversely affected and potentially resulting in a decline in the market price of our stock.

***New legislation, regulations, executive orders, or rules related to obtaining patents or enforcing patents could significantly increase our operating costs and decrease our income.***

If new legislation, regulations or rules are implemented either by Congress, the USPTO, other regulatory agencies or the courts, or if the President of the United States issues executive orders that impact the patent application process, the patent enforcement process or the rights of patent holders, these changes could materially and negatively affect our revenue and expenses. For example, relatively new rules regarding the burden of proof in patent enforcement actions could significantly increase the cost of our enforcement actions, and new standards or limitations on liability for patent infringement or limitations on the ability to bring patent enforcement claims could negatively impact our income derived from such enforcement actions.  Similarly, recent judicial decisions relating to fee shifting in patent infringement actions and limitations relating to software patents may make patent licensing and enforcement activities more difficult and costly, though it is unclear what the precise impact of these judicial decisions will be.

Furthermore, U.S. patent laws have been amended by the Leahy-Smith America Invents Act, or the AIA, certain sections of which became effective in September 2011. The AIA includes a number of significant changes to U.S. patent law. In general, the legislation attempts to address issues surrounding the enforceability of patents and the increase in patent litigation by, among other things, establishing new procedures for patent litigation. For example, the AIA changes the way that parties may be joined in patent infringement actions, increasing the likelihood that such actions will need to be brought individually against parties allegedly infringing by their respective allegations of infringement. In practice, however, many courts have consolidated separate actions asserting the same patent for the purposes of case management and discovery, although individual trials remain separate. In addition, accused infringers may now choose to attack patent validity by instituting an IPR process before the PTAB. In 2015, in *In Re Cuozzo Speed Techs*., 793 F.3d 1268 (Fed. Cir. 2015), the Federal Circuit upheld a decision permitting the PTAB to evaluate patent claims under a "broadest reasonable interpretation" ("BRI") standard. This standard used by the PTAB is higher than the "plain

Table of Contents

and ordinary meaning" standard used in federal district courts, and has led to an arguably higher incidence of the PTAB finding claims invalid in light of prior art. In January 2016, the Supreme Court agreed to hear the appeal on this issue as well as the issue of what decisions by the PTAB are appealable to the traditional appellate court system. It remains unclear what, if any, impact the AIA will have on the operation of our patent monetization and enforcement business. However, the AIA and its implementation could increase the uncertainties and costs surrounding the enforcement of our patented technologies, which could have a material adverse effect on our business and financial condition.

In addition, the United States Department of Justice ("DOJ") has conducted reviews of the patent system to evaluate the impact of patent assertion entities on industries in which those patents relate. It is possible that the findings and recommendations of the DOJ could impact the ability to effectively license and enforce standards-essential patents and could increase the uncertainties and costs surrounding the enforcement of any such patented technologies.

Furthermore, in various pending litigation and appeals in the United States Federal courts, various arguments and legal theories are being advanced to potentially limit the scope of damages a patent licensing company might be entitled to. Any one of these pending cases could result in new legal doctrines that could make our existing or future patent portfolios less valuable or costlier to enforce.

On April 29, 2014, the United States Supreme Court ("Supreme Court") issued a decision, *Octane Fitness, LLC v. Icon Health & Fitness, Inc.,* 134 S. Ct. 1749 (2014), relaxing the standard for awarding attorneys' fees to prevailing parties in patent cases. While the Supreme Court maintained the standard that a case must be deemed "exceptional" under 35 U.S.C. § 285 for an award of attorneys' fees, it held that district courts were to consider the "totality of the circumstances" in making that determination, that it was not necessary for a court to find independently sanctionable conduct or both objective baselessness and subjective bad faith, and that clear and convincing evidence was not required. Although we are committed to litigating our patent cases in the court room with the highest standard of professional conduct and on the merits of our claims, litigation is unpredictable. We, therefore, cannot guarantee that we will prevail in our litigation matters or that we will not be ordered to pay the prevailing party's attorneys' fees, which may be substantial.

On June 19, 2014, the Supreme Court issued a landmark decision in which it significantly tightened the standard for patentability of software patents. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l,* 134 S. Ct. 2347 (2014). Specifically, the Supreme Court stated that if you have an idea so abstract that it cannot be patented, simply tying it to a "generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." The Supreme Court further stated that tying the abstract idea to "purely functional and generic" hardware would, similarly, not make the idea patentable. Arguably, the *Alice* decision is intended to limit the validity of poor quality software patents. The *Alice* decision may provide accused infringers of software patents new arguments to challenge the validity of such patents. Since *Alice,* however, the Court of Appeals for the Federal Circuit ("Federal Circuit") has addressed a handful of decisions regarding patent eligibility of software and user interfaces in relation to electronic devices. Pertinent to our business are *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc., LG Electronics Mobilecomm U.S.A., Inc.,* __F.3d __ (Case No. 2016-2684, 2017-1922, Fed. Cir. 2018) and *Finjan, Inc. v. Blue Coat Systems, Inc*., __ F.3d __ (Case No. 2016-2520, Fed. Cir. 2018). In both cases, the Federal Circuit found the subject claimed inventions patent eligible and not abstract because they each recited "specific improvement[s] over prior systems." Practically, the effects of the *Alice* decision are still being assessed as patent holders, attorneys, the USPTO, and courts, are trying to determine the proper bounds of the *Alice* decision. We cannot guarantee that the Alice decision and ensuing developments will not have a negative impact on our business.

On June 16, 2015, the Federal Circuit issued an opinion which may lead to more patents being challenged on indefiniteness grounds. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). One type of patent claim is a "means-plus-function" claim. Section 112(f) of the Patent Act requires that means-plus-function claims include a "corresponding structure," described in the specification, for performing the function. Previous cases had held that if a claim did not include the word "means," there was a strong presumption that the requirements of section 112(f) did not apply. The *Williamson* court removed the word "strong" from the presumption, as well as the requirement for a heightened evidentiary showing. *Williamson* may result in an increase in accused infringers challenging patent claims on indefiniteness grounds. Such result could have a material adverse effect on our business and operations.

On June 13, 2016, the Supreme Court issued *Halo Electronics, Inc. v. Pulse Electronics, Inc.,* 579 U.S. ___ (No. 14-1513, June 13, 2016), in which a unanimous Supreme Court rejected the 2007 Federal Circuit decision, *In re Seagate Technology LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (en banc), which established a stringent standard for proving willful patent infringement (aka the "Seagate test". The Supreme Court instead held that the Seagate test was inconsistent with 35 USC § 284, that provides that "a court may increase the damages up to three times" the amount awarded in a lower court, and "is unduly rigid, and it impermissibly encumbers the statutory grant of discretion to district courts." Accordingly, the district court judges and juries now have greater latitude to decide the willfulness question and award the prevailing patentee enhanced damages, with the caveat that such a finding

Table of Contents

should be made only in "egregious" cases. Notwithstanding *Halo*, enhanced damages for willful infringement is not guaranteed, and we, therefore, cannot guarantee that *Halo* will not have a negative impact on our business.

On May 22, 2017, the Supreme Court issued *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S.Ct. 1514 (No. 16-341, May 22, 2017). This decision focused on the question of where a domestic corporate defendant can be sued, i.e., the patent venue under 28 USC §1400(b). Where the Federal Circuit had held in *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574 (Fed.Cir. 1990), that patent cases could be brought in any district having personal jurisdiction over the defendant, the Supreme Court in *TC Heartland* determined that for purposes of patent venue, a domestic corporate defendant only resides in its state of incorporation. The impact of *TC Heartland* has shown, among other things, a dramatic decrease in new patent actions filed in the Eastern District of Texas (which accounted for nearly 40% of patent cases filed in the US), while the District of Delaware, where more than half of all publicly traded domestic companies are incorporated had a significant increase in the number of new patent cases filings. The District Court for the Northern District of California - which is where the majority of our cases are filed -- has also gained noticeable increase in new patent filings. Although most of our cases are filed in the Northern District of California, we cannot guarantee that we will not have to file in another venue or that filing in another venue will not have a negative impact on our business.

Further, and in general, it is impossible to determine the extent of the impact of any new laws, regulations or initiatives that may be proposed, or whether any of the proposals will become enacted as laws. Compliance with any new or existing laws or regulations could be difficult and expensive, affect the manner in which we conduct our business and negatively impact our business, prospects, financial condition and results of operations.

***Our operations are subject to risks of natural disasters, acts of war, terrorism or widespread illness, any one of which could result in a business stoppage and negatively affect our operating results.***

Our business operations depend on our ability to maintain and protect our facility, computer systems and personnel, which are primarily located in East Palo Alto. Our business operations are in close proximity to known earthquake fault zones. Our facility and transportation for our employees are susceptible to damage from earthquakes and other natural disasters such as fires, floods and similar events. Should earthquakes or other catastrophes such as fires, floods, power outages, communication failures or similar events disable our facilities, we do not have readily available alternative facilities from which we could conduct our business, which stoppage could have a negative effect on our operating results. Acts of terrorism, widespread illness and war could also have a negative effect at our international and domestic facilities and on our operating results.

**Risks Related to Our Common Stock**

***Concentration of ownership among our existing executive officers, directors and their affiliates, and others who beneficially own at least 10% of our outstanding common stock, may prevent new investors from influencing significant corporate decisions.***

Our executive officers, directors and their affiliates, together with others who own at least 10% of our outstanding common stock, beneficially own or control approximately 20% of our common stock. Accordingly, these persons, acting individually or as a group, will have substantial influence over the outcome of a corporate action requiring stockholder approval, including the election of directors, any merger, consolidation or sale of all or substantially all of our assets or any other significant corporate transaction. These stockholders may also exert influence in delaying or preventing a change in control of our company, even if such change in control would benefit our other stockholders. In addition, the significant concentration of stock ownership may adversely affect the market value of our common stock due to investors' perception that conflicts of interest may exist or arise.

***Future sales by us or our existing stockholders could dilute our stockholders and depress the market price of our common stock.***

Based on information contained in Schedule 13D/A and Form 4 filings made throughout 2017 and in January and February 2018, two of our significant stockholders sold a significant number of shares of our common stock. While it is not easy to quantify how such sales may have depressed our share price, if these stockholders continue to sell (which we expect), or other existing stockholders sell a large number of shares of our common stock, or if we sell additional common stock or securities that are convertible into common stock, in the future, the market price of our common stock could decline.  Further, even the perception in the public market that we or our existing stockholders might sell shares of common stock could depress the market price of our common stock.

In addition, the issuance of additional shares by us, including (i) 4,140,000 shares of our common stock in a public offering in 2017 and (ii) the issuance of 2,196,836 shares of our common stock underlying outstanding stock options and restricted stock units, 1,280,979 of which were vested as of December 31, 2017, could dilute our stockholders' ownership and voting interests in

21

Table of Contents

the Company and increase the number of shares of our common stock eligible for resale in the public market. Further, following approval of our stockholders at our 2017 annual meeting of stockholders, we (i) increased the number of shares reserved under our 2014 Incentive Compensation Plan ("2014 Plan") by 1,000,000 shares and (ii) added an "evergreen" feature which provides for the annual replenishment of shares to the 2014 Plan share reserve without stockholder approval (equal to 5.0% of our outstanding shares of Common Stock as of the end of our immediately preceding fiscal year). The issuance of shares of our common stock underlying stock options and restricted stock units to be issued following such increase will dilute our stockholders' ownership and voting interests in the Company and increase the number of shares of our common stock eligible for resale in the public market. Finally, in 2017 the Company issued to Soryn HLDR a fully vested common stock warrant to purchase 2,355,506 shares of common stock, at an exercise price of $3.18 per share, with a term of three years in connection with the Series A-1 Preferred Stock financing. The exercise of such warrant will further dilute our stockholders' ownership and voting interests in the Company and increase the number of shares of our common stock eligible for resale in the public market.

***Our Common Stock may be affected by trading volume and price fluctuations, which could adversely impact the value of our Common Stock.***

The stock market in general has experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of companies with securities traded in those markets. Broad market and industry factors may seriously affect the market price of companies' stock, including ours, regardless of actual operating performance.

Market prices for public companies whose principle revenues are derived from the licensing of intellectual property have been particularly volatile. We believe that various factors may cause the market price of our common stock to fluctuate, perhaps substantially, and the factors include, among others, the following:

- quarterly variations in our operating results compared to market expectations;

- our raising or failure to raise additional capital;

- the risk of our inability to continue to meet listing requirements of the NASDAQ;

- developments in relationships with licensees;

- our or our competitors' technological innovations;

- announcements of developments in our patent enforcement actions

- our failure to meet or exceed securities analysts' expectations of our financial results;

- a change in financial estimates or securities analysts' recommendations;

- changes in management's or securities analysts' estimates of our financial performance;

- changes in market valuations of similar companies;

- regulatory developments and court decisions that negatively impact the ability of patent owners to protect their assets.

- actual or expected sales of our common stock by our stockholders, including any of our significant stockholders.

***Our common stock may be considered a "penny stock."***

The SEC has adopted regulations, which generally define "penny stock" to be an equity security that has a market price of less than $5.00 per share, subject to specific exemptions. The market price of our common stock is less than $5.00 per share and therefore may be a "penny stock." Brokers and dealers effecting transactions in "penny stock" must disclose certain information concerning the transaction, obtain a written agreement from the purchaser and determine that the purchaser is reasonably suitable to purchase the securities. These rules may restrict the ability of brokers or dealers to sell our common stock and may affect your ability to sell shares of our common stock in the future.

Table of Contents

***Our stockholders may experience significant dilution if future equity offerings are used to fund operations or acquire complementary businesses.***

Our authorized capital stock consists of eighty million (80,000,000) shares of common stock and ten million (10,000,000) shares of blank check preferred stock, of which one hundred fifty three thousand (153,000) shares have been designated Series A-1 Preferred Stock. If we engage in capital raising activities in the future as we did in May 2016 and June 2017, including issuances of common stock or securities that are convertible into, or exercisable for, our common stock, to fund the growth of our business, our stockholders could experience significant dilution. In addition, securities issued in connection with future financing activities or potential acquisitions may have rights and preferences senior to the rights and preferences of our common stock. We have adopted an equity incentive plan pursuant to which equity awards may be granted to eligible employees (including our executive officers), directors and consultants, if our board of directors determines that it is in the best interest of the Company and our stockholders to do so. The issuance of shares of our common stock upon the exercise of any such equity awards may result in dilution to our stockholders and adversely affect our earnings.

***If securities or industry analysts do not publish, or cease publishing, research or reports about us, our business or our market, or if they change their recommendations regarding our stock adversely, our stock price and trading volume could decline.***

The trading market for our common stock may be influenced by whether industry or securities analysts publish research and reports about us, our business, our market or our competitors and if any analysts do publish such reports, what they publish in those reports. We may not obtain analyst coverage in the future. Any analysts that do cover us may make adverse recommendations regarding our stock, adversely change their recommendations from time to time, and/or provide more favorable relative recommendations about our competitors. If any analyst who may cover us in the future were to cease coverage of our company or fail to regularly publish reports on us, or if analysts fail to cover us or publish reports about us at all, we could lose, or never gain, visibility in the financial markets, which in turn could cause our stock price or trading volume to decline.

***If we fail to maintain an effective system of internal controls, we may not be able to accurately report our financial results or prevent fraud and our stock price may be adversely affected.***

Effective internal controls are necessary for us to provide reliable financial reports and effectively prevent fraud. If we cannot provide reliable financial reports or prevent fraud, our operating results could be harmed. Any system of internal control over financial reporting, regardless of how well designed, operated and evaluated, can provide only reasonable, not absolute, assurance that its objectives will be met.  We have experienced material weaknesses in the past and we cannot be certain that in the future material weaknesses or significant deficiencies will not exist or otherwise be discovered. Any weaknesses or deficiencies could result in misstatements of our results of operations, restatements of our consolidated financial statements, inability to timely file periodic reports, a decline in our stock price and investor confidence, or other material effects on our business, reputation, results of operations, financial condition or liquidity.

***Anti-takeover provisions in our charter and bylaws may prevent or frustrate attempts by stockholders to change the board of directors or current management and could make a third-party acquisition of our company difficult.***

Our certificate of incorporation and bylaws contain provisions that may discourage, delay or prevent a merger, acquisition or other change in control that stockholders may consider favorable, including transactions in which stockholders might otherwise receive a premium for their shares.  These provisions include the following:

- our certificate of incorporation authorizes our board of directors, without the approval of our stockholders, to establish classes or series of preferred stock with such rights, privileges and preferences as our board determines (i.e., "blank check" preferred stock), including rights that may be senior to those of our common stockholders, which could be used to discourage an unsolicited acquisition proposal;

- our certificate of incorporation provides for a classified board of directors with staggered terms, which could delay or otherwise make it more difficult for an outsider to gain control of our board of directors;

- our certificate of incorporation requires supermajority voting to approve certain amendments to our certificate of incorporation and bylaws;

- our certificate of incorporation prohibits stockholders from acting by written consent or calling a special meeting, which could make it more difficult for stockholders to wage a proxy contest for control of our board of directors or to vote to repeal any of the antitakeover provisions contained in our certificate of incorporation and bylaws;

- our certificate of incorporation provides that directors may only be removed for cause by a supermajority vote of our stockholders; and

- our bylaws contain advance notice provisions with respect to nominees for election to our board of directors.

***If we issue shares of preferred stock, investments in common stock could be diluted or subordinated to the rights of the holders of preferred stock.***

Our board of directors is authorized by our Certificate of Incorporation to establish classes or series of preferred stock and fix the designation, powers, preferences and rights of the shares of each such class or series without any further vote or action by our stockholders. Any shares of preferred stock so issued could have priority over our common stock with respect to dividend or liquidation rights. For instance, we issued 153,000 shares of Series A-1 Preferred Stock in June 2017. Under the terms of such Series A-1 Preferred Stock, with respect to payment of dividends and distribution of assets upon liquidation, dissolution or winding up of the Company, whether voluntary or involuntary, the shares of the Series A-1 Preferred Stock shall rank senior to all other classes of securities of the Company. Further, the issuance of shares of preferred stock, or the issuance of rights to purchase such shares, could be used to discourage an unsolicited acquisition proposal. For instance, the issuance of a series of preferred stock might impede a business combination by including class voting rights that would enable a holder to block such a transaction. In addition, under certain circumstances, the issuance of preferred stock could adversely affect the voting power of holders of our common stock. Although our board of directors is required to make any determination to issue preferred stock based on its judgment as to the best interests of our stockholders, our board of directors could act in a manner that would discourage an acquisition attempt or other transaction that some, or a majority, of our stockholders might believe to be in their best interests or in which such stockholders might receive a premium for their stock over the then-market price of such stock. Presently, our board of directors does not intend to seek stockholder approval prior to the issuance of currently authorized preferred stock, unless otherwise required by law or applicable stock exchange rules. Although we have no plans to issue any additional shares of preferred stock or to adopt any new series, preferences or other classification of preferred stock, any such action by our board of directors or issuance of preferred stock by us could dilute your investment in our common stock and warrants or subordinate your holdings to such shares of preferred stock.

## ITEM 1B. UNRESOLVED STAFF COMMENTS.

None

## ITEM 2. PROPERTIES.

Our headquarters are located at 2000 University Avenue, Suite 600, East Palo Alto, CA 94303, which we lease pursuant to a sublease entered into in January 2015. Finjan, Finjan Mobile and CyberRisk are based at the headquarters location. The initial term of the sublease terminates in September 2018. In December 2016, the Company entered into a monthly lease agreement in Tel Aviv, Israel, where it is conducting operations in support of CyberRisk. The Company also has office leases in New York, NY, which is subleased for the remainder of the lease term.

We believe that the facilities described above are suitable and adequate for our present purposes and needs in the near future.

## ITEM 3. LEGAL PROCEEDINGS

See "NOTE 8 - Litigation, Claims, and Assessments" to our Consolidated Financial Statements.

## ITEM 4. MINE SAFETY DISCLOSURES.

None

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

### Market Information

Our common stock has been trading on the NASDAQ under the symbol "FNJN" since May 12, 2014. The following table sets forth the high and low sales prices for our common stock, as reported on the NASDAQ, for each of the periods listed below.

No dividends were declared or paid.

| | High | | Low | |
|---|---|---|---|---|
| **Year Ending December 31, 2017** | | | | |
| Fourth Quarter | $ | 2.71 | $ | 1.66 |
| Third Quarter | $ | 3.50 | $ | 2.06 |
| Second Quarter | $ | 4.06 | $ | 1.68 |
| First Quarter | $ | 1.78 | $ | 1.21 |
| **Year Ending December 31, 2016** | | | | |
| Fourth Quarter | $ | 1.90 | $ | 1.00 |
| Third Quarter | $ | 2.24 | $ | 1.28 |
| Second Quarter | $ | 2.35 | $ | 0.87 |
| First Quarter | $ | 1.26 | $ | 0.81 |
| **Year Ended December 31, 2015** | | | | |
| Fourth Quarter | $ | 1.93 | $ | 1.14 |
| Third Quarter | $ | 2.80 | $ | 1.28 |
| Second Quarter | $ | 2.22 | $ | 1.16 |
| First Quarter | $ | 3.25 | $ | 1.76 |

**Holders**

As of March 7, 2018, there were approximately 36 holders of record of our common stock. As many of our shares of common stock are held by brokers and other institutions on behalf of stockholders, we are unable to estimate the total number of stockholders represented by these record holders.

**Dividend Policy**

We have not paid any cash dividends on our common stock to date. The payment of dividends in the future will be contingent upon our revenues and earnings, if any, capital requirements and general financial condition, and will be within the discretion of our then-existing board of directors.

**Recent Sales of Unregistered Securities**

Not applicable.

**Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

Not applicable.

**ITEM 6. SELECTED FINANCIAL DATA.**

We are a smaller reporting company as defined by Rule 12b-2 of the Securities Exchange Act of 1934 and are not required to provide the information under this item.

Table of Contents

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and related notes appearing elsewhere in this Annual Report on Form 10-K. In addition to historical information, this discussion and analysis contains forward-looking statements that involve risks, uncertainties and assumptions. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of certain factors, including but not limited to, those set forth under "Risk Factors" and elsewhere in this Annual Report on Form 10-K. See Cautionary Statement Regarding Forward-Looking Statements."*

Our Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is organized as follows:

***Overview.*** A discussion of our business and overall analysis of financial and other highlights in order to provide context for the remainder of MD&A.

***Significant Developments***. We highlight significant developments in our business and operations during the past year.

***Industry Trends & Outlook***. A discussion of notable industry trends and how such trends might affect our business and operations as well as an outlook on developments we see on the horizon.

***Comparability to Future Results.*** We discuss areas of our historical business and operations that may not be indicative of future results.

***Results of Operations.*** A discussion of the nature and trends in our financial results and an analysis of our financial results comparing fiscal 2017 to 2016, and 2016 to 2015.

***Liquidity and Capital Resources.*** An analysis of changes in our balance sheets and cash flows, and a discussion of our financial condition and our ability to meet cash needs.

***Contractual Obligations.*** An overview of our contractual obligations outstanding as of December 31, 2017, including expected payment schedules.

***Critical Accounting Policies and Estimates.*** A discussion of our accounting policies that require critical estimates, assumptions, and judgments.

***Recent Accounting Pronouncements.*** A discussion of expected impacts of impending accounting changes on financial information to be reported in the future.

**Overview**

We operate a cybersecurity business, focused on licensing and enforcement, developing mobile security applications, providing advisory services, and investing in emerging cybersecurity technologies and intellectual property.

We operate our cybersecurity business through subsidiaries including, Finjan, Finjan Blue, Finjan Mobile and CybeRisk.

Through Finjan, we own a portfolio of patents, related to software and hardware technologies that proactively detect malicious code and thereby protect end users from identity and data theft, spyware, malware, phishing, trojans and other web and network threats. Founded in 1997, Finjan developed and patented technologies that are capable of detecting previously unknown and emerging threats on a real-time, behavior-based, basis, in contrast to signature-based methods of intercepting only known threats to computers. The older signature-based methods, were standard in the web and network security industry during the 1990s. As the web and endpoint security industries - known as cybersecurity - have transitioned to behavior-based detection of malicious code, we believe that our patented technologies continue to be widely used by third parties in a number of market segments. We intend to maximize the economic benefits of our technologies through further licensing and to broaden our technologies and patent holdings through acquisitions and strategic partnerships.

As a core element of our continued patent licensing and enforcement business, our management team, having expertise with technology and IP monetization, monitors a number of markets and assesses and observes the adoption of our patented technologies in these markets.  Our management team, in conjunction with outside legal, technical, and financial experts concludes on a case-by-case basis whether or not they believe that Finjan's patented technologies are being used.  Based on these observations, we continue to believe our patented technologies are highly relevant in specific cybersecurity technology areas including, but not limited to endpoint/cloud software, web gateway/internet infrastructure, networking equipment markets, and mobile security. From that basis, the Company pursues unlicensed entities through licensing, assertion of claims or both to preserve the value of our portfolio in general. This also reinforces the value to existing licensees of the Finjan patent portfolio.

Since the sale of its hardware and software operations in 2009, Finjan's primary source of income and related cash flows has been the enforcement of its patent rights against unauthorized use and to a lesser extent, income derived from intellectual property licenses granted to third parties for the use of patented technologies that are owned by Finjan.

Finjan Blue was founded to support our development and licensing efforts of the IBM Security Patents obtained by Finjan Blue through the Patent Assignment and Support Agreement with IBM. The Agreement, the terms of which are confidential, includes pathways for Finjan and IBM to consider development efforts in the future and provides for the sharing of pertinent institutional knowledge and resources by IBM to Finjan Blue.

Finjan Mobile was founded to ensure that consumers data as well as their mobile devices are protected against spies, phishing and malware attacks. Given the uptrend in mobile device usage coupled with the amount of transient corporate data, the average mobile user presents and represents higher risks of data loss through hacking. The consumer mobile device has become so convenient that consumers often forget about online security and download apps and blindly agree to terms of service, purchase products, pay bills, connect to free Wi-Fi, and not think twice about personal data and photos stored on their devices. As such, in June of 2015, the Company returned to the research and development world with the creation of security products for mobile devices.

CybeRisk was founded to deliver global advanced cyber risk and cyber security advisory services. We continue to analyze how best to leverage our investment in CybeRisk and our cybersecurity advisory services business.

As of December 31, 2017, we had 10 employees. We intend to hire or engage additional full-time professionals, employees, and/or consultants in alignment with our growth strategy. Although the market is highly competitive for attracting and retaining highly qualified professionals in our industry, we continue our endeavor to find such candidates for our Company. Our management team and additional personnel that we may hire in the future will be primarily responsible for executing and implementing our licensing and enforcement strategy, including analyzing licensing and enforcement opportunities, making tactical decisions related to our strategy, identifying new applications for our existing cybersecurity technologies and pursuing opportunities to invest in new technologies through strategic partnerships and acquisitions.

Table of Contents

**Significant Developments During 2017 and early 2018**

*Retired Series A Preferred Stock*

During 2017, the Company redeemed $13.8 million or 83,502 shares of the Company's Series A Preferred stock; $8.4 million reduced the original recorded value of the Series A Preferred stock and $5.4 million reduced the accreted value. As a result, as of April 3, 2017 the Company retired all shares of Series A Preferred Stock issued in its $10.2 million Series A Preferred Stock financing.

*Equity Raise of $15.3 Million in Preferred Stock*

In June 2017 Finjan Holdings entered into a Redeemable Preferred Stock Purchase Agreement with Soryn HLDR Vehicle II LLC, pursuant to which the Company agreed to issue to Soryn HLDR in a private placement an aggregate of 153,000 shares of the Company's Series A-1 Preferred Stock at a purchase price of $100.00 per share, for aggregate proceeds of $15.3 million.

The Company also agreed to issue to Soryn HLDR a fully vested common stock warrant to purchase 2,355,506 shares of common stock, at an exercise price of $3.18 per share, with a term of three years.

In January 2018, the Company redeemed $6.2 million or 48,076 shares of the Company's Series A-1 Preferred stock; $4.8 million reduced the original recorded value of the Series A-1 Preferred stock and $1.4 million reduced the accreted value.

*Common Share Raise*

In June 2017, the Company entered into an underwriting agreement (the "Underwriting Agreement") with B. Riley & Co., LLC (the "Underwriter") pursuant to which the Company agreed to issue and sell an aggregate of 3,600,000 shares of its common stock, par value $0.0001 per share (the "Common Stock"), at a public offering price of $3.15 per share gross proceeds, with net proceeds to the Company of $2.90 per share, for a total of $10.4 million. Under the terms of the Underwriting Agreement, the Company also granted the Underwriters a 30-day over-allotment option to purchase an additional 540,000 shares of Common Stock, which was exercised July 21, 2017. The Company received $1.6 million net proceeds from the exercise of the over-allotment.

*Patent Assignment and support Agreement*

In August 2017, the Company and Finjan Blue entered into a Patent Assignment and Support Agreement (the "Patent Assignment Agreement") with IBM effective August 24, 2017. Pursuant to the Patent Assignment Agreement, Finjan Blue acquired select IBM patents in the security sector (the "IBM Security Patents") in exchange for $8.5 million cash, payable as follows: (i) $2.0 million upon execution of the Patent Assignment Agreement and (ii) $6.5 million over the subsequent four years. The Company's initial $2.0 million payment was made on August 24, 2017. For the period ended December 31, 2017, the Company recorded $0.7 million in amortization expense of these intangible assets.

*Finjan Mobile Launched Gen4 Mobile Secure Browser, VitalSecurity™*

In September 2017 Finjan Mobile, Inc. launched Gen4 Mobile Secure Browser, VitalSecurity, a fully functional browser that offers protection for both mobile and tablet devices. Using VitalSecurity, users can safely browse the internet and be warned that sites might contain malicious or suspicious content.

For the IOS and Android operating systems, Finjan Mobile VitalSecurity Browser educates users by identifying potential vulnerabilities on websites. The app can identify URL's that have been flagged by industry leading cyber companies and protect you from viruses and malicious content.

The Gen4 mobile secure browser is completely redesigned and is built from Finjan's patented technology.

Type in a search term and Finjan Mobile VitalSecurity will scan search results and present informative notifications - Safe, Caution or Danger. If a site is considered dangerous, you can choose to click and go right to the website or learn about potential privacy and phishing vulnerabilities. Educating users on privacy and potential vulnerabilities is our main objective.

Table of Contents

*New Patent*

In January 2017, our subsidiary, Finjan Mobile received its first US patent, U.S. Patent No. 9,554,279. The patent relates to authorizing a mobile device to access a secure server based in part on whether the mobile device is currently located within an authorized geographical area.

*JVP Capital Call*

In February 2018, the Company made a payment to the JVP fund of $0.5 million, reducing the commitment outstanding to $2.2 million.

*Settlement with Symantec*

In March 2018, the Company, including its wholly-owned subsidiary, Finjan, Inc. ("Finjan" and collectively with the Company and its affiliated companies, the "Finjan Parties"), announced that Finjan Parties and Symantec Corporation ("Symantec") and its subsidiary, Blue Coat Systems, LLC ("Blue Coat") (collectively, the "Symantec Parties") entered into a Confidential Patent License and Settlement Agreement (the "License and Settlement Agreement") effective as of February 28, 2018 ("Effective Date"). Specifically, the Parties have resolved and settled all claims between them. As part of the settlement, the Symantec Parties will obtain a license to, among others, the Finjan patents and pay the Finjan Parties $65.0 million in cash within twenty (20) days of the Effective Date of the License and Settlement Agreement. Further, if Symantec acquires certain entities within four years from the Effective Date, the Symantec Parties will pay additional license fees of up to $45.0 million to the Finjan Parties, unless otherwise mutually agreed to by the Company and Symantec. The remaining terms of the License and Settlement Agreement are confidential.

*Inter Partes Reviews*

See "NOTE 8 - Litigation, Claims, and Assessments" to our Consolidated Financial Statements.

*Patent Litigations*

See "NOTE 8 - Litigation, Claims, and Assessments" to our Consolidated Financial Statements.

**Industry Trends and Outlook**

We believe cybersecurity will be a very active sector in 2018. Cybersecurity is not just another technology but a critical business issue that intersects government, corporations and individual citizens. We have recently seen a number of devastatingly successful cybersecurity breaches targeting high profile government offices and corporations. The full extent of the cost and damage associated with these attacks may not be known for some time. Nonetheless, these attacks are expected to continue, along with their associated and sometimes unprecedented costs. In many cases, it is not just the government or corporation that suffers losses or damages but their clients and customers, who can also fall victim by the breach of their personal and otherwise confidential data. These issues have forced both government and corporations to take a serious look at their vulnerabilities, which will lead to increased spending on cybersecurity infrastructure, including hardware and software, as well as cybersecurity consulting services.

Given our 20-year history in the cybersecurity market we have had the benefit of actively participating in the progression on how technology has moved to meet the new threats and demands. We believe this puts us in a unique position to make observations and determine the best course of action in order to make investments in new developing technologies. There is still a limited appreciation for how much personal data is being pushed out over the internet for anyone to capture and unlike desktops and laptop computers, mobile devices do not have the same kind of access to security. We believe this represents a unique opportunity for Finjan to develop products for consumer mobile devices that were once only available to our enterprise customers. As such, we are building upon our current patented technology and migrating it into the mobile platform so consumers can have greater control of their security and personal information.

We believe that there are some proponents of patent law reform, largely made up of an individual or coalitions of technology corporations that continue to seek statutory limitations on how companies can enforce their patents. In an effort to ensure fair and balanced protections for all good faith patent owners, our executives have dedicated time and resources to actively educate our lawmakers and existing and prospective stakeholders on how certain proposed reforms could harm individual inventors, startups, small companies, the licensing industry and therefore, U.S. innovation and the economy as a whole.

Further, since the enactment of the Leahy-Smith America Invents Act ("AIA") on September 16, 2011, several aspects of the patent law have been interpreted by the courts, including what constitutes patentable subject matter, inducement of infringement, and

Table of Contents

(attorney) fee-shifting to the non-prevailing party in the context of litigation, among other issues. Moreover, under AIA, patents previously granted by the USPTO may be reviewed through post-patent grant proceedings such as reexamination or IPR. It is becoming a trend, if not a practice, for accused infringers to petition for reexaminations or IPRs of asserted patents as these proceedings may give the petitioner "two bites at the apple." The outcome of the proceedings can range from decisions favorable to the patent holder, favorable to both parties, or favorable to the petitioner. If the outcome is the latter, the value of the challenged patent can be materially reduced or extinguished. Thus, patent rights, including enforcement of such rights against unauthorized use is inherently subject to uncertainties.

## Comparability to Future Results

We have set forth below selected factors that we believe have had, or can be expected to have, a significant effect on the comparability of our recent or future results. In addition to the factors described below, please see Item 1A. "Risk Factors" for additional factors that may affect our operating results.

### *Fluctuations of Income, Expenses and Cash Flows Related to Licensing and Enforcement*

Our licenses and judgments may not be recurring and are not necessarily indicative of the income or cash flows that we expect to generate in the future from our existing technology portfolio or otherwise. We expect income, expenses and cash flows related to patent enforcement to be unpredictable and to fluctuate significantly from period to period. A number of factors, many of which are beyond our control, may affect the timing and amount of our income and cash flows related to patent licensing and enforcement actions, including, but not limited to, trial dates, the strength of our claims and likelihood of achieving an acceptable license on settlement, the timing and nature of any appeals and our ability to collect on any favorable judgments. Significant fluctuations in our income and cash flows may make our business difficult to manage and adversely affect our business and operating results. We do not recognize income from our licensing and enforcement actions until the terms are fixed and determinable or litigation is finalized (whether resolved at trial or in a settlement).

Our expenses, principally with respect to litigation costs, may also vary significantly from period to period depending upon a number of factors, including, but not limited to, whether fees of outside legal counsel are paid on an hourly, contingent or other basis, the timing of depositions, discovery and other elements of litigation, costs of expert witnesses and other consultants, and other costs incurred in support of enforcement actions.

As a result of the factors described above and other known and unknown risks affecting our business, our historical operating performance may not be indicative of our future results.

### *Stock-Based and Other Executive Compensation*

Our Board of Directors has adopted the Finjan Holdings Amended and Restated 2014 Incentive Compensation Plan ("2014 Restated Plan"), which our shareholders approved at our 2014 annual meeting of stockholders on July 10, 2014, pursuant to which 2,196,836 shares of common stock are authorized for issuance and on June 21, 2017, at our 2017 annual meeting of stockholders, the Company's shareholders approved (i) an increase of 1,000,000 shares to the Finjan Holdings, Inc. Restated 2014 Plan and (ii) the addition of an "evergreen" feature which provides for the annual replenishment of shares to the Restated 2014 Plan share reserve without stockholder approval (equal to 5.0% of our outstanding shares of Common Stock as of the end of our immediately preceding fiscal year). A total of 438,712 restricted stock units and 2,341,340 options remain outstanding as of December 31, 2017, under the Restated 2014 Plan. We expect that future equity-based awards will continue to be made under the Restated 2014 Plan to our directors, officers and other employees and consultants. As a result, to the extent relevant, we may incur non-cash, stock-based compensation expenses in future periods that may not be comparable to past periods.

We expect to increase the number of employees and consultants to help execute our strategy in the cybersecurity business and support our public company functions. Accordingly, we will continue to incur compensation expenses in future periods that we did not incur during the historical periods presented in our financial statements.

30

Table of Contents

**Results of Operations**

We operate a cybersecurity business, focused on licensing and enforcement, providing advisory services, developing mobile security applications, and investing in emerging cybersecurity technologies and intellectual property. The following table summarizes our results of operations for the periods presented and as a percentage of our total revenue for those periods based on our consolidated statement of operations data. The year to year comparison of results of operations is not necessarily indicative of results of operations for future periods.

|  | For the Years Ended December 31, | | | | | |
|  | 2017 | | 2016 | | 2015 | |
|  | Amount | % of Revenue | Amount | % of Revenue | Amount | % of Revenue |
|  | (In thousands, except percentages) | | | | | |
| Revenues | $ 50,484 | 100 % | $ 18,387 | 100% | $ 4,687 | 100 % |
| Cost of revenues | 6,008 | 12 % | 3,037 | 17% | 814 | 17 % |
| Gross profit | 44,476 | 88 % | 15,350 | 83% | 3,873 | 83 % |
| Operating expenses: | | | | | | |
|   Sales, general and administrative [1] | 28,596 | 57 % | 14,427 | 78% | 17,362 | 371 % |
|   Research and development | 1,473 | 3 % | 570 | 3% | 391 | 8 % |
| Total operating expenses | 30,069 | 60 % | 14,997 | 82% | 17,753 | 379 % |
| Other income | 2,244 | 4 % | — | — | 1,283 | 27 % |
| Income (loss) before income taxes | 16,651 | 33 % | 353 | 2% | (12,597) | (269)% |
| Income tax provision (benefit) | (6,160) | (12)% | 3 | —% | 5 | — % |
| **Net income (loss)** | $ 22,811 | 45 % | $ 350 | 2% | $ (12,602) | (269)% |
| [1] Includes stock based compensation | $ 843 | 2 % | $ 872 | 5% | $ 766 | 16 % |

31

*Year ended December 31, 2017 compared with the year ended December 31, 2016:*

|  | For the Years Ended December 31, | | | |
|  | 2017 | 2016 | Change | % Change |
| --- | --- | --- | --- | --- |
|  | (In thousands, except percentages) | | | |
| Revenues | $  50,484 | $  18,387 | $  32,097 | 175% |
| Cost of revenues | 6,008 | 3,037 | 2,971 | 98% |
| Gross profit | 44,476 | 15,350 | 29,126 | 190% |
| Gross margin | 88% | 83% |  |  |
| Operating expenses: |  |  |  |  |
| Sales, general and administrative | 28,596 | 14,427 | 14,169 | 98% |
| Research and development | 1,473 | 570 | 903 | 158% |
| Total operating expenses | 30,069 | 14,997 | 15,072 | 101% |
| Other income | 2,244 | — | 2,244 | 100% |
| Income before income taxes | 16,651 | 353 | 16,298 | NM |
| Income tax provision (benefit) | (6,160) | 3 | (6,163) | NM |
| Net income | $  22,811 | $  350 | $  22,461 | NM |

Revenue in 2017 is derived from multiple license agreements that we entered into with third-parties following negotiations pursuant to our patent licensing and enforcement program. The revenue increase is primarily due to licensing revenues, as further described in "Item 1. Business" - "Licensing and Enforcement - Current Activities, Post 2013".

Cost of revenues includes contingent legal fees directly associated with our licensing and enforcement programs. Cost of revenues increased largely in proportion to increased revenues.

Gross profit as a percentage of revenues increased in 2017 in relation to the increase in revenues.

Operating expenses consists of sales and marketing, general and administrative, and research and development. Sales, general and administrative expenses ("SG&A") consisted primarily of legal fees incurred in operations and employee headcount related expenses. These comprise approximately 60% of total SG&A expense. Litigation expenses increased $6.0 million to $12.3 million in 2017 compared to 2016 and are primarily due to the timing of various outstanding litigation actions. See "Item 3. Legal Proceedings". Employee headcount related expenses increased $1.0 million to $4.6 million in 2017 compared to 2016. In addition, in 2017 we signed a patent license agreement with FireEye for $5.0 million and increased efforts focusing on the growth of the business. The balance of the increase includes other SG&A expenses including consulting, other professional fees, facilities and other administrative fees and expenses.

Operating expenses from the Company's Finjan Mobile security business increased by $1.0 million to $1.5 million in 2017 compared to 2016, as we added resources to grow this market.

Other income is the change in fair value of the warrant liability.

We recognized a reduction in the valuation allowance based on the anticipated benefit of $6.2 million from utilizing previous net operating losses.

32

Table of Contents

*Year ended December 31, 2016 compared with the year ended December 31, 2015:*

| | For the Years Ended December 31, | | | |
| | 2016 | 2015 | Change | % Change |
|---|---|---|---|---|
| | (In thousands, except percentages) | | | |
| Revenues | $ 18,387 | $ 4,687 | $ 13,700 | 292 % |
| Cost of revenues | 3,037 | 814 | 2,223 | 273 % |
| Gross profit | 15,350 | 3,873 | 11,477 | 296 % |
| Gross margin | 83% | 83% | | |
| Operating expenses: | | | | |
| Sales, general and administrative | 14,427 | 17,362 | (2,935) | (17)% |
| Research and development | 570 | 391 | 179 | 46 % |
| Total operating expenses | 14,997 | 17,753 | (2,756) | (16)% |
| Other income | — | 1,283 | (1,283) | (100)% |
| Income before income taxes | 353 | (12,597) | 12,950 | (103)% |
| Income tax provision | 3 | 5 | (2) | (40)% |
| Net income (loss) | $ 350 | $ (12,602) | $ 12,952 | (103)% |

Revenue in 2016 was derived from multiple license agreements that we entered into with third-parties following negotiations pursuant to our patent licensing and enforcement program. In addition, our consulting business started in 2015. Our revenue increase is primarily due to licensing revenues, as further described in "Item 1. Business" - "Licensing and Enforcement - Current Activities, Post 2013".

Cost of revenues includes legal fees directly associated with our licensing and enforcement program. Cost of revenues increased largely in proportion to increased revenues.

Gross profit as a percentage of revenues remained consistent in 2016 compared to 2015 at approximately 83%, with gross margin growing 296%, in relation to the increase in revenues between years, largely due to the timing of legal costs directly associated with enforcement of our intellectual property.

Operating expenses consists of sales and marketing, general and administrative, and research and development. Sales, general and administrative expenses ("SG&A") consisted primarily of legal fees incurred in pursuing our revenues and employee headcount related expenses. These comprise approximately 70% of total SG&A expense. Litigation expenses decreased $1.7 million to $6.3 million in 2016 compared to 2015 and is primarily due to the timing of various outstanding actions. See "Item 3. Legal Proceedings". Employee headcount related expenses remained consistent year over at approximately $4.5 million. In addition, SG&A expenses include consulting and other professional fees, facilities and other administrative expenses and fees; decreased by over $1.0 million, primarily due to the cost of relocating to California in 2015.

Other income of $1.3 million for the year ended December 31, 2015 was primarily from our gain on investing activities through a liquidity event in a cybertechnology fund.

**Liquidity and Capital Resources**

As of December 31, 2017, we had approximately $41.2 million of cash and cash equivalents, an increase of approximately $27.5 million from $13.7 million in 2016.

On December 22, 2017, the 2017 Tax Cut and Jobs Act (the Act) was enacted into law and the new legislation contains several key tax provisions, including a reduction of the corporate income tax rate to 21% effective January 1, 2018, among others. We are required to recognize the effect of the tax law changes in the period of enactment, such as re-measuring our U.S. deferred tax assets and liabilities at a 21% rate as well as reassessing the net realizability of our deferred tax assets and liabilities. The re-measurement of our deferred tax asset resulted in a reduction of approximately $2.8 million.

Subsequent to December 31, 2017, the Company redeemed $6.2 million  or 48,076 shares of the Series A-1 Preferred stock. This redemption is related to the license fee received in late December 2017.

In addition, on November 21, 2013, we made a $5 million commitment to invest in an innovation fund through JVP to invest in early-stage cyber technology companies, of which $2.7 million of the commitment remains unfunded. The fund can make a call on our remaining commitment at any time.  We expect to make payments to honor this commitment if and when capital calls are made by the fund.

Subsequent to December 31, 2017, the Company made a payment to the JVP fund of $0.5 million pursuant to a capital call, reducing the commitment outstanding to $2.2 million.

| | December 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| | (in thousands) | |
| Cash & cash equivalents | $ 41,169 | $ 13,678 |

*Cash flows for the year ended December 31, 2017, 2016 and 2015*

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| | (in thousands) | | |
| Net cash provided by (used in) operating activities | $ 16,586 | $ 1,328 | $ (11,259) |
| Net cash used in investing activities | $ (1,873) | $ (559) | $ (199) |
| Net cash provided by financing activities | $ 12,778 | $ 6,808 | $ 54 |

***Operating Activities***: Net cash provided by operating activities was $16.6 million for the year ended December 31, 2017 and is comprised of $22.8 million in net income, $0.8 million in stock-based compensation, $0.8 million in depreciation and amortization, $0.6 million change in net operating assets and liabilities, offset by $2.2 million change in the warrant liability and a change in deferred income taxes of $6.2 million.

Net cash provided by operating activities was $1.3 million for the year ended December 31, 2016 and is comprised of $0.4 million in net income, $0.9 million in stock-based compensation, $0.1 million in depreciation, offset by $0.1 million change in net operating assets and liabilities.

Net cash used in operating activities was $11.3 million for the year ended December 31, 2015. This is comprised of a net loss of $12.6 million and a $1.3 million return on investment, offset by $0.8 million in stock-based compensation and $1.8 million change in net operating assets and liabilities.

34

Table of Contents

*Investing Activities*: During the year ended December 31, 2017, cash used in investing activities of $2.0 million was related to the purchase of assets under the Patent Purchase Agreement, offset by $0.1 million in cash distribution received from our investment in the JVP fund.

During the year ended December 31, 2016, cash used by investing activities primarily related to the $0.6 million cash call by JVP.

During the year ended December 31, 2015, cash used by investing activities primarily related to the $0.8 million cash call by JVP and $0.2 million related to the purchase of property, plant and equipment, offset by proceeds of $0.8 million in cash from the exit of one of JVP's portfolio companies.

*Financing Activities*: During the year ended December 31, 2017, net cash provided by financing activities of $12.8 million was primarily from the Series A-1 Preferred Stock Financing totaling $14.4 million and a Common Share offering for $12.0 million, offset by redeeming and retiring Series A Preferred Stock Financing of $13.8 million.

During the year ended December 31, 2016, net cash provided by financing activities was $6.8 million. Cash provided by financing activities of $6.8 million during 2016 primarily resulted from the Series A Preferred Stock Financing in May 2016 of $6.7 million, net comprised of the initial financing of $9.5 million, net, offset by subsequent redemptions of $2.8 million.

During the year ended December 31, 2015, net cash provided by financing activities was deemed immaterial.

**Contractual Obligations**

The following table summarizes, as of December 31, 2017, the Company's contractual obligations over the next four years for the property leases entered into during the years ended 2015, 2014, and 2013, the Company's investment in JVP, the VPN arrangement with Avira and the asset purchase from IBM:

| | Payments due by Period (In thousands) | | |
|---|---|---|---|
| **Contractual Obligations** | Less Than 1 Year | 2-4 Years | Total |
| Operating Lease Obligations: | $          459 | $          — | $          459 |
| | | | |
| Other Long-Term Liabilities: | | | |
| Capital Commitments not Called | 750 | 1,950 | 2,700 |
| Finjan Mobile future commitment | 1,300 | 1,950 | 3,250 |
| Finjan Blue future commitment | 1,000 | 5,500 | 6,500 |
| | | | |
| **Total** | $      3,509 | $      9,400 | $    12,909 |

**Critical Accounting Policies and Estimates**

The discussion and analysis of our financial condition and results of operations are based on our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States, or "U.S. GAAP." The preparation of these financial statements in accordance with U.S. GAAP requires us to make estimates, assumptions and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. On an on-going basis, we evaluate our estimates, assumptions and judgments, including those related to revenue recognition, bad debts, inventories, warranties and income taxes. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities and our revenue recognition. Actual results may differ from these estimates under different assumptions or conditions and the impact of such differences may be material to our consolidated financial statements.

Critical accounting policies are those policies that, in management's view, are most important in the portrayal of our financial condition and results of operations. The methods, estimates and judgments that we use in applying our accounting policies have a significant impact on the results that we report in our financial statements. These critical accounting policies require us to make difficult and subjective judgments, often as a result of the need to make estimates regarding matters that are inherently uncertain. Those critical accounting policies and estimates that require the most significant judgment are discussed further below. We consider

35

Table of Contents

our most critical accounting policies and estimates to be revenue recognition, gain on settlements, valuation of long lived assets, derivative liabilities, stock based compensation and accounting for business combinations-acquisition method accounting.

### Revenue Recognition

Revenue is recognized when persuasive evidence of an arrangement exists, delivery of the product or service has occurred and all obligations have been performed pursuant to the terms of the agreement, the sales price is fixed or determinable, and collectability is reasonably assured.

Depending on the complexity of the underlying revenue arrangement and related terms and conditions, significant judgments, assumptions and estimates may be required to determine when substantial delivery of contract elements has occurred, whether any significant ongoing obligations exist subsequent to contract execution, whether amounts due are collectible and the appropriate period or periods in which, or during which, the completion of the earnings process occurs. Depending on the magnitude of specific revenue arrangements, if different judgments, assumptions and estimates are made regarding contracts executed in any specific period, our periodic financial results may be materially affected.

Monetization of patented technologies by licensing through a negotiated agreement and/or enforcement of such patented technologies by a court of law is the main source of our income. Licenses achieved by ordinary business negotiations where a fair value of the license is determined by the Company is recognized as revenue. Due to our unique business, it is often necessary to file patent infringement litigation against users of our patented technologies as part of the licensing and enforcement activities. We may enter into certain settlements of patent infringement disputes once litigation commences. The amount of consideration received upon any settlement or judgment is allocated to each element of the settlement based on the fair value of each element using the residual method. Elements with fair values related to licensing agreement, royalty revenues, net of contingent legal fees, are recognized as revenue. When the Company is unable to determine the fair value of a license agreement or a settlement, the value of the license agreement or settlement is recognized as contra expense or gain on settlements in other income.

### Stock-based Compensation Expense

Stock-based compensation payments to employees, non-employee consultants and directors are recognized as expense in the statements of income. The compensation cost for all stock-based awards is measured at the grant date, based on the fair value of the award (determined using a Black-Scholes option pricing model for stock options and intrinsic value on the date of grant for non-vested restricted stock), and is recognized as an expense over the employee's requisite service period (generally the vesting period of the equity award). Determining the fair value of stock-based awards at the grant date requires significant estimates and judgments, including estimating the market price volatility of our common stock, future employee stock option exercise behavior and requisite service periods.

Stock-based compensation expense is recorded only for those awards expected to vest using an estimated pre-vesting forfeiture rate. As such, we are required to estimate pre-vesting option forfeitures at the time of grant and reflect the impact of estimated pre-vesting option forfeitures on compensation expense recognized. Estimates of pre-vesting forfeitures must be periodically revised in subsequent periods if actual forfeitures differ from those estimates. We consider several factors in connection with our estimate of pre-vesting forfeitures, including types of awards, employee class, and historical pre-vesting forfeiture data. The estimation of stock awards that will ultimately vest requires judgment, and to the extent that actual results differ from our estimates, such amounts will be recorded as cumulative adjustments in the period the estimates are revised. The Company granted options to a small number of employees and consultants.

### Off-Balance Sheet Arrangements

In connection with the investment in JVP, we have a commitment balance outstanding of approximately $2.7 million, which can be called at any time.

In connection with our Distribution Agreement with Avira, we have approximately $3.3 million outstanding, which is payable quarterly over the next three years, final payment due April 1, 2019.

### Recent Accounting Pronouncements

See "NOTE 2 - Summary of significant accounting policies, - Recently issued accounting pronouncements"

36

Table of Contents

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Our exposure to market risk for changes in interest rates relates primarily to our holdings of cash and cash equivalents. Our cash and cash equivalents as of December 31, 2017, totaled $41.2 million and consisted primarily of cash and money market funds with original maturities of three months or less from the date of purchase. Our primary exposure to market risk is interest income sensitivity, which is affected by changes in the general level of the interest rates in the United States. However, because of the short-term nature of the instruments in our portfolio, a sudden change in market interest rates of 10% would not be expected to have a material impact on our financial condition or results of operations. We do not have any foreign currency or other derivative financial instruments.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

The consolidated financial statements and supplementary data of the Company required by this Item are described in Item 15 of this Annual Report on Form 10-K and are presented beginning on page F-1.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

None.

**ITEM 9A. CONTROLS AND PROCEDURES.**

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this report. Based on our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective, as of December 31, 2017, to provide reasonable assurances that information required to be disclosed in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported accurately and within the time periods specified in the Securities and Exchange Commission rules and forms and accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

***Management's Annual Report on Internal Control over Financial Reporting***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control over financial reporting includes those policies and procedures that:

- • pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets

- • provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

- • provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management assessed the effectiveness of our internal control over financial reporting of operations as of December 31, 2017. In making this assessment, management used the criteria in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) ("COSO").  Based on this assessment, our management concluded that, as of December 31, 2017, our internal controls over financial reporting was effective.

Table of Contents

This Annual Report on Form 10-K does not include an audit or attestation report from our registered public accounting firm regarding our internal control over financial reporting. Our management's report was not subject to audit or attestation by our registered public accounting firm since we are not an accelerated filer or a large accelerated filer as defined in Rule 12b-2 under the Securities Exchange Act of 1934.

***Changes in Internal Control over Financial Reporting***

There were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the fourth quarter of the year ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## ITEM 9B. OTHER INFORMATION

None.

## PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information required by this item regarding directors, executive officers and corporate governance is hereby incorporated by reference to the material appearing in the Proxy Statement for the Annual Stockholders Meeting to be held in 2018 (the "Proxy Statement") under the caption "Directors, Management and Corporate Governance." The information required by this item regarding compliance with Section 16(a) of the Exchange Act, is hereby incorporated by reference to the material appearing in the Proxy Statement under the caption "Section 16(a) Beneficial Ownership Reporting Compliance." The information required by this Item 10 with respect to the availability of our code of ethics is provided in Item 1 of this Annual Report on Form 10-K. See "Item 1. Business — Corporate Information."

## ITEM 11. EXECUTIVE COMPENSATION

The information required by this item is hereby incorporated by reference to the material appearing in the Proxy Statement under the caption "Executive Compensation."

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information regarding security ownership of certain beneficial owners and management required by this item is hereby incorporated by reference to the material appearing in the Proxy Statement under the captions "Voting Securities of Certain Beneficial Owners and Management" and "Executive Compensation—Outstanding Equity Awards at Fiscal Year End."

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by this item is hereby incorporated by reference to the material appearing in the Proxy Statement under the captions "Certain Relationships and Related Transactions" and "Directors, Management and Corporate Governance —Director Independence."

## ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES

The information required by this item is hereby incorporated by reference to the material appearing in the Proxy Statement under the caption "Proposal 3 – Ratification of Appointment of Independent Registered Public Accounting Firm – Disclosure of Marcum LLP Fees for the Years Ended December 31, 2017, 2016 and 2015" and "- Pre-Approval Policies and Procedures."

**PART IV**

**ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.**

| Exhibit Number | Exhibit Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of the Company, effective July 10, 2014 (incorporated by reference to Exhibit 3.1 to our current report on Form 8-K filed July 11, 2014) |
| 3.2 | Certificate of Designation of Series A-1 Preferred Stock dated June 19, 2017 (incorporated by reference to Exhibit 3.1 to our current report on Form 8-K filed on June 20, 2017) |
| 3.3 | Amended and Restated Bylaws, adopted July 10, 2014 (incorporated by reference to Exhibit 3.1 to our current report on Form 8-K filed July 11, 2014) |
| 4.1 | Form of Warrant in favor of Soryn HLDR Vehicle II LLC (incorporated by reference to Exhibit 4.1 to our current report on Form 8-K filed on June 20, 2017) |
| 10.1 | Form of Registration Rights Agreement, dated as of June 3, 2013, by and between the Company and certain stockholders of the Company (incorporated by reference to Exhibit 10.3 to our current report on Form 8-K filed June 3, 2013) |
| 10.2 | Amended and Restated Employment Agreement, dated January 14, 2015, between Finjan Holdings, Inc. and Philip Hartstein (incorporated by reference to Exhibit 10.1 to our current report on Form 8-K filed January 16, 2015)# |
| 10.3 | Employment Agreement, dated as of July 5, 2013, by and between the Company and Philip Hartstein (incorporated by reference to Exhibit 10.1 to our current report on Form 8-K filed July 12, 2013)# |
| 10.4 | Amended and Restated Employment Agreement, dated November 11, 2014, between Finjan Holdings, Inc. and Michael Noonan (incorporated by reference to Exhibit 10.1 to our current report on Form 8-K filed November 12, 2014)# |
| 10.5 | Employment Agreement, dated January 19, 2014, between Finjan Holdings, Inc. and Julie Mar-Spinola (incorporated by reference to Exhibit 10.1 to our current report on Form 8-K filed March 31, 2015)# |
| 10.6 | Finjan Holdings, Inc. 2013 Global Share Option Plan (incorporated by reference to Exhibit 10.7 to our current report on Form 8-K filed June 3, 2013)# |
| 10.7 | Form of Option Award under the Finjan Holdings, Inc. 2013 Global Share Option Plan (incorporated by reference to Exhibit 10.8 to our annual report on Form 10-K filed March 14, 2014)# |
| 10.8 | Finjan Holdings, Inc. Amended and Restated 2014 Incentive Compensation Plan, dated July 10, 2014, as amended and restated June 21, 2017*# |
| 10.9 | Form of Finjan Holdings, Inc. 2014 Incentive Compensation Plan Restricted Stock Unit Agreement (incorporated by reference to Exhibit 10.2 to our quarterly report on Form 10-Q filed August 11, 2014)# |
| 10.10 | Form of Finjan Holdings, Inc. 2014 Incentive Compensation Plan Non-Qualified Stock Option Agreement (incorporated by reference to Exhibit 10.3 to our quarterly report on Form 10-Q filed August 11, 2014)# |
| 10.11 | Summary of Director Compensation (incorporated by reference to our Current Report on Form 8-K filed April 8, 2014)# |
| 10.12 | Finjan Holdings, Inc. Israeli Appendix to the 2014 Incentive Compensation Plan (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K filed June 26, 2015)# |
| 10.13 | Form of Israeli Option Award Agreement (incorporated by reference to Exhibit 10.2 to our Current Report on Form 8-K filed June 26, 2015)# |
| 10.14 | Sublease Agreement, dated January 7, 2015, between Finjan Holdings, Inc. and Tribune Media Company (incorporated by reference to Exhibit 10.1 to our current report on form 8-K filed February 25, 2015) |

| Exhibit Number | Exhibit Description |
| --- | --- |
| 10.15 | Series A-1 Preferred Stock Purchase Agreement, dated June 15, 2017, between Finjan Holdings, Inc. and Soryn HLDR Vehicle II LLC (incorporated by reference to Exhibit 10.1 to our current report on Form 8-K filed on June 20, 2017) |
| 21.1 | Subsidiaries of Finjan Holdings, Inc.* |
| 23.1 | Consent of Marcum LLP.* |
| 31.1 | Certification of Principal Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002* |
| 31.2 | Certification of Principal Financial Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002* |
| 32.1 | Certifications of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002*† |
| 32.2 | Certifications of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002*† |
| 101.INS | XBRL Instance Document*+ |
| 101.SCH | XBRL Taxonomy Extension Schema Document*+ |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document*+ |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document*+ |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document*+ |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document*+ |

| | |
| --- | --- |
| * | Filed herewith. |
| % | Confidential treatment has been obtained with respect to certain omitted portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission. |
| † | This certification is being furnished and shall not be deemed "filed" with the SEC for purposes of Section 18 of the Exchange Act, or otherwise subject to the liability of that section, and shall not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the registrant specifically incorporates it by reference. |
| + | Pursuant to Rule 406T of Regulation S-T, the Interactive Data Files in Exhibit 101 hereto are deemed not filed or part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act of 1933, as amended, are deemed not filed for purposes of Section 18 of the Securities and Exchange Act of 1934, as amended, and otherwise are not subject to liability under those sections. |
| # | Management contract or compensatory plan or arrangement. |

**ITEM 16. FORM 10-K SUMMARY.**

**None.**

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**FINJAN HOLDINGS, INC.**

| | | |
|---|---|---|
| Date:  March 14, 2018 | By: | /s/ Philip Hartstein |
| | | **Philip Hartstein** |
| | | *President & Chief Executive Officer* |
| | | *(Principal Executive Officer)* |

| | | |
|---|---|---|
| Date:  March 14, 2018 | By: | /s/ Michael Noonan |
| | | **Michael Noonan** |
| | | *Chief Financial Officer & Treasurer* |
| | | *(Principal Financial and Accounting Officer)* |

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below hereby constitutes and appoints Philip Hartstein and Michael Noonan, and each of them, jointly and severally, his attorneys-in-fact, each with the power of substitution, for him in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Name | Title | Date |
|---|:---:|:---:|
| /s/ Eric Benhamou<br>**Eric Benhamou** | **Director** | March 14, 2018 |
| /s/ Daniel Chinn<br>**Daniel Chinn** | **Chairman** | March 14, 2018 |
| /s/ Glenn Daniel<br>**Glenn Daniel** | **Director** | March 14, 2018 |
| /s/ Harry Kellogg<br>**Harry Kellogg** | **Director** | March 14, 2018 |
| /s/ Michael Southworth<br>**Michael Southworth** | **Director** | March 14, 2018 |
| /s/ Alex Rogers<br>**Alex Rogers** | **Director** | March 14, 2018 |
| /s/ Gary Moore<br>**Gary Moore** | **Director** | March 14, 2018 |
| /s/ Philip Hartstein<br>**Philip Hartstein** | **President & Chief Executive Officer**<br>(Principal Executive Officer) | March 14, 2018 |
| /s/ Michael Noonan<br>**Michael Noonan** | **Chief Financial Officer & Treasurer**<br>(Principal Financial and Accounting Officer) | March 14, 2018 |

41

**FINJAN HOLDINGS, INC.**
**CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets | F-3 |
| Consolidated Statements of Operations | F-4 |
| Consolidated Statements of Changes in Stockholders' Equity | F-5 |
| Consolidated Statements of Cash Flows | F-6 |
| Notes to Consolidated Financial Statements | F-8 |

F-1

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**To the Shareholders and Board of Directors of
Finjan Holdings, Inc.**

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Finjan Holdings, Inc. (the "Company") as of December 31, 2017, and 2016, the related consolidated statements of operations, changes in stockholders' equity and cash flows for each of the three years in the period ended December 31, 2017, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

Marcum LLP
/s/ Marcum LLP

We have served as the Company's auditor since 2012.

New York, NY
March 14, 2018

**FINJAN HOLDINGS, INC.**
**Consolidated Balance Sheets**
**(In thousands, except share and per share data)**

| | December 31, | | |
|---|---|---|---|
| | 2017 | | 2016 |
| **Assets** | | | |
| Current Assets: | | | |
| Cash and cash equivalents | $ | 41,169 | $ 13,678 |
| Accounts receivable | | 2,606 | 1,066 |
| Prepaid expenses and other current assets | | 765 | 292 |
| Total current assets | | 44,540 | 15,036 |
| Property and equipment, net | | 140 | 203 |
| Investments | | 2,618 | 2,745 |
| Intangible assets, net | | 7,748 | — |
| Other assets, non-current | | — | 321 |
| Deferred income taxes, non-current | | 6,201 | — |
| Total Assets | $ | 61,247 | $ 18,305 |
| | | | |
| **Liabilities and Stockholders' Equity** | | | |
| Current Liabilities: | | | |
| Accounts payable | $ | 4,646 | $ 1,858 |
| Accounts payable, related parties | | 112 | 88 |
| Accrued expenses | | 1,303 | 1,832 |
| Accrued income taxes | | 13 | 3 |
| Warrant liability | | 1,096 | — |
| Other liabilities, current | | 1,086 | 33 |
| Total current liabilities | | 8,256 | 3,814 |
| | | | |
| Other liabilities, non-current, patent purchase | | 5,500 | 119 |
| Total Liabilities | | 13,756 | 3,933 |
| | | | |
| Commitments and contingencies (Note 7) | | | |
| | | | |
| Redeemable Preferred Stock | | | |
| Series A Preferred stock - $0.0001 par value, no shares and 83,502 shares issued and outstanding at December 31, 2017 and 2016, respectively (Liquidation preference of $13,778 at December 31, 2016) | | — | 13,486 |
| Series A-1 Preferred stock - $0.0001 par value, 153,000 and no shares issued and outstanding at December 31, 2017 and 2016, respectively (Liquidation preference of $19,890 at December 31, 2017) | | 18,965 | — |
| Stockholders' Equity | | | |
| Preferred stock - $0.0001 par value; 10,000,000 shares authorized; no shares issued and outstanding (which excludes 153,000 and 83,502 shares of Redeemable Preferred Stock at December 31, 2017 and 2016, respectively) at December 31, 2017 and 2016 | | — | — |
| Common stock - $0.0001 par value; 80,000,000 shares authorized; 27,707,328 and 23,102,728 shares issued and outstanding at December 31, 2017 and 2016 | | 3 | 2 |
| Additional paid-in capital | | 22,968 | 18,140 |
| Retained earnings (accumulated deficit) | | 5,555 | (17,256) |
| Total Stockholders' Equity | | 28,526 | 886 |
| | | | |
| Total Liabilities and Stockholders' Equity | $ | 61,247 | $ 18,305 |

The accompanying notes are an integral part of these Consolidated Financial Statements

F-3

Table of Contents

**FINJAN HOLDINGS, INC.**
**Consolidated Statements of Operations**
**(In thousands, except share and per share data)**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Revenues | $ 50,484 | $ 18,387 | $ 4,687 |
| Cost of revenues | 6,008 | 3,037 | 814 |
| Gross profit | 44,476 | 15,350 | 3,873 |
| | | | |
| **Operating Expenses:** | | | |
| Selling, general and administrative | 28,596 | 14,427 | 17,362 |
| Research and development | 1,473 | 570 | 391 |
| Total operating expenses | 30,069 | 14,997 | 17,753 |
| | | | |
| Income (loss) from operations | 14,407 | 353 | (13,880) |
| | | | |
| **Other Income** | | | |
| Return on investment | — | — | 1,271 |
| Interest income | 27 | — | 12 |
| Change in fair value of warrant liability | 2,217 | — | — |
| Total other income | 2,244 | — | 1,283 |
| | | | |
| Income (loss) before provision for income taxes | 16,651 | 353 | (12,597) |
| | | | |
| Income tax provision (benefit) | (6,160) | 3 | 5 |
| | | | |
| **Net Income (Loss)** | 22,811 | 350 | (12,602) |
| | | | |
| Accretion of preferred stock | (4,882) | (6,789) | — |
| Net income (loss) attributable to common stockholders | $ 17,929 | $ (6,439) | $ (12,602) |
| | | | |
| Net income (loss) per share, basic | $ 0.90 | $ 0.02 | $ (0.56) |
| Net income (loss) per share, diluted | $ 0.87 | $ 0.02 | $ (0.56) |
| | | | |
| Net income (loss) per share applicable to common stockholders, basic | $ 0.71 | $ (0.28) | $ (0.56) |
| Net income (loss) per share applicable to common stockholders, diluted | $ 0.68 | $ (0.28) | $ (0.56) |
| | | | |
| Weighted average common shares outstanding, basic | 25,353,966 | 22,837,263 | 22,548,932 |
| Weighted average common shares outstanding, diluted | 26,269,727 | 22,837,263 | 22,548,932 |

The accompanying notes are an integral part of these Consolidated Financial Statements

F-4

Table of Contents

**FINJAN HOLDINGS, INC.**
**Consolidated Statement of Changes in Stockholders' Equity**
**For the Years Ended December 31, 2017, 2016 and 2015**
**(In thousands, except share and per share data)**

| | Common Stock | | Additional Paid-In Capital | Retained Earnings / (Accumulated Deficit) | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance - December 31, 2014 | 22,448,098 | $ 2 | $ 23,126 | $ (5,004) | $ 18,124 |
| Stock based compensation expense | — | — | 766 | — | 766 |
| Proceeds from exercise of stock options | 192,513 | — | 54 | — | 54 |
| Net loss | — | — | — | (12,602) | (12,602) |
| Balance – December 31, 2015 | 22,640,611 | 2 | 23,946 | (17,606) | 6,342 |
| Stock based compensation expense | — | — | 872 | — | 872 |
| Proceeds from exercise of stock options | 462,117 | — | 111 | — | 111 |
| Accretion of Series A preferred stock | — | — | (6,789) | — | (6,789) |
| Net income | — | — | — | 350 | 350 |
| Balance – December 31, 2016 | 23,102,728 | 2 | 18,140 | (17,256) | 886 |
| Stock based compensation expense | — | — | 843 | — | 843 |
| Proceeds from exercise of stock options | 464,600 | — | 229 | — | 229 |
| Accretion of Series A preferred stock | — | — | (292) | — | (292) |
| Accretion of Series A-1 preferred stock | — | — | (4,590) | — | (4,590) |
| Issuance of warrants classified as a liability | — | — | (3,313) | — | (3,313) |
| Sale of Common Stock | 4,140,000 | 1 | 11,951 | — | 11,952 |
| Net income | — | — | — | 22,811 | 22,811 |
| Balance – December 31, 2017 | 27,707,328 | $ 3 | $ 22,968 | $ 5,555 | $ 28,526 |

The accompanying notes are an integral part of these Consolidated Financial Statements

F-5

Table of Contents

**FINJAN HOLDINGS, INC.**
**Consolidated Statements of Cash Flows**
**(In thousands)**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| **Cash Flows From Operating Activities** | | | |
| Net Income (Loss) | $ 22,811 | $ 350 | $ (12,602) |
| Adjustments to reconcile net gain (loss) to net cash provided by (used in) operating activities | | | |
| Return on investment | — | — | (1,271) |
| Depreciation and amortization | 815 | 63 | 50 |
| Loss on disposal of assets | — | — | 34 |
| Change in fair value of warrant liability | (2,217) | — | — |
| Deferred income taxes | (6,201) | — | — |
| Stock-based compensation expense | 843 | 872 | 766 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (1,540) | (1,066) | 2,016 |
| Prepaid expenses and other assets | (152) | 34 | (535) |
| Accrued expenses | (529) | 1,382 | (350) |
| Accounts payable | 2,788 | (362) | 545 |
| Accounts payable - related parties | 24 | 71 | (83) |
| Accrued income taxes | 10 | (6) | 9 |
| Other liabilities | (66) | (10) | 162 |
| **Net Cash Provided by (used in) Operating Activities** | 16,586 | 1,328 | (11,259) |
| | | | |
| **Cash Flows From Investing Activities** | | | |
| Purchase of intangible assets | (2,000) | — | — |
| Purchases of additional investment | — | (550) | (750) |
| Proceeds from investment | — | — | 826 |
| Distribution from investment | 127 | — | — |
| Purchase of property and equipment | — | (9) | (275) |
| | | | |
| **Net Cash Used in Investing Activities** | (1,873) | (559) | (199) |
| | | | |
| **Cash Flows From Financing Activities** | | | |
| Proceeds from the sale of Series A Preferred shares, net of issuance costs | — | 9,490 | — |
| Proceeds from the sale of Series A-1 Preferred shares, net of issuance costs | 14,375 | — | — |
| Redemption of Series A Preferred shares | (13,778) | (2,793) | — |
| Proceeds from Common share offering, net of issuance costs | 11,952 | — | — |
| Proceeds from exercise of stock options | 229 | 111 | 54 |
| | | | |
| **Net Cash Provided by Financing Activities** | 12,778 | 6,808 | 54 |
| | | | |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | 27,491 | 7,577 | (11,404) |
| **Cash and Cash Equivalents - Beginning** | 13,678 | 6,101 | 17,505 |
| | | | |
| **Cash and Cash Equivalents - Ending** | $ 41,169 | $ 13,678 | $ 6,101 |

F-6

Table of Contents

| | | | | | |
|---|---|---|---|---|---|
| **Supplemental Disclosures of Cash Flow Information:** | | | | | |
| Cash paid during the year for income taxes | $ | 30 | $ | — | $ | 7 |
| Non-cash investing and financing activities: | | | | | |
| Distribution of investment held by investee | | — | | — | | 445 |
| Accretion of Series A Preferred Stock | | 292 | | 6,789 | | — |
| Accretion of Series A-1 Preferred Stock | | 4,590 | | — | | — |
| Series A-1 warrant liability | | 3,313 | | — | | — |
| Patent purchase in exchange for payable | | 6,500 | | — | | — |

The accompanying notes are an integral part of these Consolidated Financial Statements

F-7

**FINJAN HOLDINGS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1 – ORGANIZATION AND OPERATIONS

### *ORGANIZATION*

Finjan Holdings, Inc. (the "Company" or "Finjan Holdings"), a Delaware corporation, and its wholly owned subsidiaries, Finjan, Finjan Blue, Finjan Mobile and CybeRisk operates a cybersecurity business focused in four business lines: intellectual property licensing and enforcement, advisory services, mobile security application development and investing in cybersecurity technologies and intellectual property. Revenues and operations from the Company's Finjan Mobile security business and the Company's CybeRisk advisory services were immaterial to the consolidated financial statements for the years ended December 31, 2017, 2016 and 2015. Licensing and enforcement of the Company's cybersecurity patent portfolio is operated, through its wholly-owned subsidiary Finjan, Inc. The Company's common stock has been trading on the NASDAQ Capital Market ("NASDAQ") since May 2014.

Finjan was founded in 1997 as a wholly-owned subsidiary of Finjan Software Ltd. ("FSL"). FSL, together with its subsidiaries, sold enterprise web security solutions, including real-time and behavior-based malware prevention. In October 2003, FSL transferred all of its shares in Finjan to Finjan Software, Inc. ("FSI"). As a result of this transfer, Finjan became a wholly-owned subsidiary of FSI (the "Former Parent"). On December 8, 2010, Finjan, Inc. changed its name to FI Delaware, Inc. On October 22, 2012, FI Delaware, Inc. changed its name back to Finjan, Inc.

In October 2009, FSI transferred its portfolio of intellectual property to Finjan (its wholly-owned subsidiary at the time). Thereafter, in November 2009, FSI sold certain assets, including certain of its operating subsidiaries, not including Finjan, and its sales and marketing assets to M86 Security ("M86"). Finjan also granted a fully-paid, non-exclusive patent license to M86, in consideration for which M86 issued shares of its common stock to Finjan and FSI. In connection with that transaction, and subsequent to November 2009, FSI and its remaining subsidiaries (including Finjan) ceased the development, manufacture, marketing and sale of its products, as well as research conducted through its Malicious Code Research Center as part of a confidential non-compete provision. Finjan retained ownership of its patents and all related rights. In March 2012, M86 merged with Trustwave Holdings, Inc. ("Trustwave") through which M86's license from Finjan was renewed with Trustwave to include an expanded scope and an extension of the non-compete for the development of software and hardware security products. In September 2015, Trustwave was acquired by Singapore Telecom ("SingTel"). Finjan's agreement with Trustwave includes extended royalty obligations upon achievement of certain sales milestones. To date, Finjan has not received any additional payments under the license.

In February 2013, Finjan distributed all securities it held in two unaffiliated entities to FSI and made a payment of cash in an amount sufficient to repay and satisfy in full a pre-existing intercompany loan from FSI to Finjan. Following that distribution, the board of directors and stockholders of FSI approved the dissolution of, and a plan of liquidation for, FSI that resulted, among other things, in the distribution of Finjan's common stock to certain of FSI's stockholders, whereby Finjan ceased to be a subsidiary of the Former Parent.

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### *BASIS OF PRESENTATION*

The consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated in consolidation.

### *RECLASSIFICATIONS*

Where applicable, certain prior period amounts have been reclassified for comparative purposes to conform to the current presentation. These reclassifications have no impact on the previously reported loss.

### *USE OF ESTIMATES*

The preparation of financial statements in conformity with US Generally Accepted Accounting Principles ("US GAAP"), requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. On an ongoing basis, the Company evaluates its estimates, including those related to derivative liabilities, stock-based

F-8

Table of Contents

compensation expense, impairment of long-lived assets, the determination of the economic useful life of property and equipment, income taxes and valuation allowances against net deferred tax assets. Management bases its estimates on historical experience or on various other assumptions that it believes to be reasonable under the circumstances. Actual results could differ from those estimates.

### CASH AND CASH EQUIVALENTS

For purposes of the statement of cash flows, the Company considers all highly liquid instruments with original maturities of three months or less when purchased to be cash equivalents. Included in cash and cash equivalents are demand deposits and money market accounts.

### CONCENTRATIONS OF CREDIT RISK

The Company maintains its cash and cash equivalents in financial institutions located in the United States and Israel. At times, the Company's cash and cash equivalent balances may be uninsured or in deposit accounts that exceed the Federal Deposit Insurance Corporation ("FDIC") insurance limits. The Company has not experienced any losses in such accounts. As of December 31, 2017, and 2016, substantially all of the Company's cash and cash equivalents are uninsured.

During 2017, revenues generated by the Company were derived from five license agreements that the Company entered into with third parties in 2017 and existing agreements from 2016 and 2015, that had agreed upon future payment terms.

See "Note 9 - License, Settlement and Release Agreement."

### ALLOWANCE FOR DOUBTFUL ACCOUNTS

The allowance for doubtful accounts is based on the Company's assessment of the collectability of customer accounts. The Company does not currently require any collateral for accounts receivable. The Company regularly reviews the allowance by considering factors such as historical experience, credit quality, the age of the accounts receivable balances, and current economic conditions that may affect a customer's ability to pay. The Company did not record an allowance for doubtful accounts as of December 31, 2017 and 2016, respectfully. Bad debt expense for the years ended December 31, 2017, 2016 and 2015 was nil.

### PROPERTY AND EQUIPMENT, NET

Property and equipment are stated at cost, less accumulated depreciation. Depreciation is calculated on the straight-line method over the estimated useful lives of the related assets, which range from 3 to 7 years. Leasehold improvements are amortized on the straight-line method over the shorter of the remaining lease term or the estimated useful economic lives of the related assets using the straight-line method. The costs of additions and betterments are capitalized and expenditures for repairs and maintenance are expensed in the period incurred. When items of property and equipment are sold or retired, the related costs and accumulated depreciation are removed from the accounts and any gain or loss is included in income.

### INVESTMENTS

Investments that are not controlled, and over which the Company does not have the ability to exercise significant influence are accounted for under the cost method. All of the Company's investments as of December 31, 2017 and 2016 and are accounted for under the cost method.

### IMPAIRMENT OF LONG-LIVED ASSETS

Intangible assets with finite lives are amortized over their estimated useful lives. The Company reviews these assets for impairment periodically or whenever potential indicators of impairment exist. The Company continually evaluates whether events or changes in circumstances might indicate that the remaining estimated useful life of long-lived assets may warrant revision, or that the remaining balance may not be recoverable. When factors indicate that long-lived assets should be evaluated for possible impairment, the estimate of fair value is based on the best information available as of the date of the assessment, is subjective and requires judgment, including management assumptions as deemed appropriate and would be based on generally accepted valuation methodologies.

Table of Contents

### *REVENUE RECOGNITION*

Revenue is recognized when persuasive evidence of an arrangement exists, delivery of the product or service has occurred, all obligations have been performed pursuant to the terms of the agreement, the sales price is fixed or determinable, and collectability is reasonably assured.

Revenue results from grants of licenses to its patented cyber-security technology and settlements reached from legal enforcement of the Company's patent rights. The Company does not grant, at this time, technology or software end-user licenses. Revenue is recognized when the arrangement with the licensee has been signed and the license has been delivered and made effective, provided license fees are fixed or determinable and collectability is reasonably assured. The fair value of licenses achieved is recognized as revenue.

The amount of consideration received upon any settlement or judgment is allocated to each element of the settlement based on the fair value of each element. Elements related to licensing agreements and royalty revenues, is recognized as revenue in the consolidated statement of operations. Elements that are not related to license agreements and royalty revenue in nature will be reflected as a separate line item within the Other Income section of the consolidated statements of operations. Elements provided in either settlement agreements or judgments include, the value of a license, legal release, and interest. When settlements or judgments are achieved at discounts to the fair value of a license, the Company allocates the full settlement or judgment, excluding specifically named elements as mentioned above, to the value of the license agreement or royalty revenue under the residual method relative to full license fair value prior to the discount. Legal release as part of a settlement agreement is recognized as a separate line item in the consolidated statements of operations when value can be allocated to the legal release. When the Company reaches a settlement with a defendant, no value is allocated to the legal release since the existence of a settlement removes legal standing to bring a claim of infringement, and without a legal claim, the legal release has no economic value. The element that is applicable to interest income will be recorded as a separate line item in Other Income.

### *RESEARCH AND DEVELOPMENT EXPENSE*

The Company expenses the cost of research and development as incurred. Research and development expenses consist primarily of professional services costs associated with the development of mobile security application products.

### *SOFTWARE DEVELOPMENT COSTS*

Software development costs are expensed as incurred. Development costs of computer software to be sold, leased, or otherwise marketed are subject to capitalization beginning when a product's technological feasibility has been established and ending when a product is available for general release to customers. In most instances, the Company's products are released soon after technological feasibility has been established. Software development costs incurred subsequent to achievement of technological feasibility were not material and were expensed as incurred during the years ended December 31, 2017, 2016 and 2015.

### *FOREIGN CURRENCY*

Foreign currency denominated assets and liabilities of foreign subsidiaries, where the local currency is the functional currency, are translated into U.S. dollars using the exchange rates in effect at the balance sheet dates, and income and expenses are translated using average exchange rates during the period. Foreign currency translation gains (losses) were immaterial for the years ended December 31, 2017, 2016 and 2015.

Foreign currency transaction gains (losses) were immaterial for the years ended December 31, 2017, 2016 and 2015, and are included as general and administrative expense, in the accompanying consolidated statements of operations.

### *PREFERRED STOCK*

The Company accounts for the redemption premium and issuance costs on its preferred stock by recognizing changes in the redemption value immediately as they occur and adjusting the carrying value of the security to equal the redemption value at the end of each reporting period. This method views the end of the reporting period as if it were also the redemption date for the security.

F-10

*ACCOUNTING FOR WARRANTS*

The Company classifies as equity any contracts that (i) require physical settlement or net-share settlement or (ii) gives the Company a choice of net-cash settlement or settlement in its own shares (physical settlement or net-share settlement). The Company classifies as assets or liabilities any contracts that (i) require net-cash settlement (including a requirement to net-cash settle the contract if an event occurs and if that event is outside the control of the Company) or (ii) gives the counterparty a choice of net-cash settlement or settlement in shares (physical settlement or net-share settlement).

*DERIVATIVE LIABILITIES*

In connection with the issuance of Series A-1 Preferred Stock in June 2017, the Company issued a warrant with variable consideration. The Company determined that this instrument is an embedded derivative pursuant to ASC 815, "Derivatives and Hedging." The accounting treatment of derivative financial instruments requires that the Company record the warrant, at its fair value as of the inception date of the agreement and at fair value as of each subsequent balance sheet date. Any change in fair value is recorded as a change in the fair value of derivative liabilities for each reporting period at each balance sheet date. The Company reassesses the classification at each balance sheet date. If the classification changes as a result of events during the period, the contract is reclassified as of the date of the event that caused the reclassification.

The Monte Carlo Valuation model is used to estimate the fair value of the warrant. The model was developed for use in estimating the fair value of traded options or warrants. The expected volatility is estimated based on the most recent historical period of time equal to the weighted average life of the instrument granted.

The risk-free interest rate used is the United States Treasury rate for the day of the grant having a term equal to the life of the equity instrument. The volatility is a measure of the amount by which the Company's share price has fluctuated or is expected to fluctuate. The dividend yield is zero percent as the Company has not made any dividend payment and has no plans to pay dividends in the foreseeable future. The Company determines the expected term of its warrant awards by using the contractual term.

The principal assumptions used in applying the model were as follows:

|  | For the Year Ended December 31, 2017 |
| --- | --- |
| Assumptions: |  |
| Risk-free interest rate | 1.5% - 2.0% |
| Expected life | 2.5 - 3 years |
| Expected volatility | 50% - 60% |
| Dividends | 0.0% |

*FAIR VALUE OF FINANCIAL INSTRUMENTS*

The reported amounts of the Company's financial instruments, including cash and cash equivalents, accounts receivable, accounts payable and accrued liabilities, approximate their fair value due to their short maturities.

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. These fair value measurements apply to all financial instruments that are measured and reported on a fair value basis.

Where available, fair value is based on observable market prices or is derived from such prices. The Company uses the market approach valuation technique to value its investments. The market approach uses prices and other pertinent information generated from market transactions involving identical or comparable assets or liabilities. The types of factors that the Company may take into account in fair value pricing the investments include available current market data, including relevant and applicable market quotes.

Based on the observability of the inputs used in the valuation techniques, financial instruments are categorized according to the fair value hierarchy, which ranks the quality and reliability of the information used to determine fair values.

Financial assets and liabilities carried at fair value are classified and disclosed in one of the following three categories:

F-11

Table of Contents

Level 1 - Observable inputs such as quoted prices in active markets.

Level 2 - Inputs, other than the quoted prices in active markets, that are observable either directly or indirectly.

Level 3 - Unobservable inputs in which there is little or no market data, which require the reporting entity to develop its own assumptions.

In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, the assignment of an asset or liability within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. The Company's assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment and considers factors specific to the asset or liability.

The fair value measurement of the warrant issued in conjunction with the Series A-1 Preferred Stock is a derivative liability based on significant inputs not observed in the market and thus represents a Level 3 measurement. Level 3 instruments are valued based on unobservable inputs that are supported by little or no market activity. For fair value measurements categorized within Level 3 of the fair value hierarchy, the Company's Controller who reports to the Chief Financial Officer, determines valuation policies and procedures, which are reflected in the the Company's assumptions in measuring fair value.

### NET INCOME (LOSS) PER COMMON SHARE

Basic net income (loss) per common share is based upon the weighted-average number of common shares outstanding. Diluted net income (loss) per common share is based on the weighted-average number of common shares outstanding and potentially dilutive common shares outstanding.

|  | Years Ended December 31, | | |
|  | 2017 | 2016 | 2015 |
|  | (In thousands, except share and per share data) | | |
| Numerator: | | | |
| Net income (loss) attributable to common stockholders | $ 17,929 | $ (6,439) | $ (12,602) |
| | | | |
| Denominator: | | | |
| Weighted-average common shares, basic | 25,353,966 | 22,837,263 | 22,548,932 |
| Weighted-average common shares, diluted* | 26,269,727 | 22,837,263 | 22,548,932 |
| Net income (loss) per common share: | | | |
| Basic: | $ 0.71 | $ (0.28) | $ (0.56) |
| Diluted: | $ 0.68 | $ (0.28) | $ (0.56) |

* The diluted earnings per common share included 438,712 unvested Restricted Stock Units and the weighted average effect of 477,048 stock options that are potentially dilutive to earnings per share for the twelve months ended December 31, 2017, since the exercise price of such securities was less than the average market price during the period.

Potentially dilutive common shares from employee equity plans and warrants are determined by applying the treasury stock method to the assumed exercise of warrants and share options and were excluded from the computation of diluted net loss per share because their inclusion would be anti-dilutive and consist of the following:

|  | December 31, | | |
|  | 2017 | 2016 | 2015 |
| Stock options | 2,341,340 | 1,607,347 | 1,510,832 |
| Restricted stock units | 438,712 | 185,260 | 408,710 |
| Warrants | 2,355,506 | — | — |
| Total | 5,135,558 | 1,792,607 | 1,919,542 |

Table of Contents

***STOCK-BASED COMPENSATION***

The Company measures compensation cost for all employee stock-based awards at their fair values on the date of grant. Stock-based awards issued to non-employees are measured at their fair values on the date of grant and are re-measured at each reporting period through their vesting dates. When a non-employee becomes an employee and continues to vest in the award, the fair value of the individual's award is re-measured on the date that he becomes an employee, and then is not subsequently re-measured at future reporting dates. The fair value of stock based awards is recognized as expense over the service period, net of estimated forfeitures, using the straight-line method for stock options and restricted stock. The Company uses the Black-Scholes option-pricing model to estimate the fair value of its stock-based awards.

***INCOME TAXES***

The Company files consolidated income tax returns in the U.S. federal jurisdiction and is headquartered in California, formerly in New York. The federal and state income tax returns for the tax years 2013 and after remain subject to examination for federal and state taxes. The Company files state income tax returns for California and New York.

The Company accounts for income taxes pursuant to the asset and liability method which requires deferred income tax assets and liabilities to be computed annually for temporary differences between the financial statement and tax bases of assets and liabilities that will result in taxable or deductible amounts in the future based on enacted tax laws and rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred tax assets to the amount expected to be realized. The income tax provision or benefit is the tax payable or refundable for the period plus or minus the change during the period in deferred tax assets and liabilities.

The benefit of tax positions taken or expected to be taken in income tax returns are recognized in the financial statements if such positions are more likely than not of being sustained. As of December 31, 2017, 2016 and 2015, an immaterial or no liability for unrecognized tax benefits was required to be reported. The Company does not expect its unrecognized tax benefit position to change during the next twelve months.

The Company's policy is to classify assessments, if any, for tax-related interest as interest expense and penalties as general and administrative expenses. There were no amounts accrued for penalties or interest as of, or during the years ended December 31, 2017, 2016 and 2015.

***RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS***

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2014-09, Revenue from Contracts with Customers (Topic 606). This ASU is a comprehensive new revenue recognition model that requires a company to recognize revenue to depict the transfer of goods or services to a customer at an amount that reflects the consideration it expects to receive in exchange for those goods or services. In August 2015, FASB issued ASU 2015-14, Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date, which deferred the effective date of ASU 2014-09 to reporting periods beginning after December 15, 2017, with early adoption permitted for reporting periods beginning after December 15, 2016. Subsequently, FASB issued ASUs in 2016 containing implementation guidance related to ASU 2014-09, including: ASU 2016-08, Revenue from Contracts with Customers (Topic 606): Principal versus Agent Considerations (Reporting Revenue Gross versus Net), which is intended to improve the operability and understanding of the implementation guidance on principal versus agent considerations; ASU 2016-10, Revenue from Contracts with Customers (Topic 606): Identifying Performance Obligations and Licensing, which is intended to clarify two aspects of Topic 606: identifying performance obligations and the licensing implementation guidance; and ASU 2016-12, Revenue from Contracts with Customers (Topic 606): Narrow-Scope Improvements and Practical Expedients, which contains certain practical expedients in response to identified implementation issues. The Company has completed its analysis of the new revenue standards and has established an implementation plan and believes the systems in place are adequate to support application of this guidance. The Company has adopted the new standard effective January 1, 2018, using the modified retrospective transition method. However, as the Company's revenues in 2017 were from Licensing and Enforcement activities, which does not change significantly under the new standard, adoption via the full retrospective approach or the modified retrospective approach on January 1, 2018 would not have a material impact on the Company's consolidated financial statements and the internal controls over financial reporting.

In February 2016, FASB issued ASU No. 2016-02 "Leases" that requires a lessee to recognize the assets and liabilities that arise from operating leases. A lessee should recognize in the statement of financial position a liability to make lease payments (the lease liability) and a right-of-use asset representing its right to use the underlying asset for the lease term. For leases with a term of 12 months or less, a lessee is permitted to make an accounting policy election by class of underlying asset not to recognize lease

Table of Contents

assets and lease liabilities. The new guidance is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. Early adoption is permitted. The Company is currently evaluating the effect of the standard on its consolidated financial statements and related disclosures.

In March 2016, the FASB issued ASU No. 2016-09, "Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting" ("ASU 2016-09"). The standard is intended to simplify several areas of accounting for share-based compensation arrangements, including the income tax impact, classification on the statement of cash flows and forfeitures. ASU 2016-09 is effective for fiscal years, and interim periods within those years, beginning after December 15, 2016. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15, "Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments." ASU No. 2016-15 clarifies and provides specific guidance on eight cash flow classification issues that are not currently addressed by current GAAP and thereby reduce the current diversity in practice. ASU No. 2016-15 is effective for public business entities for annual periods, including interim periods within those annual periods, beginning after December 15, 2017, with early application permitted. This guidance is applicable to the Company's fiscal year beginning January 1, 2018. The Company is currently evaluating the standard to determine the impact of its adoption on the Company's consolidated financial statements.

In July 2017, the FASB issued ASU 2017-11, "Earnings Per Share (Topic 260), Distinguishing Liabilities from Equity (Topic 480) and Derivatives and Hedging (Topic 815): I. Accounting for Certain Financial Instruments with Down Round Features; II. Replacement of the Indefinite Deferral for Mandatorily Redeemable Financial Instruments of Certain Nonpublic Entities and Certain Mandatorily Redeemable Noncontrolling Interests with a Scope Exception". Part I of this update addresses the complexity of accounting for certain financial instruments with down round features. Down round features are features of certain equity-linked instruments (or embedded features) that result in the strike price being reduced on the basis of the pricing of future equity offerings. Current accounting guidance creates cost and complexity for entities that issue financial instruments (such as warrants and convertible instruments) with down round features that require fair value measurement of the entire instrument or conversion option. Part II of this update addresses the difficulty of navigating Topic 480, Distinguishing Liabilities from Equity, because of the existence of extensive pending content in the FASB Accounting Standards Codification. This pending content is the result of the indefinite deferral of accounting requirements about mandatorily redeemable financial instruments of certain nonpublic entities and certain mandatorily redeemable noncontrolling interests. The amendments in Part II of this update do not have an accounting effect. This ASU is effective for fiscal years, and interim periods within those years, beginning after December 15, 2018. Early adoption is permitted. The Company is currently evaluating the effect of the standard on its consolidated financial statements and related disclosures.

Other recent accounting standards that have been issued or proposed by FASB or other standards-setting bodies that do not require adoption until a future date are not expected to have a material impact on the Company's consolidated financial statements upon adoption.

**NOTE 3 - INTANGIBLE ASSETS**

*Patents*

The Company owns or possesses licenses to use its patents. The costs of maintaining the patents are expensed as incurred.

*Intangible Assets*

The Company and Finjan Blue entered into a Patent Assignment and Support Agreement (the "Patent Assignment Agreement") with IBM effective as of August 24, 2017 (see "Note 7 - Commitments and Contingencies"). Pursuant to the Patent Assignment Agreement, Finjan Blue acquired select IBM patents in the security sector (the "IBM Security Patents"). In accordance with ASC 350-30-35-2 through 35-4, Intangibles-Goodwill and Other, the Company determined that the useful life of the patents acquired under the Patent Assignment and Support Agreement should be amortized over the four-year term of the agreement. Management did not identify any triggering events which would have necessitated an impairment change.

The components of these intangible assets are as follows:

| | As of December 31, | |
|---|---|---|
| | 2017 | 2016 |
| | (in thousands) | |
| Patents | $ 26,552 | $ 18,052 |
| Less accumulated amortization | (18,804) | (18,052) |
| Intangible assets, net | 7,748 | $ — |

Amortization expense for the year ended December 31, 2017 was approximately $752,000 and $0 for the years ended December 31, 2016 and 2015.

Future amortization costs of $2.1 million annually will be recognized over the next 3.75 years.

## NOTE 4 – ACCRUED EXPENSES AND WARRANT LIABILITY

### Accrued expenses

The components of accrued expenses are as below:

| | As of December 31, | |
|---|---|---|
| | 2017 | 2016 |
| | (In thousands) | |
| Legal - licensing & litigation | $ — | $ 1,195 |
| Compensation | 1,233 | 560 |
| Other | 70 | 77 |
| | $ 1,303 | $ 1,832 |

### Warrant Liability

A summary of the Company's Level 3 derivative liabilities for the twelve months ended December 31, 2017 is as follows (in thousands):

| | |
|---|---|
| Balance, December 31, 2016 | $ — |
| Fair value of derivative liabilities at issuance | 3,313 |
| Change in the fair value of derivative liabilities | (2,217) |
| Balance, December 31, 2017 | $ 1,096 |

## NOTE 5 – PROPERTY AND EQUIPMENT

The components of property and equipment were as follows:

| | As of December 31, | |
|---|---|---|
| | 2017 | 2016 |
| | (In thousands) | |
| Office equipment, leasehold improvements and furniture | $ 319 | $ 319 |
| Less accumulated depreciation | (179) | (116) |
| Property and equipment, net | $ 140 | $ 203 |

Depreciation expense for the years ended December 31, 2017 and 2016 was approximately $63,000 for both years, respectively and $50,000 in 2015.

## NOTE 6 – INVESTMENTS

On November 21, 2013, the Company made a $5 million commitment to invest in Jerusalem Venture Partners ("JVP Fund"). As of December 31, 2017, $2.7 million remains outstanding on this commitment. If and when the Company funds the entire amount of the investment, the investment will be less than a 10% limited partnership interest in which the Company will not be able to exercise control over the fund. Accordingly, the Company has accounted for this investment under the cost method of accounting.

On June 8, 2015, the Company received a cash distribution of $826,000 as a portion of a gross entitlement of approximately $1,271,000 from its investment in the JVP Fund. This distribution represents a portion of the gross proceeds allocated to the Company's investment, with the remaining amount to be retained by the JVP Fund to fund future investment activities. The retained proceeds did not reduce the Company's future capital commitment to the venture capital fund.

There were no identified events or changes in circumstances that are believed to have had a significant adverse effect on the fair value of the investments as of December 31, 2017, 2016 and 2015.

Subsequent to December 31, 2017, the Company made a payment to the JVP fund of $0.5 million pursuant to a capital call, reducing the commitment outstanding to $2.2 million.

The following is a summary of the Company's investments (in thousands):

|  | Venture Capital Fund |
| --- | --- |
| **Balance** - January 1, 2015 | $ 1,000 |
| Investment made during 2015 | 750 |
| Proceeds retained and reinvested in fund | 445 |
| **Balance** - December 31, 2015 | 2,195 |
| Investment made during 2016 | 550 |
| **Balance** - December 31, 2016 | 2,745 |
| Cash distribution during 2017 | (127) |
| **Balance** - December 31, 2017 | $ 2,618 |

## NOTE 7 – COMMITMENTS AND CONTINGENCIES

### *OPERATING LEASES*

On September 9, 2013, the Company entered into a lease for its former corporate headquarters in New York, NY for a period of five years beginning October 1, 2013. Under the terms of the lease, the Company owed an initial annual rent of approximately $139,000, payable in monthly installments of approximately $12,000, unless earlier terminated in accordance with the lease. As of December 31, 2017, the total future minimum lease payments to be paid under the agreement, which expires in September 2018, was $115,000. The agreement also required an initial security deposit of $69,000 which is included in other current assets. The annual rental rate, beginning after the first year, is subject to an increase, on a cumulative basis, at a rate of 2.5% per annum compounded annually.

In May 2015, the Company entered into a sublease agreement for its former corporate headquarters in New York, NY. As of December 31, 2017, the total future minimum lease payments to be received under the sublease agreement, which expires in September 2018, was $127,000.

On March 20, 2014, the Company received the consent of the master landlord for a sublease agreement dated March 10, 2014, pursuant to which the Company subleased office space in Menlo Park, CA through November 30, 2017. From the commencement date, the Company owed an initial annual rent of approximately $165,000, payable in equal monthly installments, unless earlier terminated by either party in accordance with the lease. The lease term expired November 2017.

On January 7, 2015, the Company entered into a sublease agreement to sublease office space in East Palo Alto, CA through September 2018, to serve as its new Company headquarters. The annual rent is approximately $450,000, payable in equal monthly installments, unless earlier terminated by either party in accordance with the lease. The annual rent is subject to an approximate

Table of Contents

3.0% increase at each anniversary of the commencement date during the term of the sublease agreement. The agreement also required an initial security deposit of $231,000 which is included in other current assets. As of December 31, 2017, the total future minimum lease payments to be paid under the agreement, which expires in September 2018 is $344,000.

On December 1, 2016, the Company entered into a monthly lease agreement in Tel Aviv, Israel, where it is conducting operations in support of CybeRisk. The annual rent is approximately $12,000, payable in equal monthly installments, unless earlier terminated by either party in accordance with the lease.

The Company accounted for its "Cease-Use Liability" in accordance with ASC 420 "Exit or Disposal Cost Obligations", and accounts for its leases under the straight line method of accounting

The following table sets forth the Company's aggregate future minimum payments under its operating lease commitments as of December 31, 2017 (in thousands):

| Year ending December 31, | | |
|---|---|---|
| 2018 | $ | 459 |
| Total | $ | 459 |

For the years ended December 31, 2017, 2016 and 2015, rent expense was approximately $754,000, $782,000 and $667,000, respectively.

The Company accounts for its leases under the straight-line method of accounting. Deferred rent payable was $36,000 and $69,000 as of December 31, 2017 and December 31, 2016, respectively, and is included in other current liabilities on the consolidated balance sheets.

Rental income for the years ended December 31, 2017, 2016 and 2015 was $350,000, $349,000 and $132,000, respectively.

Sublease income is recorded as a reduction in rental expense. Future minimum lease payments to be received under existing sublease agreements as of December 31, 2017 are as follows (in thousands):

| Year ending December 31, | | |
|---|---|---|
| 2018 | | 127 |
| | $ | 127 |

### CONTRACTUAL OBLIGATIONS

### Finjan Mobile

On April 21, 2017, the Company and Finjan Mobile, a wholly-owned subsidiary of the Company, entered into a Confidential Avira VPN Platform Distribution Agreement (the "Distribution Agreement") with Avira, Inc., a Delaware corporation ("Avira"). Pursuant to the Distribution Agreement, Avira will provide its Virtual Private Network ("VPN") platform and technical support ("VPN Platform") to Finjan Mobile, and Finjan Mobile will use the VPN Platform as part of its Vital Security™ suite of product offerings. Avira also granted Finjan Mobile related license rights in connection with the Distribution Agreement and starting July 1, 2017, Finjan Mobile will pay Avira $3.9 million in fees under the Distribution Agreement, payable in 12 quarterly installments of $325,000 over the next 3 years. The Company has analyzed the terms of the agreement and has accounted for the transaction as a service agreement, to be expensed over the service period. As of December 31, 2017, the Company has a $3.3 million contractual obligation due over the next 10 quarters.

### Finjan Blue

As described in Note 3, pursuant to the Patent Assignment Agreement, Finjan Blue acquired select IBM patents in the security sector (the "IBM Security Patents") in exchange for $8.5 million cash, payable as follows: (i) $2.0 million upon execution of the Patent Assignment Agreement and (ii) $6.5 million over the subsequent four years. The Company's initial $2.0 million payment was made on August 24, 2017.

F-17

Table of Contents

IBM will support Finjan Blue in its development and licensing of the IBM Security Patents and provide assistance for such efforts as needed for the term of the Agreement and Finjan Blue will reimburse IBM for reasonable time and out of pocket costs for such assistance, however IBM will not receive further proceeds from such efforts. IBM does have reservation of rights with respect to the IBM Security Patents for its current licensees and open source initiatives.

## NOTE 8 - LITIGATION, CLAIMS AND ASSESSMENTS

### A. United States District Court Actions

Finjan, Inc. v. FireEye, Inc., Case No. 13-cv-03133SBA, (N.D. Cal)

Finjan filed a patent infringement lawsuit against FireEye, Inc. ("FireEye") in the United States District Court for the Northern District of California on July 8, 2013, asserting that FireEye, Inc. is directly and indirectly infringing certain claims of Finjan's U.S. Patent Nos. 6,804,780, 7,058,822, 7,647,633, 7,975,305, 8,079,086, and 8,225,408, through the manufacture, use, importation, sale, and/or offer for sale of its products and services, including but not limited to FireEye's Threat Protection Platform, including the FireEye Malware Protection System, the FireEye Dynamic Threat  Intelligence, and the FireEye Central Management System. Finjan amended its Complaint on August 16, 2013, to add U.S. Patent No. 6,154,844 to the list of asserted patents. The principal parties in this proceeding are Finjan, Inc. and FireEye, Inc. Finjan seeks entry of judgment that FireEye, Inc. has infringed, is infringing, and has induced infringement of the above-listed patents, a preliminary and permanent injunction from infringing, or inducing the infringement of the above-listed patents, an accounting of all infringing sales and revenues, damages of no less than a reasonable royalty and consistent with proof, enhanced damages, and enhanced damages for willful infringement, costs, interest, and reasonable attorneys' fees under 35 U.S.C. §285. FireEye, Inc. answered Finjan's Amended Complaint on September 3, 2013, by denying Finjan's allegations of infringement and counterclaiming that the asserted patents are invalid under 35 U.S.C. §§ 101, 102, 103 and/or 112. Both parties have demanded a jury trial. On June 2, 2014, the Honorable Saundra Brown Armstrong entered an Order Granting Motion to Stay Pending Reexamination of U.S. Patent Nos. 7,058,822 ("the '822 Patent") and 7,647,633 ("the '633 Patent"). Accordingly, the action was placed off calendar until the U.S. Patent and Trademark Office ("USPTO") completed its administrative reexamination proceedings. On February 16, 2016, the USPTO issued an Ex Parte Reexamination Certificate confirming the validity of claims 1-8 and 16-27 of the '822 Patent. On May 31, 2016, pursuant to the Court's Order Granting Motion to Stay Pending Reexamination, the parties filed a joint status report regarding the status of reexamination proceedings of the '822 and '633 Patents. On September 16, 2016, the USPTO issued an Ex Parte Reexamination Certificate confirming the validity of claims 1-7 and 28-33 of the '633 Patent. On October 4, 2016, the Court directed the parties that if FireEye intends to file a Renewed Motion to Stay, it must do so by November 4, 2016. On November 3, 2016, FireEye filed its Renewed Motion for Stay. Finjan's response to the motion was filed November 17, 2016, and FireEye filed a reply on November 23, 2016. The Court vacated the hearing on the Motion to stay scheduled for December 14, 2016 and stated that the Motion will be decided on the pleadings. On March 28, 2017, the Court denied FireEye's Renewed Motion to Stay the case. On April 20, 2017, the Court conducted a case management conference. On May 1, 2017, the Court issued a Scheduling order setting a claim construction hearing for January 28, 2018. On May 31, 2017, FireEye filed an Amended Answer to Finjan's First Amended Complaint, and Finjan filed a Second Amended Complaint to add claims of willful infringement and claims of infringement of U.S. Patent No. 8,141,154. On June 14, 2017, Finjan filed an answer and counterclaims to FireEye's Amended Counterclaims and FireEye filed an answer to Finjan's Second Amended Complaint. On June 29, 2017, Finjan filed an answer to FireEye's Amended Counterclaims. On January 12, 2018, the parties stipulated that all claims in the case be dismissed with prejudice pursuant to a confidential patent license and settlement agreement.

Finjan, Inc. v. Blue Coat Systems, Inc., Case No. 13-cv-03999-BLF (N.D. Cal.)

Finjan filed a patent infringement lawsuit against Blue Coat Systems, Inc., ("Blue Coat") in the United States District Court for the Northern District of California on August 28, 2013, asserting that Blue Coat is directly and indirectly infringing certain claims of Finjan's U.S. Patent Nos. 6,154,844, 6,804,780, 6,965,968, 7,058,822, 7,418,731, and 7,647,333. The principal parties in this proceeding are Finjan and Blue Coat. This action is before the Honorable Judge Beth Labson Freeman. The Court held a claim construction hearing, or Markman Hearing, for this matter on August 22, 2014. The Court entered its Markman Order entitled "Order Construing Claims in U.S. Patent Nos. 6,154,844, 7,058,822, 7,418,731 and 7,647,633," on October 20, 2014, which is available on PACER (www.pacer.gov), as Docket No. 118.  Trial for this action took place from July 20, 2015 through August 4, 2015.  On August 4, 2015, the jury returned a unanimous verdict that each of the Finjan asserted patents are valid and enforceable.  Further, the jury returned a unanimous verdict that Finjan's U.S. Patent Nos. 6,154,844, 6,804,780, 6,965,968 and 7,418,731 were literally infringed by Blue Coat, and that U.S. Patent No. 7,647,633 was infringed by Blue Coat under the Doctrine of Equivalents.  Upon the findings of infringement, the jury also awarded Finjan approximately $39.5 million in damages as reasonable royalties for Blue Coat's infringement. On September 9, 2015, the Court held a bench trial on non-jury legal issues and issued findings of fact and conclusions of law on November 20, 2015. On November 20, 2015, the Court entered Judgment in favor of

Table of Contents

Finjan. On January 29, 2016, the Court taxed costs against Blue Coat. A hearing for the parties' post-trial motions was held on April 28, 2016. On July 18, 2016, the Court issued an order upholding the jury's verdict of infringement, validity, and damages, and denying Blue Coat's motion to amend the Court's findings of fact and conclusions of law, denying Blue Coat's motion for judgment as a matter of law, granting Blue Coat's motion to amend the judgment to show infringement under the doctrine of equivalents is moot for U.S. Patent Nos. 6,154,844, 6,804,780, and 6,965,968, denying Blue Coat's motion for a new trial, denying Finjan's motion for enhanced damages, granting Finjan's motion for pre-and post-judgment interest, and denying Finjan's motion for attorneys' fees. Blue Coat filed a Notice of Appeal to the United States Court of Appeals for the Federal Circuit on August 17, 2016, and an Amended Notice of Appeal on August 22, 2016. On September 2, 2016, the parties submitted a joint stipulation for approval of a supersedeas bond and a stay of enforcement of the judgment pending the resolution of Blue Coat's appeal. On September 7, 2016, the Court approved Blue Coat's bond in the amount of $40,086,172.78. Blue Coat filed its Opening Appellant Brief on December 20, 2016, and appealed the patent eligibility of U.S. Patent No. 6,154,844, infringement of U.S. Patent Nos. 6,154,844, 6,965,968, and 7,418,731, and the jury's damages award. Finjan filed its Response Brief on January 30, 2017. Blue Coat filed its Reply Appeal Brief on February 13, 2017. The hearing before the Federal Circuit was held on September 8, 2017. On January 10, 2018, the Federal Circuit affirmed that: (1) the '844 Patent is patent eligible subject matter; (2) substantial evidence supported the jury's verdict that Blue Coat infringed the '844 and '731 Patents; (3) substantial evidence supported the jury's damages awards for infringement of the '731 and '633 Patents. The Federal Circuit reversed the denial of judgment as a matter of law of non-infringement with regard to the '968 Patent and remanded to the district court to determine the damages for the '844 Patent. On February 2, 2018, Blue Coat filed a motion to extend time to file a petition for rehearing, which the Federal Circuit granted on February 6, 2018. On March 2, 2018, the Federal Circuit issued a mandate in accordance with its judgment, and the parties filed a stipulation with the district court that all claims in the case be dismissed with prejudice pursuant to a confidential settlement agreement. On March 5, 2018, the Court ordered, pursuant to stipulation between the parties, that all claims in the case be dismissed with prejudice.

Finjan, Inc. v. Sophos Inc., Case No. 14-cv-01197-WHO (N.D. Cal.)

Finjan filed a patent infringement lawsuit against Sophos Inc. ("Sophos") in the United States District Court for the Northern District of California on March 14, 2014, asserting that Sophos is directly and indirectly infringing certain claims of Finjan's U.S. Patent Nos. 6,154,844, 6,804,780, 7,613,918, 7,613,926, 7,757,289, and 8,141,154. Finjan amended the Complaint on April 8, 2014 to add U.S. Patent Nos. 8,677,494 and 8,566,580 to the list of asserted patents. Finjan asserts infringement against Sophos through the manufacture, use, importation, sale, and/or offer for sale of its products and services, including but not limited to End User Protection Suites, Endpoint Antivirus, Endpoint Antivirus - Cloud, Sophos Cloud, Unified Threat Management, Next-Gen Firewall, Secure Web Gateway, Secure Email Gateway, Web Application Firewall, Network Storage Antivirus, Virtualization Security, SharePoint Security, Secure VPN, Secure Wi-Fi and Server Security. The principal parties in this proceeding are Finjan and Sophos. This action is before the Honorable William H. Orrick. Finjan seeks entry of judgment that Sophos has infringed and is infringing the above-listed patents, a judgment that Sophos has induced infringement of U.S. Patent Nos. 6,804,780, 7,613,918, 7,613,926, 7,757,289, 6,154,844, and 8,667,494, a judgment that Sophos has contributorily infringed U.S. Patent No. 8,566,580, a preliminary and permanent injunction from infringing, inducing, or contributorily infringing the same patents, an accounting of all infringing sales and revenues, damages of no less than a reasonable royalty and consistent with proof, enhanced damages, costs, interest, and reasonable attorneys' fees under 35 U.S.C. §285. A claim construction or Markman Hearing occurred on February 13, 2015. The Court entered its Markman Order entitled "Claim Construction Order" on March 2, 2015, which is available on PACER (www.pacer.gov), as Docket No. 73. On April 9, 2015, Finjan filed a Second Amended Complaint that included a certificate of correction for the '154 Patent. On November 17, 2015, Finjan filed a Third Amended Complaint to add claims of Sophos's willful infringement. Sophos filed an answer to Finjan's Third Amended Complaint on December 4, 2015. On May 24, 2016, the Court issued an order on the parties' motions to strike, motions for summary judgment, and discovery matters. In its Order, the Court granted Sophos' motion for summary judgment of non-infringement for U.S. Patent Nos. 7,757,289 and 7,613,918, denied the remainder of Sophos' motion for summary judgment, denied Finjan's motion for summary judgment of infringement for U.S. Patent Nos. 7,613,926 and 8,677,494, granted Finjan's motion for summary judgment that certain prior art references were not publicly accessible, granted Finjan's motion to strike in part to exclude certain prior art, granted Sophos's motion to strike in part to exclude portions of Finjan's expert reports on infringement, and deferred ruling on Finjan's motion for summary judgment of validity for U.S. Patent Nos. 8,141,154, 8,677,494, 6,804,780, 8,154,844 and 7,613,926 after reviewing supplemental filings to be submitted with the parties' pre-trial filings. The Court also precluded Sophos from relying on documents that were produced after the close of fact discovery. A mandatory settlement conference was held on July 25, 2016 with no settlement. On August 26, 2016, the parties stipulated to withdrawing allegations in the case, including Finjan's claim of infringement of U.S. Patent No. 8,566,580.

Trial for this action took place from September 6, 2016 through September 21, 2016. On September 21, 2016, the jury returned a unanimous verdict that each of the Finjan asserted patents are valid and enforceable. Further, the jury returned a unanimous verdict that Sophos literally infringed U.S. Patent Nos. 6,154,844, 8,677,494, 6,804,780, 7,613,926 and 8,141,154 and awarded Finjan $15 million in damages. The jury found that Sophos did not willfully infringe Finjan's patents. On October 31, 2016, the

Court entered Judgment in favor of Finjan. Sophos filed post-trial motions on December 20, 2016, asking the Court to overturn jury's determination and to find that there was no infringement, that U.S. Patent Nos. 6,154,844 and 8,677,494 are not patent eligible, the damages were improper, and that collateral estoppel should apply, or, in the alternative, grant a new trial. The Court held a hearing on the post-trial motions on January 18, 2017, and on March 14, 2017, the Court issued an order denying Sophos' request to overturn the jury's determination and to find that there was no infringement, held that U.S. Patent Nos. 6,154,844 and 8,677,494 are patent eligible, that damages were proper, that collateral estoppel was not applicable, and denied the request for a new trial. The Court also granted Finjan's request for pre- and post-judgment interest. On March 30, 2017, the parties entered into a settlement agreement, see Note 9 and on April 4, 2017, the Court ordered, pursuant to stipulation between the parties, that all claims in the case be dismissed with prejudice.

Finjan, Inc. v. Blue Coat Systems LLC, Case No. 5:15-cv-03295-BLF (N.D. Cal.)

Finjan filed a second patent infringement lawsuit against Blue Coat Systems LLC ("Blue Coat") in the United States District Court for the Northern District of California on July 15, 2015, asserting that Blue Coat is directly infringing certain claims of Finjan's U.S. Patent Nos. 6,154,844, 6,965,968, 7,418,731, 8,079,086, 8,225,408, 8,677,494, and 8,566,580 (collectively, the "asserted patents"), through the manufacture, use, importation, sale, and/or offer for sale of its products and services, including but not limited to the Web Security Service, WebPulse Cloud Service, ProxySG Appliances and Software, Blue Coat Systems SV2800 and SV3800, Malware Analysis Appliances and Software, Security Analytics Platform, Content Analysis System, and Mail Threat Defense, S400-10 and S400-20. Finjan seeks entry of judgment that Blue Coat has infringed and is infringing the above-listed patents, a preliminary and permanent injunction from the infringement of the same patents, an accounting of all infringing sales and revenues, damages of no less than a reasonable royalty consistent with proof, and enhanced damages for willful infringement, costs, interest, and reasonable attorneys' fees under 35 U.S.C. §285. Blue Coat filed its Answer to the Complaint with Jury Demand and Counterclaim with Jury Demand against Finjan on September 8, 2015. On September 29, 2015, Finjan filed its Answer to Blue Coat's Counterclaim. This second Blue Coat action is also assigned to the Honorable Beth Labson Freeman. On December 15, 2015, Blue Coat filed a Motion to Stay the case pending final resolution of Case 5:13-cv-03999-BLF, and Motions for Joinder of several Petitions for Inter Partes review ("IPR") on five of seven asserted patents, and Ex Parte Reexamination requests for two asserted patents, filed previously by other defendants. A case management conference was held on December 17, 2015. On March 1, 2016 Finjan filed an amended Complaint to add existing Finjan U.S. Patent No. 9,141,786 and two newly issued Finjan U.S. Patent Nos. 9,189,621 (issued November 17, 2015) and 9,219,755 (issued December 22, 2015). On March 18, 2016, Blue Coat filed its Answer to the Amended Complaint and Counterclaims with Jury Demand. On April 8, 2016, Finjan filed its Answer to Blue Coat's Counterclaims. On April 28, 2016, the Court held a hearing on Blue Coat's motion to stay. On June 10, 2016, Finjan notified the Court on the status of the IPR and Ex Parte Reexamination proceedings for the asserted patents. On June 27, 2016, Finjan filed an Amended Answer to Blue Coat's counterclaims, adding an affirmative defense of collateral estoppel. On June 27, 2016, Blue Coat filed an Amended Answer to Finjan's Amended Complaint. On July 11, 2016, Finjan filed a motion to strike certain affirmative defenses in Blue Coat's Amended Answer, and a reply to Blue Coat's counterclaims. On July 26, 2016 the Court denied Blue Coat's motion to stay the second case pending proceedings before the USPTO and the United States Patent Trial and Appeal Board's ("PTAB"). On July 28, 2016 Finjan filed a motion for preliminary injunction against Blue Coat. The preliminary injunction would prohibit Blue Coat from making, using, offering to sell or selling within the U.S. or import into the U.S. the Dynamic Real-Time Rating component of Blue Coat's WebPulse product. On August 12, 2016, the parties filed a joint claim construction statement setting forth the parties' undisputed and disputed claim terms. On August 19, 2016, the Court issued an Order setting a schedule for discovery relating to Finjan's preliminary injunction motion. On August 23, 2016, Blue Coat filed a motion to stay Finjan's infringement contentions on the grounds of collateral estoppel and res judicata, which Finjan opposed on September 27, 2016. On September 16, 2016, Blue Coat filed a motion for judgment on the pleadings under 35 U.S.C. § 101, claiming that the asserted claims of the '494 patent are ineligible for lack of patentable subject matter. The Court held a claim tutorial hearing on February 3, 2017, but canceled the Markman hearing when Finjan and Blue Coat agreed to the meaning of all terms. The hearing on Finjan's Motion to Strike Blue Coat's Sixth, Ninth and Tenth Affirmative Defenses, Finjan's Motion for Preliminary Injunction and Blue Coat's Motion for Judgment on the Pleadings was heard on November 10, 2016. On November 14, 2016, the Court granted-in-part Finjan's Motion to Strike Blue Coat's Affirmative Defenses. On November 22, 2016, the Court denied Finjan's Motion for a Preliminary Injunction. On December 13, 2016, the Court denied Blue Coat's Motion for Judgment on the Pleadings. On January 31, 2017, the Court granted-in-part and denied-in-part Finjan's motion to compel discovery from Blue Coat. On February 7, 2017, Finjan supplemented its infringement contentions. On February 2, 2017, the Court granted-in-part and denied-in-part Blue Coat's Motion to Strike Finjan's Infringement Contentions. On April 18, 2017, Blue Coat filed a Motion to Strike Portions of Finjan's Expert Reports. Finjan filed its opposition brief on May 2, 2017. On May 9, 2017, Blue Coat filed its reply brief in support of its Motion to Strike Portions of Finjan's Expert Reports. The Court scheduled Blue Coat's motion to strike to be heard on July 20, 2017. On May 17, 2017, Finjan filed a Motion for Summary Judgment of Infringement and Validity and Blue Coat filed a Motion for Summary Judgment of Noninfringement. The Parties filed their opposition briefs to the summary judgment motions on May 31, 2017, and their reply briefs on June 7, 2017. A summary judgment hearing was held on June 22, 2017. On July 28, 2017, the Court granted in part and denied in part Blue Coat's motion to strike Finjan's infringement expert reports. The Court also issued an order regarding the parties' motions for summary judgment on July 28, 2017. In its Order,

F-20

Table of Contents

the Court granted Blue Coat's motion for summary judgment of non-infringement of certain products for U.S. Patent Nos. 8,566,580 and certain products for U.S. Patent No. 9,141,786; denied the remainder of Blue Coat's motion for summary judgment; granted Finjan's motion for summary judgment of validity of U.S. Patent Nos. 7,418,731, 8,677,494, 8,566,580, 8,154,844, and 6,965,968; and denied the remainder of Finjan's motion for summary judgment. A pretrial conference was held on October 5-6, 2017. On October 31, 2017, the Court granted the parties' stipulation to narrow issues for trial. In the stipulation, the parties stipulated to withdraw Blue Coat's affirmative defenses of invalidity and laches and counterclaims of invalidity, and Finjan's affirmative defenses of waiver and collateral estoppel-issue preclusion as those defenses relate to invalidity. The parties also stipulated to withdraw Finjan's claims of infringement regarding the '086 Patent, the '755 Patent, claims 1 and 7 of the '844 Patent, claim 2 of the '731 Patent, and claims 14 and 16 of the '494 Patent, and all accused product combinations containing the Security Analytics, ProxySG, and Content Analysis System products, and Blue Coat's counterclaims and affirmative defenses of non-infringement regarding the '086 Patent, the '755 Patent, claims 1 and 7 of the '844 Patent, claim 2 of the '731 Patent, claims 14 and 16 of the '494 Patent, and all accused product combinations containing the Security Analytics, ProxySG, and Content Analysis System products. The parties also stipulated to withdraw the '086 Patent and jointly seek termination of the *inter partes* review concerning the '086 Patent with respect to Blue Coat (IPR2016-01444) as well as dates damages commence for the asserted patents for the purpose of the jury calculating damages. Trial began October 31, 2017. On November 20, 2017, the jury returned a verdict that Blue Coat literally infringes the '731 and '968 Patents and does not infringe the '408 and '621 Patents. The jury was unable to reach a verdict on infringement related to the '844 and '494 Patents. Upon the findings of infringement of the '731 and '968 Patents, the jury awarded Finjan $490,000 as reasonable royalties for Blue Coat's infringement. A hearing for the post-trial motions was heard on January 5, 2018. On January 8, 2018, the Court issued an order denying Finjan's motion for judgment as a matter of law, denying Blue Coat's motion for judgment as a matter of law with respect to literal and willful infringement of the '844 and '494 Patents and worldwide damages for the '494 Patent, and granting Blue Coat's motion for judgment as a matter of law with respect to no infringement under the doctrine of equivalents of the '844 and '494 Patents and no worldwide damages of the '844 Patent.

A retrial concerning Finjan's claims of infringement of the '844 and '494 Patents and damages began on January 8, 2018. Based on the Federal Circuit decision relating to *Finjan, Inc. v. Blue Coat Systems, Inc.*, Case No. 13-cv-03999-BLF (N.D. Cal.) that issued on January 10, 2018, the Court declared a mistrial. The Court bifurcated the retrial and the infringement retrial was scheduled for February 12, 2018, and the retrial on damages and willful infringement was scheduled for December 10, 2018. On February 9, 2018, the Court vacated the retrial. On March 2, 2018, the parties filed a stipulation with the district court that all claims in the case be dismissed with prejudice pursuant to a confidential settlement agreement. On March 5, 2018, the Court ordered, pursuant to stipulation between the parties, that all claims in the case be dismissed with prejudice.

Finjan, Inc. v. Symantec Corporation., Case No. 14-cv-02998-HSG (N.D. Cal.)

Finjan filed a patent infringement lawsuit against Symantec Corporation ("Symantec") in the United States District Court for the Northern District of California on June 30, 2014, asserting that Symantec is directly and indirectly infringing certain claims of Finjan's U.S. Patent Nos. 7,756,996, 7,757,289, 7,930,299, 8,015,182, and 8,141,154, through the manufacture, use, importation, sale, and/or offer for sale of certain products and services. Finjan amended the Complaint on September 11, 2014 to add U.S. Patent Nos. 6,154,844, 7,613,926 and 8,677,494.  The accused products and services include Symantec Endpoint Protection, Symantec Endpoint Protection Small Business Edition, Network Access Control, Norton Internet Security, Norton Anti-Virus, Norton 360, Safe-Web Lite, Norton Safe Web, Messaging Gateway, Messaging Gateway for Service Providers, Messaging Gateway Small Business Edition Managed Security Services-Advance Threat Protection, Advanced Threat Protection Solution, Symantec Protection Engine for Cloud Services, Symantec Protection Engine for Network Attached Storage, Symantec Mail Security for Domino, Symantec Mail Security for Microsoft Exchange, Symantec Scan Engine for Windows, Web Security.cloud, Email Security.cloud, AntiVirus/Filtering for Domino, AntiVirus for Linux, Mail Security for SMTP, Scan Engine for Linux/Solaris, AntiVirus for Caching/Messaging/NAS for Linux/Solaris, Protection Engine for Linux/Solaris, AntiVirus for Caching/Messaging/NAS for Windows, Web Gateway and Norton Security.  The principal parties in this proceeding are Finjan and Symantec. Finjan seeks entry of judgment that Symantec has infringed and is infringing the asserted patents, has contributorily infringed and is contributorily infringing U.S. Patent No. 8,015,182, and has induced infringement, and/or is inducing infringement of U.S. Patent Nos. 6,154,844, 7,613,926, 7,756,996, 7,757,289, 7,930,299, and 8,677,494, a preliminary and permanent injunction from infringing, contributorily infringing, or inducing the infringement of the same patents, an accounting of all infringing sales and revenues, damages of no less than a reasonable royalty and consistent with proof, enhanced damages, and enhanced damages for willful infringement, costs, interest, and reasonable attorneys' fees under 35 U.S.C. §285. Symantec answered the Amended Complaint on September 25, 2014, by denying Finjan's allegations of infringement and counterclaiming that the asserted patents are invalid under 35 U.S.C. §§ 101, 102, 103 and/or 112.  Symantec filed an Amended Answer on October 31, 2014, removing its Fourteenth Affirmative Defense of unenforceability.  Both parties have demanded a jury trial.  This matter is assigned to the Honorable Haywood S. Gilliam, Jr., United States District Judge.  A Markman Hearing was heard on June 29, 2015.

On July 3, 2015, Symantec filed petitions for IPR before the PTAB for all asserted claims of U.S. Patent Nos. 8,015,182, 8,141,154, 7,757,289, 7,930,299, and 7,756,996. On September 10, 2015, Symantec filed a total of 11 IPR petitions for all asserted claims of asserted patents. On August 20, 2015, Symantec filed a motion to stay the case pending completion of these eight IPR petitions. The motion was heard on October 1, 2015 and on October 9, 2015, the Court stayed the case pending the PTAB's decision on whether to institute IPR of the claims that are the subject of Symantec's petitions. On January 14, 2016, the PTAB denied institution of six IPRs of five asserted patents. On January 21, 2016, the parties filed a joint status report giving the Court an update regarding the status of the IPR petitions. On February 26, 2016 the PTAB denied institution of an additional two IPRs filed on separate patents, denying a total of eight petitions as of February 26, 2016. On March 11, 2016 the PTAB denied two more IPR's on patents against Symantec, denying a total of 10 petitions to date. On March 18, 2016, the PTAB granted institution on the 11th Petition by Symantec, relating to U.S. Patent No. 8,677,494 (IPR2015-01892). On March 29, 2016, the parties jointly requested the Court lift the stay, and on March 30, 2016, the Court lifted the stay.  On April 15, 2016, the parties jointly submitted a proposed schedule to the Court for the remainder of the case. On August 1, 2016, the Court issued a Scheduling Order indicating a timeline to trial but without specifically identifying a trial date. On August 31, 2016, the parties filed a joint stipulation requesting that the Court set a date for a settlement conference. There was a settlement conference that took place on March 3, 2017, and the parties provided an update on settlement discussions on March 17, 2017.

On August 25, 2016, Symantec filed an administrative motion requesting leave to submit supplemental authority regarding various claim construction issues and requesting the Court take judicial notice of statements made during and in connection with the IPR proceedings. Finjan opposed the motion on August 28, 2016. On August 24, 2016, Finjan filed a request that the Court take judicial notice of the PTAB's construction of certain claim terms in connection with its denial to institute inter partes review with respect to U.S. Patent Nos. 7,613,926 and 8,677,494. On August 25, 2016, Finjan filed a request that the Court take judicial notice of the PTAB's construction of certain claims in connection with its granting-in-part of inter partes review of U.S. Patent No. 8,677,494 and denial of inter partes review of U.S. Patent No. 7,613,926. Following a hearing on November 3, 2016, the Court granted the Motion and ordered the parties to file a joint statement by no later than November 11, 2016, proposing an expedited schedule for disclosures, briefs, and a Markman hearing if "deemed necessary by the Court". Finjan filed an opening supplemental claim construction brief on November 29, 2016, Symantec filed a responsive supplemental claim construction brief on December 13, 2016, and Finjan filed a reply brief on December 20, 2016. A supplemental Markman Hearing was held on January 20, 2017. The Court issued a Claim Construction Order on February 10, 2017. The Court issued an Order denying Symantec's Motion to Strike Finjan's Infringement Contention and Sanctions on February 15, 2017. A case management conference was held on February 21, 2017 to discuss the schedule of the case. On March 14, 2017, the Court issued an order scheduling summary judgment motions to be filed by September 22, 2017, the pretrial conference to be held on February 27, 2018, and a 10-day trial to commence on April 9, 2018. On March 24, 2017 and May 26, 2017, the parties provided updates on settlement discussions to the Court. On July 28, 2017, Symantec filed a Motion to Strike Finjan's Doctrine of Equivalents Infringement Contentions. Finjan's opposition to Symantec's Motion to Strike was filed on August 11, 2017, and Symantec's Reply was filed on August 18, 2017. On September 13, 2017, the Court issued an order denying Symantec's Motion to Strike Finjan's Doctrine of Equivalents Infringement Contentions.  On August 18, 2017, IAC Search & Media, Inc. ("IAC") filed a Motion to Intervene and Sever with respect to claims related to the '182 Patent. Finjan and Symantec filed their respective Opposition to IAC's Motion to Intervene on September 1, 2017, and IAC filed its Reply on September 8, 2017. On September 29, 2017, the Court granted IAC's request to intervene and extend the case schedule and declined to sever the claims related to the '182 Patent. On October 10, 2017, the Court issued an order scheduling summary judgment motions to be filed on January 11, 2018, the summary judgment hearing on February 15, 2018, and a pretrial conference on June 5, 2018. Trial is scheduled for July 9, 2018. On October 19, 2017, Finjan filed a motion to amend its answer to add collateral estoppel as an affirmative defense, and Symantec filed its opposition on November 2, 2017. Finjan filed its reply in support of its motion to amend its answer to add collateral estoppel as an affirmative defense on November 9, 2017. On December 7, 2017, the Court issued an order granting Finjan's Motion to Amend its Answer to include the Collateral Estoppel Affirmative Defense. On November 29, 2017, Finjan filed a motion to strike prior art references and invalidity theories from Symantec's expert reports and Symantec filed a motion to strike sections of Finjan's expert reports.  The parties filed their oppositions to the motions to strike expert report reports on December 18, 2017, and their replies on January 3, 2018. A hearing for the motions to strike was held on January 25, 2018. On January 30, 2018, the Court issued an order granting in part and denying in part Symantec and Finjan's motions to strike. On January 11, 2018, the parties filed their motions for summary judgment, and on January 25, 2018, the parties filed their oppositions to the motions for summary judgments and filed their replies on February 1, 2018. On February 12, 2018, the Court continued the hearing on the pending motions for summary judgment to March 2, 2018, and vacated the hearings set for February 15, 2018. On February 13, 2018, Finjan and Symantec stipulated to stay the case for 30 days, which the Court granted. On March 5, 2018, the Court ordered, pursuant to stipulation between the parties, that all claims in the case be dismissed with prejudice.

Finjan, Inc. v. Palo Alto Networks, Inc., Case No. 3:14-cv-04908 PJH (N.D. Cal.)

Finjan filed a patent infringement lawsuit against Palo Alto Networks, Inc. ("Palo Alto Networks") in the United States District Court for the Northern District of California on November 4, 2014, asserting that Palo Alto Networks is directly and indirectly

infringing certain claims of Finjan's U.S. Patent Nos. 6,804,780, 6,965,968, 7,058,822, 7,418,731, 7,613,918, 7,613,926, 7,647,633, 8,141,154, 8,225,408, and 8,677,494, through the manufacture, use, importation, sale, and/or offer for sale of its products and services, including but not limited to Next-Generation Security Platform, Next-Generation Firewall, Virtualized Firewall, WildFire Subscription, WildFire Platform, URL Filtering Subscription, Threat Prevention Subscription, and Advanced EndPoint Protection. Palo Alto Networks failed to timely respond to the Complaint and Finjan submitted an application for Entry of Default. On Palo Alto Networks' request, Finjan stipulated to an extension of time for Palo Alto Networks to respond. The principal parties in this proceeding are Finjan and Palo Alto Networks. Finjan seeks entry of judgment that Palo Alto Networks has infringed and is infringing the above-listed patents, and has induced infringement and is inducing infringement of U.S. Patent Nos. 6,804,780, 6,965,968, 7,058,822, 7,418,731, 7,613,918, 7,613,926, 7,647,633, 8,141,154, 8,225,408, and 8,677,494, a preliminary and permanent injunction from infringing, or inducing the infringement the same patents, an accounting of all infringing sales and revenues, damages of no less than a reasonable royalty consistent with proof, and enhanced damages for willful infringement, costs, interest, and reasonable attorneys' fees under 35 U.S.C. §285. Palo Alto Networks filed its Answer and Counterclaims on December 31, 2015, by denying Finjan's allegations of infringement and counterclaiming that the asserted patents are invalid under 35 U.S.C. §§ 101, 102, 103 and/or 112. Both parties have demanded a jury trial. On October 8, 2015, the Honorable Edward M. Chen recused himself from the case and requested the case be reassigned to another judge. Also, on October 8, 2015, the case was reassigned to the Honorable Phyllis J. Hamilton in the Oakland division of the District Court for the Northern District of California. On September 25, 2015, Palo Alto Networks filed a petition for IPR before the PTAB of U.S. Patent No. 8,141,154. On September 30, 2015, Palo Alto Networks filed petitions for IPR of U.S. Patent Nos. 7,058,822, 7,418,731, 7,647,633 and 8,225,408. On November 4, 2015, Palo Alto Networks filed an IPR petition of U.S. Patent No. 7,613,926. On November 5, 2015, Palo Alto Networks filed IPR petitions of U.S. Patent Nos. 6,965,968 and 8,141,154. On November 6, 2015, Palo Alto Networks filed IPR petitions of U.S. Patent Nos. 6,804,780, 7,613,918, 8,225,408 and 8,667,494. On December 10, 2015, the matter was stayed pending a decision by the PTAB on whether to institute IPR of Finjan's claims of its ten patents asserted against Palo Alto Networks. On March 21, 2016, the PTAB instituted trial on claims 1-8, 10 and 11 of U.S. Patent No. 8,141,154, and on April 20, 2016, the PTAB instituted trial on the same claims from a separate petition. On March 29, 2016, the PTAB instituted trial on U.S. Patent No. 8,225,408, claims 14 and 19 of U.S. Patent No. 7,647,633, and denied institution of inter partes review for U.S. Patent Nos. 7,058,822 and 7,418,731. On May 9, 2016, the PTAB denied institution of trial on U.S. Patent Nos. 7,613,926, 6,965,968, 6,804,780, and 7,613,918. On May 13, 2016, the PTAB instituted trial on U.S. Patent No. 8,677,494. On May 26, 2016, the Court ordered the stay to remain in effect until the PTAB's final determination of the instituted IPRs. There can be no assurance that Finjan will be successful in settling or litigating these claims.

Finjan, Inc. v ESET, LLC et al., Case No. 3:16-cv-03731-JD (N.D. Cal.)

Finjan filed a patent infringement lawsuit against ESET, LLC ("ESET, LLC") and ESET SPOL S.R.O. ("ESET SPOL") (collectively "ESET") in the United States District Court for the Northern District of California on July 1, 2016, asserting that ESET infringes Finjan's U.S. Patent Nos. 6,154,844, 6,804,780, 7,975,305, 8,079,086, 9,189,621, and 9,219,755, through the manufacture, use, importation, sale, and/or offer for sale of its products and services, including but not limited to, ESET ThreatSense, ESET Advanced Heuristic, ESET DNA Signature, Host-based Intrusion Prevention System (HIPS), and ESET LiveGrid technologies including ESET'S Home Protection, Small Office, and Business product lines and ESET Services. Finjan seeks entry of a judgment that ESET has infringed and is infringing the asserted patents, a preliminary and permanent injunction from the infringement of the same patents, an accounting of all infringing sales and revenues, damages of no less than a reasonable royalty consistent with proof, and enhanced damages for willful infringement, costs, interest, and reasonable attorneys' fees under 35 U.S.C. § 285. On July 14, 2016, this case was assigned to the Honorable James Donato in the San Francisco division. On July 27, 2016, ESET, LLC filed a motion to dismiss or stay this action on the grounds that ESET, LLC first filed a declaratory judgment action in the Southern District of California (ESET, LLC v. Finjan, Inc., Case No. 16-cv-01704 (S.D. Cal.)). A hearing was held on this motion on August 31, 2016, during which the Court stayed this matter pending the Southern District's resolution of Finjan's motion to dismiss ESET, LLC's declaratory judgment action. On September 16, 2016, the Southern District dismissed ESET LLC's declaratory judgment action without prejudice. On September 27, 2016, Finjan filed a notice of supplemental authority informing the Court that ESET's declaratory judgment action in the Southern District of California was dismissed without prejudice and requesting that the Court lift the stay. A Case Management Conference was held on October 6, 2016, wherein the Court granted Finjan's request to lift the stay, referred the matter to a settlement conference, and ordered service of the Complaint on ESET's counsel on behalf of ESET SPOL under Federal Rules of Civil Procedure 4(f). On January 27, 2017, the Court ordered that this Case be transferred to the Southern District of California under 28 U.S.C. § 1404(a). This case was transferred to the Southern District of California on January 30, 2017 and was assigned to the Honorable Cathy Ann Bencivengo on February 8, 2017, Case No. 3-17-cv-00183 (S.D. Cal.). There can be no assurance that Finjan will be successful in settling or litigating these claims.

Finjan, Inc. v. ESET, LLC et al., Case No. 3:17-cv-00183 (S.D. Cal.)

Finjan filed a patent infringement lawsuit against ESET, LLC ("ESET, LLC") and ESET SPOL S.R.O. ("ESET SPOL") (collectively, "ESET") in the United States District Court for the Northern District of California on July 1, 2016 (Case No. 3:16-

cv-03731-JD (N.D. Cal.)), which was transferred to the Southern District of California on January 31, 2017. This action is currently before the Honorable Cathy Ann Bencivengo. A Case Management Conference was held on March 20, 2017. On October 20, 2016, defendant ESET, LLC filed a motion to dismiss Finjan's Complaint for failure to state a claim for patent infringement. On November 2, 2016, defendant ESET SPOL filed a motion to dismiss Finjan's Complaint for lack of personal jurisdiction and for failure to state a claim for patent infringement. A hearing regarding ESET's motions to dismiss was held on March 20, 2017. On March 21, 2017, the Court denied the motions to dismiss. On April 3, 2017, ESET SPOL S.R.O. and ESET, LLC filed Answers to Finjan's Complaint, by denying Finjan's allegations of infringement and asserting counterclaims of non-infringement and invalidity, unenforceability, and invalidity under 35 U.S.C. §§ 101, 102, 103, 112, and/or 116. Both parties have demanded a jury trial. On April 10, 2017, the Court issued an order regarding claim construction briefing and discovery, and scheduled a Markman hearing for September 25, 2017. On April 24, 2017, Finjan filed (i) a motion to strike Defendants' affirmative defenses and to dismiss Defendants' counterclaims; and (ii) answers to Defendants' counterclaims. On May 16, 2017, ESET filed its Opposition to Finjan's motion to strike and motion to dismiss, and on May 23, 2017, Finjan filed its Reply in support of its motion to strike and motion to dismiss. On June 12, 2017, the Parties filed a Joint Claim Construction and Hearing Statement. On July 24, 2017, the Court granted Finjan's motion to strike ESET's affirmative defenses and dismiss counterclaims with leave to amend. ESET filed its Amended Answer and Counterclaims on August 4, 2017. On August 28, 2017, Finjan filed a Motion to Strike ESET's Amended Affirmative Defenses and Dismiss Amended Counterclaims, ESET filed its Opposition on September 18, 2017, and on September 25, 2017, Finjan filed its Reply. The Court denied Finjan's Motion to Strike ESET's Amended Affirmative Defenses and Dismiss Amended Counterclaims on October 2, 2017. The Court held a Markman hearing on September 25 and 26, 2017. On October 2, 2017, the Court issued a preliminary claim construction order and an order requesting the parties submit supplemental information and briefing related to claim construction for certain terms. Finjan filed a Motion for Reconsideration regarding the Preliminary Claim Construction Order on October 19, 2017, ESET filed its response on November 9, 2017, and Finjan filed its reply on November 16, 2017. On October 16, 2017, Finjan filed its Answer to ESET's Amended Counterclaims. The Court entered its Markman order entitled "Claim Construction Order" on November 14, 2017. On December 19, 2017, the Court entered an order denying Finjan's Motion for Reconsideration. Finjan filed a Motion for Reconsideration in Light of Recent Federal Circuit Authority on January 22, 2018. ESET's opposition to Finjan's Motion for Reconsideration is due on February 12, 2018, and Finjan's Reply is due on February 16, 2018. On February 26, 2018, a hearing for the Motion for Reconsideration was and the Court denied Finjan's Motion for Reconsideration. On January 25, 2018, the Court issued an order setting the following dates: November 16, 2018, for summary judgment and *Daubert* hearings, January 7, 2019, for the final pretrial conference, and February 4, 2019, for trial. On February 20, 2018, ESET filed a motion to stay pending *inter partes* review. Finjan's opposition is due on March 13, 2018, and ESET's reply is due on March 20, 2018. There can be no assurance that Finjan will be successful in settling or litigating these claims.

ESET, LLC v. Finjan, Inc., Case No. 16-cv-01704 (S.D. Cal.)

ESET, LLC ("ESET") filed a Complaint for Declaratory Judgment against Finjan, Inc. ("Finjan") in the United States District Court for the Southern District of California on July 1, 2016, asserting that there is an actual controversy between the parties to declare that ESET does not infringe any claim of U.S. Patent No. 7,975,305 ("the '305 Patent"). ESET sought an entry of judgment that it has not infringed any claim of the '305 Patent, an injunction against Finjan from asserting any of the claims in the '305 Patent against ESET or any of its customers or suppliers, and a finding that the case is exceptional and an award of fees and costs under 35 U.S.C. § 285. On July 11, 2016, ESET filed an Amended Complaint for Declaratory Judgment, seeking entry of judgment that it does not infringe any claim of the U.S. Patent Nos. 6,154,844, 6,804,780, 7,975,305, 8,079,086, 9,189,621, and 9,219,755. ESET seeks an injunction against Finjan from asserting infringement of these patents against ESET or any of its customers or suppliers, and a finding that the case is exceptional and an award of fees and costs under 35 U.S.C. § 285. On July 26, 2016, Finjan filed a motion to dismiss the action pursuant to the first-to-file rule, asserting that Finjan was first to file an action in the Northern District of California with respect to five of the six patents at issue between the parties (Finjan, Inc. v ESET, LLC et al., Case 3:16-cv-03731-JD (N.D. Cal.). In the alternative, Finjan sought to have the case transferred to the Northern District of California on the basis that it is the most appropriate venue. On September 26, 2016, the Court granted Finjan's motion and dismissed this action without prejudice. ESET has appealed the dismissal to the Court of Appeals for the Federal Circuit. The Federal Circuit dismissed this Appeal to the Federal Circuit on February 2, 2017 after the Court in Finjan, Inc. v. ESET, LLC et al., Case 3:16-cv-03731-JD, transferred that case to the Southern District of California.

Finjan, Inc. v. Cisco Systems, Inc., Case No. 17-cv-00072-BLF (N.D. Cal.)

Finjan filed a patent infringement lawsuit against Cisco Systems, Inc. ("Cisco") in the United States District Court for the Northern District of California on January 6, 2017, asserting that Cisco infringes Finjan's U.S. Patent Nos. 6,154,844, 6,804,780, 7,647,633, 8,141,154 and 8,677,494 through the manufacture, use, importation, sale, and/or offer for sale of its products and services, including but not limited to, Cisco's Advanced Malware Protection, Cisco Collective Security Intelligence, Cisco Outbreak Filters, Talos Security Intelligence and Research Group, and AMP Threat Grid technologies, including Cisco AMP for Endpoints, Cisco AMP for Networks (also referred to by Cisco as "NGIPS"), Cisco AMP for ASA with FirePOWER Services, Cisco AMP Private Cloud

F-24

Virtual Appliance, Cisco AMP for CWS, ESA, or WSA, Cisco AMP for Meraki MX, Cisco AMP Threat Grid.  Finjan seeks entry of a judgment that Cisco has infringed and is infringing the asserted patents, a preliminary and permanent injunction from the infringement of the same patents, an accounting of all infringing sales and revenues, damages of no less than a reasonable royalty consistent with proof, and enhanced damages for willful infringement, costs, interest, and reasonable attorneys' fees under 35 U.S.C. § 285. Finjan filed a Proof of Service for January 12, 2017 on January 18, 2017. This matter is assigned to the Honorable Beth Labson Freeman, United States District Judge. On March 6, 2017, Cisco answered Finjan's Complaint by denying Finjan's allegations of infringement, and alleging a counterclaim of breach of contract. On March 27, 2017, Finjan filed an amended complaint. On April 7, 2017, the Court granted the parties' stipulation that Cisco has until April 24, 2017 to answer or otherwise respond to Finjan's First Amended Complaint. On April 24, 2017, the Court granted the parties' stipulation for Cisco to answer or otherwise respond to Finjan's First Amended Complaint by April 26, 2017.  On April 26, 2017, Cisco filed a motion to dismiss Finjan's first amended complaint for failure to state a claim for willful infringement. On May 10, 2017, Finjan filed an opposition brief to Cisco's motion to dismiss, and Cisco filed a reply brief to its motion to dismiss on May 17, 2017. On June 1, 2017, the parties filed a joint case management statement. On June 7, 2017, the Court granted Cisco's motion to dismiss with leave to amend. A case management conference was held on June 8, 2017, during which the Court set the following dates:  October 31, 2019 for summary judgment hearings, March 26, 2020 for *Daubert* hearings, April 23, 2020 for the final pretrial conference and June 1, 2020 for trial.  The Court also set dates for the claim construction tutorial and hearing, which were later moved to June 7, 2018 for the tutorial and June 15, 2018 for the hearing. On June 16, 2017, the Court granted the parties' stipulation for Cisco to answer or otherwise respond to Finjan's complaint within 14 days of Finjan's deadline to file a second amended complaint. On July 7, 2017, Finjan filed a Second Amended Complaint. On July 21, 2017, Cisco filed a motion to dismiss Finjan's Second Amended Complaint.  Finjan's opposition to Cisco's motion to dismiss was filed on August 4, 2017, Cisco filed its reply on August 15, 2017 and the hearing was held on December 14, 2017. On February 6, 2018, the Court issued an order denying Cisco's motion to dismiss. The last date to hear dispositive motions is October 31, 2019. On February 20, 2018, Cisco filed an answer and affirmative defenses to Finjan's Amended Complaint. There can be no assurance that Finjan will be successful in settling or litigating these claims.

Finjan, Inc. v. ESET SPOL S.R.O. et al., Docket Nos. 2 Ni 53/16 (EP). 4c O 33/16 (Düsseldorf District Court and Munich Court)

Finjan filed a patent infringement lawsuit against ESET SPOL. S.R.O. (ESET SPOL"), a Slovak Republic Corporation, and ESET Deutschland GmbH (collectively "ESET") in the Düsseldorf District Court of Germany on July 1, 2016, asserting that ESET infringes Finjan's European Patent No. 0 965 094 B1 ("the '094 Patent"), through the offering and/or delivering to customers in the Federal Republic of Germany software covered by the '094 Patent, including but not limited to ESET's ThreatSense, ESET Advanced Heuristic, ESET DNA Signature, ESET LiveGrid technologies, including ESET's Home Users, Small Office, and Business product lines and ESET services. Finjan seeks a judgment sentencing ESET to a fine for each violation of patent infringement or, alternatively imprisonment of ESET directors, cease and desist orders for offering or delivering infringing software, providing Finjan with profit information for offering or delivering infringing software, damages, which Finjan has suffered or shall suffer as a result of ESET offering or delivering infringing software since November 1, 2008. The infringement hearing was held on October 5, 2017. No decision has been entered into date. On November 24, 2016, ESET filed a nullity action. Finjan responded to the nullity action contesting the nullity action completely and requesting the Court to reject the action and impose the cost of the proceedings to the claimant. There can be no assurance that Finjan will be successful in settling or litigating these claims.

Finjan, Inc. v. Blue Coat Systems, Inc., and Blue Coat Systems GmbH., Docket Nos. 2 Ni 22/17 (EP), 4c O 57/16 (Dusseldorf District Court and Munich Court)

Finjan filed a third patent infringement lawsuit against Blue Coat Systems, Inc., which is its first patent infringement suit against Blue Coat's subsidiary Blue Coat Systems GmbH, located in Munich Germany in the Dusseldorf District Court of Germany on October 14, 2016.  Finjan asserts that Blue Coat infringes Finjan's European Patent No. 0 965 094 B1 ("the '094 Patent"), through the offering and/or delivering to customers in the Federal Republic of Germany software covered by the '094 Patent, including but not limited to Blue Coat's ProxySG Secure Web Gateway, Blue Coat's Content Analysis System, Blue Coat's Malware Analysis Appliance, Webpulse, Security Analytics, Web Security Service, and Advanced Secure Gateway.  Finjan seeks a judgment sentencing Blue Coat to a fine for each violation of patent infringement or, alternatively imprisonment of Blue Coat's directors, cease and desist orders for offering or delivering infringing software, providing Finjan with profit information for offering or delivering infringing software, damages, which Finjan has suffered or shall suffer as a result of Blue Coat offering or delivering infringing software since November 1, 2008. Blue Coat filed a nullity action. Finjan responded to the nullity action contesting the nullity action completely and requesting the Court to reject the action and impose the cost of the proceedings to the claimant. The infringement hearing was held November 27, 2017. On March 2, 2018, the parties entered into a confidential settlement agreement. On March 6, 2018, Blue Coat withdrew their nullity action in Germany.

Finjan, Inc. v. SonicWall, Inc., Case No. 5:17-cv-04467 (N.D. Cal.)

Finjan filed a patent infringement lawsuit against SonicWall, Inc. ("SonicWall") in the United States District Court for the Northern District of California on August 4, 2017, asserting that SonicWall is directly and indirectly infringing certain claims of Finjan's U.S. Patent Nos. 6,154,844, 7,058,822, 6,804,780, 7,613,926, 7,647,633, 8,141,154, 8,677,494, 7,975,305, 8,225,408, and 6,965,968, through the manufacture, use, sale, importation, and/or offer for sale of its products and services, including but not limited to, Appliance Products utilizing Capture ATP and/or Gateway Security Services and Email Security Products utilizing Capture ATP and/or Gateway Security Services. Finjan seeks entry of a judgment that SonicWall has infringed and is infringing the asserted patents, a preliminary and permanent injunction from the infringement of the same patents, an accounting of all infringing sales and revenues, damages of no less than a reasonable royalty consistent with proof, and enhanced damages for willful infringement, costs, interest, and reasonable attorneys' fees under 35 U.S.C. § 285. This matter is assigned to the Honorable Beth Labson Freeman, United States District Judge.  On October 13, 2017, SonicWall filed a Motion to Dismiss Finjan's Complaint for Failure to State a Claim for Willful Infringement. Finjan filed its Opposition on October 27, 2017, and SonicWall's Reply was due November 3, 2017. A hearing regarding the Motion to Dismiss is scheduled for March 29, 2018. On December 14, 2017, the Court issued a Case Management Order scheduling a claim construction tutorial on October 5, 2018, claim construction hearing on October 12, 2018, the last day to hear dispositive motions on January 14, 2021, a final pretrial conference on March 18, 2021, and trial on May 3, 2021. On February 1, 2018, the Court entered an order setting the following dates: a Markman hearing on October 12, 2018; a summary judgment hearing on January 14, 2021; a pretrial conference on March 18, 2021, and trial on May 3, 2021. There can be no assurance that Finjan will be successful in settling or litigating these claims.

Finjan, Inc. v. Bitdefender Inc., et al., Case No. 5:17-cv-04790 (N.D. Cal.)

Finjan filed a patent infringement lawsuit against Bitdefender Inc. and Bitdefender S.R.L. ("Bitdefender") in the United States District Court for the Northern District of California on August 16, 2017, asserting that Bitdefender is directly and indirectly infringing certain claims of Finjan's U.S. Patent Nos. 6,804,780, 7,930,299, 8,141,154, and 8,677,494, through the manufacture, use, sale, importation, and/or offer for sale of its products and services, including but not limited to, Total Security, Family Pack, Internet Security, Antivirus Plus, Security for XP and Vista, Antivirus for Mac, Mobile Security, GravityZone Enterprise Security, GravityZone Elite Security, GravityZone Advanced Business Security, GravityZone Business Security, Hypervisor Introspection, Security for AWS, Cloud Security for MSP, GravityZone for xSP, and BOX. Finjan seeks entry of a judgment that Bitdefender has infringed and is infringing the asserted patents, a preliminary and permanent injunction from the infringement of the same patents, an accounting of all infringing sales and revenues, damages of no less than a reasonable royalty consistent with proof, and enhanced damages for willful infringement, costs, interest, and reasonable attorneys' fees under 35 U.S.C. § 285. This matter is assigned to the Honorable Haywood S. Gilliam, Jr., United States District Judge. A case management conference was held November 21, 2017. Bitdefender filed its answer and counterclaims on November 22, 2017. On November 27, 2017, the Court issued a Scheduling Order setting the claim construction hearing for June 6, 2018. On December 13, 2017, Finjan filed a Motion to Strike Bitdefender's Answer, Counterclaims, and Affirmative Defenses. Bitdefender filed its Opposition to the Motion to Strike on December 27, 2017, and on January 3, 2018, Finjan filed its Reply. A hearing for the Motion to Strike is scheduled for March 8, 2018. On December 21, 2017, Bitdefender S.R.L. filed a Motion to Dismiss or, in the Alternative, to Quash the Return of Service of Summons, Finjan filed its Opposition on January 4, 2018. On January 11, 2018, the parties stipulated that Bitdefender agrees to accept service of Finjan's Complaint through counsel, that Bitdefender would withdraw its Motion to Dismiss, and that Bitdefender would file its responsive pleading no later than January 26, 2018. Bitdefender filed its answer and counterclaim against Finjan on January 26, 2018. On February 5, 2018, Bitdefender filed a Motion to Stay. Finjan filed its opposition February 20, 2018, and Bitdefender's reply was filed on February 27, 2018. A hearing for the Motion to Stay is set for May 10, 2018. On March 1, 2018, the Court granted the parties' stipulation extending Finjan's time to respond to Bitdefender S.R.L.'s Answer and Counterclaims until two weeks after the Court issues an order resolving Finjan's motion to strike portions of Bitdefender Inc.'s Answer. There can be no assurance that Finjan will be successful in settling or litigating these claims.

Finjan, Inc. v. Juniper Networks, Inc., Case No. 4:17-cv-05659 (N.D. Cal.)

Finjan filed a patent infringement lawsuit against Juniper Networks, Inc. ("Juniper") in the United States District Court for the Northern District of California on September 29, 2017, asserting that Juniper is directly and indirectly infringing certain claims of Finjan's U.S. Patent Nos. 6,154,844, 6,804,780, 7,647,633, 7,613,926, 8,141,154, 8,677,494, 7,975,305, and 8,225,408, through the manufacture, use, sale, importation, and/or offer for sale of its products and services, including but not limited to, SRX Gateways, SRX Gateways using Sky ATP, and Contrail. Finjan seeks entry of a judgment that Juniper has infringed and is infringing the asserted patents, has and is inducing infringement, a preliminary and permanent injunction from the infringement of the same patents, an accounting of all infringing sales and revenues, damages of no less than a reasonable royalty consistent with proof, and enhanced damages for willful infringement, costs, interest, and reasonable attorneys' fees under 35 U.S.C. § 285. This matter is assigned to the Honorable William H. Alsup, United States District Judge. A case management conference is set for February 22, 2018. On November 8, 2017, the parties filed a stipulation that Juniper shall respond to Finjan's Complaint by December 22,

F-26

Table of Contents

2017, Finjan shall respond to Juniper's counterclaims, if any, by January 26, 2018, and Finjan shall file its opposition to Juniper's pleading motions, if any, by January 19, 2018. On November 9, 2017, the Court granted the stipulation. Juniper filed a Motion to Dismiss Finjan's claims of willfulness and induced infringement for failure to state a claim on December 22, 2017, Finjan filed its Opposition on January 5, 2018, and Juniper filed its Reply on January 12, 2018. A hearing for the Motion to Dismiss was held on February 1, 2018. On February 14, 2018, the Court granted the motion to dismiss Finjan's claims of willfulness and induced infringement for failure to state a claim. On February 28, 2018, Juniper filed its answer and counterclaims against Finjan. There can be no assurance that Finjan will be successful in settling or litigating these claims.

Finjan, Inc. v. ZScaler, Inc., Case No. 3:17-cv-06946 (N.D. Cal.)

Finjan filed a patent infringement lawsuit against ZScaler, Inc. ("ZScaler") in the United States District Court for the Northern District of California on December 5, 2017, asserting that ZScaler is directly and indirectly infringing certain claims of Finjan's U.S. Patent Nos. 6,804,780 (the "'780 Patent"), 7,647,633 (the "'633 Patent"), 8,677,494 (the "'494 Patent"), 7,975,305 (the "'305 Patent"), through the manufacture, use, sale, importation, and/or offer for sale of its products and services, including, but not limited to, ZScaler's Internet Access Bundles (including Professional, Business, and Transformation), Private Access Bundle (including Professional Business, and Enterprise), ZScaler Enforcement Node ("ZEN"), Secure Web Gateway, Cloud Firewall, Cloud Sandbox, and Cloud Architecture products and services. Finjan seeks entry of a judgment that ZScaler has and continues to infringe the asserted patents, has and continues to induce infringement, a preliminary and permanent injunction from the infringement of the same patents, an accounting of all infringing sales and revenues, damages of no less than a reasonable royalty, enhanced damages for willful infringement, costs, interest, and reasonable attorneys' fees under 35 U.S.C. § 285. This matter is assigned to the Honorable Jon S. Tigar, United States District Judge. A case management conference is set for March 5, 2018. ZScaler filed its answer and counterclaims against Finjan on February 12, 2018. On March 5, 2018, Finjan filed a motion to strike Zscaler's fifth affirmative defense. A hearing for the motion to strike is set for April 19, 2018.

**B. Proceedings before the United States Patent & Trademark Office (USPTO)**

*Ex Parte* Reexamination Proceedings

As defined by the USPTO, an *Ex Parte* Reexamination is a "proceeding in which any person may request reexamination of a U.S. Patent based on one or more prior patents or printed publications. A requester who is not the patent owner has limited participation rights in the proceedings."

U.S. Patent No. 8,079,086 (Assignee, Finjan, Inc.)
A first third-party request for *Ex Parte* Reexamination of U.S. Patent No. 8,079,086 was filed on October 7, 2013, on behalf of FireEye, Inc. and assigned Reexamination Control Number 90/013,015. The USPTO denied FireEye's request on November 19, 2013, and the reexamination proceedings terminated on January 14, 2014.

A second third-party request by FireEye, Inc., for *Ex Parte* Reexamination of U.S. Patent No. 8,079,086 was filed on February 7, 2014, and assigned Reexamination Control Number 90/013,147. The USPTO denied FireEye's second request on March 27, 2014, and the reexamination proceedings terminated on April 29, 2014.

A third third-party request for *Ex Parte* Reexamination of Claims 17 and 24 of U.S. Patent No. 8,079,086 was filed on December 9, 2015 by Proofpoint, Inc. and assigned Reexamination Control Number 90/013,654. The reexamination request was partially granted on February 2, 2016. Requester's petitioned the Director to reconsider the partial denial and the petition was granted on March 21, 2016. A response to non-final Office Action was filed on August 10, 2016. On November 23, 2016, the Patent Office issued a Reexamination Certificate confirming the patentability of all claims.

U.S. Patent No. 7,975,305 (Assignee, Finjan, Inc.)
A third-party request for *Ex Parte* Reexamination of Claims 1, 2, 5 and 13 of U.S. Patent No. 7,975,305 was filed on December 11, 2015 by Proofpoint, Inc. and assigned Reexamination Control Number 90/013,660. The request for reexamination was granted on January 19, 2016 and a non-final Office Action was mailed on April 12, 2016. A response to the non-final Office Action was filed on June 13, 2016. A Final Action was mailed on August 24, 2016 with a response due October 24, 2016. A response to the Final Action was filed on October 24, 2016 and a second interview with the Patent Office was conducted. The Patent Office issued an Advisory Action maintaining the rejections. A Notice of Appeal was filed on November 11, 2016 and an Appeal Brief was filed on January 23, 2017. An Examiner's Answer was mailed on March 29, 2017. Finjan's Reply Brief and Request for Oral Hearing were filed on May 30, 2017. Oral Hearing was held December 12, 2017 and we now await a decision on Appeal. There can be no assurance that Finjan will be successful in rebutting the patentability challenge before the USPTO.

Table of Contents

U.S. Patent No. 7,647,633 (Assignee, Finjan, Inc.)

A third-party request for *Ex Parte* Reexamination of Claims 1-7 and 28-33 of U.S. Patent No. 7,647,633 was filed on October 7, 2013, on behalf of FireEye, Inc. and assigned Reexamination Control Number 90/013,016. The request for reexamination was granted and a non-final Office Action was mailed November 19, 2013. The non-final Office Action included rejections of Claims 1-7 and 28-33 under various prior art (including previously considered and disclosed prior art) under 35 U.S.C. §§ 102 and/or 103. An in-person Examiner interview was conducted at the USPTO on February 4, 2014, and a timely response to non-final Office Action was filed on February 19, 2014. The response to non-final Office Action included arguments and a supporting declaration by Finjan showing commercial success, industry praise, and copying by others of products covered by pending claims; a declaration by a technology expert rebutting improper technical interpretations of the prior art and the invention; and additional new claims for consideration. Additionally, a renewed petition to accept an unintentionally delayed priority claim was also submitted and the petition was granted on January 23, 2015.  An updated filing receipt reflecting the priority claim was issued. A final Office Action was issued May 22, 2015, and a Notice of Appeal was filed by Finjan on May 22, 2015. Finjan's appeal brief was filed August 24, 2015, appealing the rejections of Claims 1-7, 28-33 and 42-52.  An Examiner's Answer was received on December 18, 2015. Finjan filed its Reply Brief requesting reversal of the rejections and a Request for Oral Hearing February 18, 2016. An Oral Hearing was conducted on June 22, 2016 and a decision reversing the Examiner's rejections of claim 1-7, 28-33, 42, 44, 48 and 49 was mailed on June 29, 2016. An amendment canceling rejected claims 43, 45-47 and 50-52 was filed on July 5, 2016 to move the application to Notice of Intent to Issue Reexamination Certificate (NIRC). A Reexamination Certificate confirming the patentability of original claims 1-7 and 28-33 and new claims 42, 44, 48 and 49 was issued on September 16, 2016.

A second third-party request for *Ex Parte* Reexamination of Claims 8 and 12 of U.S. Patent No. 7,647,633 was filed on December 9, 2015 by Proofpoint, Inc. and assigned Reexamination Control Number 90/013,652. The reexamination request was granted on February 3, 2016. On May 10, 2016, the USPTO terminated the reexamination and mailed a Notice of Intent to Issue a Reexamination Certificate and on May 26, 2016, a Reexamination Certificate was issued confirming the patentability of all claims.

U.S. Patent No. 7,058,822 (Assignee, Finjan, Inc.)

A third-party request for *Ex Parte* Reexamination of Claims 1-8 and 16-27 of U.S. Patent No. 7,058,822 was filed on October 7, 2013, on behalf of FireEye, Inc. and assigned Reexamination Control Number 90/013,017. The request for reexamination was granted and a non-final Office Action was mailed December 6, 2013. The non-final Office Action included rejections of Claims 1-8 and 16-27 under various prior art (including previously considered and disclosed prior art) under 35 U.S.C. §§ 102 and/or 103. An in-person Examiner interview was conducted at the USPTO on February 4, 2014, and a timely response to non-final Office Action was filed on March 6, 2014. A final Office Action was mailed on September 8, 2014 and a response thereto was filed on October 8, 2014, which included proposed claims amendments and arguments rebutting the various prior rejections. On October 23, 2014, an Advisory Action was issued by the Patent Office maintaining the rejections from the final Office Action and indicating that Finjan's proposed claims amendments would not be entered.  On December 8, 2014, Finjan: (1) filed a petition to the Director of the Central Reexamination Unit (CRU) under 37 CFR 1.181 challenging the Examiner's failure to enter the amendments and requesting entry; and (2) a notice of appeal to the Patent Trial and Appeal Board. Finjan filed an appeal brief on February 8, 2015.  The Examiner filed a brief on March 30, 2015.  Finjan filed a Reply Brief and a Request for Oral Hearing on June 1, 2015, and the Appeal was docketed at the PTAB and assigned Appeal No. 2015-006304. An oral hearing before the PTAB took place on November 3, 2015. On December 30, 2015, the PTAB issue a decision reversing the Examiner's rejection of Claims 1-8 and 16-27 and new claims 37 and 40 added during prosecution of the reexamination. On February 16, 2016, an *Ex Parte* Reexamination Certificate (Certificate No. US 7,058,822 C1) was issued to Finjan by the USPTO. Finjan was granted U.S. Patent Nos. 9,141,786 and 9,219,755 containing additional claims on September 22, 2015 and December 2, 2015, respectively.

U.S. Patent No. 6,154,844 (Assignee, Finjan, Inc.)

A third-party request for ex parte reexamination of claims 32 and 42 of U.S. Patent No. 6,154,844 was filed on December 9, 2015 by Proofpoint, Inc. and assigned Reexamination Control Number 90/013,653. The request for reexamination was granted on January 13, 2016. On March 30, 2016, the Patent Office terminated the reexamination and mailed a Notice of Intent to Issue a Reexamination Certificate. On May 13, 2016, a Reexamination Certificate was issued confirming the patentability of all claims.

U.S. Patent No. 7,930,299 (Assignee, Finjan, Inc.)

A third-party request for ex parte reexamination of claims 13, 14-18, 20 of U.S. Patent No. 7,930,299 was filed on September 16, 2016 and assigned Reexamination Control Number 90/013,811. The request for reexamination was granted on November 14, 2016. On January 17, 2017, Finjan filed a petition to consider pre-institution argument requesting, *inter alia*, that the Director rescind and/or terminate the reexamination pursuant to 35 U.S.C. § 325(d). A decision dismissing Finjan's petition to vacate the reexamination order was mailed on March 27, 2017. A Petition for Writ of Mandamus was filed with the Court of Appeal for the Federal Circuit (CAFC) requesting review of the Office's Dismissal. A non-final Office Action was received and a response was filed January 30, 2018. There can be no assurance that Finjan will be successful in rebutting the patentability challenge before the USPTO.

Table of Contents

U.S. Patent No. 8,015,182 (Assignee, Finjan, Inc.)

A third-party request for ex parte reexamination of claims 8-11, 13 of U.S. Patent No. 8,015,182 was filed on September 16, 2016 and assigned Reexamination Control Number 90/013,812. The request for reexamination was granted on October 17, 2016. On December 19, 2016, Finjan filed a petition to consider pre-institution argument requesting, *inter alia*, that the Director rescind and/or terminate the reexamination pursuant to 35 U.S.C. § 325(d). A decision dismissing Finjan's petition to vacate the reexamination order was mailed on March 27, 2017. A Petition for Writ of Mandamus was filed with the Court of Appeal for the Federal Circuit (CAFC) requesting review of the Office's Dismissal. The CAFC denied the petition. A non-final Office Action rejecting claims 8-11 and 13 was issued on April 13, 2017. An Examiner Interview was conducted on May 23, 2017 and a response to the non-final Office Action was filed on June 13, 2017. A final Office Action was mailed November 9, 2017 and a response was filed January 8, 2018. An Advisory Action was mailed February 8, 2018 and a Notice of Appeal was filed February 12, 2018. An Appeal Brief is due April 12, 2018. There can be no assurance that Finjan will be successful in rebutting the patentability challenge before the USPTO.

U.S. Patent No. 7,756,996 (Assignee, Finjan, Inc.)

A third-party request for ex parte reexamination of claims 1-7 of U.S. Patent No. 7,756,996 was filed on September 16, 2016 and assigned Reexamination Control Number 90/013,813. The request for reexamination was granted on November 14, 2016. On January 17, 2017, Finjan filed a petition to consider pre-institution argument requesting, *inter alia*, that the Director rescind and/or terminate the reexamination pursuant to 35 U.S.C. § 325(d). A decision dismissing Finjan's petition to vacate the reexamination order was mailed on March 27, 2017. A Petition for Writ of Mandamus was filed with the Court of Appeal for the Federal Circuit (CAFC) requesting review of the Office's Dismissal. The CAFC denied the petition. A non-final Office Action was mailed February 1, 2018 and a response is due April 1, 2018. There can be no assurance that Finjan will be successful in rebutting the patentability challenge before the USPTO.

*Inter Partes* Reexamination Proceedings

As defined by the USPTO, an *Inter Partes* Reexamination is a "proceeding in which any person who is not the patent owner and is not otherwise estopped may request examination of a U.S. Patent issued from an original application filed on or after November 29, 1999, based on one or more prior patents or printed publications. Both patent owner and third party requester have participation rights throughout the proceeding, including appeal rights." Effective September 16, 2012, the American Invents Act ("AIA") replaced *Inter Partes* Reexaminations with proceedings referred to as post-grant review and *Inter Partes* Review ("IPR"). Post-grant proceedings are generally available immediately after patent issuance. For patents filed under the pre-AIA first to invent rules (*i.e.*, applications filed prior to March 16, 2013, IPRs can be initiated immediately following issuance of patent. For patents examined under the AIA first-to-file rules (*i.e.*, applications filed on or after March 16, 2013), IPRs can be initiated after the nine-month window of eligibility for post-grant review.

U.S. Patent No. 6,480,962 (Assignee, Finjan, Inc.)

A third-party request for *Inter Partes* Reexamination of all Claims 1-55 of U.S. Patent No. 6,480,962 was filed on November 29, 2011, on behalf of Symantec Corporation, and assigned Reexamination Control Number 95/001,836. The request for reexamination was granted and a non-final Office Action was mailed January 25, 2012. The non-final Office Action included rejections of claims 1-55 under numerous prior art references and combinations of such references (including previously considered and disclosed prior art) under 35 U.S.C. §§ 102 and/or 103. Finjan filed a response to non-final Office Action and the USPTO mailed an Action Closing Prosecution (ACP) on October 2, 2013. Finjan responded to the ACP on December 2, 2013, which included proposed claim amendments for consideration. Symantec responded on January 2, 2014. On June 27, 2014, the USPTO stated that the proposed claim amendments would not be entered and issued a Right of Appeal Notice. On July 1, 2014, Finjan filed a Notice of Appeal of the rejection of Claims 1-55 followed by an Appeal Brief on September 2, 2014. The Requester Symantec filed a respondent brief on October 2, 2014. The Examiner filed a brief on March 25, 2015. Finjan filed a Rebuttal Brief on April 27, 2015 and a Request for Oral Hearing on May 26, 2015. The Rebuttal Brief maintained Finjan's request to review the rejections of Claims 2-4, 7-11, 13-14, 16-20, 22-32, 34-36, 39-44, 46-51, 53 and 54. Claims 1, 5, 6, 12, 15, 21, 33, 37, 38, 45, 52 and 55 were withdrawn from appeal in view the final invalidity decision issued on September 15, 2014 by the Federal Circuit. The Appeal was forwarded to the PTAB in accordance with the Notice mailed June 2, 2015. Finjan also sought examination of additional claims through multiple Track I expedited continuation applications. Finjan was granted U.S. Patent Nos. 9,189,621 and 9,291,755 containing those additional claims on November 17, 2015 and December 22, 2015, respectively. Oral argument was heard on February 17, 2016. On February 29, 2016, the PTAB issued a decision affirming the rejections of the Examiner. On March 29, 2016, Finjan filed a request for rehearing regarding the rejection of claims 22-32 and 46 and the Requester filed comments on April 28, 2016. The PTAB denied Finjan's Request for Rehearing on August 5, 2016. Finjan did not appeal the PTAB decision to the Federal Circuit. A Reexamination Certificate canceling the rejected claims 2-4, 7-11, 13-14, 16-20, 22-32, 34-36, 39-44, 46-51, 53 and 54 was issued on January 12, 2017.

F-29

*Inter Partes* Review Proceedings

As defined by the USPTO, *Inter Partes* Review ("IPR") is a trial proceeding conducted at the Patent and Trial and Appeal Board (PTAB or Board) to review the patentability of one or more claims in a patent only on a ground that could be raised under §§ 102 or 103, and only on the basis of prior art consisting of patents or printed publications. For first-inventor-to-file patents IPR process begins with a third party (a person who is not the owner of the patent) filing a petition after the later of either: (1) nine months after the grant of the patent or issuance of a reissue patent; or (2) if a post grant review is instituted, the termination of the post grant review. These deadlines do not apply to first-to-invent patents. The patent owner may file a preliminary response to the petition. An IPR may be instituted upon a showing that there is a reasonable likelihood that the petitioner would prevail with respect to at least one claim challenged. If the proceeding is instituted and not dismissed, a final determination by the Board will be issued within one year (extendable for good cause by six months). The procedure for conducting IPR took effect on September 16, 2012, and applies to any patent issued before, on, or after September 16, 2012.

U.S. Patent No. 7,613,926 (the "'926 Patent")
On March 19, 2015, Sophos, Inc. filed a petition for IPR of U.S. Patent No. 7,613,926 (IPR2015-00907). Finjan filed a Patent Owner's Preliminary Response ("POPR") to the petition on June 26, 2015. The PTAB denied Sophos' petition to institute the IPR proceeding on the '926 Patent on September 24, 2015. On October 26, 2015, Sophos filed a Request for Rehearing, and on December 4, 2015, the PTAB denied Sophos' Request for Rehearing.

U.S. Patent No. 8,677,494 (the "'494 Patent")
On April 8, 2015, Sophos, Inc. filed a petition for IPR of U.S. Patent No. 8,677,494 (IPR2015-01022). Finjan filed a POPR to the petition on July 14, 2015. The PTAB denied Sophos' petition to institute the IPR proceeding on the '494 Patent on September 24, 2015. On October 26, 2015, Sophos filed a Request for Rehearing, and on January 28, 2016, the PTAB denied Sophos' Request for Rehearing.

U.S. Patent No. 7,756,996 (the "'996 Patent")
On July 3, 2015, Symantec Corporation filed two (2) separate petitions for IPR of U.S. Patent No. 7,756,996 (IPR2015-01545/01546). Finjan filed POPRs to the petitions October 19 and 20, 2015. The PTAB denied both of Symantec's petitions to institute IPR proceedings on the '996 Patent on January 14, 2016. On February 16, 2016, Symantec filed a Request for Rehearing, and on February 25, 2016, the PTAB denied Symantec's Request for Rehearing.

U.S. Patent No. 7,757,289 (the "'289 Patent")
On July 3, 2015, Symantec Corporation filed a petition for IPR of U.S. Patent No. 7,757,289 (IPR2015-01552). Finjan filed a POPR to the petition on October 19, 2015. The PTAB denied Symantec's petition to institute IPR proceedings on the '289 Patent on January 14, 2016.

U.S. Patent No. 7,930,299 (the "'299 Patent")
On July 3, 2015, Symantec Corporation filed a petition for IPR of U.S. Patent No. 7,930,299 (IPR2015-01549). Finjan filed a POPR to the petition October 20, 2015. The PTAB denied Symantec's petition to institute IPR proceedings on the '299 Patent on January 14, 2016.

U.S. Patent No. 8,015,182 (the "'182 Patent")
On July 3, 2015, Symantec Corporation filed a petition for IPR of U.S. Patent No. 8,015,182 (IPR2015-01548). Finjan filed a POPR to the petition on October 20, 2015. The PTAB denied Symantec's petition to institute IPR proceedings on the '182 Patent on January 14, 2016.

U.S. Patent No. 8,141,154 (the "'154 Patent")
On July 3, 2015, April 19, 2016, and May 26, 2016, Symantec Corporation filed three (3) separate petitions for *IPR* of U.S. Patent No. 8,141,154 (IPR2015-01547; IPR2016-00919; IPR2016-01071), and moved to join the petition for IPR filed by Palo Alto Networks with respect to the '154 Patent (IPR2016-00151). Finjan filed a POPR to the petition in IPR2015-01547 on October 19, 2015. The PTAB denied Symantec's petition to institute IPR proceedings in IPR2015-01547 on January 14, 2016. On February 16, 2016, Symantec filed a Request for Rehearing with respect to IPR2015-01547, and on February 25, 2016, the PTAB denied Symantec's Request for Rehearing. With respect to IPR2016-00919 and IPR2016-01071 on the '154 Patent, the PTAB granted Symantec's motions for joinder on September 8, 2016. On March 15, 2017, the PTAB issued a final written decision maintaining the validity of the instituted claims in both IPR2016-00919 and IPR2016-01071.

Table of Contents

U.S. Patent No. 8,677,494 (the "'494 Patent")
On September 10, 2015, Symantec filed a petition for inter partes review of the '494 Patent (IPR2015-01892). Finjan filed a POPR to the petition on December 28, 2015. On March 18, 2016, the PTAB granted Symantec's petition to institute the IPR proceeding on claims 1, 2, 5, 6, 10, 11, 14, and 15 of the '494 Patent. On April 1, 2016, Finjan filed a request for rehearing. The PTAB denied the request for rehearing on May 23, 2016. On March 15, 2017, the PTAB issued a final written decision maintaining the validity of claims 5, 10, 11, 14, and 15 and invalidating claims 1, 2, and 6 of the '494 Patent. Symantec filed a Notice of Appeal to the United States Court of Appeals for the Federal Circuit on May 16, 2017, and on May 18, 2017, Finjan filed its Notice of Appeal to the United States Court of Appeals for the Federal Circuit (Case No. 17-2034 and 2017-2047). Symantec and Blue Coat filed its Opening Appellant Brief on August 25, 2017. The Federal Circuit consolidated Case No. 17-2543 filed by Palo Alto Networks and Blue Coat Systems with Case No. 17-2034. Palo Alto Networks' and Blue Coat Systems' Opening Appellant Brief filed its Opening Appellant Brief on December 29, 2017. Finjan filed its Cross-Appellant Principal and Response Brief on February 7, 2018. Appellant's Reply Brief is due on March 19, 2018. On March 8, 2018, Symantec and Blue Coat filed a motion to withdraw from appeal numbers 2017-2543, 2623.

On September 11, 2015, Symantec Corp. filed a petition for inter partes review of the '494 Patent (IPR2015-01897). Finjan filed a POPR to the petition on December 28, 2015. The PTAB denied Symantec's petition to institute the IPR proceeding on the '494 Patent on February 26, 2016.

U.S. Patent No. 6,154,844 (the "'844 Patent")
On September 11, 2015, Symantec Corporation filed a petition for IPR of U.S. Patent No. 6,154,844 ("the '844 Patent") (IPR2015-01894). Finjan filed a POPR to the petition on December 17, 2015. The PTAB denied institution of the IPR proceeding on the '844 Patent on March 11, 2016.

U.S. Patent No. 7,613,926 (the "'926 Patent")
On September 11, 2015, Symantec, Corp. ("Symantec") filed two petitions for IPR of the '926 Patent (IPR2015-01893, IPR2015-01895). Finjan filed its POPRs to the Petition on December 17, 2015. The PTAB denied Symantec's petition to institute the IPR proceeding for IPR2015-01895 on February 26, 2016. The PTAB denied Symantec's petition to institute the IPR proceeding for IPR2015-01893 on March 11, 2016.

U.S. Patent No. 8,141,154 (the "'154 Patent")
On September 25, 2015 and November 5, 2015, Palo Alto Networks Inc. filed two (2) separate petitions for IPR of U.S. Patent No. 8,141,154 and a Motion for Joinder to Symantec's Petition for IPR of the '154 Patent (IPR2015-01547). (IPR2015-01979; IPR2016-00151). Finjan filed a POPR to the first petition in IPR2015-01979 on December 29, 2015. With respect to IPR2015-01979, the PTAB granted institution of IPR proceedings on the '154 Patent on March 21, 2016. On April 5, 2016, Finjan filed a partial request for rehearing, and on April 19, 2016, the PTAB denied Finjan's partial request for rehearing. On July 12, 2016, Finjan submitted a Patent Owner Response to the Petition. With respect to IPR2016-00151 on the '154 Patent, Finjan filed a POPR on February 17, 2016, and on April 20, 2016, the PTAB instituted trial on claims 1-8, 10, and 11, denied institution on the remaining claims and denied Palo Alto Network's Motion for Joinder. On May 4, 2016, Finjan filed a partial request for rehearing, and on June 2, 2016, the PTAB denied Finjan's Request for Rehearing. On June 16, 2016, the parties filed a joint notice to amend the Scheduling Order. On August 31, 2016, Finjan filed its Patent Owner Response to Palo Alto Network's Petition in IPR 2016-00151. The parties had an oral hearing for IPR2016-00151 on January 24, 2017 and on March 15, 2017, the PTAB issued a final written decision maintaining the validity of all instituted claims. The parties had an oral hearing for IPR2015-01979 on December 15, 2016 and on March 15, 2017, the PTAB issued a final written decision maintaining the validity of all instituted claims. On April 14, 2017, Palo Alto Networks filed a request for rehearing. On May 19, 2017, the PTAB denied Palo Alto Networks' request for rehearing. Palo Alto Networks and Symantec Corp. filed Notice of Appeals for IPR2016-00151, IPR2015-01979, IPR2016-00919, and IPR2016-01071 to the United States Court of Appeals for the Federal Circuit on July 19, 2017 (Case No. 17-2315 and 17-2314). On July 24, 2017, the Federal Circuit consolidated the two appeals. On October 30, 2017, Palo Alto Networks and Symantec Corp. filed their Opening Appellant Brief. Finjan's Responsive Brief was filed on December 20, 2017. Palo Alto Network and Symantec Corp.'s Reply Brief was filed on January 25, 2018. On March 8, 2018, Symantec and Blue Coat filed a motion to withdraw from appeal numbers 2017-2314, 2315.

U.S. Patent No. 7,647,633 (the "'633 Patent")
On September 30, 2015, Palo Alto Networks, Inc. filed a petition for IPR of U.S. Patent No. 7,647,633 (IPR2015-01974). Finjan filed a POPR to the petition on January 7, 2016. On March 29, 2016, the PTAB granted institution of IPR proceedings with respect to claims 14 and 19 of the '633 Patent, and denied institution with respect to all other challenged claims. On April 12, 2016, Palo Alto Networks filed a request for rehearing. On May 18, 2016, the PTAB denied Palo Alto Networks' Request for Rehearing. On June 1, 2016, the parties filed a joint notice to amend the Scheduling Order. On August 9, 2016, Finjan filed its Patent Owner Response to Palo Alto Network's Petition in IPR 2015-01974. The parties had an oral hearing on January 5, 2017, and on March 16, 2017, the PTAB issued a final written decision maintaining the validity of all instituted claims.

Table of Contents

U.S. Patent No. 7,058,822 (the "'822 Patent")
On September 30, 2015, Palo Alto Networks Inc. filed a petition for IPR of United States Patent No. 7,058,822 (IPR2015-01999). Finjan filed a POPR to the petition on January 6, 2016. The PTAB denied institution of IPR proceedings on the '822 Patent on March 29, 2016. On April 28, 2016, Palo Alto Networks filed a Request for Rehearing, and on May 18, 2016, the PTAB granted Palo Alto Networks' Request for Rehearing but did not alter its Decision denying institution.

U.S. Patent No. 7,418,731 (the "'731 Patent")
On September 30, 2015, Palo Alto Networks Inc. filed a petition for IPR of United States Patent No. 7,418,731 (IPR2015-02000). Finjan filed a POPR to the petition on January 8, 2016. The PTAB denied institution of IPR proceedings on the '731 Patent on March 23, 2016. On April 22, 2016, Palo Alto Networks filed a Request for Rehearing. On May 20, 2016, the PTAB denied Palo Alto Networks' Request for Rehearing.

U.S. Patent No. 8,225,408 (the "'408 Patent")
On September 30, 2015 and November 6, 2015, Palo Alto Networks Inc. filed two (2) separate petitions for IPRs of United States Patent No. 8,225,408 (IPR2015-02001; IPR2016-00157). Finjan filed POPRs to the petitions on January 6, 2016, and February 17, 2016, respectively. On March 29, 2016, the PTAB granted institution of the IPR proceedings in IPR2015-02001 and IPR2016-00157 and consolidated the two IPR proceedings. On April 12, 2016, Finjan filed requests for rehearing. On May 16, 2016, the PTAB denied Finjan's Requests for Rehearing. On June 27, 2016, the parties filed a joint notice to amend the Scheduling Order. On August 9, 2016, Finjan filed its Patent Owner Response to Palo Alto Network's Petition in IPR 2015-02001 and IPR 2016-00157. The parties had an oral hearing on January 5, 2017, and on March 17, 2017, the PTAB issued a final written decision maintaining the validity of all instituted claims. Palo Alto Networks and Blue Coat Systems LLC filed a Notice of Appeal to the United States Court of Appeals for the Federal Circuit on May 22, 2017 (Case No. 17-2059). Palo Alto Networks and Blue Coat Systems LLC filed their Opening Appellant Brief on September 15, 2017. Finjan filed its Response Brief on November 27, 2017, and Palo Alto Networks and Blue Coat Systems LLC filed their Reply Brief on January 11, 2018.

U.S. Patent No. 7,613,926 (the "'926 Patent")
On November 4, 2015, Palo Alto Networks, Inc. filed a petition for IPR of the '926 Patent (IPR2016-00145). Finjan filed its POPR on February 17, 2016. The PTAB denied Palo Alto Networks' petition to institute the IPR proceeding on the '926 Patent on May 9, 2016.

U.S. Patent No. 6,965,968 (the "'968 Patent")
On November 5, 2015, Palo Alto Networks Inc. filed two (2) separate petitions for IPR of United States Patent No. 6,965,968 (IPR 2016-00149, IPR2016-00150). Finjan filed POPRs to the petitions on February 17, 2016. On May 16, 2016, the PTAB denied institution of IPR proceedings on both petitions.

U.S. Patent No. 6,804,780 (the "'780 Patent")
On November 6, 2015, Palo Alto Networks Inc. filed a petition for IPR of United States Patent No. 6,804,780 (IPR 2016-00165). Finjan filed a POPR to the petition on February 17, 2016. On April 21, 2016, the PTAB denied institution of IPR.

U.S. Patent No. 7,613,918 (the "'918 Patent")
On November 6, 2015, Palo Alto Networks Inc. filed a petition for IPR of United States Patent No. 7,613,918 (IPR 2016-00164). Finjan filed a POPR to the petition on February 17, 2016. On May 5, 2016, the PTAB denied institution of IPR.

U.S. Patent No. 8,677,494 (the "'494 Patent")
On November 6, 2015, Palo Alto Networks Inc. filed a petition for IPR of United States Patent No. 8,677,494 (IPR 2016-00159). Finjan filed a POPR to the petition on February 17, 2016. On May 13, 2016, the PTAB granted institution of IPR. On May 27, 2016, Finjan filed a Request for Rehearing, and on June 23, 2016 the PTAB denied Finjan's Request for Rehearing. On June 27, 2016, the parties filed a joint notice to amend the Scheduling Order. On August 12, 2016, Finjan filed its Patent Owner Response to Palo Alto Network's Petition in IPR 2016-00159. The parties had an oral hearing on February 16, 2017. On April 11, 2017, the PTAB issued a final written decision stating that claims 3 - 5 and 10 - 15 have not been shown to be unpatentable, and claims 1, 2, and 6 have been shown to be unpatentable. Finjan filed a request for rehearing on May 11, 2017, and on July 17, 2017, the PTAB denied Finjan's request. Palo Alto Networks and Blue Coat Systems LLC filed a Notice of Appeal for IPR2016-00159 and IPR2016-01174 to the United States Court of Appeals for the Federal Circuit on September 14, 2017, and on September 28, 2017, Finjan filed its Notice of Appeal (Case No. 17-2543). The Federal Circuit consolidated the appeal with Case No. 17-2034.

Table of Contents

U.S. Patent No. 6,965,968 (the "'968 Patent")
On January 19, 2016, Blue Coat Systems, Inc. filed two petitions for IPR of the '968 Patent (IPR2016-00478; IPR2016-00479) and a Motion for Joinder to Palo Alto Networks' Petition for IPR of the '968 Patent (IPR2015-00149; IPR2015-00150). On April 22, 2016, Finjan filed a POPR to the petitions. On June 20, 2016, the PTAB denied institution of IPR proceedings on both petitions.

U.S. Patent No. 7,647,633 (the "'633 Patent")
On January 20, 2016, Blue Coat Systems, Inc. filed a Petition for IPR of U.S. Patent No. 7,647,633 ("the '633 Patent") (IPR2016-00480) and a Motion for Joinder to Palo Alto Networks' Petition for IPR of the '633 Patent (IPR2015-01974). On April 22, 2016, Finjan filed a POPR to the petition. On June 24, 2016, the PTAB instituted IPR, and granted Blue Coat's Motion for Joinder. On March 16, 2017, the PTAB issued a final written decision maintaining the validity of all instituted claims.

U.S. Patent No. 7,418,731 (the "'731 Patent")
On January 21, 2016, Blue Coat Systems, Inc. filed a Petition for IPR of U.S. Patent No. 7,418,731 ("the '731 Patent") (IPR2016-00493) and a Motion for Joinder to Palo Alto Networks' Petition for IPR of the '731 Patent (IPR2015-02000). On April 29, 2016, Finjan filed a POPR to the petition. On June 8, 2016, the PTAB denied institution of IPR.

U.S. Patent No. 6,804,780 (the "'780 Patent")
On January 21, 2016, Blue Coat Systems, Inc. filed a petition for IPR of U.S. Patent No. 6,804,780 (IPR2016-00492) and a Motion for Joinder to Palo Alto Networks' Petition for IPR of the '780 Patent (IPR2016-00165). On April 29, 2016, Finjan filed a POPR to the petition. On June 8, 2016, the PTAB denied institution of IPR.

U.S. Patent No. 6,154,844 (the "'844 Patent")
On January 25, 2016, Blue Coat Systems, Inc. filed a Petition for IPR of U.S. Patent No. 6,154,844 (IPR2016-00498) and a Motion for Joinder to Symantec Corp.'s Petition for IPR of the '844 Patent (IPR2015-01894). On April 29, 2016, Finjan filed a POPR to the petition. On June 20, 2016, the PTAB dismissed the Petition and motion for joinder pursuant to Blue Coat's motion to dismiss.

U.S. Patent No. 8,225,408 (the "'408 Patent")
On April 27, 2016, Blue Coat Systems, Inc. filed two (2) separate petitions for IPRs of United States Patent No. 8,225,408 (IPR2016-00955; IPR2016-00956), and Motion for Joinder to Palo Alto Networks, Inc.'s Petitions for IPR of the '408 Patent (IPR2015-02001 and IPR2016-00157). On August 30, 2016, the PTAB granted Blue Coat Systems, Inc.'s Motions for Joinder. On March 17, 2017, the PTAB issued a final written decision maintaining the validity of all instituted claims in IPR2015-02001 and IPR2016-00157.

U.S. Patent No. 8,677,494 (the "494 Patent")
On April 14, 2016 and on June 10, 2016, Blue Coat Systems, Inc. filed two Petitions for IPR of United States Patent No. 8,677,494 (IPR2016-00890; IPR2016-01174) and a Motion for Joinder to Symantec Corp.'s Petition for IPR of the '494 Patent (IPR2015-01892) and Palo Alto Networks, Inc.'s Petition for IPR of the '494 Patent (IPR2016-00159). The PTAB granted Blue Coat's motions for joinder.  On March 15, 2017, the PTAB issued a final written decision maintaining the validity of claims 5, 10, 11, 14, and 15 and invalidating claims 1, 2, and 6 of the '494 Patent in IPR2015-01892.

U.S. Patent No. 8,141,154 (the "'154 Patent")
On April 21, 2016, Proofpoint, Inc. and Armorize Technologies, Inc. filed a Petition for IPR of U.S. Patent No. 8,141,154 (IPR2016-00937) and a Motion for Joinder to Palo Alto Networks, Inc.'s Petition for IPR of the '154 (IPR2015-01979). On June 24, 2016, the PTAB terminated the IPR proceedings pursuant to a joint motion.

U.S. Patent No. 7,647,633 (the "'633 Patent")
On April 29, 2016, Proofpoint, Inc. and Armorize Technologies, Inc. filed a Petition for IPR of U.S. Patent No. 7,647,633 ("the '633 Patent") (IPR2016-00966) and a Motion for Joinder to Palo Alto Networks' Petition for IPR of the '633 Patent (IPR2015-01974). On June 24, 2016, the PTAB terminated the IPR proceedings pursuant to a joint motion.

U.S. Patent No. 8,225,408 (the "'408 Patent")
On April 29, 2016, Proofpoint, Inc. and Armorize Technologies, Inc. filed  two separate Petitions for IPR of U.S. Patent No. 8,225,408 (the "'408 Patent") (IPR2016-00967; IPR2016-00970) and a Motion for Joinder to Palo Alto Networks' Petition for IPR of the '408 Patent (IPR2015-02001; IPR2016-00157). On June 24, 2016, the PTAB terminated the IPR proceedings pursuant to a joint motion.

Table of Contents

U.S. Patent No. 8,079,086 (the "'086 Patent")
On July 15, 2016, Blue Coat Systems, Inc. filed a Petition for IPR of U.S. Patent No. 8,079,086 (the "'086 Patent") (IPR2016-01444). Finjan filed its POPR on November 18, 2016. The PTAB denied institution of IPR on February 16, 2017. Blue Coat Systems, Inc. filed a request for hearing on March 20, 2017 and July 18, 2017 the PTAB granted Blue Coat Systems, Inc's request and instituted IPR. On November 27, 2017, Finjan and Blue Coat filed a joint motion to terminate. On December 1, 2017, the PTAB granted the joint motion to terminate with respect to Blue Coat.

U.S. Patent No. 8,225,408 (the "'408 Patent")
On July 15, 2016, Blue Coat Systems, Inc. filed a Petition for IPR of U.S. Patent No. 8,225,408 (the "'408 Patent") (IPR2016-01441). On November 18, 2016, Finjan filed a POPR. On December 13, 2016, the PTAB authorized Blue Coat to file a Reply to the POPR and Finjan a sur-reply to respond to the arguments in Petitioner's Reply. On January 23, 2017, the PTAB denied institution of IPR.

U.S. Patent No. 8,677,494 (the "'494 Patent")
On July 15, 2016, Blue Coat Systems, Inc. filed a Petition for IPR of U.S. Patent No. 8,677,494 (the "'494 Patent") (IPR2016-01443). On January 23, 2017, the PTAB denied Blue Coat's petition to institute the IPR proceeding on the '494 Patent.

U.S. Patent No. 8,225,408 ("'408 Patent")
On October 28, 2016, FireEye, Inc. filed a Petition for IPR of the '408 Patent (IPR2017-00157) and a Motion for Joinder to Blue Coat Systems, Inc.'s Petition for IPR of the '408 Patent (IPR2016-01441). Finjan filed its POPR on February 3, 2017 and the PTAB denied institution of IPR of Blue Coat's Petition for IPR on January 23, 2017. On April 13, 2017, the PTAB denied the Petition and Motion for Joinder.

U.S. Patent No. 8,079,086 (the "'086 Patent")
On October 28, 2016, FireEye, Inc. filed a petition for IPR of the '086 Patent (IPR2017-00155) and a Motion for Joinder to Blue Coat's Petition for IPR of the '086 Patent (IPR2016-01444). Finjan filed its POPR on February 3, 2017 and on May 1, 2017, the PTAB denied institution of IPR. FireEye filed a request for rehearing on May 31, 2017. The PTAB denied institution of IPR of Blue Coat's Petition for IPR in IPR2016-014444 on February 16, 2017. Blue Coat filed a request for hearing on March 20, 2017 and on July 18, 2017, the PTAB granted Blue Coat Systems, Inc's request and instituted IPR. On July 19, 2017, the PTAB granted FireEye's request and joined it as a party to the Blue Coat proceeding. On November 27, 2017, Finjan and Blue Coat filed a joint motion to terminate. On December 1, 2017, the PTAB granted the joint motion to terminate with respect to Blue Coat and ordered that the proceeding shall continue with respect to FireEye. On January 12, 2018, Finjan and FireEye filed a joint motion to terminate. On February 16, 2018, the PTAB issued an order terminating the proceeding with respect to all parties.

U.S. Patent No. 9,189,621 (the "'621 Patent")
On March 1, 2017, Blue Coat Systems LLC filed a petition for IPR of the '621 Patent (IPR2017-00995). Finjan filed its POPR on June 22, 2017. On September 5, 2017, the PTAB instituted IPR for claims 1, 4-6, 9, 12-14, 17, 24, 35, 37, and 42. Finjan filed its Patent Owner Response on December 11, 2017. Petitioner's Reply is due on March 5, 2018. Oral argument is scheduled for May 23, 2018.

U.S. Patent No. 9,141,786 (the "'786 Patent")
On March 1, 2017, Blue Coat Systems LLC filed a petition for IPR of the '786 Patent (IPR2017-00996). Finjan filed its POPR on June 14, 2017. On September 5, 2017, the PTAB denied institution of IPR.

U.S. Patent No. 9,219,755 (the "'755 Patent")
On March 1, 2017, Blue Coat Systems LLC filed a petition for IPR of the '755 Patent (IPR2017-00997). Finjan filed its POPR on June 15, 2017. On September 5, 2017, the PTAB denied institution of IPR.

U.S Patent No. 7,975,305 (the "'305 Patent")
On July 4, 2017, ESET, LLC and ESET SPOL S.R.O. filed a petition for IPR of the '305 Patent (IPR2017-01738). Finjan filed its POPR on November 3, 2017. On January 31, 2018, the PTAB instituted IPR on claims 1-25 of the '305 Patent. Finjan's Patent Owner Response is due on April 30, 2018, and Petitioner's Reply is due on July 30, 2018. Oral argument is scheduled for October 24, 2018.

U.S. Patent No. 8,079,086 (the "'086 Patent")
On August 16, 2017, ESET, LLC and ESET SPOL S.R.O. filed a petition for IPR of the '086 Patent and motion for joinder to Blue Coat Systems, Inc. v. Finjan, Inc. IPR2016-01444 (IPR2017-01969). On November 3, 2017, Finjan filed its POPR. On January 9, 2018, the PTAB denied institution of IPR. On February 6, 2018, ESET filed a request for rehearing. On February 15, 2018, the PTAB denied ESETs' request for rehearing.

F-34

U.S. Patent No. 6,154,844 (the "'844 Patent")
On September 22, 2017, Cisco Systems, Inc. filed a petition for IPR of the '844 Patent (IPR2017-02154). Finjan filed its POPR on January 6, 2018.

U.S. Patent No. 8,677,494 (the "'494 Patent")
On September 22, 2017, Cisco Systems, Inc. filed a petition for IPR of the '494 Patent (IPR2017-02155). Finjan filed its POPR on January 8, 2018.

U.S. Patent No. 7,647,633 (the "'633 Patent")
On December 22, 2017, Cisco Systems, Inc. ("Cisco") filed a petition for IPR of the '633 Patent (IPR2018-00391). Finjan's POPR is due on March 28, 2018.

Except for the foregoing disclosures, Finjan is not presently aware of any other material pending legal proceedings, to which Finjan or any of its subsidiaries are a party or of which any of its property is the subject.

Litigation, including patent litigation, is inherently subject to uncertainties. As such, there can be no assurance that Finjan will be successful in litigating and/or settling any of these claims.

**NOTE 9 – LICENSE, SETTLEMENT AND RELEASE AGREEMENTS**

Subsequent to December 31, 2017, the Company, including its wholly-owned subsidiary, Finjan, Inc. ("Finjan" and collectively with the Company and its affiliated companies, the "Finjan Parties"), announced on March 1, 2018, that Finjan Parties and Symantec Corporation ("Symantec") and its subsidiary, Blue Coat Systems, LLC ("Blue Coat") (collectively, the "Symantec Parties") entered into a Confidential Patent License and Settlement Agreement (the "License and Settlement Agreement") effective as of February 28, 2018 (the "Effective Date"). Specifically, the Parties have resolved and settled all claims between them. As part of the settlement, the Symantec Parties will obtain a license to, among others, the Finjan patents and pay the Finjan Parties $65.0 million in cash within twenty (20) days of the Effective Date of the License and Settlement Agreement. Further, if Symantec of acquires certain entities within four years from the Effective Date, the Symantec Parties will pay additional license fees of up to $45.0 million to the Finjan Parties, unless otherwise mutually agreed to by the Company and Symantec. The remaining terms of the License and Settlement Agreement are confidential.

On December 29, 2017, Finjan entered into a Confidential Patent License and Settlement Agreement (the "Finjan License") with FireEye, Inc. whereby the companies resolved all pending litigation matters and together with a contemporaneous license agreement from FireEye to Finjan and its affiliates (the "FireEye License" and collectively with the Finjan License, the "Agreements"), the parties granted each other cross-licenses going forward. Under the terms of the Finjan License, FireEye agreed to pay Finjan $17.5 million in license fees, as follows: (a) $12.5 million on the Effective Date of the Finjan License, which amount was paid on December 29, 2017 and recognized as revenues as of December 31, 2017, in accordance with the Company's revenue recognition policy as described in Note 2, and (b) $5.0 million which was offset by $5 million in license fees from Finjan to FireEye under the FireEye License, granting a perpetual license for the use of FireEye's patents. The FireEye License was determined not to be an intangible asset since it had no defined future benefit.  Therefore, the FireEye License was expensed under SG&A.

On April 21, 2017, the Company entered into a Confidential Patent License Agreement (the "EU Agreement") with a European corporation ("EU Licensee"). Pursuant to the EU Agreement, EU Licensee obtained a license to our patent portfolio and agreed to pay Finjan $4.9 million cash, in license fees, paid as follows, (i) $2.3 million to be paid within 10 days after the effective date of the April 2017 Agreement, (ii) $1.3 million on or before January 31, 2018, and (iii) $1.3 million on or before January 31, 2019. The Company recognized $2.3 million of the $4.9 million license as revenues as of June 30, 2017, in accordance with the Company's revenue recognition policy as described in Note 2. The second installment of $1.3 million was received on February 1, 2018 and recognized as revenues as of December 31, 2017, in accordance with the Company's revenue recognition policy as described in Note 2. Such license does not grant EU Licensee any right to transfer, sublicense or grant any rights under the EU Agreement to a third party except as specifically provided under the EU Agreement. Such license also has certain provisions relating to certain unlicensed products of any company that acquires EU Licensee, or is acquired by EU Licensee or its affiliates, in which case additional license fees may apply. The specific terms of the EU Agreement are confidential.

On March 30, 2017, Finjan entered into a Confidential Master Agreement (the "Master Agreement") with Sophos Group plc, a public limited company organized and existing under the laws of England and Wales, Sophos Limited, a corporation organized and existing under the laws of England and Wales ("Sophos Limited"), and Sophos Inc. ("Sophos Inc."), a Massachusetts corporation (collectively, "Sophos"). Pursuant to the Master Agreement, Finjan and Sophos Inc. agreed to dismiss the suit Finjan, Inc. v. Sophos, Inc. before the United States District Court of the Northern District of California (case no. 3:14cv1197-WHO) with

Table of Contents

prejudice. The Master Agreement also provides for full releases by the parties and covenants not to sue. Under the terms of the Sophos Agreement, on March 30, 2017, Sophos obtained a fully paid up license to the Finjan patent portfolio and agreed to pay a license fee of $15.0 million in cash, which Finjan received on March 31, 2017. The Company recognized $15.0 million as revenues as of March 31, 2017, in accordance with the Company's revenue recognition policy as described in Note 2. Finally, in connection with the Sophos Agreement, on March 30, 2017, Finjan Mobile entered into a Confidential Patent Cross License Agreement (the "Finjan Mobile Cross License Agreement") with Sophos Limited. Pursuant to the terms of the Finjan Mobile Cross License Agreement, the parties granted patent cross licenses in the Field of Use and Sophos Limited agreed to pay Finjan Mobile $2.5 million cash, $1.25 million on or before March 31, 2018, and $1.25 million on or before March 31, 2019, of which $1.25 million was recognized as revenues as of December 31, 2017, in accordance with the Company's revenue recognition policy as described in Note 2 of our consolidated financial statements.

On March 24, 2017, Finjan entered into a Patent License, Settlement and Release Agreement (the "Avast Agreement") with Avast Software s.r.o., a company organized under the laws of the Czech Republic ("Avast"), which provided that upon Avast's satisfaction of certain terms, Finjan would dismiss its breach of contract and patent infringement claims, filed in the U.S. District Court for the Northern District of California (Case No. 3:17-cv-00283-BLF), against Avast and its newly acquired subsidiary, AVG Technologies, with prejudice.  Under the terms of the Avast Agreement, Avast agreed to pay Finjan  $7.745 million in cash on or before March 24, 2017. Payment was received on March 24, 2017 and was recorded as revenue in the first quarter of 2017, in accordance with the Company's revenue recognition policy, as described in Note 2. As provided in the Avast Agreement, specific terms of the agreement are confidential.

On March 2, 2017, Finjan entered into a Confidential Patent License Agreement (the "Veracode Agreement") with Veracode, Inc., a Delaware corporation ("Veracode"). Pursuant to the Veracode Agreement, Veracode obtained a license to the Finjan patent portfolio and agreed to pay a license fee of $2.0 million in cash, which Finjan received on March 2, 2017 and was recorded as revenue in the first quarter of 2017, in accordance with the Company's revenue recognition policy, as described in Note 2. Such license does not grant Veracode any right to transfer, sublicense or grant any rights under the Veracode Agreement to a third party except as specifically provided under the Veracode Agreement.  Such license also has certain provisions relating to certain unlicensed products of any company that acquires Veracode, or is acquired by Veracode or its affiliates, in which case additional license fees may apply. The specific terms of the Veracode Agreement are confidential.

On December 28, 2016, Finjan entered into a Confidential Patent License Agreement (the "December 2016 License") with F5 Networks, Inc. ("F5"). The December 2016 License provides for F5 to pay a license fee of $4.0 million in cash, which Finjan received on December 30, 2016. Finjan recognized all of the $4.0 million license as revenue as of December 31, 2016, as such amount was determined to be fixed and determinable, in accordance with the Company's revenue recognition policy as described in Note 2. In exchange for the foregoing and other valuable consideration, Finjan agreed to, subject to certain restrictions, limits and other conditions, grant F5 a nonexclusive, irrevocable (except in the case of non-payment by F5), worldwide paid-up license under Finjan's patents as specified in the December 2016 License.

On June 30, 2016, Finjan entered into a Confidential Patent License Agreement (the "June 30, 2016 License") with a European cloud-based network security firm (the "2016 European Licensee"). The June 30, 2016 License provides for the 2016 European Licensee to pay Finjan $565,000 in cash, which was paid on or about the time of execution of the June 30, 2016 License. Finjan recognized all of the $565,000 license as revenue as of December 31, 2016, as such amount was determined to be fixed and determinable, in accordance with the Company's revenue recognition policy as described in Note 2. In exchange for the foregoing and other valuable consideration, Finjan agreed to, subject to certain restrictions, limits and other conditions, grant the 2016 European Licensee a nonexclusive, term license in the United States under Finjan's U.S. patents as specified in the June 30, 2016 License.

On June 3, 2016, Finjan entered into a Confidential Patent License, Settlement and Release Agreement ("June 3, 2016 License") with Proofpoint, Inc. ("Proofpoint"). As part of the June 3, 2016 License, Case No. 3:15-cv-5808-HSG, entitled Finjan, Inc. v. Proofpoint, Inc. and Armorize Technologies, Inc., pending before the Honorable Haywood S. Gilliam, Jr. in the U.S. District Court for the Northern District of California, was dismissed with prejudice on June 7, 2016. The June 3, 2016 License provides for Proofpoint to pay Finjan the sum of $10.9 million in cash, in which $4.3 million was received on June 6, 2016, $3.3 million was received in December 28, 2016, and $3.3 million was received on December 29, 2017. The Company recognized $7.6 million of the $10.9 million license as revenues as of December 31, 2016, as such amount was determined to be fixed and determinable, in accordance with the Company's revenue recognition policy as described in Note 2. The Company recognized $3.3 million under the terms of the June 3, 2016 License as revenues as of December 31, 2017, in accordance with the Company's revenue recognition policy as described in Note 2. In exchange for the foregoing and other valuable consideration, Finjan agreed to, subject to certain restrictions, limits and other conditions, grant Proofpoint a worldwide, non-royalty bearing, fully paid-up (as of the final payment), nonexclusive, perpetual, irrevocable (except in the case of non-payment by Proofpoint or other material breach) license under Finjan's patents as specified in the June 3, 2016 License. Certain portions of the June 3, 2016 License are subject to Confidential

F-36

Table of Contents

Treatment pursuant to a Confidential Treatment request filed with the Securities and Exchange Commission ("SEC") on August 8, 2016 and Confidential Treatment Order granted by the SEC on September 26, 2016.

On December 30, 2015, Finjan entered into a Confidential Patent License, Settlement and Release Agreement ("December 30, 2015 License"), effective December 29, 2015, with a United States-based third party ("Licensee"). The December 30, 2015 License provides for Licensee to pay Finjan the sum of $3.65 million in cash, in which $1.0 million was received on December 30, 2015, $1.65 million was received on June 27, 2016, and $1.0 million was received on September 1, 2016. The Company recognized $1.0 million of the $3.65 million license as revenues as of December 31, 2015. The remaining balance of $2.65 million under the terms of the December 30, 2015 License was recognized as revenues as of December 31, 2016. In exchange for the foregoing and other valuable consideration, Finjan agreed to, subject to certain restrictions, limits and other conditions, grant Licensee a non-exclusive, irrevocable (except in the case of non-payment by Licensee or other material breach), worldwide license under Finjan Patents during the Term as specified in the December 30, 2015 License.

On April 7, 2015, Finjan entered into a Confidential Asset Purchase and Patent License Agreement (the "April 7, 2015 License"), effective as of April 7, 2015, with F-Secure Corporation, a company incorporated in Finland ("F-Secure"). The April 7, 2015 License provides for F-Secure to pay Finjan the sum of $1.0 million in cash, of which $700,000 was received on April 22, 2015 and $300,000 received on March 31, 2016. The Company recognized $700,000 of the $1.0 million license as revenues as of September 30, 2015, as such amount was determined to be fixed and determinable, in accordance with the Company's revenue recognition policy as described in Note 2. The remaining balance of $300,000 under the terms of the April 7, 2015 License, was recognized as revenues as of March 31, 2016. Finjan agreed to, subject to certain restrictions, limits and other conditions, grant F-Secure a worldwide, fully-paid, non-exclusive field of use license to Finjan patents owned as of the effective date or acquired by Finjan or its affiliates within two years from the effective date, as well as to the F-Secure Patents.

On September 24, 2014, Finjan entered into a Confidential Patent License, Settlement and Release Agreement (the "September 24, 2014 License") with Websense, Inc. ("Websense") against whom Finjan had filed a patent infringement lawsuit. Pursuant to this September 24, 2014 License, Websense and Finjan also agreed to dismiss the infringement litigation, and each party gave the other a general release for all claims that it might have against the other, known or unknown, based on the actions of either party on or before the date of the settlement. Under the September 24, 2014 License, Websense paid Finjan a license fee of $8.0 million payable in four installments. $3.0 million was received on execution of the agreement, $2.0 million was received on January 16, 2015, $2.0 million was received on January 14, 2016 and $1.0 million was received on January 13, 2017 and recognized as revenues in accordance with the Company's revenue recognition policy as described in Note 2.

## NOTE 10 – STOCKHOLDERS' EQUITY

### *AUTHORIZED CAPITALIZATION*

The Company's capital structure is comprised of preferred stock and common stock. The Company's authorized capitalization consists of (i) 80,000,000 shares of common stock, par value $0.0001 per share, and (ii) 10,000,000 shares of Preferred Stock, $0.0001 par value per share.

The Company's certificate of incorporation authorizes the Board of Directors to establish one or more classes or series of preferred stock. Unless required by law or by any stock exchange on which our common stock is listed in the future, the authorized shares of preferred stock will be available for issuance at the discretion of our Board of Directors without further action by our stockholders. The Board of Directors is able to determine, with respect to any class or series of preferred stock, the terms and rights of that series.

### *PREFERRED STOCK*

*Series A*

On May 6, 2016, Finjan entered into a Series A Preferred Stock Purchase Agreement with Halcyon LDRII, pursuant to which the Company agreed to issue to Halcyon LDRII in a private placement an aggregate of 102,000 shares of the Company's Series A Preferred Stock Shares at a purchase price of $100.00 per share, for aggregate proceeds of $10.2 million. The closing of the Private Placement occurred on May 20, 2016. The Company incurred issuance costs of $0.7 million which are recorded as an offset to the redeemable preferred stock.

The Series A Preferred Stock was accounted under Section 480-10-S99 - Distinguishing Liabilities from Equity (FASB Accounting Standards Codification 480) as amended by ASU 2009-04 - Accounting for Redeemable Equity Instruments ("ASU 2009-04"). Under ASU 2009-04, a redeemable equity security is to be classified as temporary equity if it is conditionally redeemable a) at a

fixed or determinable price on a fixed or determinable date, b) at the option of the holder, or c) upon the occurrence of an event that is not solely within the control of the issuer. The Company's financing is redeemable at the option of the holder. Therefore, the Company classified the Series A Preferred Stock as temporary equity in the consolidated balance sheet.

During 2016, the Company redeemed $2.8 million or 18,498 shares; $1.8 million reducing the original recorded value of the Series A Preferred stock and $1.0 million reducing the accretion value.

During 2017, the Company retired all shares of the Series A Preferred stock with a final redemption of $13.8 million or 83,502 shares; $8.4 million reduced the original recorded value of the Series A Preferred stock and $5.4 million reduced the accreted value.

*Series A-1*

In June 2017, Finjan entered into a Series A-1 Preferred Stock Purchase Agreement with Soryn HLDR Vehicle II LLC, a Delaware limited liability company ("Soryn HLDR"), pursuant to which the Company agreed to issue to Soryn HLDR in a private placement an aggregate of 153,000 shares of the Company's Series A-1 Preferred Stock at a purchase price of $100.00 per share, for aggregate proceeds of $15.3 million. The closing of the private placement occurred on June 19, 2017. The Company incurred issuance costs of $1.0 million which were recorded as an offset to the preferred stock. Such costs will be recognized as a deemed dividend upon the earlier of redemption or the date at which the Preferred Stock can be redeemed.

The accounting for the Series A-1 Preferred Stock is similar to the Series A accounting (see above) and classified as temporary equity in the consolidated balance sheet since it is redeemable at the option of the holder.

The Series A-1 Preferred Stock have redemption features at the option of the Company that have a determinable price and determinable date based on the following liquidation preferences:

The lesser of:

  2.8x the original purchase price (OPP); or the following:

   &bull; 1.2375x the OPP if redeemed within 180 days of closing - December 16, 2017; or
   &bull; 1.3x the OPP if redeemed between 180 and 270 days of closing - March 16, 2018; or
   &bull; 1.34x the OPP if redeemed between 270 days and 360 days of closing - June 14, 2018; or
   &bull; 1.575x the OPP if redeemed between 360 days and 720 days of closing - June 9, 2019; or
   &bull; Thereafter, 1.75x the OPP plus 0.125x the OPP for every 90 day period the preferred remains outstanding.

The redemption feature is also at the option of the holder in accordance with the terms and conditions set forth in the Certificate of Designation and is redeemable as a percentage of certain revenues, which varies by type of revenue as well as date received. These revenues include monetary awards, damages, fees, recoveries, judgments in a suit, as well as monies received from gross licensing, royalty or similar revenue. The Company accretes changes in redemption value over the period from the date of issuance to the earliest redemption dates of the security. The increase in the redemption value is a deemed dividend that increases the carrying value of the Series A-1 Preferred Stock to equal the redemption value at the end of each reporting period with an offsetting decrease to additional paid-in-capital. During the twelve months ended December 31, 2017, the Company recorded a deemed dividend of $4.6 million, representing an increase to the Series A-1 Preferred Stock's redemption (liquidation) value, net of costs.

The Company also agreed to issue to Soryn HLDR a fully vested common stock warrant (the "Warrant"), to purchase 2,355,506 shares of common stock, $0.0001 par value per share of the Company at an exercise price of $3.18 per share, the Warrant has a term of three years. The closing of 2,000,000 shares occurred on June 19, 2017, 309,136 occurred June 30, 2017 and 46,370 on July 25, 2017. The Warrant has the rights to acquire a variable amount of common stock at a fixed price for the first 15 months. Under ASC 815-40-15-8A, the Warrant is not considered indexed to the Company's stock, and thus it has a derivative feature and has been classified as a liability. The Company valued the Warrant at inception using a Monte Carlo valuation model, recording a $3.3 million Warrant liability at inception. The warrant was revalued at December 31, 2017, reducing the Warrant liability by $2.2 million to $1.1 million, the change in the fair value of the warrant was recorded in Other Income. As of December 31, 2017 the aggregate intrinsic value of the warrant was $0, with a weighted average contracted term of 2.5 years.

Subsequent to December 31, 2017, the Company redeemed $6.2 million or 48,076 shares of the Series A-1 Preferred stock; $4.8 million reducing the original recorded value of the Series A Preferred stock and $1.4 million reducing the accreted value.

F-38

Table of Contents

*COMMON STOCK*

Holders of the Company's common stock are entitled to one vote on each matter submitted to a vote at a meeting of stockholders. The Company's common stock does not have cumulative voting rights, which means that the holders of a majority of voting shares voting for the election of directors can elect all of the members of the Board of Directors. The Company's common stock has no preemptive rights and no redemption or conversion privileges. The holders of the outstanding shares of the Company's common stock are entitled to receive dividends out of assets legally available at such times and in such amounts as the Board of Directors may, from time to time, determine, and upon liquidation and dissolution are entitled to receive all assets available for distribution to the stockholders. A majority vote of shares represented at a meeting at which a quorum is present is sufficient for all actions that require the vote of stockholders.

On June 30, 2017, the Company completed an underwriting agreement (the "Underwriting Agreement") with B. Riley & Co., LLC (the "Underwriter") pursuant to which the Company agreed to issue and sell an aggregate of 3,600,000 shares of its common stock, par value $0.0001 per share (the "Common Stock"), at a public offering price of $3.15 per share gross proceeds, with net proceeds to the Company of $2.90 per share, for a total of $10.4 million. Under the terms of the Underwriting Agreement, the Company also granted the Underwriters a 30-day over-allotment option to purchase an additional 540,000 shares of Common Stock, which was exercised July 21, 2017. The Company received $1.6 million net proceeds from the exercise of the over-allotment.

On June 30, 2017, as a result of the common stock offering, pursuant to the terms and conditions of the Warrant issued to Soryn HLDR, the number of shares of Common Stock exercisable under the Warrant increased from 2.0 million to 2.4 million. On July 21, 2017, upon the exercise of the over-allotment option the number of shares of Common Stock for which such Warrant is exercisable increased an additional 0.05 million shares. The Warrant is exercisable at $3.18 per common share for all such shares, for a period of 3 years.

**NOTE 11 – STOCK-BASED COMPENSATION**

On July 10, 2014, the Company's stockholders approved the Finjan Holdings, Inc. 2014 Incentive Compensation Plan (the "2014 Plan"), upon shareholder approval of the 2014 Plan, the Finjan Holdings, Inc. 2013 Global Share Option Plan and Israeli Sub-Plan (the "2013 Option Plan") were terminated, other than respect to the 1,489,532 shares of common stock underlying options outstanding under such plan.

The Company shareholders approved the 2014 Plan at the annual meeting of stockholders held July 10, 2014, pursuant to which 2,196,836 shares of common stock are authorized for issuance. On June 21, 2017, at the annual meeting of stockholders, the Company's shareholders approved an increase of 1,000,000 shares to the Finjan Holdings, Inc. 2014 Plan. As of December 31, 2017, the Company has 749,443 shares available for issuance under the 2014 Plan.

During 2016, the Company issued 200,000 RSU's and granted an aggregate of 295,000 options to purchase shares of our common stock to certain employees in connection with their employment with the Company.

During 2017, the Company issued 576,212 RSU's and granted an aggregate of 898,334 options to purchase shares of our common stock to certain employees in connection with their employment with the Company.

During the year ended December 31, 2017, the Company issued 141,840 shares of common stock and received proceeds of $0.2 million from the exercise of stock options.

During the year ended December 31, 2016, the Company issued 67,000 shares of common stock and received proceeds of $0.1 million from the exercise of stock options.

Total stock-based compensation for stock options and restricted stock awards, of $0.8 million, $0.9 million and $0.8 million was recorded in selling, general and administrative expenses in the accompanying consolidated statements of operations for the years ended December 31, 2017, 2016 and 2015, respectively. The stock-based compensation expense is for options and restricted stock awards granted to certain employees, consultants, and members of the Board of Directors.

Table of Contents

***STOCK OPTIONS***

The following is a summary of stock option activity during the years ended December 31, 2017 and 2016:

| | Number of Options Outstanding | | Weighted Average Exercise Price | Average Remaining Contractual Life (in years) | | Aggregate Intrinsic Value (thousands) |
|---|---|---|---|---|---|---|
| Outstanding – December 31, 2015 | 1,510,832 | | 1.63 | | $ | — |
| Options granted | 295,000 | | 1.12 | | | |
| Options exercised | 67,000 | | 0.76 | | | |
| Options forfeited | 131,486 | | 0.97 | | | |
| Outstanding – December 31, 2016 | 1,607,346 | $ | 0.83 | 7.07 | $ | — |
| Options granted | 898,334 | $ | 2.13 | | | |
| Options exercised | 141,840 | $ | 1.60 | | | |
| Options forfeited | 22,500 | $ | 1.78 | | | |
| Outstanding – December 31, 2017 | 2,341,340 | $ | 1.77 | 5.78 | $ | 1,087 |
| Exercisable – December 31, 2017 | 1,280,979 | $ | 1.60 | 5.78 | $ | 815 |
| Exercisable – December 31, 2016 | 1,229,704 | $ | 0.77 | 6.48 | $ | — |

The Company estimates the fair values of stock options using the Black-Scholes option-pricing model on the date of grant. For the years ended December 31, 2017 and 2016, the assumptions used in the Black-Scholes option pricing model, which was used to estimate the grant date fair value per option, were as follows:

| | 2017 Employee Grants | | 2016 Employee Grants |
|---|---|---|---|
| Weighted-average Black-Scholes option pricing model assumptions: | | | |
| Volatility | 138.90% | | 148.68% |
| Expected term (in years) | 6 | | 7 |
| Risk-free rate | 2.00% | | 1.26% |
| Expected dividend yield | 0.0% | | 0.0% |
| Weighted average grant date fair value per share | $ 2.05 | $ | 1.15 |

The risk-free interest rate is the United States Treasury rate for the day of the grant having a term equal to the life of the equity instrument. The volatility is a measure of the amount by which the Company's share price has fluctuated or is expected to fluctuate. Since the Company's common stock was not publicly traded, or was not publicly traded for an extended duration at the time of the grant, an average of the historic volatilities of comparative companies was used. The dividend yield is zero percent as the Company has not made any dividend payment and has no plans to pay dividends in the foreseeable future. Due to the limited historical information, the Company determines the expected term of its stock option awards by using the simplified method, which assumes each vesting tranche of the award has a term equal to average of the contractual term and the vesting period.

As of December 31, 2017, total compensation cost not yet recognized related to unvested stock options was approximately $1.7 million, which is expected to be recognized over a weighted-average period of 5.9 years.

*RESTRICTED STOCK UNITS*

The following is a summary of non-vested RSUs award activity for the years ended December 31, 2017 and 2016:

| | 2017 | | 2016 | |
| --- | --- | --- | --- | --- |
| | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value |
| Non-vested | 185,260 | $ 2.67 | 408,710 | $ 2.66 |
| Shares granted | 576,212 | 1.95 | 200,000 | 1.20 |
| Shares vested | 322,760 | 1.92 | 395,117 | 1.99 |
| Shares forfeited | — | — | 28,333 | 1.74 |
| Non-vested | 438,712 | $ 2.28 | 185,260 | $ 2.67 |

The Company estimates the fair value of the granted shares using the market price of the Company's stock price at the grant date. For the years ended December 31, 2017, 2016 and 2015, the Company recognized $0.6 million, $0.7 million and $0.5 million, respectively of stock-based compensation expense related to the RSUs.

**NOTE 12 – RELATED PARTY TRANSACTIONS**

In the course of business, the Company obtains legal services from a firm in which an executive of Finjan and member of the Company's board is a member. The Company incurred approximately $240,000, $227,000 and $228,000 in legal fees to the firm during the years ended December 31, 2017, 2016 and 2015 respectively. As of December 31, 2017 and 2016 the Company had balances due to this firm amounting to approximately $113,000 and $88,000, respectively.

The Company obtained social media and investor related services from a firm in which the Company's Chief Financial Officer holds a 50% interest. The Company incurred approximately $22,000 and $80,000 in fees to the firm during the years ended December 31, 2016 and 2015, respectively. As of December 31, 2016 and 2015, the Company has balances due to this firm amounting to $0 and $4,000, respectively. The Company canceled this service agreement effective June 30, 2016.

**NOTE 13 – INCOME TAX**

The domestic and foreign components of loss before income taxes from operations for the years ended December 31, 2017, 2016 and 2015 are as follows:

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| | (in thousands) | | |
| Domestic | $ 17,120 | $ 1,097 | $ (11,996) |
| Foreign | (469) | (744) | (601) |
| | $ 16,651 | $ 353 | $ (12,597) |

F-41

Table of Contents

The provision (benefit) for income tax for the years ended December 31, 2017, 2016 and 2015, consist of the following:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| | (in thousands) | | |
| Federal: | | | |
| Current | $ — | $ — | $ — |
| Deferred | 7,694 | 416 | (3,868) |
| State: | | | |
| Current | 43 | 3 | 5 |
| Deferred | 269 | (380) | 488 |
| Foreign: | | | |
| Current | — | — | — |
| Deferred | (129) | (174) | (159) |
| | 7,877 | (135) | (3,534) |
| Change in valuation allowance | (14,037) | 138 | 3,539 |
| Income tax provision (benefit) | $ (6,160) | $ 3 | $ 5 |

The expected tax expense (benefit) based on the statutory rate is reconciled with actual tax expense (benefit) as follows:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| U.S. Federal statutory rate | 34.0 % | 34.0 % | 34.0 % |
| State rate, net of federal benefit | 2.8 % | 7.8 % | 1.3 % |
| Permanent differences: | | | |
| Change in tax rate | 16.4 % | (113.0)% | — % |
| Impact of tax reform | (16.4)% | — % | — % |
| Deferred tax adjustment | (0.3)% | (19.1)% | — % |
| Stock based compensation | 0.1 % | 28.9 % | (1.1)% |
| Foreign tax rate difference | 0.3 % | 19.3 % | (0.4)% |
| Fair value measurement of warrants | (4.5)% | — % | — % |
| Other | (1.6)% | 3.0 % | — % |
| Change in valuation allowance | (67.9)% | 40.0 % | (33.9)% |
| Income tax provision (benefit) | (37.1)% | 0.9 % | (0.1)% |

Table of Contents

The approximate tax effects of temporary differences, which give rise to significant deferred tax assets and liabilities, are as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2017** | **2016** | **2015** |
| | (in thousands) | | |
| Deferred tax assets | | | |
| Net operating losses | $ 3,912 | $ 10,032 | $ 9,666 |
| Stock-based compensation | 572 | 949 | 890 |
| Intangible assets | 2,190 | 3,748 | 3,752 |
| Other | 115 | 77 | 50 |
| Total deferred tax assets | 6,789 | 14,806 | 14,358 |
| Valuation allowance | (462) | (14,497) | (14,358) |
| Deferred tax asset, net of valuation allowance | 6,327 | 309 | — |
| Deferred tax liability | (126) | (309) | — |
| Net deferred tax assets | $ 6,201 | $ — | $ — |

As of December 31, 2017, 2016 and 2015, the Company had net operating losses ("NOL") carryforwards of approximately $12.7 million, $26.1 million and $25.5 million, respectively. The federal and state net operating loss carryforwards will begin to expire in 2026.

The use of NOL and tax credit carryforwards may be subject to a substantial annual limitation due to the ownership change limitations provided by Section 382 and 383 of the U.S. Internal Revenue Code ("IRC"), and similar state provisions. The annual limitation may result in the expiration of NOL and tax credit carryforwards before they are used. The Company completed an IRC Section 382 analysis through December 31, 2017 and determined that no ownership changes, within the meaning of Section 382 of the Code, had occurred for the loss making periods that could place significant limitations to the use of NOL or tax credit carryforwards. As such, the NOL and tax credit carryforwards presented are not expected to expire unused, unless there is a future ownership change as determined by Section 382 and 383 of the IRC.

In assessing the realization of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred tax assets will be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible.

Management considers the scheduled reversal of deferred tax liabilities, carryback potential, projected future taxable income and tax planning strategies in making this assessment. Management has considered both positive and negative evidence in evaluating the need for a valuation allowance and has given more weight to the objective evidence available. At the end of 2017, the Company now has three-year cumulative profit and as a result of recent events is now projecting significant income for 2018. Based on its assessment, management has determined a valuation allowance against all of the domestic deferred tax assets in excess of the deferred tax liabilities is no longer needed, since it is more likely than not that the deferred tax assets will be realized. The Company's foreign subsidiary had generated book and tax losses since its inception. Management has determined that it is not more likely than not that the foreign deferred tax assets will be realized.  As such, the Company has maintained the valuation allowance against its foreign deferred tax assets. The change in valuation allowance for the years ended December 31, 2017, 2016 and 2015, is $14.0 million, $0.1 million and $3.5 million, respectively.

On December 22, 2017, the 2017 Tax Cut and Jobs Act (the "Act") was enacted into law and the new legislation contains several key tax provisions, including a one-time mandatory transition tax on accumulated foreign earnings and a reduction of the corporate income tax rate to 21% effective January 1, 2018, among others. We are required to recognize the effect of the tax law changes in the period of enactment, such as determining the estimated transition tax, re-measuring our U.S. deferred tax assets and liabilities at a 21% rate as well as reassessing the net realizability of our deferred tax assets and liabilities.  The one-time transition tax does not generate a deemed distribution as the Company has no foreign deferred income. The provisional amount related to the re-measurement of our deferred tax balance is a reduction of approximately $2.8 million.

In December 2017, the SEC staff issued Staff Accounting Bulletin No. 118, Income Tax Accounting Implications of the Tax Cuts and Jobs Act ("SAB 118") which allows companies to record provisional amounts during a measurement period not to extend beyond one year of the enactment date. Since the Act was passed late in the fourth quarter of 2017, and ongoing guidance and accounting interpretation are expected over the next 12 months, we are still analyzing certain aspects of the Act and refining our calculations, which could potentially affect the measurement of these balances or potentially give rise to new deferred tax amounts.

We expect to complete our analysis within the measurement period in accordance with SAB 118. We do not expect any material subsequent adjustment to these amounts.

**NOTE 14 – SUBSEQUENT EVENTS**

On January 4, 2018, the Company redeemed $6.2 million or 48,076 shares of the Series A-1 Preferred stock; $4.8 million reducing the original recorded value of the Series A-1 Preferred stock and $1.4 million reducing the accreted value.

On February 1, 2018, the Company received its second installment of $1.3 million under the April 2017 Agreement. This was recognized as revenues as of December 31, 2017, in accordance with the Company's revenue recognition policy as described in Note 2.

On February 23, 2018, the Company made a payment to the JVP fund of $0.5 million pursuant to a capital call, reducing the commitment outstanding to $2.2 million.

On March 1, 2018, the Company, including its wholly-owned subsidiary, Finjan, Inc. ("Finjan" and collectively with the Company and its affiliated companies, the "Finjan Parties"), announced that Finjan Parties and Symantec Corporation ("Symantec") and its subsidiary, Blue Coat Systems, LLC ("Blue Coat") (collectively, the "Symantec Parties") entered into a Confidential Patent License and Settlement Agreement (the "License and Settlement Agreement") effective as of February 28, 2018. Specifically, the Parties have resolved and settled all claims between them. As part of the settlement, the Symantec Parties will obtain a license to, among others, the Finjan patents and pay the Finjan Parties $65.0 million in cash within twenty (20) days of the Effective Date of the License and Settlement Agreement. Further, if Symantec acquires certain entities within four years from the Effective Date, the Symantec Parties will pay additional license fees of up to $45.0 million to the Finjan Parties, unless otherwise mutually agreed to by the Company and Symantec. The remaining terms of the License and Settlement Agreement are confidential.

F-44

# Finjan Holdings, Inc.
## Amended and Restated
## 2014 Incentive Compensation Plan
### (As Amended and Restated June 21, 2017)

**Finjan Holdings, Inc.**

**2014 Incentive Compensation Plan**

**Section 1.**
**Establishment, Purpose and Duration**

1.1.     Effective Date and Purpose. Finjan Holdings, Inc., a Delaware corporation (the "**Company**"), hereby amends and restates the Finjan Holdings, Inc. 2014 Incentive Compensation Plan (the "**Plan**") as of June 21, 2017, the date the Company's shareholders approve the Amended and Restated Plan. The Company's Board of Directors (the "**Board**") approved the amendments and restatement on March 22, 2017. The original Effective Date of the Plan is July 10, 2014. The Plan is intended to assist the Company in attracting and retaining exceptionally qualified officers, employees, consultants and directors upon whom, in large measure, the sustained progress, growth and profitability of the Company depend, to motivate such persons to achieve long-term Company goals and to more closely align such persons' interests with those of the Company's shareholders by providing them with a proprietary interest in the Company's growth and performance.

1.2.     Duration of the Plan. The Plan shall commence on the Effective Date and shall remain in effect, subject to the right of the Committee to amend or terminate the Plan at any time pursuant to Section 15 hereof, until the earlier to occur of (a) the date all Shares subject to the Plan shall have been purchased or acquired and the Restrictions on all Restricted Stock granted under the Plan shall have lapsed, according to the Plan's provisions, and (b) ten (10) years from the Effective Date of the Plan. The termination of the Plan pursuant to this Section 1.2 shall not adversely affect any Awards outstanding on the date of such termination.

**Section 2.**
**Definitions**

As used in the Plan, in addition to terms elsewhere defined in the Plan, the following terms shall have the meanings set forth below:

2.1.     "**Annual Incentive Award**" means a performance bonus determined under Section 12.

2.2.     "**Available Shares**" has the meaning set forth in Section 4.1(a).

2.3.     "**Award**" means any Option (including a Non-Qualified Stock Option and an Incentive Stock Option), Stock Appreciation Right, Restricted Stock, Restricted Stock Unit, Deferred Stock, Performance Unit, Substitute Award, Share, Dividend Equivalent or Annual Incentive Award.

2.4.     "**Award Agreement**" means any written agreement, contract or other instrument or document evidencing any Award granted hereunder between the Company and the Grantee.

2.5.     "**Beneficiary**" means the Person designated to receive Plan benefits, if any, following a Grantee's death in accordance with Section 16.

2.6.     "**Board**" has the meaning set forth in Section 1.1.

2.7.        "**Bonus Opportunity**" means a Grantee's threshold, target and maximum bonus opportunity for a Year, provided that such bonus opportunity shall be either (a) to the extent that the Grantee has entered into an Employment Agreement with the Company, the threshold, target and maximum bonus levels, if any, specified in such Employment Agreement for such Year based on the Grantee's base salary in effect on the first day of such Year, or (b) if there is no Employment Agreement in effect between the Company and the Grantee as of the first day of such Year or if the Employment Agreement does not specify such bonus levels, the percentage of such Grantee's base salary in effect on the first day of such Year (or such later date as such person is designated as a Grantee) as determined by the Committee in its sole discretion within the first ninety (90) days of such Year (or before such later date as such person is designated as a Grantee).

2.8.        "**Cause**" means, as determined by the Committee, the occurrence of any one of the following: (a) commission of an act of fraud, embezzlement or other act of dishonesty that would reflect adversely on the integrity, character or reputation of the Company, or that would cause harm to its customer relations, operations or business prospects; (b) breach of a fiduciary duty owed to the Company; (c) violation or threatening to violate a restrictive covenant agreement, such as a non-compete, non-solicit, or non-disclosure agreement, between an Eligible Person and any Employer; (d) unauthorized disclosure or use of confidential information or trade secrets; (e) violation of any lawful policies or rules of the Company, including any applicable code of conduct; (f) commission of criminal activity; (g) failure to reasonably cooperate in any investigation or proceeding concerning the Company; or (h) neglect or misconduct in the performance of the Grantee's duties and responsibilities, provided that he or she did not cure such neglect or misconduct within ten (10) days after the Company gave written notice of such neglect or misconduct to such Grantee; provided, however, that in the event a Grantee is party to an Employment Agreement that contains a different definition of Cause, the definition of Cause contained in such Employment Agreement shall be controlling.

2.9.        "**Change in Control**" means the occurrence of any one or more of the following:  (a) any corporation, person or other entity (other than the Company, a majority-owned subsidiary of the Company or any of its subsidiaries, or an employee benefit plan (or related trust) sponsored or maintained by the Company), including a "group" as defined in Section 13(d)(3) of the Exchange Act, becomes the beneficial owner of stock representing more than fifty percent (50%) of the combined voting power of the Company's then outstanding securities; (b) the consummation of the Company's consolidation or merger with or into another corporation other than a majority-owned subsidiary of the Company, or the sale, lease, exchange, or other transfer of at least eighty-five percent (85%) of the Company's assets, provided, that, following such a transaction, the members of the Board prior to such transaction no longer constitute a majority of the board surviving after such transaction; (c) the consummation of a plan of liquidation; or (d) within any period of 12 consecutive months, persons who were members of the Board immediately prior to such 12-month period, together with persons who were first elected as directors (other than as a result of any settlement of a proxy or consent solicitation contest or any action taken to avoid such a contest) during such 12-month period by or upon the recommendation of persons who were members of the Board immediately prior to such 12-month period and who constituted a majority of the Board at the time of such election, cease to constitute a majority of the Board. Notwithstanding the foregoing, (i) a Change in Control shall not occur with respect to a Deferred Compensation Award unless such Change in Control constitutes a "change in control event" (within the meaning of Treasury Regulations Section 1.409A-3(i)(5)) with respect to the Company, and (ii) in the event a merger or other event described in clause (a) of the foregoing sentence occurs but the Board determines in good faith that such merger or other event is an acquisition by the Company of a target larger than the Company, then no Change in Control shall be deemed to have occurred in connection with such merger or other event.

2.10.        "**Code**" means the Internal Revenue Code of 1986 (and any successor thereto), as amended from time to time. References to a particular section of the Code include references to regulations and rulings promulgated and in effect thereunder and to any successor provisions.

2.11.        "**Committee**"» has the meaning set forth in Section 3.1(a).

2.12.        "**Common Stock**" means common stock, par value $0.0001 per share, of the Company.

2.13.        "**Company**" has the meaning set forth in Section 1.1.

2.14.        "**Covered Employee**" means a Grantee who, as of the last day of the fiscal year in which the value of an Award is includable in income for federal income tax purposes, is one of the group of "covered employees," within the meaning of Code Section 162(m), with respect to the Company.

2.15.     "**Deferred Compensation Award**" means an Award that is not exempt from Code Section 409A and, thus, could subject the applicable Grantee to adverse tax consequences under Code Section 409A.

2.16.     "**Deferred Stock**" means a right, granted as an Award under Section 10, to receive payment in the form of Shares (or measured by the value of Shares) at the end of a specified deferral period.

2.17.     "**Disability**" means a mental or physical illness that entitles the Grantee to receive benefits under the long-term disability plan of an Employer, or if the Grantee is not covered by such a plan or the Grantee is not an employee of an Employer, a mental or physical illness that renders a Grantee totally and permanently incapable of performing the Grantee's duties for the Company or a Subsidiary; provided, however, that the Grantee of a Deferred Compensation Award shall not be considered to have a Disability unless such Disability also constitutes a "disability" within the meaning of Treasury Regulations Section 1.409A-3(i)(4). Notwithstanding anything to the contrary in this Section 2.16, a Disability shall not qualify under the Plan if it is the result of (i) a willfully self-inflicted injury or willfully self-induced sickness; or (ii) an injury or disease contracted, suffered or incurred while participating in a criminal offense.

2.18.     "**Dividend Equivalent**" means any right to receive payments equal to dividends or property, if and when paid or distributed, on Shares or Restricted Stock Units.

2.19.     "**Effective Date**" has the meaning set forth in Section 1.1.

2.20.     "**Eligible Person**" means any (a) officer, employee of an Employer (including leased employees and co-employees with a professional employer organization), (b) non-employee director of the Company or (c) consultant engaged by an Employer.

2.21.     "**Employer**" means the Company or any Subsidiary.

2.22.     "**Employment Agreement**" means an employment agreement, offer letter, consulting agreement or other written agreement between an Employer and an Eligible Person which relates to the terms and conditions of such person's employment or other services for an Employer.

2.23.     "**Exchange Act**" means the Securities Exchange Act of 1934 (and any successor thereto), as amended from time to time. References to a particular section of the Exchange Act include references to rules, regulations and rulings promulgated and in effect thereunder, and to any successors thereto.

2.24.     "**Exercise Date**" means the date the Grantee or other holder of an Award that is subject to exercise delivers notice of such exercise to the Company, accompanied by such payment, attestations, representations and warranties or other documentation required under the Plan and applicable Award Agreement or as  the  Committee may otherwise specify.

2.25.     "**Fair Market Value**" means, as of any applicable date, (a) the closing sales price for one Share on such date as reported on the market system or stock exchange on which the Common Stock is then listed or admitted to trading, or on the last previous day on which a sale was reported if no sale of a Share was reported on such date, or (b) if the foregoing subsection (a) does not apply, the fair market value of a Share as reasonably determined in good faith by the Board in accordance with Code Section 409A. For purposes of subsection (b), the determination of such Fair Market Value by the Board will be made no less frequently than every twelve (12) months and will either (i) use one of the methodologies permitted under Treasury Regulations Section 1.409A-1(b)(5)(iv)(B)(2) (or such other similar regulation provision as may be provided) or (ii) include, as applicable, the value of tangible and intangible assets of the Company, the present value of future cash flows of the Company, the market value of stock or other equity interests in similar corporations and other entities engaged in trades or businesses substantially similar to those engaged in by the Company, the value of which can be readily determined through objective means (such as through trading prices or an established securities market or an amount paid in an arm's length private transaction), and other relevant factors such as control premiums or discounts for lack of marketability and whether the valuation method is used for other purposes that have a material economic effect on the Company, its shareholders or its creditors.

2.26.     "**Grant Date**" means the date on which an Award is granted, which date may be specified in advance by the Committee.

2.27.     "**Grantee**" means an Eligible Person who has been granted an Award.

2.28.     "**Immediate Family**" means, with respect to a Grantee, the Grantee's spouse, former spouse, children, stepchildren, grandchildren, parents, stepparents, siblings, grandparents, nieces, nephews, mother-in-law, father-in-law, sons-in-law, daughters-in-law, brothers-in-law, or sisters-in-law, including adoptive relationships.

2.29.     "**Incentive Stock Option**" means an option to purchase Shares that is granted under Section 6 and that is intended to meet the requirements of Code Section 422.

2.30.     "**including**" or "**includes**" means "including, but not limited to," or "includes, but is not limited to," respectively.

2.31.     "**Non-Qualified Stock Option**" means an option to purchase Shares that is granted under Section 6 and that is not intended to be an Incentive Stock Option.

2.32.     "**Option**" means an Incentive Stock Option or Non-Qualified Stock Option.

2.33.     "**Option Price**" means the price at which a Share may be purchased by a Grantee pursuant to an Option.

2.34.     "**Performance-Based Exception**" means the performance-based exception from the tax deductibility limitations of Code Section 162(m) contained in Code Section 162(m)(4)(C) (including, to the extent applicable, the special provision for options thereunder).

2.35.     "**Performance Goal**" means the objective and/or subjective criteria determined by the Committee, the degree of attainment of which will affect (a) in the case of an Award other than an Annual Incentive Award, the amount of the Award the Grantee is entitled to receive or retain, and (b) in the case of an Annual Incentive Award, the portion of the individual's Bonus Opportunity potentially payable as an Annual Incentive Award. Performance Goals may contain threshold, target and maximum levels of achievement and, to the extent the Committee intends an Award (other than an Option, but including an Annual Incentive Award) to comply with the Performance-Based Exception, the Performance Goals shall be chosen from among the Performance Measures set forth in Section 4.4(a).

2.36.     "**Performance Measure**" has the meaning set forth in Section 4.4(a).

2.37.     "**Performance Period**" means that period established by the Committee at the time any Performance Unit is granted or at any time thereafter during which any Performance Goals specified by the Committee with respect to such Award are to be measured.

2.38.     "**Performance Unit**" means any grant pursuant to Section 11 of (a) a bonus consisting of cash or other property the amount and value of which, and/or the receipt of which, is conditioned upon the attainment of any Performance Goals specified by the Committee, or (b) a unit valued by reference to a designated amount of property other than Shares.

2.39.     "**Permitted Transferee**" means, in respect of any Grantee, any member of the Immediate Family of such Grantee, any trust of which all of the primary beneficiaries are such Grantee or members of his or her Immediate Family, or any partnership, limited liability company, corporation or similar entity of which all of the partners, members or shareholders are such Grantee or members of his or her Immediate Family.

2.40.     "**Person**" means any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, institution, public benefit corporation, entity or government instrumentality, division, agency, body or department.

2.41.     "**Plan**" has the meaning set forth in Section 1.1 and also includes any appendices and amendments hereto.

2.42.     "**Restricted Stock**" means any Share issued as an Award under the Plan that is subject to Restrictions.

2.43.    "**Restricted Stock Unit**" or "**RSU**" means the right granted as an Award under the Plan to receive a Share, conditioned on the satisfaction of Restrictions imposed by the Committee.

2.44.    "**Restrictions**" means any restriction on a Grantee's free enjoyment of the Shares or other rights underlying Awards, including (a) a restriction that the Grantee or other holder may not sell, transfer, pledge, or assign a Share or right, and (b) such other restrictions as the Committee may impose in the Award Agreement (including any restriction on the right to vote such Share and the right to receive any dividends). Restrictions may be based upon the passage of time, the satisfaction of performance criteria and/or the occurrence of one or more events or conditions, and shall lapse separately or in combination upon such conditions and at such time or times, in installments or otherwise, as the Committee shall specify. Awards subject to a Restriction shall be forfeited if the Restriction does not lapse prior to such date, the occurrence of such event or the satisfaction of such other criteria as the Committee shall determine.

2.45.    "**Rule 16b-3**" means Rule 16b-3 promulgated by the SEC under the Exchange Act, as amended from time to time, together with any successor rule.

2.46.    "**SEC**" means the United States Securities and Exchange Commission, or any successor thereto.

2.47.    "**Section 16 Non-Employee Director**" means a member of the Board who satisfies the requirements to qualify as a "non-employee director" under Rule 16b-3.

2.48.    "**Section 16 Person**" means a person who is subject to potential liability under Section 16(b) of the Exchange Act with respect to transactions involving equity securities of the Company.

2.49.    "**Settlement Date**" means the payment date for Restricted Stock Units or Deferred Stock, as set forth in Section 9.3(b) or Section 10.4(c), as applicable.

2.50.    "**Share**" means a share of Common Stock.

2.51.    "**Stock Appreciation Right**" or "**SAR**" means a right granted as an Award under the Plan to receive, as of the date specified in the Award Agreement, an amount equal to the number of Shares with respect to which the SAR is exercised, multiplied by the excess of (a) the Fair Market Value of one Share on the Exercise Date over (b) the Strike Price.

2.52.    "**Strike Price**" means the per-Share price used as the baseline measure for the value of a SAR, as specified in the applicable Award Agreement.

2.53.    "**Subsidiary**" means any Person that directly, or through one (1) or more intermediaries, is controlled by the Company and that would be treated as part of a single controlled group of corporations with the Company under Code Sections 414(b) and 414(c) if the language "at least 50 percent" is used instead of "at least 80 percent" each place it appears in Code Sections 1563(a)(1), (2) and (3) and Treasury Regulations 1.414(c)-2.

2.54.    "**Substitute Award**" has the meaning set forth in Section 5.6.

2.55.    "**Term**" means the period beginning on the Grant Date of an Option or SAR and ending on the date such Option or SAR expires, terminates or is cancelled.

2.56.    "**Termination of Service**" means: (a) with respect to awards other than Deferred Compensation Awards, the first day on which (i) an individual is for any reason no longer providing services to an Employer as an officer, employee, director or consultant or (ii) with respect to an individual who is an officer, employee or consultant to a Subsidiary, such entity ceases to be a Subsidiary of the Company and such individual is no longer providing services to the Company or another Subsidiary; provided, however, that the Committee shall have the discretion to determine when a Grantee who terminates services as an employee, but continues to provide services in the capacity of an officer, consultant or director immediately following such termination, has incurred a Termination of Service; or (b) with respect to Deferred Compensation Awards, a "separation from service" (within the meaning of Treasury Regulations Section 1.409A-1(h) occurs).

2.57.    "**Year**" means the calendar year.

**Section 3.**
**Administration**

3.1.    Committee.

(a)    Subject to Section 3.2, the Plan shall be administered by the Compensation Committee of the Board, unless otherwise determined by the Board (the "**Committee**"). The members of the Committee shall be appointed by the Board from time to time and may be removed by the Board from time to time. To the extent the Board considers it desirable to comply with Rule 16b-3 and/or meet the Performance-Based Exception, the Committee shall consist of two or more directors of the Company, all of whom shall (i) be Section 16 Non-Employee Directors and/or (ii) qualify as "outside directors" within the meaning of Code Section 162(m), as applicable. The number of members of the Committee shall from time to time be increased or decreased, and shall be subject to such conditions, in each case if and to the extent the Board deems it appropriate to permit transactions in Shares pursuant to the Plan to satisfy such conditions of Rule 16b-3 and the Performance-Based Exception as then in effect.

(b)    Subject to Section 4.4(c), the Committee may delegate, to the fullest extent permitted under applicable law, to executive officers of the Company any or all of the authority of the Committee with respect to the grant of Awards to Grantees, other than Grantees who are executive officers, or are (or are expected to be) Covered Employees and/or are Section 16 Persons at the time any such delegated authority is exercised.  In addition, with respect to plan administration issues (and not with respect to issues directly related to Awards), to the fullest extent permitted by Delaware General Corporation Law, other federal or state law or regulation, or any stock exchange or automated quotation system on which the Shares may then be listed or quoted, the Committee may delegate to the Company or any officer thereof any or all of the authority of the Committee.  When the authority of the Committee has been properly delegated pursuant to this Section3.1(b), reference to the "Committee" herein shall be deemed to be references to such delegate (except where the context clearly indicates otherwise).

3.2.    Powers of the Committee. Subject to and consistent with the provisions of the Plan, the Committee shall have full power and authority and sole discretion as follows:

(a)    to determine when, to whom (*i.e.*, what Eligible Persons) and in what types and amounts Awards should be granted;

(b)    to grant Awards to Eligible Persons in any number, and to determine the terms and conditions applicable to each Award, including (in each case, based on such considerations as the Committee shall determine) conditions intended to comply with Code Section 409A, the number of Shares or the amount of cash or other property to which an Award will relate, any Option Price or Strike Price, grant price or purchase price, any limitation or Restriction, any schedule for or performance conditions relating to the earning of the Award or the lapse of limitations, forfeiture restrictions, restrictive covenants, restrictions on exercisability or transferability, any Performance Goals, including those relating to the Company and/or a Subsidiary and/or any division thereof and/or an individual, and/or vesting based on the passage of time, satisfaction of performance criteria or the occurrence of one or more events or conditions;

(c)    to determine the benefit (including any Bonus Opportunity) payable under any Award and to determine whether any performance, vesting or transfer conditions, including Performance Measures or Performance Goals, have been satisfied;

(d)    to determine whether or not specific Awards shall be granted in connection with other specific Awards;

(e)    to determine the Term of an Award, as applicable;

(f)    to determine the amount, if any, that a Grantee shall pay for Restricted Stock, whether to permit or require the payment of cash dividends thereon to be paid and/or deferred, and the terms related thereto, when Restricted Stock (including Restricted Stock acquired upon the exercise of an Option) shall be forfeited and whether such Shares shall be held in escrow or other custodial arrangement;

(g)    to determine whether, to what extent and under what circumstances an Award may be settled in, or the exercise price of an Award may be paid in, cash, Shares, other Awards or other property, or an Award may be accelerated, vested, canceled, forfeited or surrendered or any terms of the Award may be waived, and to accelerate the exercisability of, and

to accelerate or waive any or all of the terms and conditions applicable to, any Award or any group of Awards for any reason and at any time or to extend the period subsequent to the Termination of Service within which an Award may continue to vest and/or be exercised;

(h)        to determine with respect to Awards granted to Eligible Persons, whether, to what extent and under what circumstances cash, Shares, other Awards, other property and other amounts payable with respect to an Award will be deferred, either at the election of the Grantee or if and to the extent specified in the Award Agreement automatically or at the election of the Committee (for purposes of limiting loss of deductions pursuant to Code Section 162(m) or otherwise) and to provide for the payment of interest or other rate of return determined with reference to a predetermined actual investment or independently set interest rate, or with respect to other bases permitted under Code Section 162(m), Code Section 409A or otherwise, for the period between the date of exercise and the date of payment or settlement of the Award;

(i)        to determine whether a Grantee has a Disability;

(j)        to determine whether and under what circumstances a Grantee has incurred a Termination of Service (*e.g.*, whether Termination of Service was for Cause);

(k)        to make, amend, suspend, waive and rescind rules and regulations relating to the Plan;

(l)        without the consent of the Grantee, to make adjustments in the terms and conditions of, and the criteria in, Awards in recognition of unusual or non-recurring events (including events described in Section 4.2) affecting an Employer or the financial statements of an Employer, or in response to changes in applicable laws, regulations or accounting principles; provided, however, that in no event shall such adjustment increase the value of an Award for a person expected to be a Covered Employee for whom the Committee desires to have the Performance-Based Exception apply;

(m)        to appoint such agents as the Committee may deem necessary or advisable to administer the Plan;

(n)        to determine the terms and conditions of all Award Agreements applicable to Eligible Persons (which need not be identical) and, with the consent of the Grantee (except as provided in this Section 3.2(n), and Sections 5.5 and 15.2), to amend any such Award Agreement at any time; provided, however, that the consent of the Grantee shall not be required for any amendment (i) that does not adversely affect the rights of the Grantee, (ii) that is necessary or advisable (as determined by the Committee) to carry out the purpose of the Award as a result of any new law or regulation, or a change in an existing law or regulation or interpretation thereof, (iii) to the extent the Award Agreement specifically permits amendment without consent, or (iv) to the extent such amendment is a termination that is intended to comply with Treasury Regulations Section 1.409A-3(j)(4)(ix);

(o)        to impose such additional terms and conditions upon the grant, exercise or retention of Awards as the Committee may, before or concurrently with the grant thereof, deem appropriate, including limiting the percentage of Awards that may from time to time be exercised by a Grantee and requiring the Grantee to enter into restrictive covenants;

(p)        to make such adjustments or modifications to Awards to Grantees who are working outside the United States as are advisable to fulfill the purposes of the Plan or to comply with applicable local law and to establish sub-plans for Eligible Persons outside the United States with such provisions as are consistent with the principles of the Plan (but in compliance with local law) as may be suitable in other jurisdictions;

(q)        to correct any defect, supply any omission or reconcile any inconsistency, and to construe and interpret the Plan, any rules and regulations adopted hereunder, Award Agreements or any other instrument entered into or relating to an Award under the Plan; and

(r)        to take any other action with respect to any matters relating to the Plan for which it is responsible and to make all other decisions and determinations, including factual determinations, as may be required under the terms of the Plan or as the Committee may deem necessary or advisable for the administration of the Plan.

Any action of the Committee with respect to the Plan shall be final, conclusive and binding on all Persons, including the Company, Subsidiaries, any Grantee, any Eligible Person, any Person claiming any rights under the Plan from or through any Grantee, and shareholders, except to the extent the Committee may subsequently modify, or take further action not

consistent with, its prior action. If not specified in the Plan, the time at which the Committee must or may make any determination shall be determined by the Committee, and any such determination may thereafter be modified by the Committee. The express grant of any specific power to the Committee, and the taking of any action by the Committee, shall not be construed as limiting any power or authority of the Committee.

All determinations of the Committee shall be made by a majority of its members; provided, however, that any determination affecting any Awards made or to be made to a member of the Committee may, at the Board's election, be made by the Board.

**Section 4.**
**Shares Subject to the Plan and Adjustments**

4.1.        Number of Shares Available for Grants.

(a)        Subject to adjustment as provided in Section 4.2, the aggregate number of Shares which may be delivered under the Plan shall not exceed 4,686,368 (the "**Available Shares**") of which 2,201,488 are the Remaining Available Shares (as defined below). For purposes of this Section 4.1(a), (i) each Share underlying an Option or SAR shall reduce the number of Shares remaining available for delivery under the Plan (the "**Remaining Available Shares**") by one (1) Share (provided, that an SAR that, by its terms, from and after the Grant Date thereof, is payable only in cash shall not reduce the number of Remaining Available Shares); and (ii) each Share delivered pursuant to an Award or Substitute Award (other than Shares delivered pursuant to an Award that reduced the number of Remaining Available Shares pursuant to clause (i) of this sentence) shall reduce the Remaining Available Shares by one (1) Share. Should all or a portion any Award for any reason expire or be canceled prior to its exercise or relinquishment in full, the Shares subject to such Award may again be subjected to an Award under the Plan and shall again be considered Remaining Available Shares.

For the avoidance of doubt, Shares used to satisfy tax withholding obligations shall not again be considered Remaining Available Shares.  If any Award is settled in cash, the Shares subject to such Award that are not delivered shall again be considered Remaining Available Shares for purposes of the Plan to the extent (and in the amount) that the number of Remaining Available Shares was previously reduced as a result of the grant of such Award.

(b)        The number of Available Shares will automatically increase on January 1st of each year in an amount equal to 5% of the total number of shares of outstanding Common Stock on December 31st of the preceding calendar year. The Board may act prior to January 1st of a given year to provide that there will be no January 1st increase in the Available Shares for such year or that the increase in the Available Shares for such year will be a smaller number of shares of Common Stock than would otherwise occur pursuant to the preceding sentence.

(c)        The Committee shall from time to time determine the appropriate methodology for calculating the number of Shares that have been delivered pursuant to the Plan. Shares delivered pursuant to the Plan may be, in whole or in part, authorized and unissued Shares, or treasury Shares, including Shares repurchased by the Company for purposes of the Plan.

(d)        The maximum number of shares of Common Stock that may be issued under the Plan in this Section 4.1 shall not be affected by (i) the cash payment of dividends or Dividend Equivalents in connection with outstanding Awards; or (ii) any Shares required to satisfy Substitute Awards.

4.2.        Adjustments in Authorized Shares and Awards.

(a)        In the event that the Committee determines that any dividend or other distribution (whether in the form of cash, Shares, or other securities or property), stock split or combination, forward or reverse merger, reorganization, subdivision, consolidation or reduction of capital, recapitalization, consolidation, scheme of arrangement, split-up, spin-off or combination involving the Company or repurchase or exchange of Shares, issuance of warrants or other rights to purchase Shares or other securities of the Company, or other similar corporate transaction or event affects the Shares such that an adjustment is determined by the Committee to be appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan, then the Committee shall, in such manner as it may deem equitable, adjust any or all of:  (i) the number and type of Shares (or other securities or property) with respect to which Awards may be granted, (ii) the number and type of Shares (or other securities or property) subject to outstanding Awards, (iii) the grant or exercise price with respect to any Award or, if deemed appropriate, make provision for a cash payment to the holder of an outstanding Award, (iv)

the number and kind of Shares of outstanding Restricted Stock or relating to any other outstanding Award in connection with which Shares are subject, and (v) the number of Shares with respect to which Awards may be granted to a Grantee; provided, however, that, in each case, with respect to Awards of Incentive Stock Options intended to continue to qualify as Incentive Stock Options after such adjustment, no such adjustment shall be authorized to the extent that such adjustment would cause the Incentive Stock Option to fail to continue to qualify under Code Section 424(a); provided, further, that unless determined otherwise by the Committee, the number of Shares subject to any Award denominated in Shares shall always be a whole number.

(b)      Notwithstanding Section 4.2(a), any adjustments made pursuant to Section 4.2(a) shall be made in such a manner as to ensure that, after such adjustment, Awards continue not to be non-qualified deferred compensation subject to Code Section 409A (or if such Awards are already subject to Code Section 409A, so as not to give rise to adverse tax consequences thereunder.)

4.3.      Compliance with Code Section 162(m).

(a)      Section 162(m) Compliance. To the extent the Committee determines that compliance with the Performance-Based Exception is desirable with respect to an Award, Sections 4.3 and 4.4 shall apply. In the event that changes are made to Code Section 162(m) to permit flexibility with respect to any Awards available under the Plan, the Committee may, subject to this Section 4.3, make any adjustments to such Awards as it deems appropriate.

(b)      Annual Individual Limitations. No Grantee may be granted Awards for Options or SARs with respect to a number of Shares in any one (1) Year exceeding 223,683 Shares. No Grantee may be granted Awards for Restricted Stock, Deferred Stock, Restricted Stock Units or Performance Units (or any other Award, other than Options or SARs, that is determined by reference to the value of Shares or appreciation in the value of Shares) with respect to a number of Shares in any one (1) Year exceeding 223,683  Shares. If an Award denominated in Shares is cancelled, the Shares subject to the cancelled Award continue to count against the maximum number of Shares that may be granted to a Grantee in any Year. All Shares specified in this Section 4.3(b) shall be adjusted to the extent necessary to reflect adjustments to Shares required by Section 4.2. No Grantee may be granted a cash Award that would have a maximum payout, during any Year, exceeding $1,000,000.00. No Grantee may be granted a cash Award for a Performance Period of more than one (1) Year that would have a maximum payout, during the Performance Period, that would exceed $3,000,000.00.

4.4.      Performance Based Exception Under Code Section 162(m).

(a)      Performance Measures. Subject to Section 4.4(d), unless and until the Committee proposes for shareholder vote and shareholders approve a change in the general Performance Measures set forth in this Section 4.4(a), for Awards (other than Options and SARs) designed to qualify for the Performance-Based Exception, the objective performance criteria shall be based upon one or more of the following (each, a "**Performance Measure**"):

(i)      Earnings (either in the aggregate or on a per-Share basis);

(ii)      Net income or loss (either in the aggregate or on a per-Share basis);

(iii)      Operating profit;

(iv)      Earnings before any or all of interest, tax, depreciation or amortization (actual and adjusted and either in the aggregate or on a per-Share basis);

(v)      Growth or rate of growth in cash flow;

(vi)      Cash flow provided by operations (either in the aggregate or on a per-Share basis);

(vii)      Free cash flow (either in the aggregate on a per-Share basis);

(viii)      Costs;

(ix)       Gross or net revenues;

(x)  Reductions in expense levels in each case, where applicable, determined either on a Company-wide basis or in respect of any one or more business segments;

(xi)  Operating and maintenance cost management and employee productivity;

(xii)  Share price or total shareholder return (including return on assets, investments, equity, or sales);

(xiii)  Return on assets, equity, or sales;

(xiv)  Growth or rate of growth in return measures;

(xv)  Share price (including growth measures and total shareholder return or attainment by Common Stock of a specified value for a specified period of time);

(xvi)  Strategic business criteria, consisting of one or more objectives based on meeting specified revenue, market share, market penetration, geographic business expansion goals, objectively identified project milestones, production volume levels, cost targets and goals relating to acquisitions or divestitures;

(xvii)  Achievement of business or operational goals such as market share and/or business development;

(xviii)  Debt ratings, debt leverage and debt service;

provided, however, that applicable Performance Measures may be applied on a pre- or post-tax basis; provided, further, that the Committee may, on the Grant Date of an Award intended to comply with the Performance-Based Exception, and in the case of other Awards, at any time, provide that the formula for such Award may include or exclude items to measure specific objectives, such as losses from discontinued operations, extraordinary gains or losses, the cumulative effect of accounting changes, acquisitions or divestitures, foreign exchange impacts and any unusual, non-recurring gain or loss.

(b)  Flexibility in Setting Performance Measures. For Awards intended to comply with the Performance-Based Exception, the Committee shall set the Performance Measures within the time period prescribed by Code Section 162(m). The levels of performance required with respect to Performance Measures may be expressed in absolute or relative levels and may be based upon a set increase, set positive result, maintenance of the status quo, set decrease or set negative result. Performance Measures may differ for Awards to different Grantees. The Committee shall specify the weighting (which may be the same or different for multiple objectives) to be given to each performance objective for purposes of determining the final amount payable with respect to any such Award. Any one or more of the Performance Measures may apply to the Grantee, a department, unit, division or function within the Company or any one or more Subsidiaries, and may apply either alone or relative to the performance of other businesses or individuals (including industry or general market indices).

(c)  Adjustments. The Committee shall have the discretion to adjust the determinations of the degree of attainment of the pre-established Performance Goals; provided, however, that Awards designed to qualify for the Performance-Based Exception may not (unless the Committee determines to amend the Award so that it no longer qualifies for the Performance-Based Exception) be adjusted upward (the Committee shall retain the discretion to adjust such Awards downward). The Committee may not, unless the Committee determines to amend the Award so that it no longer qualifies for the Performance-Based Exception, delegate any responsibility with respect to Awards intended to qualify for the Performance-Based Exception. All determinations by the Committee as to the achievement of the Performance Measure(s) shall be in writing prior to payment of the Award.

(d)  Changes to Performance Measures. In the event that applicable laws, rules or regulations change to permit Committee discretion to alter the governing Performance Measures without obtaining shareholder approval of such changes, and still qualify for the Performance-Based Exception, the Committee shall have sole discretion to make such changes without obtaining shareholder approval.

**Section 5.**
**Eligibility and General Conditions of Awards**

5.1.    <u>Eligibility</u>. The Committee may in its discretion grant Awards to any Eligible Person, whether or not he or she has previously received an Award.

5.2.    <u>Award Agreement</u>. To the extent not set forth in the Plan, the terms and conditions of each Award shall be set forth in an Award Agreement.

5.3.    <u>General Terms and Termination of Service</u>. Except as provided in an Award Agreement or as otherwise provided below in this <u>Section 5.3</u>, all Options or SARs that have not been exercised, or any other Awards that remain subject to Restrictions or that are not otherwise vested or exercisable, at the time of a Termination of Service shall be cancelled and forfeited to the Company. Any Restricted Stock that is forfeited by the Grantee upon Termination of Service shall be reacquired by the Company, and the Grantee shall sign any document and take any other action required to assign such Shares back to the Company.

(a)    <u>Options and SARs</u>. Except as otherwise provided in an Award Agreement:

(i)    If the Grantee incurs a Termination of Service due to his or her death or Disability, the Options or SARs shall become fully vested and exercisable at the time of such Termination of Service, and such Options or SARs shall remain exercisable for a period of one (1) year from the date of such Termination of Service (but not beyond the original Term). To the extent the Options or SARs are not exercised at the end of such one (1) year period, the Options or SARs shall be immediately cancelled and forfeited to the Company.

(ii)    If the Grantee either incurs a Termination of Service which is voluntary on the part of the Grantee (and not due to such Grantee's death or Disability), the Options and SARs may thereafter be exercised, to the extent they were vested and exercisable at the time of such Termination of Service, for a period of thirty (30) days from the date of such Termination of Service (but not beyond the original Term). To the extent the Options or SARs are not exercised at the end of such thirty (30) day period, the Options or SARs shall be immediately cancelled and forfeited to the Company. To the extent the Options and SARs are not vested and exercisable on the date of such Termination of Service, they shall be immediately cancelled and forfeited to the Company.

(iii)    If the Grantee either incurs a Termination of Service by an Employer without Cause, the Options and SARs may thereafter be exercised, to the extent they were vested and exercisable at the time of such Termination of Service, for a period of ninety (90) days from the date of such Termination of Service (but not beyond the original Term). To the extent the Options or SARs are not exercised at the end of such ninety (90) day period, the Options or SARs shall be immediately cancelled and forfeited to the Company. To the extent the Options and SARs are not vested and exercisable on the date of such Termination of Service, they shall be immediately cancelled and forfeited to the Company.

(iv)    If the Grantee incurs a Termination of Service for Cause, all unexercised Options and SARs (whether vested or unvested) shall be immediately canceled and forfeited to the Company.

(b)    <u>Restricted Stock</u>. Except as otherwise provided in an Award Agreement:

(i)    If Termination of Service occurs by reason of the Grantee's death or Disability, such Grantee's Restricted Stock shall become immediately vested and no longer subject to Restrictions.

(ii)    If Termination of Service occurs for any reason other than the Grantee's death or Disability while the Grantee's Restricted Stock is subject to a Restriction(s), all of such Grantee's Restricted Stock that is unvested or still subject to Restrictions shall be forfeited by the Grantee.

(c)    <u>Dividend Equivalents</u>. If Dividend Equivalents have been credited with respect to any Award and such Award (in whole or in part) is forfeited, all Dividend Equivalents issued in connection with such forfeited Award (or portion of an Award) shall also be forfeited to the Company.

(d)        Waiver. Notwithstanding anything to the contrary in the Plan, the Committee may in its sole discretion as to all or part of any Award, at the time the Award is granted or thereafter, (i) determine that Awards shall become exercisable or vested, or Restrictions shall lapse, (ii) determine that Awards shall continue to become exercisable or vested in full or in installments, or Restrictions shall continue to lapse, after a Termination of Service, (iii) extend the period for exercise of Options or SARs following a Termination of Service (but not beyond the original Term), or (iv) provide that any Award shall, in whole or in part, not be forfeited upon such Termination of Service.

5.4.        Non-transferability of Awards.

(a)        Each Award and each right under any Award shall be exercisable only by the Grantee during the Grantee's lifetime, or, if permissible under applicable law, by the Grantee's guardian or legal representative.

(b)        No Award (prior to the time, if applicable, Shares are delivered in respect of such Award), and no right under any Award, may be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by a Grantee other than by will or by the laws of descent and distribution, and any such purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance shall be void and unenforceable against the Company or any Subsidiary; provided, however, that the designation of a Beneficiary to receive benefits in the event of the Grantee's death, or a transfer by the Grantee to the Company with respect to Restricted Stock, shall not constitute an assignment, alienation, pledge, attachment, sale, transfer or encumbrance for purposes of this Section 5.4(b). If so determined by the Committee, a Grantee may, in the manner established by the Committee, designate a Beneficiary or Beneficiaries to exercise the rights of the Grantee, and to receive any distribution with respect to any Award upon the death of the Grantee. A transferee, Beneficiary, guardian, legal representative or other person claiming any rights under the Plan from or through any Grantee shall be subject to the provisions of the Plan and any applicable Award Agreement, except to the extent the Plan and Award Agreement otherwise provide with respect to such persons, and to any additional restrictions or limitations deemed necessary or appropriate by the Committee.

(c)        Nothing herein shall be construed as requiring the Committee to honor the order of a domestic relations court regarding an Award, except to the extent required under applicable law.

5.5.        Cancellation and Rescission of Awards. Unless the Award Agreement specifies otherwise, the Committee may cancel, rescind, suspend, withhold or otherwise limit or restrict any unexercised or unsettled Award at any time if the Grantee is not in compliance with all applicable provisions of the Award Agreement and the Plan, or is in violation of any restrictive covenant or other agreement with an Employer.

5.6.        Substitute Awards. The Committee may, in its discretion and on such terms and conditions as the Committee considers appropriate under the circumstances, grant Substitute Awards under the Plan. For purposes of this Section 5.6, "**Substitute Award**" means an Award granted under the Plan in substitution for stock and stock-based awards ("**Acquired Entity Awards**") held by current and former officers, employees or non-employee directors of, or consultants to, another corporation or entity who become Eligible Persons as the result of a merger, consolidation or combination of the employing corporation or other entity (the "**Acquired Entity**") with the Company or a Subsidiary or the acquisition by the Company or a Subsidiary of property or stock of the Acquired Entity immediately prior to such merger, consolidation, acquisition or combination in order to preserve for the Grantee the economic value of all or a portion of such Acquired Entity Award at such price as the Committee determines necessary to achieve such preservation of economic value.

5.7.        Exercise by Non-Grantee. If any Award is exercised as permitted by the Plan by any Person other than the Grantee, the exercise notice shall be accompanied by such documentation as may reasonably be required by the Committee, including, without limitation, evidence of authority of such Person or Persons to exercise the Award and, if the Committee so specifies, evidence satisfactory to the Company that any estate taxes payable with respect to such Shares have been paid or provided for.

5.8.        No Cash Consideration for Awards. Awards may be granted for no cash consideration or for such minimal cash consideration as may be required by applicable law.

**Section 6.**
**Stock Options**

6.1.      <u>Grant of Options</u>. Subject to and consistent with the provisions of the Plan, Options may be granted to any Eligible Person in such number, and upon such terms, and at any time and from time to time as shall be determined by the Committee.

6.2.      <u>Award Agreement</u>. Each Option grant shall be evidenced by an Award Agreement in such form as the Committee may approve that shall specify the Grant Date, the Option Price, the Term (which shall be ten (10) years from its Grant Date unless the Committee otherwise specifies a shorter period in the Award Agreement), the number of Shares to which the Option pertains, the time or times at which such Option shall be exercisable and such other provisions (including Restrictions) not inconsistent with the provisions of the Plan as the Committee shall determine.

6.3.      <u>Option Price</u>. The Option Price under an Option shall be determined by the Committee; <u>provided</u>, <u>however</u>, that the Option Price shall not be less than one hundred percent (100%) of the Fair Market Value of a Share on the Grant Date. Subject to the adjustment allowed in <u>Section 4.2</u>, or as otherwise permissible under this <u>Section 6.3</u>, neither the Committee nor the Board shall have the authority or discretion to change the Option Price of any outstanding Option. Without the approval of shareholders, neither the Committee nor the Board will amend or replace previously granted Options or SARs in a transaction that constitutes "repricing," which for this purpose means any of the following or any action that has the same effect:  (a) lowering the Option Price of an Option or the Strike Price of a SAR after it is granted; (b) any other action that is treated as a "repricing" under generally accepted accounting principles; (c) cancelling an Option or SAR at a time when its Option Price or Strike Price (as applicable) exceeds the Fair Market Value of the underlying Shares, in exchange for another Award, other equity, cash or other property; <u>provided</u>, <u>however</u>, that the foregoing transactions shall not be deemed a "repricing" if done pursuant to an adjustment authorized under <u>Section 4.2</u>.

6.4.      <u>Vesting</u>. Unless otherwise specified in the applicable Award Agreement, <u>Section 5.3(a)</u>, or <u>Section 14</u>, Options shall become vested and exercisable as follows:

(a)      One-third (1/3) of the Options subject to such Award Agreement shall vest on the first anniversary of the Grant Date; and

(b)      an additional one-twelfth (1/12) of the Options subject to such Award Agreement shall vest on the each of the eight quarterly anniversaries of the Grant Date following the first anniversary of the Grant Date such that the Options subject to such Award Agreement shall become fully vested on the third (3rd) anniversary of the Grant Date.

6.5.      <u>Grant of Incentive Stock Options</u>. At the time of the grant of any Option, the Committee may, in its discretion, designate that such Option shall be made subject to additional restrictions to permit it to qualify as an Incentive Stock Option. Any Option designated as an Incentive Stock Option:

(a)      shall be granted only to an employee of the Company or a Subsidiary Corporation (as defined below in this <u>Section 6.5</u>);

(b)      shall have an Option Price of not less than one hundred percent (100%) of the Fair Market Value of a Share on the Grant Date, and, if granted to a person who owns capital stock (including stock treated as owned under Code Section 424(d)) possessing more than ten percent (10%) of the total combined voting power of all classes of capital stock of the Company or any Subsidiary Corporation (a "**10% Owner**"), have an Option Price not less than one hundred ten percent (110%) of the Fair Market Value of a Share on its Grant Date;

(c)      shall have a Term of not more than ten (10) years (five (5) years if the Grantee is a 10% Owner) from its Grant Date, and shall be subject to earlier termination as provided herein or in the applicable Award Agreement;

(d)      shall not have an aggregate Fair Market Value (as of the Grant Date) of the Shares with respect to which Incentive Stock Options (whether granted under the Plan or any other equity incentive plan of the Grantee's employer or any parent or Subsidiary Corporation ("**Other Plans**")) are exercisable for the first time by such Grantee during any Year ("**Current Grant**"), determined in accordance with the provisions of Code Section 422, which exceeds $100,000 (the "**$100,000 Limit**");

(e)        shall, if the aggregate Fair Market Value of the Shares (determined on the Grant Date) with respect to the Current Grant and all Incentive Stock Options previously granted under the Plan and any Other Plans that are exercisable for the first time during a Year ("**Prior Grants**") would exceed the $100,000 Limit, be, as to the portion in excess of the $100,000 Limit, exercisable as a separate Non-Qualified Stock Option at such date or dates as are provided in the Current Grant;

(f)        shall require the Grantee to notify the Committee of any disposition of any Shares delivered pursuant to the exercise of the Incentive Stock Option under the circumstances described in Code Section 421(b) (relating to holding periods and certain disqualifying dispositions) ("**Disqualifying Disposition**"), within ten (10) days of such a Disqualifying Disposition;

(g)        shall, by its terms, not be assignable or transferable other than by will or the laws of descent and distribution and may be exercised, during the Grantee's lifetime, only by the Grantee; provided, however, that the Grantee may, to the extent provided in the Plan in any manner specified by the Committee, designate in writing a Beneficiary to exercise his or her Incentive Stock Option after the Grantee's death; and

(h)        shall, if such Option nevertheless fails to meet the foregoing requirements, or otherwise fails to meet the requirements of Code Section 422 for an Incentive Stock Option, be treated for all purposes of the Plan as a Non-Qualified Stock Option.

For purposes of this Section 6.5, "**Subsidiary Corporation**" means a corporation other than the Company in an unbroken chain of corporations beginning with the Company if, at the time of granting the Option, each of the corporations other than the last corporation in the unbroken chain owns stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. Notwithstanding the foregoing and Sections 3.2(n) and 15.2, the Committee may, without the consent of the Grantee, at any time before the exercise of an Option (whether or not an Incentive Stock Option), take any action necessary to prevent such Option from being treated as an Incentive Stock Option.

6.6.        Exercise and Payment.

(a)        Except as may otherwise be provided by the Committee in an Award Agreement, Options shall be exercised by the delivery of a written notice ("**Notice**") to the Company setting forth the number of Shares to be exercised, accompanied by full payment (including any applicable tax withholding) for the Shares made by any one or more of the following means on the Exercise Date (or such other date as may be permitted in writing by the Secretary of the Company):

(i)        cash, personal check, money order, cashier's check, or wire transfer;

(ii)        with the approval of the Committee, Shares or Shares of Restricted Stock valued at the Fair Market Value of a Share on the Exercise Date; or

(iii)        subject to applicable law and the Company's policies, through the sale of the Shares acquired on exercise of the Option through a broker-dealer to whom the Grantee has submitted an irrevocable notice of exercise and irrevocable instructions to deliver promptly to the Company the amount of sale or loan proceeds sufficient to pay for such Shares, together with, if requested by the Company, the amount of applicable withholding taxes payable by Grantee by reason of such exercise.

(b)        The Committee may, in its discretion, specify that, if any Shares of Restricted Stock ("**Tendered Restricted Shares**") are used to pay the Option Price, (i) all the Shares acquired on exercise of the Option shall be subject to the same Restrictions as the Tendered Restricted Shares, determined as of the Exercise Date, or (ii) a number of Shares acquired on exercise of the Option equal to the number of Tendered Restricted Shares shall be subject to the same Restrictions as the Tendered Restricted Shares, determined as of the Exercise Date.

(c)        If the Option is exercised as permitted by the Plan by any Person other than the Grantee, the Notice shall be accompanied by documentation as may reasonably be required by the Company, including evidence of authority of such Person or Persons to exercise the Option.

(d)        At the time a Grantee exercises an Option or to the extent provided by the Committee in the applicable Award Agreement, in lieu of accepting payment of the Option Price of the Option and delivering the number of Shares of

Common Stock for which the Option is being exercised, the Committee may direct that the Company either (i) pay the Grantee a cash amount, or (ii) issue a lesser number of Shares of Common Stock, in any such case, having a Fair Market Value on the Exercise Date equal to the amount, if any, by which the aggregate Fair Market Value (or such other amount as may be specified in the applicable Award Agreement, in the case of an exercise occurring concurrent with a Change in Control) of the Shares of Common Stock as to which the Option is being exercised exceeds the aggregate Option Price for such Shares, based on such terms and conditions as the Committee shall establish.

(e)        No payment or issuance of Shares in respect of an exercised Options shall be made unless applicable tax withholding requirements have been satisfied in accordance with Section 17.1 or otherwise.

**Section 7.**
**Stock Appreciation Rights**

7.1.        Grant of SARs. Subject to and consistent with the provisions of the Plan, the Committee, at any time and from time to time, may grant SARs to any Eligible Person on a standalone basis or in tandem with an Option. The Committee may impose such conditions or restrictions on the exercise of any SAR as it shall deem appropriate.

7.2.        Award Agreements. Each SAR grant shall be evidenced by an Award Agreement in such form as the Committee may approve, which shall specify the Grant Date, the Strike Price, the Term (which shall be ten (10) years from its Grant Date unless the Committee otherwise specifies a shorter period in the Award Agreement), the number of Shares to which the SAR pertains, the time or times at which such SAR shall be exercisable and such other provisions (including Restrictions) not inconsistent with the provisions of the Plan as shall be determined by the Committee.

7.3.        Strike Price. The Strike Price of a SAR shall be determined by the Committee in its sole discretion; provided, however, that the Strike Price shall not be less than one hundred percent (100%) of the Fair Market Value of a Share on the Grant Date of the SAR. Subject to the adjustment allowed in Section 4.2, or as otherwise permissible under Section 6.3, neither the Committee nor the Board shall have the authority or discretion to change the Strike Price of any outstanding SAR.

7.4.        Vesting. Unless otherwise specified in the applicable Award Agreement, Section 5.3(a), or Section 14, SARs shall become vested and exercisable as follows:

(a)        One-third (1/3) of the SARs subject to such Award Agreement shall vest on the first anniversary of the Grant Date; and

(b)        an additional one-twelfth (1/12) of the SARs subject to such Award Agreement shall vest on the each of the eight quarterly anniversaries of the Grant Date following the first anniversary of the Grant Date such that the SARs subject to such Award Agreement shall become fully vested on the third (3rd) anniversary of the Grant Date.

7.5.        Exercise and Payment. Except as may otherwise be provided by the Committee in an Award Agreement, SARs shall be exercised by the delivery of a Notice to the Company, setting forth the number of Shares with respect to which the SAR is to be exercised. No payment of a SAR shall be made unless applicable tax withholding requirements have been satisfied in accordance with Section 17.1 or otherwise. Any payment by the Company in respect of a SAR may be made in cash, Shares, other property, or any combination thereof, as the Committee, in its sole discretion, shall determine.

7.6.        Grant Limitations. The Committee may at any time impose any other limitations or Restrictions upon the exercise of SARs that it deems necessary or desirable in order to achieve desirable tax results for the Grantee or the Company.

**Section 8.**
**Restricted Stock**

8.1.     <u>Grant of Restricted Stock</u>. Subject to and consistent with the provisions of the Plan, the Committee, at any time and from time to time, may grant Restricted Stock to any Eligible Person in such amounts as the Committee shall determine.

8.2.     <u>Award Agreement</u>. Each grant of Restricted Stock shall be evidenced by an Award Agreement that shall specify the Restrictions, the number of Shares subject to the Restricted Stock Award, and such other provisions not inconsistent with the provisions of the Plan as the Committee shall determine. The Committee may impose such Restrictions on any Award of Restricted Stock as it deems appropriate, including time-based Restrictions, Restrictions based upon the achievement of specific Performance Goals, Restrictions based on the occurrence of a specified event, Restrictions under applicable laws or pursuant to a regulatory entity with authority over the Company or a Subsidiary, and/or a combination of any of the foregoing.

8.3.     <u>Consideration for Restricted Stock</u>. The Committee shall determine the amount, if any, that a Grantee shall pay for Restricted Stock.

8.4.     <u>Vesting</u>. Unless otherwise specified in the applicable Award Agreement, Section 5.3(b), or Section 14, all of the Shares subject to such Award Agreement shall vest on the first anniversary of the Grant Date.  For purposes of calculating the number of Shares of Restricted Stock that vest as set forth above, unless determined otherwise by the Committee, Share amounts shall be rounded to the nearest whole Share amount, unless otherwise specified in the applicable Award Agreement.

8.5.     <u>Effect of Forfeiture</u>. If Restricted Stock is forfeited, and if the Grantee was required to pay for such Shares of Restricted Stock or acquired such Shares upon the exercise of an Option, the Grantee shall be deemed to have resold such Restricted Stock to the Company at a price equal to the lesser of (a) the amount paid by the Grantee for such Restricted Stock or the Option Price, as applicable, and (b) the Fair Market Value of a Share on the date of such forfeiture. The Company shall pay to the Grantee the deemed sale price as soon as administratively practical following the forfeiture of Restricted Stock. Such Restricted Stock shall cease to be outstanding and shall no longer confer on the Grantee thereof any rights as a shareholder of the Company, from and after the date of the event causing the forfeiture, whether or not the Grantee accepts the Company's tender of payment for such Restricted Stock.

8.6.     <u>Escrow; Legends</u>. The Committee may provide that the certificates for any Restricted Stock (a) shall be held (together with a stock power executed in blank by the Grantee) in escrow by the Secretary of the Company until such Restricted Stock becomes non-forfeitable or vested and transferable, or is forfeited and/or (b) shall bear an appropriate legend restricting the transfer of such Restricted Stock under the Plan. If any Restricted Stock becomes non-forfeitable or vested and transferable, the Company shall cause certificates for such Shares to be delivered without such legend or shall cause a release of restrictions on a book entry account maintained by the Company's transfer agent.

8.7.     <u>Shareholder Rights in Restricted Stock</u>. Restricted Stock, whether held by a Grantee or in escrow or other custodial arrangement by the Secretary of the Company, shall confer on the Grantee all rights of a shareholder of the Company, except as otherwise provided in the Plan or Award Agreement. At the time of a grant of Restricted Stock, the Committee may require the payment of cash dividends thereon to be deferred and, if the Committee so determines, reinvested in additional Shares of Restricted Stock. Stock dividends and deferred cash dividends issued with respect to Restricted Stock shall be subject to the same Restrictions and other terms (including forfeiture) as apply to the Shares of Restricted Stock with respect to which such dividends are issued. The Committee may, in its discretion, provide for payment of interest on deferred cash dividends.

**Section 9.**
**Restricted Stock Units**

9.1.     <u>Grant of Restricted Stock Units</u>. Subject to and consistent with the provisions of the Plan and applicable requirements of Code Sections 409A(a)(2), (3) and (4), the Committee, at any time and from time to time, may grant Restricted Stock Units to any Eligible Person, in such amount and upon such terms as the Committee shall determine. A Grantee shall have no shareholder voting rights with respect to Restricted Stock Units.

9.2.     <u>Award Agreement</u>. Each grant of Restricted Stock Units shall be evidenced by an Award Agreement that shall specify the Restrictions, the number of Shares subject to the Restricted Stock Units granted, and such other provisions not inconsistent with the Plan or Code Section 409A as the Committee shall determine. The Committee may impose such

Restrictions on Restricted Stock Units as it deems appropriate, including time-based Restrictions, Restrictions based on the achievement of specific Performance Goals, Restrictions based on the occurrence of a specified event, restrictions under securities laws or pursuant to a regulatory entity with authority over the Company or a Subsidiary, and/or a combination of any of the above.

9.3.     Crediting Restricted Stock Units. The Company shall establish an account ("**RSU Account**") on its books for each Eligible Person who receives a grant of Restricted Stock Units. Restricted Stock Units shall be credited to the Grantee's RSU Account as of the Grant Date of such Restricted Stock Units. RSU Accounts shall be maintained for recordkeeping purposes only and the Company shall not be obligated to segregate or set aside assets representing securities or other amounts credited to RSU Accounts. The obligation to make distributions of securities or other amounts credited to RSU Accounts shall be an unfunded, unsecured obligation of the Company.

(a)     Crediting of Dividend Equivalents. Except as otherwise provided in an Award Agreement, whenever dividends are paid or distributions made with respect to Shares, Dividend Equivalents shall be credited to RSU Accounts on all Restricted Stock Units credited thereto as of the record date for such dividend or distribution. Such Dividend Equivalents shall be credited to the RSU Account in the form of additional Restricted Stock Units in a number determined by dividing the aggregate value of such Dividend Equivalents by the Fair Market Value of a Share on the payment date of such dividend or distribution.

(b)     Settlement of RSU Accounts. Except as otherwise provide in an Award Agreement, the Company shall settle an RSU Account by delivering to the holder thereof (which may be the Grantee or his or her Beneficiary, as applicable) a number of Shares equal to the whole number of Shares underlying the Restricted Stock Units then credited to the Grantee's RSU Account (or a specified portion in the event of any partial settlement); provided, however, that, unless otherwise determined by the Committee, any fractional Shares underlying Restricted Stock Units remaining in the RSU Account on the Settlement Date shall either be forfeited or distributed in cash in an amount equal to the Fair Market Value of a Share as of the Settlement Date multiplied by the remaining fractional Restricted Stock Unit, as determined by the Committee. Unless otherwise provided in an Award Agreement, the Settlement Date for all Restricted Stock Units credited to a Grantee's RSU Account shall be as soon as administratively practical following the date when Restrictions applicable to an Award of Restricted Stock Units have lapsed, but in no event shall such Settlement Date be later than March 15 of the Year following the Year in which the Restrictions applicable to an Award of Restricted Stock Units have lapsed. Unless otherwise provided in an Award Agreement, in the event of a Grantee's Termination of Service prior to the lapse of such Restrictions, such Grantee's Restricted Stock Units shall be immediately cancelled and forfeited to the Company.

**Section 10.**
**Deferred Stock**

10.1.     Grant of Deferred Stock. Subject to and consistent with the provisions of the Plan and applicable requirements of Code Sections 409A(a)(2), (3), and (4), the Committee, at any time and from time to time, may grant Deferred Stock to any Eligible Person in such number, and upon such terms, as the Committee, at any time and from time to time, shall determine (including, to the extent allowed by the Committee, grants at the election of a Grantee to convert Shares to be acquired upon lapse of Restrictions on Restricted Stock or Restricted Stock Units into such Deferred Stock). A Grantee shall have no voting rights in Deferred Stock.

10.2.     Award Agreement. Each grant of Deferred Stock shall be evidenced by an Award Agreement that shall specify the number of Shares underlying the Deferred Stock subject to an Award, the Settlement Date such Shares of Deferred Stock shall be settled and such other provisions as the Committee shall determine that are in accordance with the Plan and Code Section 409A.

10.3.     Deferred Stock Elections.

(a)     Making of Deferral Elections. If and to the extent permitted by the Committee, an Eligible Person may elect (a "**Deferral Election**") at such times and in accordance with rules and procedures adopted by the Committee (which shall comport with Code Section 409A), to receive all or any portion of his salary, bonus and/or cash retainer (in the case of a director) (including any cash or Share Award, other than Options or SARs) either in the form of a number of shares of Deferred Stock equal to the quotient of the amount of salary, bonus and/or cash retainer or other permissible Award to be paid in the form of Deferred Stock divided by the Fair Market Value of a Share on the date such salary, bonus, cash retainer or other such Award would otherwise be paid in cash or distributed in Shares or pursuant to such other terms and conditions as the Committee may

determine. The Grant Date for an Award of Deferred Stock made pursuant to a Deferral Election shall be the date the deferrable amount subject to a Deferral Election would otherwise have been paid to the Grantee in cash or Shares.

(b)      Timing of Deferral Elections. An initial Deferral Election must be filed with the Company (pursuant to procedures established by the Committee) no later than December 31 of the Year preceding the Year in which the amounts subject to the Deferral Election would otherwise be earned, subject to such restrictions and advance filing requirements as the Company may impose. A Deferral Election shall be irrevocable as of the filing deadline, unless the Company has specified an earlier time at which it shall be irrevocable. Each Deferral Election shall remain in effect with respect to subsequently earned amounts unless the Eligible Person revokes or changes such Deferral Election. Any such revocation or change shall have prospective application only and must be made at a time at which a subsequent Deferral Election is permitted.  Notwithstanding the foregoing, if any individual first becomes eligible to participate in the Plan during a Year, the initial Deferral Election for such individual shall comply with the requirements of 1.409A-2(a)(7).

(c)      Subsequent Deferral Elections. A Deferral Election (other than an initial Deferral Election) made with respect to a Deferred Compensation Award must meet the timing requirements for a subsequent deferral election as specified in Treasury Regulations Section 1.409A-2(b).

10.4.      Deferral Account.

(a)      Establishment of Deferral Accounts. The Company shall establish an account ("**Deferral Account**") on its books for each Eligible Person who receives a grant of Deferred Stock or makes a Deferral Election. Deferred Stock shall be credited to the Grantee's Deferral Account as of the Grant Date of such Deferred Stock. Deferral Accounts shall be maintained for recordkeeping purposes only and the Company shall not be obligated to segregate or set aside assets representing securities or other amounts credited to Deferral Accounts. The obligation to make distributions of securities or other amounts credited to Deferral Accounts shall be an unfunded, unsecured obligation of the Company.

(b)      Crediting of Dividend Equivalents. Except as otherwise provided in an Award Agreement, whenever dividends are paid or distributions made with respect to Shares, Dividend Equivalents shall be credited to Deferral Accounts on all Deferred Stock credited thereto as of the record date for such dividend or distribution. Such Dividend Equivalents shall be credited to the Deferral Account in the form of additional Deferred Stock in a number determined by dividing the aggregate value of such Dividend Equivalents by the Fair Market Value of a Share at the payment date of such dividend or distribution.

(c)      Settlement of Deferral Accounts. The Company shall settle a Deferral Account by delivering to the holder thereof (which may be the Grantee or his or her Beneficiary, as applicable) a number of Shares equal to the number of Shares of Deferred Stock then credited to the Grantee's Deferral Account (or a specified portion in the event of any partial settlement); provided, however, unless otherwise determined by the Committee, that any fractional Shares of Deferred Stock remaining in the Deferral Account on the Settlement Date shall either be forfeited or distributed in cash in an amount equal to the Fair Market Value of a Share as of the Settlement Date multiplied by the remaining fractional Share, as determined by the Committee. The Settlement Date for all Deferred Stock credited in a Grantee's Deferral Account shall be determined in accordance with Code Section 409A and shall be specified in the applicable Award Agreement or Deferral Election. The Settlement Date for Deferred Stock, as may be permitted by the Committee in its discretion and as specified in the Award Agreement or Deferral Election, is limited to one or more of the following events:  (i) a specified date within the meaning of Treasury Regulations Section 1.409A-3(i)(1), (ii) a Change in Control, (iii) the Grantee's Termination of Service, (iv) the Grantee's death, (v) the Grantee's Disability, or (vi) an "unforeseeable emergency" of the Grantee (or his or her dependent) as provided in Treasury Regulations Section 1.409A-3(i)(3).

**Section 11.**
**Performance Units**

11.1.      Grant of Performance Units. Subject to and consistent with the provisions of the Plan, Performance Units may be granted to any Eligible Person in such number and upon such terms, and at any time and from time to time, as shall be determined by the Committee. Performance Units shall be evidenced by an Award Agreement in such form as the Committee may approve, which shall contain such terms and conditions not inconsistent with the provisions of the Plan as shall be determined by the Committee.

11.2.      Value/Performance Goals. The Committee shall set Performance Goals in its discretion which, depending on the extent to which they are met during a Performance Period, will determine the number or value of Performance Units that

will be paid to the Grantee at the end of the Performance Period. Each Performance Unit shall have an initial or target value that is established by the Committee at the time of grant. The Performance Goals for Awards of Performance Units may be set by the Committee at threshold, target and maximum performance levels with the number or value of the Performance Units payable directly correlated to the degree of attainment of the various performance levels during the Performance Period. Unless otherwise provided in an Award Agreement, no payment shall be made with respect to a Performance Unit Award if the threshold performance level is not satisfied. If Performance Goals are attained between the threshold and target performance levels or between the target and maximum performance levels, the number or value of Performance Units under such Award shall be determined by linear interpolation, unless otherwise provided in an Award Agreement. With respect to Covered Employees and to the extent the Committee deems it appropriate to comply with the Performance-Based Exception, all Performance Goals shall be based on objective Performance Measures satisfying the requirements for the Performance-Based Exception, and shall be set by the Committee within the time period prescribed by Performance-Based Exception.

11.3.      Earning of Performance Units. Except as provided in Section 13, after the applicable Performance Period has ended, the holder of Performance Units shall be entitled to payment based on the level of achievement of Performance Goals set by the Committee and as described in Section 11.2. If the Performance Unit is intended to comply with the Performance-Based Exception, the Committee shall certify the level of achievement of the Performance Goals in writing before the Award is settled. At the discretion of the Committee, the Award Agreement may specify that an Award of Performance Units is payable in cash, Shares or Restricted Stock Units.

11.4.      Adjustment on Change of Position. If a Grantee is promoted, demoted or transferred to a different business unit of the Company during a Performance Period, then, to the extent the Committee determines that the Award, the Performance Goals or the Performance Period are no longer appropriate, the Committee may adjust, change, eliminate or cancel the Award, the Performance Goals or the applicable Performance Period, as it deems appropriate in order to make them appropriate and comparable to the initial Award, the Performance Goals or the Performance Period.  For the avoidance of doubt, any adjustment pursuant to this Section 11.4 may cause an Award that would otherwise have been subject to the Performance-Based Exception to fail to be subject to the Performance-Based Exception.»

**Section 12.**
**Annual Incentive Awards**

12.1.      Annual Incentive Awards. Subject to and consistent with the provisions of the Plan, Annual Incentive Awards may be granted to any Eligible Person in accordance with the provisions of this Section 12. The Committee shall designate the individuals eligible to be granted an Annual Incentive Award for a Year. Such designation shall occur within the first ninety (90) days of such Year (or for those individuals who are newly hired or enter bonus-eligible positions during a Year, within ninety (90) days of commencing employment or entering the bonus-eligible position, as applicable, but for Annual Incentive Awards intended to comply with the Performance-Based Exception, in all cases in compliance with the requirements of the Performance-Based Exception). The Committee may designate an Eligible Person as eligible for a full Year or for a period of less than a full Year. The opportunity to be granted an Annual Incentive Award shall be evidenced by an Award Agreement or in such form as the Committee may approve, which shall specify the individual's Bonus Opportunity, the Performance Goals, and such other terms not inconsistent with the Plan as the Committee shall determine.

12.2.      Determination of Amount of Annual Incentive Awards.

(a)      Aggregate Maximum. The Committee may establish guidelines as to the maximum aggregate amount of Annual Incentive Awards payable for any Year.

(b)      Establishment of Performance Goals and Bonus Opportunities. For any Annual Incentive Award granted, the Committee shall establish Performance Goals for the Year (which may be the same or different for some or all Eligible Persons) and shall establish the threshold, target and maximum Bonus Opportunity for each Grantee for the attainment of specified threshold, target and maximum Performance Goals. Such designation shall occur within the first ninety (90) days of the Year (or for those individuals who are newly hired or enter bonus-eligible positions during a Year, within ninety (90) days of commencing employment or entering the bonus-eligible position, as applicable, but for Annual Incentive Awards intended to comply with the Performance-Based Exception, in all cases in compliance with the requirements of the Performance-Based Exception). Performance Goals and Bonus Opportunities may be weighted for different factors and measures as the Committee shall determine, and as provided under Section 4.4.

(c)     Committee Certification and Determination of Amount of Annual Incentive Award. The Committee shall determine and certify in writing the degree of attainment of Performance Goals as soon as administratively practicable after the end of each Year but not later than ninety (90) days after the end of such Year. The Committee shall determine an individual's maximum Annual Incentive Award based on the level of attainment of the Performance Goals (as certified by the Committee) and the individual's Bonus Opportunity. The Committee may adjust an Annual Incentive Award as provided in Section 4.4. The determination of the Committee to reduce (or not pay) an individual's Annual Incentive Award for a Year shall not affect the maximum Annual Incentive Award payable to any other individual. No Annual Incentive Award intended to qualify for the Performance-Based Exception shall be payable to an individual unless at least the threshold Performance Goal is attained.

(d)     Termination of Service. If a Grantee has a Termination of Service during the Year, the Committee may, in its absolute discretion and under such rules as the Committee may from time to time prescribe, authorize the payment of an Annual Incentive Award to such Grantee in accordance with the foregoing provisions of this Section 12.2 and, in the absence of such determination by the Committee, the Grantee shall receive no Annual Incentive Award for such Year; provided, however, that, to extent that an Annual Incentive Award is intended to comply with the Performance-Based Exception, the payment of such Award shall be determined based upon actual performance at the end of the Year and any payment of such Award shall be paid in accordance with Section 12.3 unless otherwise provided in the applicable Award Agreement, and in any case in a manner compliant with the Performance-Based Exception.

12.3.     Time of Payment of Annual Incentive Awards. Annual Incentive Awards shall be paid as soon as administratively practicable after the Committee determines the amount of the Award payable under Section 12 but not later than the March 15 after the end of the Year to which the Annual Incentive Award relates.

12.4.     Form of Payment of Annual Incentive Awards. An individual's Annual Incentive Award for a Year shall be paid in cash, Shares, Restricted Stock, Options or any other form of an Award, or any combination thereof, as provided in the Award Agreement or in such form as the Committee may approve.

**Section 13.**
**Dividend Equivalents**

The Committee is authorized to grant Awards of Dividend Equivalents alone or in conjunction with other Awards (other than Options and SARs), on such terms and conditions as the Committee shall determine in accordance with the Plan and Code Section 409A. Unless otherwise provided in the Award Agreement or in Section 9 and Section 10 of the Plan, Dividend Equivalents shall be paid immediately when accrued and, in no event, later than March 15 of the Year following the Year in which such Dividend Equivalents accrue. Unless otherwise provided in the Award Agreement or in Section 9 and Section 10 of the Plan, if the Grantee incurs a Termination of Service prior to the date such Dividend Equivalents accrue, the Grantee's right to such Dividend Equivalents shall be immediately forfeited. Notwithstanding the foregoing, no Dividend Equivalents may be paid with respect to unvested Performance Units.

**Section 14.**
**Change in Control**

14.1.     Acceleration of Vesting. Unless otherwise provided in the applicable Award Agreement, upon the occurrence of (a) an event satisfying the Section 2.8 definition of "Change in Control" with respect to a particular Award, and (b) a Grantee's involuntary Termination of Service (other than due to Cause) that occurs during the twenty-four (24) month period immediately following such Change in Control event, such Award shall become vested, all Restrictions shall lapse and all Performance Goals shall be deemed to be met at target levels, as applicable; provided, however, that no payment of an Award shall be accelerated to the extent such payment would cause such Award to be subject to the adverse tax consequences under Code Section 409A. The Committee may, in its discretion, include such further provisions and limitations with respect to a Change in Control in any Award Agreement as it may deem desirable.

14.2.     Special Treatment in the Event of a Change in Control. In order to maintain the Grantee's rights upon the occurrence of any event satisfying the Section 2.8 definition of "Change in Control" with respect to an Award, the Committee, as constituted before such event, may, in its sole discretion, as to any such Award, either at the time the Award is granted hereunder or any time thereafter: (a) make such adjustment to any such Award then outstanding as the Committee deems appropriate to reflect such Change in Control; and/or (b) cause any such Award then outstanding to be assumed, or new rights substituted therefor, by the acquiring or surviving entity after such Change in Control. Additionally, in the event of any Change in Control with respect to unexercised Options and SARs (whether or not vested), the Committee, as constituted before such

Change in Control, may, in its sole discretion (except as may be otherwise provided in the Award Agreement): (i) cancel any outstanding unexercised Options or SARs (whether or not vested) that have an Option Price or Strike Price (as applicable) that is greater than the Change in Control Price (defined below); or (ii) cancel any outstanding unexercised Options or SARs (whether or not vested) that have an Option Price or Strike Price (as applicable) that is less than or equal to the Change in Control Price in exchange for a cash payment in an amount equal to (A) the difference between the Change in Control Price and the Option Price or Strike Price (as applicable), multiplied by (B) the total number of Shares underlying such Option or SAR that are vested and exercisable at the time of the Change in Control. The Committee may, in its discretion, include such further provisions and limitations in any Award Agreement as it may deem desirable. The "**Change in Control Price**" means the lower of (I) the Fair Market Value of a Share as of the date of the Change in Control, or (II) the price paid per Share as part of the transaction which constitutes the Change in Control.

### Section 15.
### Amendments and Termination

15.1.    Amendment and Termination.

(a)    Subject to Section 15.2, the Board may at any time amend, alter, suspend, discontinue or terminate the Plan in whole or in part without the approval of the Company's shareholders, provided that (i) any amendment shall be subject to the approval of the Company's shareholders if such approval is required by any federal or state law or regulation or any stock exchange or automated quotation system on which the Shares may then be listed or quoted and (ii) any Plan amendment or termination will not accelerate the timing of any payments that constitute non-qualified deferred compensation under Code Section 409A if it would result in adverse tax consequences under Code Section 409A.

(b)    Subject to Section 15.2, the Committee may amend the terms of any Award Agreement, prospectively or retroactively, in accordance with the terms of the Plan.

15.2.    Previously Granted Awards. Except as otherwise specifically provided in the Plan (including Sections 3.2(k), 3.2(n), 5.5, 15.1, this Section 15.2, and Section 18.6) or an Award Agreement, no termination, amendment or modification of the Plan shall adversely affect in any material respect any Award previously granted under the Plan or an Award Agreement without the written consent of the Grantee of such Award. Notwithstanding the foregoing, the Board or the Committee (as applicable) shall have the authority to amend the Plan and outstanding Awards to the extent necessary or advisable to account for changes in applicable law, regulations, rules or other written guidance without a Grantee's consent.

### Section 16.
### Beneficiary Designation

Each Grantee under the Plan may, from time to time, name any Beneficiary or Beneficiaries (who may be named contingently or successfully) to whom any benefit under the Plan is to be paid in case of his or her death before he or she receives any or all of such benefit. Each such designation shall revoke all prior designations by the same Grantee, shall be in a form prescribed by the Company, and will be effective only when filed by the Grantee in writing with the Company during the Grantee's lifetime. In the absence of any such designation, the Grantee's estate shall be the Grantee's Beneficiary.

### Section 17.
### Withholding

17.1.    Required Withholding.

(a)    The Committee in its sole discretion may provide that when taxes are to be withheld in connection with the exercise of an Option or a SAR, upon the lapse of Restrictions on an Award or upon payment of any benefit or right under the Plan (the Exercise Date, the date such Restrictions lapse or such payment of any other benefit or right occurs hereinafter referred to as the "**Tax Date**"), the Grantee may be required or may be permitted to elect to make payment for the withholding of federal, state and local taxes, including Social Security and Medicare (FICA) taxes, by one or a combination of the following methods:

(i)    payment of an amount in cash equal to the amount to be withheld;

(ii)        requesting the Company to withhold from those Shares that would otherwise be received upon exercise of an Option or a SAR, upon the lapse of Restrictions on, or upon settlement of, any other Award, a number of Shares having a Fair Market Value on the Tax Date equal to the amount to be withheld; or

(iii)       withholding from any compensation otherwise due to the Grantee.

The tax withholding upon exercise of an Option or a SAR or in connection with the payment or settlement of any other Award to be satisfied by withholding Shares, cash or other property granted pursuant to an Award shall not exceed the minimum amount of taxes required to be withheld under federal, state and local law.  Unless the Grantee elects otherwise, then as of the Tax Date, the Company shall satisfy all withhold requirements pursuant to clause (ii) above.  Unless otherwise permitted by the Company, an election by a Grantee under this Section 17.1 is irrevocable.  Unless otherwise determined by the Company, any fractional share amount shall be reserved by the Company and used to satisfy other withholding obligations of the Grantee.  Any additional withholding not paid by the withholding or surrender of Shares must be paid in cash by the Grantee.

(b)        Any Grantee who makes a Disqualifying Disposition (as defined in Section 6.5(f)) or an election under Code Section 83(b) shall remit to the Company an amount sufficient to satisfy all resulting tax withholding requirements in the same manner as set forth in Section 17.1(a).

(c)        No Award shall be settled, whether in cash or in Shares, unless the applicable tax withholding requirements have been met to the satisfaction of the Committee.

17.2.     Notification under Code Section 83(b). If the Grantee, in connection with the exercise of any Option, or the grant of Restricted Stock, makes the election permitted under Code Section 83(b) to include in such Grantee's gross income in the year of transfer the amounts specified in Code Section 83(b), then such Grantee shall notify the Company of such election within ten (10) days of filing the notice of the election with the Internal Revenue Service, in addition to any filing and notification required pursuant to regulations issued under Code Section 83(b). The Committee may, in connection with the grant of an Award or at any time thereafter, prohibit a Grantee from making the election described above.

### Section 18.
### General Provisions

18.1.     Governing Law. The validity, construction and effect of the Plan and any rules and regulations relating to the Plan shall be determined in accordance with the laws of the State of Delaware, other than its law respecting choice of laws and applicable federal law.

18.2.     Severability. If any provision of the Plan or any Award Agreement is or becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction, or as to any Person or Award, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended to conform to applicable laws, or if it cannot be so construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Plan or the Award, it shall be stricken and the remainder of the Plan and any such Award shall remain in full force and effect.

18.3.     Successors. All obligations of the Company under the Plan with respect to Awards granted hereunder shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business and/or assets of the Company.

18.4.     Requirements of Law. The granting of Awards and the delivery of Shares under the Plan shall be subject to all applicable laws, rules and regulations, and to such approvals by any governmental agencies or national securities exchanges or markets as may be required. Notwithstanding any provision of the Plan or any Award Agreement, Grantees shall not be entitled to exercise, or receive benefits under, any Award, and the Company (or any Subsidiary) shall not be obligated to deliver any Shares or deliver benefits to a Grantee, if such exercise or delivery would constitute a violation by the Grantee, the Company or a Subsidiary of any applicable law or regulation.

18.5.     Securities Law Compliance. If the Committee deems it necessary to comply with any applicable securities law, or the requirements of any securities exchange or market upon which Shares may be listed, the Committee may impose

any restriction on Awards or Shares acquired pursuant to Awards under the Plan as it may deem advisable. All evidence of Share ownership delivered pursuant to any Award or the exercise thereof shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the rules, regulations or other requirements of the SEC, any securities exchange or market upon which Shares are then listed, and any applicable securities law. If so requested by the Company, the Grantee shall make a written representation and warranty to the Company that he or she will not sell or offer to sell any Shares unless a registration statement shall be in effect with respect to such Shares under the Securities Act of 1933, as amended, and any applicable state securities law or unless he or she shall have furnished to the Company an opinion of counsel, in form and substance satisfactory to the Company, that such registration is not required.

If the Committee determines that the exercise or non-forfeitability of, or delivery of benefits pursuant to, any Award would violate any applicable provision of securities laws or the listing requirements of any national securities exchange or national market system on which any of the Company's equity securities are listed, then the Committee may postpone any such exercise, non-forfeitability or delivery to comply with all such provisions at the earliest practicable date.

18.6.    Code Section 409A. To the extent applicable and notwithstanding any other provision of the Plan, the Plan and Award Agreements hereunder shall be administered, operated and interpreted in accordance with Code Section 409A, including, without limitation, any regulations or other guidance that may be issued after the date on which the Board approves the Plan; provided, however, that, in the event that the Committee determines that any amounts payable hereunder may be taxable to a Grantee under Code Section 409A prior to the payment and/or delivery to such Grantee of such amount, the Company may (a) adopt such amendments to the Plan and related Award, and appropriate policies and procedures, including amendments and policies with retroactive effect, that the Committee determines necessary or appropriate to preserve the intended tax treatment of the benefits provided by the Plan and Awards hereunder, and/or (b) take such other actions as the Committee determines necessary or appropriate to comply with or exempt the Plan and/or Awards from the requirements of Code Section 409A. The Company and its Subsidiaries make no guarantees to any Person regarding the tax treatment of Awards or payments made under the Plan, and, notwithstanding the above provisions and any agreement or understanding to the contrary, if any Award, payments or other amounts due to a Grantee (or his or her beneficiaries, as applicable) results in, or causes in any manner, the application of any adverse tax consequence under Code Section 409A or otherwise to be imposed, then the Grantee (or his or her Beneficiaries, as applicable) shall be solely liable for the payment of, and the Company and its Subsidiaries shall have no obligation or liability to pay or reimburse (either directly or otherwise) the Grantee (or his or her Beneficiaries, as applicable) for, any such adverse tax consequences. In the case of any Deferred Compensation Award (in addition to Deferred Stock), the provisions of Section 10.4 relating to permitted times of settlement shall apply to such Award. If any Deferred Compensation Award is payable to a "specified employee" (within the meaning of Treasury Regulations Section 1.409A-1(i)), then such payment, to the extent payable due to the Grantee's Termination of Service and not otherwise exempt from Code Section 409A, shall not be paid before the date that is first day of the seventh (7th) month after the date of such Termination of Service (or, if earlier, the date of such Grantee's death).

18.7.    Mitigation of Excise Tax. If any payment or right accruing to a Grantee under the Plan (without the application of this Section 18.7), either alone or together with other payments or rights accruing to the Grantee from an Employer ("**Total Payments**"), would constitute a "parachute payment" (as defined in Code Section 280G), such payment or right shall be reduced to the largest amount or greatest right that will result in no portion of the amount payable or right accruing under the Plan being subject to an excise tax under Code Section 4999 or being disallowed as a deduction under Code Section 280G. The determination of whether any reduction in the rights or payments under the Plan is to apply shall be made by the Committee in good faith after consultation with the Grantee, and such determination shall be conclusive and binding on the Grantee. The Grantee shall cooperate in good faith with the Committee in making such determination and providing the necessary information for this purpose. The foregoing provisions of this Section 18.7 shall apply with respect to any person only if, after reduction for any applicable federal excise tax imposed by Code Section 4999 and federal income tax imposed by the Code, the Total Payments accruing to such person would be less than the amount of the Total Payments as reduced, if applicable, under the foregoing provisions of the Plan and after reduction for only federal income taxes.

18.8.    No Rights as a Shareholder. No Grantee shall have any rights as a shareholder of the Company with respect to the Shares (except as provided in Section 8.7 with respect to Restricted Stock) that may be deliverable upon exercise or payment of such Award until such Shares have been delivered to him or her.

18.9.    Awards Not Taken into Account for Other Benefits. Awards shall be special incentive payments to the Grantee and shall not be taken into account in computing the amount of salary or compensation of the Grantee for purposes of determining any pension, retirement, death or other benefit under (a) any pension, retirement, profit-sharing, bonus, insurance or other employee benefit plan of an Employer, except as such plan shall otherwise expressly provide, or (b) any Employment Agreement between an Employer and the Grantee, except as such agreement shall otherwise expressly provide.

18.10.    <u>Employment Agreement Supersedes Award Agreement</u>. In the event a Grantee is a party to an Employment Agreement with the Company or a Subsidiary that provides for vesting or extended exercisability of equity compensation Awards on terms more favorable to the Grantee than the Grantee's Award Agreement or this Plan, the Employment Agreement shall be controlling; <u>provided</u>, <u>however</u>, that (a) if the Grantee is a Section 16 Person, any terms in the Employment Agreement requiring approval of the Board, its compensation committee, or the Company's shareholders in order for an exemption from Section 16(b) of the Exchange Act to be available shall have been approved by the Board, its compensation committee, or the shareholders, as applicable, and (b) the Employment Agreement shall not be controlling to the extent the Grantee and Grantee's Employer agree it shall not be controlling, and (c) an Employment Agreement or modification to an Employment Agreement shall be deemed to modify the terms of any pre-existing Award only if the terms of the Employment Agreement expressly so provide.

18.11.    <u>Non-Exclusivity of Plan</u>. Neither the adoption of the Plan by the Board nor its submission to the shareholders of the Company for approval shall be construed as creating any limitations on the power of the Board to adopt such other compensatory arrangements for employees as it may deem desirable.

18.12.    <u>No Trust or Fund Created</u>. Neither the Plan nor any Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Subsidiary and a Grantee or any other Person. To the extent that any Person acquires a right to receive payments from the Company or any Subsidiary pursuant to an Award, such right shall be no greater than the right of any unsecured general creditor of the Company or any Subsidiary.

18.13.    <u>No Right to Continued Employment or Awards</u>. No employee shall have the right to be selected to receive an Award under this Plan or, having been so selected, to be selected to receive a future Award. The grant of an Award shall not be construed as giving a Grantee the right to be retained in the employ of the Company or any Subsidiary or to be retained as an officer of, director of or consultant to the Company or any Subsidiary. Further, the Company or a Subsidiary may at any time terminate the employment or service of a Grantee free from any liability, or any claim under the Plan, unless otherwise expressly provided in the Plan or in any Award Agreement.

18.14.    <u>Military Service</u>. Awards shall be administered in accordance with Code Section 414(u) and the Uniformed Services Employment and Reemployment Rights Act of 1994.

18.15.    <u>Construction</u>. The following rules of construction will apply to the Plan:  (a) the word "or" is disjunctive but not necessarily exclusive and (b) words in the singular include the plural, words in the plural include the singular, and words in the neuter gender include the masculine and feminine genders and words in the masculine or feminine genders include the opposite gender and the neuter gender. The headings of sections and subsections are included solely for convenience of reference, and if there is any conflict between such headings and the text of this Plan, the text shall control.

18.16.    <u>No Fractional Shares</u>. Except as otherwise determined by the Committee, no fractional Shares shall be issued or delivered pursuant to the Plan or any Award, and the Committee shall determine whether cash, other securities, or other property shall be paid or transferred in lieu of any fractional Shares, or whether such fractional Shares or any rights thereto shall be canceled, terminated or otherwise eliminated.

18.17.    <u>Plan Document Controls</u>. This Plan and each Award Agreement constitute the entire agreement with respect to the subject matter hereof and thereof; <u>provided</u>, <u>however</u>, that in the event of any inconsistency between the Plan and such Award Agreement, the terms and conditions of the Plan shall control.

Exhibit 21.1

**FINJAN HOLDINGS, INC. SUBSIDIARIES**

The following are the subsidiaries of Finjan Holdings, Inc.:

Finjan, Inc., a Delaware corporation
CybeRisk Security Solutions, Ltd, an Israeli company
Finjan Mobile, Inc., a Delaware corporation
CybeRisk Security Solutions, Inc., a Delaware corporation

**Exhibit 23.1**

<u>INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM'S CONSENT</u>

We consent to the incorporation by reference in the Registration Statement of Finjan Holdings, Inc. on Form S-3 (File No. 333-189984), Form S-8 (File No. 333-195922) and Form S-8 (File No. 333-197369) of our report dated March 14, 2018, with respect to our audits of the consolidated financial statements of Finjan Holdings, Inc. as of December 31, 2017 and 2016, and for the years ended December 31, 2017, 2016, and 2015, which report is included in this Annual Report on Form 10-K of Finjan Holdings, Inc. for the year ended December 31, 2017.

/s/ Marcum LLP

Marcum LLP
New York, NY
March 14, 2018

**Exhibit 31.1**

**CERTIFICATION**

I, Philip Hartstein, certify that:

1.   I have reviewed this Annual Report on Form 10-K of Finjan Holdings, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    March 14, 2018                    By:    _____
                                                            /s/    Philip Hartstein
                                                        **Philip Hartstein**
                                                 **President and Chief Executive Officer**

**Exhibit 31.2**

**CERTIFICATION**

I, Michael Noonan, certify that:

1.   I have reviewed this Annual Report on Form 10-K of Finjan Holdings, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    March 14, 2018                    By:    _____/s/___Michael Noonan_____

**Michael Noonan**
**Chief Financial Officer and Treasurer**

Exhibit 32.1

**CERTIFICATIONS PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to 18 U.S.C. Section 1350, the undersigned, Philip Hartstein, hereby certifies that, to the best of his knowledge, the Annual Report on Form 10-K of Finjan Holdings, Inc. for the fiscal year ended December 31, 2017 (i) fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, and (ii) that the information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Finjan Holdings, Inc.

Date:    March 14, 2018                        By:    _____/s/   Philip Hartstein_____

                                                            **Philip Hartstein**
                                                   **President and Chief Executive Officer**

Exhibit 32.2

**CERTIFICATIONS PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to 18 U.S.C. Section 1350, the undersigned, Michael Noonan, each hereby certifies that, to the best of his knowledge, the Annual Report on Form 10-K of Finjan Holdings, Inc. for the fiscal year ended December 31, 2017 (i) fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, and (ii) that the information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Finjan Holdings, Inc.

Date:     March 14, 2018                         By:  _____/s/   Michael Noonan_____

                                                             **Michael Noonan**
                                                             **Chief Financial Officer and Treasurer**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 12, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 12, 2020, upon the following in the manner indicated:

Karen E. Keller, Esquire                                              *VIA ELECTRONIC MAIL*
SHAWKELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiff*

Bijal Vakil, Esquire                                                    *VIA ELECTRONIC MAIL*
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA  94307
*Attorneys for Plaintiff*


                                                    */s/ Jack B. Blumenfeld*

                                                    Jack B. Blumenfeld (#1014)