## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINJAN LLC, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 20-371-LPS |
| | : | **UNSEALED ON** |
| TRUSTWAVE HOLDINGS, INC. and | : | **NOV. 1, 2021** |
| SINGAPORE TELECOMMUNICATIONS | : | |
| LIMITED, | : | |
| Defendants. | : | |
| | : | |

Karen E. Keller and Jeff Castellano, SHAW KELLER LLP, Wilmington, Delaware

Bijal Vakil and Jeremy T. Elman, WHITE & CASE LLP, Palo Alto, California

     Attorneys for Plaintiff

Jack B. Blumenfeld and Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware

John S. Letchinger, BAKER & HOSTETLER LLP, Chicago, Illinois

Jared A. Brandyberry, BAKER & HOSTETLER LLP, Denver, Colorado

     Attorneys for Defendants

## MEMORANDUM OPINION

October 29, 2021
Wilmington, Delaware

**STARK, U.S. District Judge:**

On March 16, 2020, Plaintiff Finjan LLC ("Finjan" or "Plaintiff") filed suit against

Trustwave Holdings, Inc. ("Trustwave") and Trustwave's parent entity, Singapore

Telecommunications Limited ("Singtel") (collectively, "Defendants"), for infringement of U.S.

Patent No. 8,141,154 (the "'154 patent") based on Trustwave's sales of certain cybersecurity

products. (*See* D.I. 1)[1] The '154 patent generally relates to the protection of computers from

malicious code such as computer viruses. (*See* D.I. 48 at 1; D.I. 28 Ex. A)

On August 5, 2020, Singtel filed a motion to dismiss for lack of personal jurisdiction

pursuant to Federal Rule of Civil Procedure 12(b)(2). (D.I. 21) Finjan filed a First Amended

Complaint ("FAC") on August 19, 2020, in which it added a claim against Singtel for breach of

contract. (D.I. 28 ¶¶ 101-15) Singtel subsequently renewed its motion to dismiss (D.I. 31),

directing it to Finjan's FAC, and the Court denied without prejudice the earlier motion directed

to the original complaint (*see* D.I. 63). On April 30, 2021, Singtel filed a motion to stay Finjan's

breach of contract claim against it pending resolution of Finjan's breach of contract claim which

is presently proceeding against Trustwave in Delaware Superior Court. (D.I. 64)

The Court heard argument on Singtel's motion to dismiss the FAC (D.I. 31) on May 7,

2021 (*see* D.I. 101) ("May 7 Tr."). At the conclusion of the hearing, the Court granted Finjan's

request for jurisdictional discovery (*see id.* at 45-47) and took the motion to dismiss under

advisement (*see* D.I. 68). After the parties engaged in jurisdictional discovery, they submitted

supplemental briefing on the motion to dismiss on August 17 and September 1. (*See* D.I. 95,

100) On September 13, the Court heard argument again, on the motion to dismiss and on

---

[1] All references to the docket index ("D.I.") are to the docket in the instant action, C.A. No. 20-371-LPS, unless otherwise indicated.

Singtel's motion to stay (*see* D.I. 106 ("Sept. 13 Tr."); *see also* D.I. 105 (post-hearing status report)).

For the reasons set forth below, the Court will deny in part and grant in part Singtel's motion to dismiss and will grant Singtel's motion to stay.

## I.   BACKGROUND

Since its founding in 1997, Finjan has developed technologies directed at detecting cybersecurity threats, for which it has been granted numerous patents. (D.I. 28 ¶ 19) In 2009, Finjan sold its manufacturing business to M86 Security, Inc. ("M86"), also licensing a subset of its patents to M86. (D.I. 48 at 3) The '154 patent was not among the patents licensed to M86, as the '154 patent application did not publish until September 30, 2010 and the patent did not issue until March 20, 2012. (*Id.* at 3-4; D.I. 28 ¶ 73) In March 2012, M86 was acquired by Trustwave. (D.I. 48 at 4) Leading up to the Trustwave-M86 transaction, the parties re-negotiated certain aspects of the 2009 agreement between Finjan and M86. (*Id.*) Thereafter, on March 6, 2012, Trustwave and Finjan entered into the 2012 Amended and Restated Patent License Agreement (the "2012 Agreement"). (*Id.*)

The parties point to several provisions of the 2012 Agreement that are relevant to the Court's analysis of Singtel's motion to dismiss.

Section 1.1 defines an "Acquir[o]r" as "[t]he Person or group of Persons acquiring the Licensee or its business." (D.I. 28 Ex. B § 1.1) There is no dispute that Singtel, as the party which acquired Trustwave, is the "Acquiror" under this definition in the 2012 Agreement.

Section 2.5 provides that "[i]n the event of an Acquisition of Licensee, all the provisions of this Agreement applicable to Licensee . . . shall be deemed to apply to the Acquir[o]r." (*Id.* § 2.5) Finjan contends that because Trustwave was the Licensee, and Singtel is the Acquiror,

"all the provisions of [the 2012] Agreement applicable to [Trustwave] . . . shall be deemed to apply to [Singtel]." (D.I. 49 at 10)

Singtel disagrees with this interpretation of Section 2.5, highlighting two provisions that, it contends, provide context for Section 2.5. (*See* Sept. 13 Tr. at 12, 15-16) Section 2.1 grants a license to "the Licensee" over the "Licensed Patents" but does not specifically mention Acquirors. (D.I. 28 Ex. B § 2.1) Section 2.4 provides that the Licensee may transfer the licenses granted under the 2012 Agreement, provided that "[e]ach Permitted Transferee shall, as a condition to the effectiveness of such Transfer, assume in writing all of the rights and obligations of such Licensee hereunder through the execution of an assignment and assumption agreement." (*Id.* § 2.4)

The 2012 Agreement also contains a forum selection clause, Section 6.4.1, which provides:

> The parties hereto hereby irrevocably submit to the exclusive jurisdiction of any federal or state court located within the State of Delaware over any dispute arising out of or relating to this Agreement and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action proceeding related thereto may be heard and determined in such courts.

(*Id.* § 6.4.1)

Finally, Section 6.9 provides:

> This Agreement shall be binding upon the parties and their successors and assigns and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement.

(*Id.* § 6.9)

On August 31, 2015, Trustwave was acquired by Singtel, a telecommunications company based in Singapore. (D.I. 28 ¶¶ 5, 9)  Singtel alleges that it has no offices or employees in the United States, has not sold the accused products in the United States, and plays no role in the design, manufacture, marketing, pricing, or sale of the accused products sold by Trustwave in the United States. (*See* D.I. 32 at 1)

During jurisdictional discovery, Singtel produced the 2015 Merger Agreement between Singtel and Trustwave (the "2015 Agreement"), along with related disclosures. (*See* D.I. 95 at 3) Section 1.2 of the 2015 Agreement provides that, upon the merger becoming effective, Trustwave ("the Company") will become a subsidiary of Singtel ("the Acquiror"). (D.I. 95 Ex. 2 § 1.2)

Singtel also produced a Company Disclosure Letter associated with the 2015 Agreement. (*See* D.I. 95 Ex. 3)  Schedule 2.18 of Trustwave's Company Disclosure Letter identifies the 2012 Finjan-Trustwave Agreement as a "Material Contract." (*Id.* at 474)  Section 2.18 of the 2015 Agreement (entitled "Material Contracts") references the contracts in Schedule 2.18, stating that "[e]xcept for this [2015] Agreement and the Contracts specifically identified in . . . Schedule 2.18 of the Company Disclosure Letter . . . , neither the Company nor any Subsidiary is a party to or bound by any of the following [enumerated types of] Contracts." (*Id.* Ex. 2 § 2.18)

Finally, Section 5.6(c) of the 2015 Agreement provides that:

> [Trustwave] shall use its reasonable best efforts to obtain, prior to the Closing, the entry by [Trustwave] and [Finjan] into a supplemental agreement relating to the [2012 Agreement] . . . to confirm that neither the Merger, nor subsequent assignment of the [2012 Agreement] to [Singtel] or any [o]f its Subsidiaries, will result in a diminution of rights under the [2012 Agreement], or royalty obligations for [Trustwave, Singtel] or any of its Subsidiaries.

(*Id.* § 5.6(c))[2]

On April 4, 2018, Finjan sued Trustwave in the Delaware Superior Court for breach of the 2012 Agreement. (*See* C.A. No. 20-372 D.I. 2 Ex. A)  Finjan alleged that Trustwave's acquisition by Singtel triggered a 4% royalty on certain products, and that Trustwave failed to pay Finjan those royalties and related costs. (*Id.* at 11)  Judge Carpenter of the Delaware Superior Court denied Trustwave's motion to dismiss the claim, explaining: "Finjan's suit for breach of contract may proceed, but only to determine whether or not Singtel is actually using the patent technology that would trigger royalty payments under the Agreement." (*Id.* at 202-04)  Judge Carpenter subsequently ordered an audit of Singtel's resales of Trustwave's products. (D.I. 70 Ex. B at 45)  He also concluded that while Trustwave does not owe royalties to Finjan under the 2012 Agreement, Singtel may owe Finjan additional royalties. (*See id.* at 42-45)

---

[2] The Court has inserted the bracketed entities for ease of reference and to indicate the Court's understanding of the application of Section 5.6 to the circumstances presented by the pending motion.  For reference, the unaltered text of Section 5.6(c) reads:

> The Company shall use its reasonable best efforts to obtain, prior to the Closing, the entry by the Company and F I Delaware, Inc. into a supplemental agreement relating to the Amended and Restated Patent License Agreement between such parties to confirm that neither the Merger, nor subsequent assignment of the Amended and Restated Patent License Agreement to Acquiror or any if [sic] its Subsidiaries, will result in a diminution of rights under the Amended and Restated Patent License Agreement, or royalty obligations for the Company, Acquiror or any of its Subsidiaries.

The Court understands F I Delaware, Inc. to mean Finjan.  Section 5.6(c) refers to the name of the specific Finjan entity listed in the 2012 Agreement, which was between Trustwave and "F I Delaware, Inc., formerly known as Finjan, Inc." (*See* D.I. 28 Ex. B)  The parties have not distinguished between F I Delaware, Inc. and the Finjan entity that is a party to this case and have proceeded under the assumption that Section 5.6(c) refers to Finjan. (*See* D.I. 95 at 9; Sept. 13 Tr. at 28-30)

After nearly two years of litigation before Judge Carpenter, Finjan removed the state court case to this Court on March 16, 2020. (*See* C.A. No. 20-372 D.I. 2) Shortly thereafter, Trustwave filed a motion to remand. (C.A. No. 20-372 D.I. 9) The Court granted Trustwave's motion, finding that Finjan's removal was untimely. (C.A. No. 20-372 D.I. 40 at 5) ("The length of the delay here is extreme, as Finjan waited approximately 18 months after Trustwave's motion to dismiss raised patent issues before Finjan removed the state court action to this court.")

On the same date that Finjan removed the breach of contract action against Trustwave from Superior Court to this Court, Finjan also filed the instant action, asserting that both Trustwave and Singtel infringe Finjan's '154 patent. (D.I. 1) On August 19, 2020, Finjan filed the FAC, which added a claim for breach of contract against Trustwave. (D.I. 28)

## II. LEGAL STANDARDS

### A. Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a party may move to dismiss a case based on the Court's lack of personal jurisdiction over that party. Determining the existence of personal jurisdiction requires a two-part analysis – one statutory and one constitutional. First, the Court analyzes the long-arm statute of the state in which the Court is located.[3] *See IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998). Delaware's long-arm statute, 10 Del. C. § 3104, has been construed "liberally so as to provide jurisdiction to the maximum extent possible. In fact, the only limit placed on § 3104 is that it remain within the constraints of the Due Process Clause." *Boone v. Oy Partek Ab*, 724 A.2d 1150, 1157 (Del. Super. Ct. 1997)

---

[3] With regard to the statutory inquiry, the Court applies the law of the state in which it is located; as to the constitutional inquiry, in a patent case the Court applies the law of the Federal Circuit. *See Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1016 (Fed. Cir. 2009).

(internal citations omitted), *aff'd*, 707 A.2d 765 (Del. 1998); *see also Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992).

Next, the Court must determine whether exercising jurisdiction over the defendant comports with the Due Process Clause of the Constitution. *See IMO Indus.*, 155 F.3d at 259. Due process is satisfied if the Court finds the existence of "minimum contacts" between the non-resident defendant and the forum state, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

When a defendant moves to dismiss a lawsuit for lack of personal jurisdiction, the plaintiff bears the burden of showing the basis for jurisdiction. *See Power Integrations, Inc. v. BCD Semiconductor*, 547 F. Supp. 2d 365, 369 (D. Del. 2008). If no evidentiary hearing has been held, a plaintiff "need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004); *see also Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1347 (Fed. Cir. 2002) (holding that, in absence of evidentiary hearing regarding jurisdiction, "all factual disputes must be resolved in [plaintiff's] favor in order to evaluate its prima facie showing of jurisdiction"). A plaintiff "presents a prima facie case for the exercise of personal jurisdiction by establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) (internal quotation marks omitted).

"To survive a motion to dismiss in the absence of jurisdictional discovery, plaintiffs need only make a prima facie showing of jurisdiction." *Nuance Commc'ns, Inc. v. Abbyy Software*

*House*, 626 F.3d 1222, 1231 (Fed. Cir. 2010). Where, as here, the parties have conducted discovery but the Court has not held an evidentiary hearing, there is little guidance as to the precise standard applicable to plaintiff's burden to establish personal jurisdiction over the defendant. About all that the parties (and the Court) have found as precedent are suggestions that a plaintiff, once provided discovery, appears to confront some unspecified greater burden than merely making out a prima facie case. *See id.*; *see also Autogenomics*, 566 F.3d at 1017 ("[B]ecause the parties ***have not conducted discovery***, [the plaintiff] needed only to make a prima facie showing that [the defendant] was subject to personal jurisdiction.") (emphasis added).

### B. *Colorado River* Abstention

"The general rule regarding simultaneous litigation of similar issues in both state and federal courts is that both actions may proceed until one has come to judgment, at which point that judgment may create a res judicata or collateral estoppel effect on the other action." *Univ. of Md. at Baltimore v. Peat Marwick Main & Co.*, 923 F.2d 265, 275-76 (3d Cir. 1991). "Nevertheless, in *Colorado River*, the Supreme Court recognized that there are certain extremely limited circumstances in which a federal court may defer to pending state court proceedings based on considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Ryan v. Johnson*, 115 F.3d 193, 195 (3d Cir. 1997) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

"In order for *Colorado River* abstention to be appropriate, there must be parallel state and federal litigations that are truly duplicative." *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 890 (3d Cir. 1997) (internal quotation marks omitted). Thus, a "threshold issue that must be

decided in any *Colorado River* abstention case is whether the [state and federal] actions are 'parallel.'" *Ryan*, 115 F.3d at 196. "Two proceedings generally are considered parallel when they involve the same parties and substantially identical claims, raising nearly identical allegations and issues." *Golden Gate Nat'l Senior Care, LLC v. Minich*, 629 F. App'x 348, 350 (3d Cir. 2015) (internal quotation marks omitted); *see also Yang v. Tsui*, 416 F.3d 199, 204 n.5 (3d Cir. 2005). In order for state and federal proceedings to be "parallel," plaintiffs in both fora should generally be "seek[ing] the same remedies." *Golden Gate*, 629 F. App'x at 350 (citing *Harris v. Pernsley*, 755 F.2d 338, 346 (3d Cir. 1985)).

"If a court finds the proceedings to be parallel, it then carefully balances a host of factors to determine if abstention is warranted, bearing in mind that it should place a thumb on the scales in favor of granting jurisdiction." *Id.* (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)). The Third Circuit has identified six factors for courts to consider when determining whether – when parallel cases are proceeding in state and federal court – abstention is warranted under *Colorado River*:

> (1) [in an in rem case,] which court first assumed jurisdiction over [the] property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal or state law controls; and (6) whether the state court will adequately protect the interests of the parties.

*Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 308 (3d Cir. 2009) (internal quotation marks omitted). "[T]he decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone*, 460 U.S. at 16. "'No one factor is determinative; a carefully considered judgment taking into account both the obligation

to exercise jurisdiction and the combination of factors counseling against that exercise is required.'" *Hamilton*, 571 F.3d at 308 (quoting *Colorado River*, 424 U.S. at 818-19).

## III.   DISCUSSION

### A.   Singtel's Motion to Dismiss

As a preliminary matter, the parties dispute which standard Finjan must meet to survive Singtel's motion to dismiss now that the parties have engaged in jurisdictional discovery. Singtel contends that the parties have "completed jurisdictional discovery" and, accordingly, Finjan's "burden is much higher than a common prima facie burden at this point." (Sept. 13 Tr. at 5-7)  In Finjan's view, however, because it has not yet received all the jurisdictional discovery it has requested, and the Court did not hold an evidentiary hearing, only a prima facie showing is required at this stage.  (*See id.* at 21-22)

The Federal Circuit has explained that "[t]o survive a motion to dismiss in the *absence* of jurisdictional discovery, plaintiffs need only make a prima facie showing of jurisdiction." *Nuance*, 626 F.3d at 1231 (emphasis added).  "Without discovery and a record on jurisdiction, [courts] must resolve all factual disputes in the plaintiff's favor." *Id.* (internal citation omitted). In this case, however, Finjan has received jurisdictional discovery.  In fact, it has received a substantial amount of jurisdictional discovery, including production of documents, a deposition, and answers to interrogatories.  More importantly, Finjan has received the jurisdictional discovery that the Court determined was sufficient for purposes of litigating the motion to dismiss.  (*See* D.I. 94; *see also* D.I. 78 (joint status report containing requests for additional discovery))  Although the parties have not identified authority explaining exactly what burden Finjan faces at this point, the Court is persuaded that Plaintiff must now do more than merely make a prima facie showing of jurisdiction.  (*See* Sept. 13 Tr. at 6-7)  Consequently, the Court is

not bound to presume that all factual disputes with respect to jurisdiction are resolved in Finjan's favor. *See Miller Yacht Sales*, 384 F.3d at 97.[4]

Singtel argues it has insufficient contacts with Delaware for the Court to exercise personal jurisdiction over it based on its own conduct or its subsidiaries' conduct in Delaware. (*See* D.I. 32 at 3-5)  In opposition, Finjan presents four arguments.  First, Finjan argues Singtel expressly consented to this Court's jurisdiction when it acquired Trustwave, since the contract between Trustwave and Finjan contains a forum selection clause designating Delaware as the forum of choice.  (*See* D.I. 49 at 8-10)  Second, Finjan contends that Singtel's marketing and offering for sale of the accused products in Delaware and the United States gives rise to personal jurisdiction.  (*See id.* at 10-12)  Third, Finjan asserts that there is both general and specific personal jurisdiction over Singtel based on Singtel's relationship with Trustwave and Singtel's other wholly owned subsidiaries.  (*See id.* at 12-16)  Fourth, Finjan argues, in the alternative, that if Singtel is not subject to jurisdiction in any district in the United States, then it has sufficient contacts with the United States as a whole to support exercising jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2).  (*See id.* at 18-19)  The Court addresses each of these issues below.

---

[4] Nevertheless – and as further explained below – the Court has concluded that the specific articulation of the burden on Plaintiff does not alter the outcome on any issue.  In other words, whether the Court were to impose on Plaintiff nothing more than an obligation to make out a prima facie case, or alternatively were the Court to require Plaintiff to prove its contentions by a preponderance of the evidence, all of the Court's findings would remain the same.  In particular, the finding that Singtel is bound (with respect to the breach of contract claim) by the forum selection clause has been proven by a preponderance of the evidence; by contrast, Plaintiff has failed to make out even a prima facie case of any other basis for this Court to exercise personal jurisdiction over Singtel (or any basis to do so with respect to the patent infringement claim).

1.     **Forum Selection Clause**

a.     **Breach of contract claim**

Unlike subject matter jurisdiction, personal jurisdiction can be waived by a party's express or implied consent to jurisdiction.  *See Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 431 (D. Del. 1999) (citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702-03 (1982)).  Execution of an agreement containing a forum selection clause, for example, can constitute express consent to the jurisdiction of the forum state.  *See id.* Once a party has expressly consented to jurisdiction, the traditional jurisdictional analysis under Delaware's long-arm statute and the Due Process Clause is not required.  *See Capriotti's Sandwich Shop, Inc. v. Taylor Fam. Holdings, Inc.*, 857 F. Supp. 2d 489, 500 (D. Del. 2012); *Eastman Chem. Co. v. AlphaPet Inc.*, 2011 WL 6004079, at \*4 (D. Del. Nov. 4, 2011).

Finjan claims that, by acquiring Trustwave, Singtel consented to this Court's jurisdiction, an argument premised on the forum selection clause in the 2012 Agreement between Finjan and Trustwave.  (*See* D.I. 49 at 8; D.I. 28 Ex. B § 6.4.1)  Specifically, Finjan relies on Section 2.5 of the 2012 Agreement, which provides that, in the event of an acquisition of Trustwave, "all the provisions of this Agreement applicable to Licensee [i.e., Trustwave] . . . shall be deemed to apply to the Acquir[o]r," which here is Singtel.  (D.I. 28 Ex. B § 2.5)

Singtel responds that Section 2.5 conflicts with other provisions in the 2012 Agreement and those latter provisions suggest the forum selection clause does ***not*** bind acquirors.  (*See* Sept. 13 Tr. at 16)  Section 2.1, for example, grants a license to the Licensee, without mentioning acquirors of the Licensee.  (*See id.*)  Section 2.4 provides that a license transfer is only valid if the transferee expressly assumes in writing the obligations of the Licensee; Section 2.5 lacks such a requirement.  (*See* May 7 Tr. at 19)  Section 6.9 provides that "[the] Agreement shall be

binding upon the parties and their successors and assigns" and that "[n]othing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement." (D.I. 28 Ex. B § 6.9) Singtel notes that Section 6.9 does not reference "Acquirors." (*See* Sept. 13 Tr. at 10-11)

Singtel argues there is a meaningful difference between Section 2.5's language – that all provisions of the Agreement applicable to Trustwave "***shall be deemed*** to apply" to Singtel – and Section 6.9's language – that the Agreement "***shall be binding*** upon the parties and their successors and assigns" (emphasis added). (*Id.* at 10) As further support for its view that "shall be deemed" in Section 2.5 cannot mean what Finjan contends, Singtel points to the remainder of Section 6.9, which includes the phrase "[n]othing in this Agreement ***shall create*** or ***be deemed to create*** any third party beneficiary rights in any person or entity not a party to this Agreement" (emphasis added). (*Id.*) To Singtel, this phrasing indicates that the drafters of the 2012 Agreement distinguished between "creating" a right and "deeming" something to be creating a right. (*See id.*) To Singtel, the "shall be deemed" language in Section 2.5 imposes an obligation on Trustwave only, providing that in the event of an acquisition and relevant conduct by an Acquiror, "Trustwave must account for royalties attributable to" that conduct, but the Acquiror need not do so. (*Id.* at 12-13) Singtel adds that any ambiguity in the 2012 Agreement should be read against Finjan, which was one of the parties drafting the agreement (while Singtel was not).

Finjan responds that Singtel makes too much of the linguistic differences between Sections 2.5 and 6.9, characterizing Singtel's position as "an artificially created distinction." (*Id.* at 27) The Court agrees with Finjan. Singtel has not persuaded the Court there is a material difference between "shall" and "shall be deemed to" as used in the pertinent provisions of the 2012 Agreement. Further, while Singtel is not unreasonable to point to Sections 2.1, 2.4, and

6.9, the far more important place to look to determine whether the parties to the 2012 Agreement intended to impose obligations on an Acquiror of Trustwave is, as Finjan argues, Section 2.5 – which is, after all, the provision defining the rights and obligations of the Acquiror. (*See* D.I. 28 Ex. B § 2.5) ("Acquiring Parties")[5]

Singtel argues that the forum selection clause of Section 6.4.1 does not apply to it because the express language of the provision binds the "***parties hereto***" to litigate disputes in Delaware. (*See* D.I. 32 at 19)  Singtel is a non-signatory to the 2012 Agreement and, hence, not a "party" to it.

Under Delaware law, courts use a three-part test to determine whether to apply a forum selection clause to a non-signatory: (1) the forum selection clause must be valid, (2) the non-signatory must be a third-party beneficiary or closely related to the contract, and (3) the claim must arise from the agreement. *See Baker v. Impact Holding, Inc.*, 2010 WL 1931032, at *3 (Del. Ch. May 13, 2010); *see also Eastman*, 2011 WL 6004079, at *4.  Singtel does not dispute the first and third requirements of the inquiry, and the Court finds that both are met.  As to the second prong, Finjan proceeds only on a theory that Singtel is "closely related" to the 2012 Agreement.  (*See* D.I. 49 at 9-10; *see also* May 7 Tr. at 27 ("We . . . claim that [Singtel is] closely related to the contract.  [Singtel is] not a third-party beneficiary."))

An entity can be closely related to an agreement if (1) it receives a direct benefit from the agreement or (2) it was foreseeable that it would be bound by the agreement. *See Baker*, 2010

---

[5] Singtel's position is further undermined by record evidence of communications from Trustwave's counsel, Annabel Lewis, about a month before the 2015 Singtel-Trustwave merger. (*See* D.I. 28 Ex. L)  Ms. Lewis wrote at the time that "the parties [i.e., Singtel and Trustwave] agree that . . . Section 2.5, and not Section 2.4, is the relevant provision that applies to the proposed acquisition." (*Id.*)  Accordingly, Ms. Lewis continued, there was "no requirement for Finjan's consent in relation to" the Singtel-Trustwave merger. (*Id.*)

WL 1931032, at *4.  Despite the characterization by some courts of the two inquiries as

disjunctive, *see McWane, Inc. v. Lanier*, 2015 WL 399582, at *8 (Del. Ch. Jan. 30, 2015), the

Third Circuit has explained that foreseeability is a "prerequisite to . . . binding a non-signatory as

a closely related party," *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 64 (3d Cir.

2018).  Further, as Singtel notes, Delaware courts have cautioned against relying on

foreseeability alone to satisfy the closely related test except in limited scenarios, which do not

apply here. *See Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *5 (Del. Ch.

Sept. 18, 2019).  The circumstances presented here do not call upon the Court to determine

whether it would suffice to show ***either*** foreseeability ***or*** a direct benefit to satisfy the closely

related test because the Court finds that both elements are satisfied here.

     First, as to foreseeability, Finjan correctly notes that jurisdictional discovery confirmed

Singtel's knowledge of the 2012 Agreement at the time Singtel proceeded with its merger with

Trustwave.  (D.I. 95 at 3-4)  Sections 2.18 and 5.6(c) of the 2015 Agreement demonstrate that

Singtel had actual notice of the 2012 Agreement during due diligence.  (*See id.*)  Specifically,

Section 2.18 references Schedule 2.18 of the Company Disclosure Letter, which identifies the

2012 Agreement as a "Material Contract."  (*Id.* Ex. 2 § 2.18; *id.* Ex. 3 at 474)  Section 5.6(c) of

the 2015 Agreement also calls out the 2012 Agreement, stating that Trustwave would agree to try

to obtain a supplemental agreement with Finjan relating to the 2012 Agreement, to avoid any

"diminution" in Singtel's rights.[6]  (*Id.* Ex. 2 § 5.6(c))  In addition, a Singtel officer, Kung Yang

Quah, testified that he "believe[d]" Singtel was aware of the 2012 Agreement when it was

---

[6] In its briefing, Singtel disputed that the "diminution" in rights referenced in Section 5.6(c)
applied to Singtel.  (D.I. 100 at 8)  At the September 13 hearing, however, Singtel adjusted its
position, noting that, although the phrase is "ambiguous," a "fair reading" of it suggests it is
concerned with the rights of the Acquiror, i.e., Singtel.  (Sept. 13 Tr. at 48)

performing due diligence in connection with the Trustwave acquisition (*id.* Ex. 4 at 93), adding that "Singtel invested in Trustwave and . . . expect[ed] whatever agreements that Trustwave has had would continue" (*id.* at 100).

The Court's review of the record leaves it with no doubt that Singtel was aware of the 2012 Agreement at the time of its merger with Trustwave. As Singtel's Mr. Quah testified, the 2012 Agreement would have been reviewed by Singtel's legal team – comprising both "external advisors" and an "inhouse . . . due diligence team" – during due diligence. (D.I. 95 Ex. 4 at 93, 107) Further, Sections 5.6(c) and 2.18 of the 2015 Agreement, with their express reference to the 2012 Agreement and characterization of it as a "Material Contract," respectively, suggest Singtel had a heightened awareness of the 2012 Agreement, from which it may reasonably be inferred that Singtel paid close attention to the Agreement during due diligence. This is corroborated by the email from Ms. Lewis to Finjan in advance of the merger, stating that "Trustwave and Singtel reviewed the license agreement together with their respective counsels," and analyzing in detail several provisions of the 2012 Agreement. (*See* D.I. 28 Ex. L)[7]

It is implausible that the careful review of the 2012 Agreement – review in which Singtel, as Acquiror of Trustwave, was fully involved – did not include noticing and understanding Section 6.4.1 of that Agreement, which contained the forum selection clause. There is no basis in the record for assuming that Singtel overlooked that provision. (Nor does the record reveal any basis to excuse such oversight were it to have occurred.) Singtel cites no authority for its

---

[7] The Court recognizes, as Singtel emphasizes (*see, e.g.*, D.I. 100 at 8-9), that the 2012 Agreement between Finjan and Trustwave is not listed among the Trustwave contracts in Schedule 5.6(a) of the 2015 Agreement, with respect to which Trustwave had to obtain third-party consent as a condition to close. (*See* D.I. 95 Ex. 2 § 5.6 & Sched. 5.6(a)) Just because the 2012 Agreement may not have been among the ***most*** material and important contracts to Singtel does not, however, detract from the strong evidence that the 2012 Agreement was a "Material Contract," to both Trustwave and Singtel.

suggestion that direct evidence of specific awareness of the forum selection clause is required in this context. (*See* D.I. 100 at 6)  The Court concludes that the record, as a whole, provides ample support to find it was foreseeable that the forum selection clause of the 2012 Agreement would apply to Singtel.

Second, assuming Finjan must also show that Singtel received a direct benefit from the 2012 Agreement, this requirement is met as well.  Singtel argues that any benefits it received are "nothing more than the indirect benefits that flow to a parent corporation when its subsidiaries receive benefits under contracts," and asserts that Finjan cannot identify anything in the 2012 Agreement that directly conveyed any benefits to Singtel. (*See* D.I. 100 at 9-10) (citing *Eastman*, 2011 WL 6004079, at *11)  Finjan counters that Singtel received a number of direct benefits from the 2012 Agreement, including acquisition of Trustwave's cybersecurity assets and access to the United States cybersecurity market. (*See* D.I. 95 at 10)

Finjan is correct that Trustwave's cybersecurity assets included rights to Finjan patents, making the 2012 Agreement the basis for whatever rights Singtel has to practice those patents. (*See* May 7 Tr. at 9; Sept. 13 Tr. at 31)  Given that roughly half of Singtel's sales are in the United States, and that a major part of those sales are generated by Trustwave, the benefits derived by Singtel from the 2012 Agreement are substantial. (*See* D.I. 95 at 11; Sept. 13 Tr. at 37)  The Court agrees with Finjan that the record establishes sufficiently direct benefits flowed to Singtel from the 2012 Agreement.

Other cases have cautioned against extending personal jurisdiction to a non-signatory based on a forum selection clause alone, noting that the strength of the "consent" in this circumstance is undermined by the absence of negotiations involving the non-signatory.  For example, in *Truinject Corp. v. Nestle Skin Health, S.A.*, 2019 WL 6828984, at *11-13 (D. Del.

17

Dec. 13, 2019), *report and recommendation adopted by* 2020 WL 1270916 (D. Del. Mar. 17, 2020), the Court determined that a non-signatory parent company, Nestlé Skin Health, S.A. ("Nestlé"), was not bound by forum selection clauses in contracts between two of its subsidiaries and the plaintiff. Notably, however, there was no evidence suggesting Nestlé performed (or had an obligation to perform) any due diligence itself in advance of the transactions, which took place after Nestlé had acquired the subsidiaries. *See id.* at *2-5. Also, the forum selection clauses applied to the subsidiaries and their "Affiliates," without defining the term; the Court was skeptical that "Affiliates" would extend to Nestlé. *Id.* at *9. Here, by contrast, there is much evidence (summarized above) that Singtel was aware of, and considered, Trustwave's agreement with Finjan prior to deciding to acquire Trustwave. Accordingly, Singtel had the opportunity to perform due diligence as to Trustwave's pre-existing contracts, and did so, even devoting special attention to the 2012 Agreement, as evidenced by Sections 2.18 and 5.6(c) of the 2015 Agreement.

At bottom, there is no question that Singtel is the "Acquiror" under Section 2.5 of the 2012 Agreement. In acquiring Trustwave, Singtel agreed that "all the provisions of this Agreement applicable to Licensee," that is, Trustwave, would henceforth apply to Singtel. (D.I. 28 Ex. B § 2.5) Thus, the forum selection clause of Section 6.4.1 binds Singtel, despite being a non-signatory to the 2012 Agreement. Accordingly, the Court may exercise personal jurisdiction over Singtel with respect to Finjan's breach of contract claim against Singtel.

### b.    Patent infringement claim

The forum selection clause of the 2012 Agreement applies only to "any dispute arising out of or relating to th[e] Agreement." (D.I. 28 Ex. B § 6.4.1) While Finjan's claim that Singtel breached provisions of the 2012 Agreement is, self-evidently, a "dispute arising out of [and]

relating to" the 2012 Agreement, the Court's conclusion that Singtel effectively consented to the breach of contract claim being brought against it here in Delaware does not inexorably lead to the same conclusion with respect to patent infringement. In fact, the Court reaches the opposite conclusion for this claim, because Finjan's allegations of patent infringement neither arise out of nor relate to the 2012 Agreement.

Finjan's principal position on this issue is to ask the Court not to reach it. (*See* D.I. 95 at 10 n.3) Singtel waited until the May 7 hearing to raise any distinction as to the applicability of the forum selection clause as between the breach of contract claim and the patent infringement claim. (*See* May 7 Tr. at 18, 28-29) To Finjan, then, Singtel lost its opportunity to press this point. The Court disagrees. Singtel raised its argument before most of the jurisdictional discovery had occurred and before the supplemental briefing was concluded. Finjan had sufficient opportunity to explore and address this issue, including during the second teleconference hearing. (*See* Sept. 13 Tr. at 13-14, 46)

Finjan further contends that the forum selection clause should apply equally and bind Singtel as to both causes of action because the two claims are so closely related. (*See, e.g.*, D.I. 95 at 10 n.3) This argument rests on the Court's denial of Finjan's motion to dismiss Trustwave's license counterclaim and affirmative defenses to Finjan's infringement claims. (*See* D.I. 68) To Finjan, the Court's decision establishes that the patent infringement claim against Singtel is "related to or arise[s] out of the dispute over" breach of the 2012 Agreement. (D.I. 95 at 10 n.3) The Court disagrees. The license counterclaim and affirmative defenses were brought by Trustwave, not Singtel. While Trustwave's counterclaim and defenses in response to the patent infringement claim against it may implicate the 2012 Agreement, the denial of Finjan's

19

motion to dismiss Trustwave's actions does not make Finjan's infringement claim against *Singtel* a claim that arises out of or even relates to the 2012 Agreement.

Accordingly, if this Court is going to exercise personal jurisdiction over Singtel with respect to Finjan's patent infringement claim, the source of that jurisdiction will have to be something other than Singtel's "consent" via the forum selection clause of the 2012 Agreement.

### 2.  **Singtel's Conduct in Delaware**

Finjan alleges specific personal jurisdiction over Singtel pursuant to subsections (c)(1) and (c)(3) of Delaware's long-arm statute, each of which requires a nexus between a plaintiff's cause of action and the defendant's conduct in Delaware.  (D.I. 95 at 11) (citing Del. Code Ann. Tit. 10 § 3104(c)(1), which confers jurisdiction over non-resident who "transacts any business or performs any character of work or service in the State," and § 3104(c)(3), which confers jurisdiction over non-resident who "causes tortious injury in the State by an act or omission in this State")  Finjan argues that Singtel "directly markets and offers for sale the accused products" in Delaware and the United States.  (D.I. 49 at 10)  As support, Finjan points to (1) brochures for the accused product that advertise a "vast network of offices" in the United States (*see* D.I. 50 Exs. 10-11); (2) two invoices showing Singtel's sales of security services to customers in California and Illinois (*see id.* Exs. 12-13); and (3) Singtel's description of itself as a "global leader in managed security services" having a network in the United States (*see id.* Ex. 8).

Singtel responds that Finjan has failed to demonstrate that Singtel's allegedly infringing acts occurred in Delaware.  (*See* D.I. 32 at 8; D.I. 100 at 12-13)  The Court agrees.

Singtel contends it "has not sold the Accused Products in Delaware" (D.I. 32 at 8), pointing out that Mr. Quah testified Singtel does not sell, design, manufacture, or market any products in Delaware (D.I. 95 Ex. 4 at 47).  None of the evidence before the Court shows

marketing or sales by Singtel in Delaware; that is, there is no evidence of Singtel itself acting in Delaware. Nor is the Court persuaded that Singtel's alleged collaboration with Trustwave in developing the accused products gives rise to specific jurisdiction over Singtel. Again, there is an absence of evidence of Singtel itself acting in Delaware.

To the extent Finjan is contending the Court may exercise general jurisdiction over Singtel, the Court again agrees with Singtel that Finjan has failed to make the required showing. (*See* D.I. 32 at 8-10) Singtel's records show "12 telecommunications customers with billing addresses in Delaware," but for each of these customers all of the services provided are in Singapore. (*Id.* at 8-9) This *de minimis* contact between Singtel and Delaware is far from the "continuous and systematic" contacts necessary to confer general jurisdiction. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

Thus, Singtel's own contacts with Delaware are not sufficient to permit this Court to exercise specific or general personal jurisdiction over Singtel.

### 3. Singtel's Subsidiaries' Contacts with Delaware

As a third basis for this Court to exercise jurisdiction over Singtel, Finjan points to the contacts that Trustwave and other Singtel subsidiaries have had with Delaware. In particular, Finjan argues that Singtel Cyber Security and Trustwave function as "a single global entity, with Trustwave operating as Singtel's agent."[8] (D.I. 49 at 2) Additionally, Finjan asserts that jurisdiction over Singtel arises from Singtel's marketing and sales of products in the United States through other subsidiaries beyond Trustwave. (*Id.* at 4-5) Finjan's contentions fail.

---

[8] Finjan clarified at the May 7 hearing that it is not alleging an alter ego theory. (*See* May 7 Tr. at 10)

Finjan contends that Trustwave acted as Singtel's agent and, as such, Trustwave's actions should be attributed to Singtel for purposes of personal jurisdiction. (*See id.* at 12) "To 'establish jurisdiction under an agency theory,' plaintiffs must 'show that the defendant [here Singtel] exercises control over the activities of the third-party [here Trustwave].'" *Pfizer Inc. v. Mylan Inc.*, 201 F. Supp. 3d 483, 489 (D. Del. 2016) (quoting *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1379 (Fed. Cir. 2015)).  If the Court concludes that an agency relationship exists, the Court "will not ignore the separate corporate identities of parent and subsidiary, but will consider the parent corporation responsible for specific jurisdictional acts of the subsidiary." *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1463 (D. Del. 1991).

To determine whether an agency relationship exists, courts consider several factors, including "the extent of overlap of officers and directors, methods of financing, the division of responsibility for day-to-day management, and the process by which each corporation obtains its business." *Id.*  Ownership of a Delaware subsidiary is "not sufficient in itself to justify Delaware's exercise of personal jurisdiction over the non-Delaware parent." *Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 636, 645 (D. Del. 2006) (internal quotation marks omitted).

Finjan identifies some overlap between Trustwave and Singtel's directors and officers: (1) from 2018 to November 2020, Arthur Wong was the CEO of both Trustwave and Singtel Cyber Security; (2) some members of Trustwave's senior management are (or were) employed by both companies; and (3) since Singtel acquired Trustwave in 2015, Singtel employees have held a controlling majority on Trustwave's board of directors. (*See* D.I. 49 at 13-14)  Finjan also points to Singtel's financing of Trustwave's operations through intercompany loans that were arguably not negotiated at arm's length and may constitute self-dealing. (*See id.* at 14-15 & n.3)

Finjan also argues that Trustwave operates through Singtel, as the two entities have integrated

and consolidated their cybersecurity marketing, strategy, and operations into Trustwave. (*Id.* at

15-16)

> While all of this suggests a close corporate relationship between Singtel and Trustwave, it
does not demonstrate an agency relationship.  While Finjan identifies some evidence of past
overlap between Singtel and Trustwave's officers and directors, "[t]he fact that a parent and a
subsidiary have common officers and directors [does not] necessarily indicate an[ ] agency
relationship." *E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 677 (D.
Del. 2018) (internal quotation marks omitted).  Further, "[t]he fact that a parent corporation
finances the operations of a subsidiary is not sufficient to support a finding that the subsidiary is
a mere agent . . . of the parent." *Id.*  Although Singtel has provided financial support to
Trustwave, the two corporations maintain separate bank accounts and payroll systems, as well as
separate executive compensation and audit committees. (*See* D.I. 55 at 4)  While Singtel
concedes that it provides consolidated reporting of the financial performance of Singtel and
Trustwave pursuant to applicable financial reporting rules and regulations (*see id.* at 5), a parent
corporation's filings of the "assets, liabilities, and financial earnings of its subsidiaries as one
indistinguishable whole do not prove agency," *Nespresso USA, Inc. v. Ethical Coffee Co. SA*,
263 F. Supp. 3d 498, 505 (D. Del. 2017) (internal quotation marks omitted).  Finally, the record
does not show that Singtel controls Trustwave's actions (in Delaware or anywhere).  Singtel's
mere ownership of Trustwave is insufficient to justify the exercise of personal jurisdiction here.
*See Monsanto*, 443 F. Supp. 2d at 645.

> As to the relationship between Singtel and its non-Trustwave subsidiaries (for example,
Singtel Cyber Security (Singapore) Pte Ltd. and Optus Cyber Security Pty Ltd.), the Court agrees

with Singtel that Finjan fails to demonstrate facts that would establish personal jurisdiction

through an agency theory. (*See* D.I. 95 at 5-6, 11-12; *id.* Exs. 5 & 6)

Accordingly, Singtel's relationships with Trustwave and other subsidiaries do not provide

a basis for this Court to exercise jurisdiction over Singtel.

### 4.      Contacts with the United States

As a final potential basis for the Court's jurisdiction over Singtel, Finjan cites Federal

Rule of Civil Procedure 4(k)(2), which allows a district court to exercise personal jurisdiction if

"(1) the plaintiff's claim arises under federal law, (2) the defendant is not subject to jurisdiction

in any state's courts of general jurisdiction, and (3) the exercise of jurisdiction comports with due

process." *M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda.*, 890 F.3d 995, 999 (Fed. Cir. 2018)

(quoting *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285,

1293-94 (Fed. Cir. 2009)). The parties agree the second element of this test is satisfied. As to

the first element, the patent infringement claim arises under federal law.[9] As to the third

element, the Court agrees with Singtel that the exercise of jurisdiction Finjan calls for would not

comport with due process.

This third element of Rule 4(k)(2) "contemplates a defendant's contacts with the entire

United States, as opposed to the state in which the district court sits." *M-I Drilling*, 890 F.3d at

999. In determining whether specific jurisdiction exists under Rule 4(k)(2), the Court is to

consider whether "(1) the defendant purposefully directed its activities at residents of the forum;

(2) the claim arises out of or relates to the defendant's activities with the forum; and (3) assertion

of personal jurisdiction is reasonable and fair." *Id.* at 1000.

---

[9] While the breach of contract claim does not arise under federal law, the Court has already
determined that it has jurisdiction over Singtel with respect to the breach of contract claim based
on the forum selection provision of the 2012 Agreement.

As evidence of Singtel's contacts with the United States, Finjan cites two invoices sent by Singtel to customers in California (*see* D.I. 50 Ex. 12) and Illinois (*see id.* Ex. 13). Even assuming, however, these invoices show that Singtel purposefully directed sales of Trustwave products to United States residents, they are – without more – insufficient to support the Court's exercise of jurisdiction. It would not comport with due process to hale Singtel into Delaware (or any federal district court) based on these two invoices. Finjan also points to the contacts Singtel's subsidiaries have with the United States. (*See* Sept. 13 Tr. at 41) This is unavailing. The Court has already held that Trustwave is not an agent of Singtel. (*See supra.*) And mere ownership of a Delaware subsidiary is "not sufficient in itself to justify Delaware's exercise of personal jurisdiction over the non-Delaware parent." *Monsanto*, 443 F. Supp. 2d at 645; *see also You Map, Inc. v. Snap Inc.*, 2021 WL 3171838, at *6 n.7 (D. Del. July 27, 2021) (applying this principle in Rule 4(k)(2) analysis).

Accordingly, Rule 4(k)(2) does not provide a basis for the Court to exercise jurisdiction here.

**B.     Singtel's Motion to Stay**

As the Court has determined it may exercise jurisdiction over Singtel with respect to Finjan's breach of contract claim, the Court must next consider Singtel's motion to stay proceedings on this claim. Relying on *Colorado River*, Singtel moves to stay Finjan's breach of contract claim against it until after final resolution of the parallel breach of contract claim now proceeding against Trustwave in Delaware Superior Court. (*See* D.I. 65 at 6-9) The Court finds that the requested stay is justified and will grant it.

Finjan's first argument against a stay is that the state court proceedings are not truly "parallel" with the instant action because Singtel is not a party to the Superior Court case, which

is brought only against Trustwave. (D.I. 69 at 4-7)  The Court disagrees.  As Singtel correctly observes, Finjan's FAC treats Singtel's liability as coextensive with that of Trustwave. (*See* D.I. 65 at 6-7) (citing D.I. 28 ¶ 104 (alleging that "[b]oth Singtel and . . . Trustwave are the Licensee" under 2012 Agreement); *id.* ¶ 105 (stating that "[b]oth Singtel and . . . Trustwave are jointly and severally liable for the royalties owed" under 2012 Agreement); *id.* ¶ 107 (alleging that "Singtel is . . . liable for Trustwave's unpaid royalties on the licensed patents[] because Trustwave acted as Singtel's agent during negotiations"))  Further, the breach of contract claims in both courts involve the same contract, the same alleged conduct, and the same disputed pool of royalties owed. (*See* D.I. 65 at 7)[10]

As to the parties' identities, the Third Circuit "ha[s] never required complete identity of parties for abstention." *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 306 (3d Cir. 2006).  Similarly, the actions are not required to be identical, but they must be "substantially similar." *Util. Lines Const. Servs. Inc. v. HOTI, Inc.*, 799 F. Supp. 2d 331, 341 (D. Del. 2011).  The issues of contract interpretation and potential breach in both the instant action and the state court action are nearly identical.  Judge Carpenter will ultimately determine whether, under the 2012 Agreement, Finjan may be owed some additional royalties based on

---

[10] During the September 13 teleconference, Finjan argued that its breach of contract claim asserted here against Singtel is materially different than its breach of contract claim against Trustwave in the Superior Court, stating – for the first time – that here it seeks royalties related to post-acquisition sales by Singtel that are unrelated to Trustwave. (*See* Sept. 13 Tr. at 58-61) These contentions conflict with the FAC's treatment of Singtel's liability as coextensive with Trustwave's.  They also appear to be in tension with Judge Carpenter's ruling that Singtel does not owe automatic royalties for conduct unrelated to Trustwave by virtue of the acquisition (*see* Sept. 13 Tr. at 62) and his skepticism of Finjan's suggestion that Singtel owes royalties based on new business they have generated since the acquisition that is unrelated to Trustwave (D.I. 70 Ex. B at 45-46; *see also* D.I. 74 at 3-4)

Trustwave's post-merger sales of allegedly infringing products through Singtel. If royalties are owed, they will have to be paid for by Trustwave, Singtel, or a combination of the two.

Given the nearly identical nature of the claims pending in both actions, Finjan's comparison to *Anderson v. GTCR, LLC*, 2016 WL 5723657 (D. Del. Sept. 29, 2016), fails. The plaintiff in *Anderson* sued defendants in federal court in their capacities as majority shareholders but did not sue those same defendants in the Delaware Chancery Court. *See id.* at *6. Instead, the plaintiff sued individual directors and the company for breaches of fiduciary duties that did not overlap entirely with the breaches of fiduciary duties alleged in federal court. *See id.* Further, the plaintiff sought equitable relief in the Chancery Court action and legal damages in federal court. *See id.* Under these circumstances, the Court concluded that "the legal claims at issue in this case . . . appear to be different enough that abstention under *Colorado River* would be improper." *Id.* The facts before this Court now, however, do not support the same conclusion; instead, the state and federal cases involved here are, as the Court has explained, "parallel."[11]

The Court further concludes, after carefully balancing the six *Colorado River* factors, that this case presents "exceptional circumstances" justifying abstention. *Ryan*, 115 F.3d at 196. The first factor – which court first assumed jurisdiction over the property in an in rem case – does not apply, as this is not an in rem case. The second factor – the inconvenience of the federal forum – is neutral, as the forum is convenient for both parties. The third factor – the desirability of avoiding piecemeal litigation – weighs heavily in favor of abstention. If this Court were to proceed in interpreting the same contract, and adjudicating nearly identical claims brought by the

---

[11] The Court's conclusion is bolstered by Finjan's contention that Singtel and Trustwave should be treated as one and the same for purposes of Singtel's motion to dismiss. (*See* Sept. 13 Tr. at 52, 57)

same plaintiff at the same time, as Judge Carpenter is doing so, the Court would not only duplicate judicial effort, but would also risk inconsistent judgments.

As to the fourth factor – the order in which jurisdiction was obtained – "[n]ot only does consideration of which action was filed first matter when analyzing this factor, but how much progress has been made in each action also is significant." *Util. Lines*, 799 F. Supp. 2d at 342-43. Finjan filed its breach of contract claim in Superior Court over two years ahead of filing a nearly identical claim against Singtel in this Court. Judge Carpenter has already made multiple rulings interpreting the 2012 Agreement and is well ahead of this Court in its handling of the parallel breach of contract claim. (*See* D.I. 65 at 7) This factor weighs in favor of abstention. The fifth factor – whether federal or state law controls – weighs in favor of abstention, as both claims allege breach under Delaware law. Finally, the Court is not convinced by Finjan's suggestion, as to the sixth factor, that the Superior Court will not adequately protect the parties' interests.[12]

Thus, the Court concludes that Singtel has met its heavy burden to show that *Colorado River* abstention is appropriate. The Court will grant Singtel's motion to stay.

---

[12] Singtel's reference to a seventh factor – "whether either the state or federal suit was a contrived, defensive reaction to the other" – does not affect the Court's conclusions, even assuming it is applicable. *See, e.g.*, *Util. Lines*, 799 F. Supp. 2d at 338

## IV.    CONCLUSION

The Court concludes that Finjan has established personal jurisdiction over Singtel as to the breach of contract claim by virtue of Singtel's consent to the forum selection clause in the 2012 Agreement.  The Court will deny Singtel's motion to dismiss as to that claim.  By contrast, Finjan has failed to establish personal jurisdiction over Singtel as to the patent infringement claim.  The Court will grant Singtel's motion to dismiss as to that claim.  Additionally, for the reasons stated above, the Court will grant Singtel's motion to stay Finjan's breach of contract claim against it.  An appropriate Order follows.