IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FINJAN LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-371-RGA |
| | ) | |
| TRUSTWAVE HOLDINGS, INC., and | ) | |
| SINGAPORE TELECOMMUNICATIONS | ) | |
| LIMITED, | ) | |
| | ) | |
| Defendants. | ) | |

SHAW KELLER LLP
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com

OF COUNSEL:

ALLEN & OVERY LLP
Bijal V. Vakil
Jeremy T. Elman
550 High Street
Palo Alto, CA 94301
(650) 388-1650

*Attorneys for Plaintiff Finjan LLC*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (No. 1014)
Alexandra M. Cumings (No. 6146)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
acumings@morrisnichols.com

OF COUNSEL:

BAKER & HOSTETLER LLP
John S. Letchinger
191 North Wacker Drive, Suite 3100
Chicago, IL 60606-1901
(312) 416-6200
jletchinger@bakerlaw.com

BAKER & HOSTETLER LLP
Jared A. Brandyberry
1801 California Street, Suite 4400
Denver, CO 80202
(303) 764-4072
jbrandyberry@bakerlaw.com

*Attorneys for Defendant Trustwave
Holdings, Inc.*

Dated: March 31, 2022

1

# TABLE OF CONTENTS

Plaintiff's Introduction ................................................................................................. 1

Statement of Facts ...................................................................................................... 1

    Plaintiff's Statement of Facts ................................................................................. 1

    Defendant's Statement of Facts .............................................................................. 3

I.      Representative Claim ........................................................................................ 5

II.     Agreed-upon Constructions ............................................................................. 5

III.    Disputed Constructions ................................................................................... 5

    A.     "content processor" / "process content" ('154 Patent, Claims 1-4, 6-7, 10) ............... 5

    B.     "first function" / "second function" ('154 Patent, Claims 1, 4, 6, 10) ..................... 21

    C.     "receiver" ('154 Patent, Claims 1, 2, 6, 7)/ "transmitter"
         ('154 Patent, Claims 1–3, 6–8) ................................................................... 32

    D.     "input"/"input variable" ('154 Patent, Claims 1–11) ................................... 42

    E.     "invoke [a/the] second function with the input" ('154 Patent, Claims 1, 4) ............. 47

    F.     "calling a function with the input variable" / "calling a second function with the
         modified input variable" ('154 Patent, Claims 6, 10)................................. 51

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*3M Innovative Properties Co. v. Avery Dennison Corp.*,
   350 F.3d 1365 (Fed. Cir. 2003) ............................................................... 23, 28, 30

*AFG Indus., Inc. v. Cardinal IG Co., Inc.*,
   239 F.3d 1239 (Fed. Cir. 2001) ............................................................................ 7

*All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*,
   309 F.3d 774 (Fed. Cir. 2002) ....................................................................... 49, 53

*Alloc, Inc. v. Int'l Trade Comm'n*,
   342 F.3d 1361, 1369 (Fed. Cir. 2003) ........................................................ 9, 14, 19

*Al-Site Corp. v. VSI Int'l, Inc.*,
   174 F.3d 1308, (Fed. Cir. 1999) ......................................................................... 34

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (Fed. Cir. 2007) ...................................................................... 8, 21

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008) ..................................................................... 37, 40

*Cacace v. Meyer Mktg. Co., Ltd.*,
   812 F. Supp. 2d 547 (S.D.N.Y. 2011) ............................................................ 50, 53

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
   899 F.3d 1291 (Fed. Cir. 2018) ..................................................................... 38, 39

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
   672 F.3d 1270 (Fed. Cir. 2012) ......................................................................... 23

*EnOcean GmbH v. Face Int'l Corp.*,
   742 F.3d 955 (Fed. Cir. 2014) ........................................................... 33, 36, 38, 41

*Epistar Corp. v. Int'l Trade Comm'n*,
   566 F.3d 1321 (Fed. Cir. 2009) ......................................................................... 29

*Finjan, Inc. v. Bitdefender Inc.*,
   No. 4:17-cv-04790-HSG, Dkt. No. 101 (N.D. Cal. Feb. 14, 2019) ......................... 6

*Finjan, Inc. v. Cisco Sys. Inc.*,
   2020 WL 1506278 (N.D. Cal. Mar. 30, 2020) ...................................................... 20

*Finjan, Inc. v. Juniper Networks, Inc.*,
   387 F. Supp. 3d 1004 (N.D. Cal. 2019), *aff'd* 825 F. App'x 922 (Fed. Cir. 2020) ....... 7, 11, 16

*Finjan, Inc. v. Proofpoint, Inc.*,
   No. 4:13-cv-05808-HSG, Dkt. No. 267 (N.D. Cal. Dec. 3, 2015) ........................................ 6

*Finjan, Inc. v. Qualys Inc*,
   No. 4:18-CV-07229-YGR, 2020 WL 3101040 (N.D. Cal. June 11, 2020) ............... 33, 36, 40

*Finjan, Inc. v. Rapid7, Inc., et al.*,
   No. 1:18-cv-01519-CJB, Dkt. No. 123 (D. Del. Feb. 5, 2020) ........................... 6, 7, 21, 27, 28

*Finjan, Inc. v. Symantec Corp.*,
   No. 4:14-cv-02998-HSG, Dkt. No. 170 (N.D. Cal. Feb. 10, 2017) ........................................ 6

*Flo Healthcare Solutions, LLC v. Kappos*,
   697 F.3d 1367 (Fed. Cir. 2012) ......................................................................................... 38

*Gillette Co. v. Energizer Holdings, Inc.*,
   405 F.3d 1367 (Fed. Cir. 2005) ......................................................................................... 30

*ID Image Sensing LLC v. OmniVision Techs., Inc.*,
   No. CV 20-136-RGA, 2021 WL 5206262 (D. Del. Nov. 9, 2021) ....................................... 46

*Indivior Inc. v. Mylan Techs. Inc.*,
   232 F. Supp. 3d 650 (D. Del. 2017) ................................................................................... 33

*Interactive Gift Exp. v. Compuserve Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) ..................................................................................... 18, 27

*Int'l Bus. Machs. Corp. v. Priceline Grp. Inc.*,
   271 F. Supp. 3d 667 (D. Del. 2017),
   *aff'd sub nom.*, 775 F. App'x 674 (Fed. Cir. 2019) ................................................................ 43

*MAZ Encryption Techs., LLC v. Lenovo (United States) Inc.*,
   No. CV 13-303-LPS, 2015 WL 4035049 (D. Del. June 30, 2015) ....................................... 22

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
   474 F.3d 1323 (Fed. Cir. 2007) ........................................................................................... 7

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
   344 F.3d 1205 (Fed. Cir. 2003) ......................................................................................... 37

*Meiresonne v. Google, Inc.*,
   849 F.3d 1379 (Fed. Cir. 2017) ......................................................................................... 28

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014) ......................................................................................... 43, 44, 48,52

*O2 Micro Intern. v. Beyond Innov*,
   521 F.3d 1351 (Fed. Cir. 2008) ..................................................................................... 40, 46

*On-Line Techs., Inc., v. Bodenseewerk Perkin-Elmer GmbH*,
   386 F.3d 1133 (Fed. Cir. 2004) ......................................................................................... 22

*Palo Alto Networks, Inc. v. Finjan, Inc.*,
   752 Fed. App'x 1017 (Fed. Cir. 2018) ............................................................................. 27, 28

*Palo Alto Networks, Inc. v. Finjan, Inc.*,
   836 F. App'x 916 (Fed. Cir. 2020) ...................................................................... 2, 3

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .................................................................... 18, 46

*Research Frontiers, Inc. v. E Ink Corp.*,
   C.A. No. 13-1231-LPS, 2016 WL 1169580 (D. Del. Mar. 24 2016) ......................... 49, 50, 53

*Roche Palo Alto LLC v. Apotex, Inc.*,
   531 F.3d 1372 (Fed. Cir. 2008) .............................................................................. 7

*Rsch. Found. of State Univ. of N.Y. v. Mylan Pharms., L.P.*,
   No. C.A.09-184JFFLPS, 2010 WL 1911589 (D. Del. May 12, 2010) .................................. 22

*Thorner v. Sony Comput. Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) .................................................................. 21, 32, 43

*Transcenic, Inc. v. Google Inc.*,
   7 F. Supp. 3d 405 (D. Del. 2013) ............................................................................ 7

*WesternGeco LLC v. ION Geophysical Corp.*,
   876 F. Supp. 2d 857 (S.D. Tex. 2012) .............................................................. 50, 53

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) .............................................................. 34, 38, 39, 41

*Xerox Corp. v. Google Inc.*,
   801 F. Supp. 2d 293 (D. Del. 2011) ...................................................... 44, 46, 47, 49, 53

**Statutes**

35 U.S.C. § 112 ....................................................................................... passim

**Rules**

Rule 36 ..................................................................................................... 7

**Plaintiff's Introduction[1]**

There is no basis to depart from the plain and ordinary meaning of any of the eight disputed terms, all of which would be easily understood by a jury without further construction.  Of the eight terms, three have already been construed by courts in this District in accordance with their plain and ordinary meanings.  And the claim language and intrinsic record make clear that the same should be true for the remaining five terms.

In an attempt to re-write and narrow the scope of the asserted claims, Defendant Trustwave Holdings, Inc. ("Defendant") seeks to add highly-specific limitations derived from its misguided interpretation of the claim language and intrinsic record, asking the Court to disregard prior related holdings in the process.  Defendant's proposed limitations do not come from either the claim language or the intrinsic record.  At times, Defendant seemingly conjures them out of thin air.

Defendant's constructions are unnecessary, unhelpful and self-serving.  They are yet another in a long-line of attempts to avoid paying for the innovative security technologies—developed by Finjan—baked into the Accused Products.  Defendant should not be allowed to misconstrue the claim language to further its exploitation of Finjan's technology.

**Statement of Facts**

**Plaintiff's Statement of Facts**

Finjan asserts U.S. Patent No. 8,141,154 (the "'154 Patent," Exhibit A to the Joint Claim Construction Chart (D.I. 131))[2] against Defendant.[3]  The '154 Patent is one of a number of Finjan-pioneered protective anti-malware technologies that are capable of detecting previously unknown

---

[1] Judge Stark's Scheduling Order (D.I. 83) did not request an introduction in the parties' joint brief.  Thus, Trustwave did not include an introduction. Trustwave disagrees with the argument Finjan includes in its introduction.

[2]   Exhibits A–M were filed with the Parties' Joint Claim Construction Chart (D.I. 131).

[3]   Finjan asserts Claims 1-4, 6, 7 and 10.

and emerging cybersecurity threats.  Many of cybersecurity's biggest players, including Microsoft, have licensed the patent.

The product of more than decades-long research and development efforts, Finjan's technologies defend networks and endpoints by identifying suspicious patterns and behaviors of content delivered over the internet.  From 1996, when Finjan introduced its first product, then state-of-the-art software that detected and deflected software intrusions and malicious code, to present day, Finjan has earned many patents and licensed its technologies to numerous industry leaders.

Finjan filed the '154 Patent in 2010, claiming priority to U.S. Application No. 11/298,475, filed on December 12, 2005.  The '154 Patent discloses and claims inventions for protecting computers against the then-new threats posed by computer viruses, specifically "against dynamically generated malicious code or viruses, which are viruses generated at run-time."  *See* Ex. N-1, *Palo Alto Networks, Inc. v. Finjan, Inc.*, 836 F. App'x 916, 917 (Fed. Cir. 2020) (affirming Patent Trial and Appeal Board determination of patentability).

As of 2005, dynamically-generated malicious code and viruses beguiled then-existing anti-malware technologies, which were not well equipped to inspect unknown viruses.  Existing solutions were either "reactive," and could not inspect dynamically-generated code, or "proactive," meaning they could inspect such code but either ran at the gateway level, which was inaccurate, or at the desktop level, which could be accurate, but was slow and susceptible to reverse engineering.  Ex. A at 1:23-33, 1:54-64, 2:31-45.  There was no solution at the time that successfully overcome these hurdles.

The '154 Patent is broadly directed toward providing computer virus protection against dynamically generated malicious code as well as statically-generated conventional viruses.  *Id.* at

1:7-9, 8:38-40.  As the Federal Circuit explained, "[t]he '154 patent describes using a separate, remotely-located security computer to inspect incoming content to determine if it is safe to run the content on a client computer."  *See Palo Alto Networks*, 836 F. App'x at 917–18.  The '154 Patent describes a system that inspects function inputs in content received over a network for potentially malicious behavior and halts execution or modifies the input if deemed unsafe.  Ex. A at Abstract. "Such content may be in the form of HTML pages, XML documents, Java applets and other such web content that is generally rendered by a web browser."  *Id.* at 8:48-51.  A content modifier modifies original content received by the gateway computer and produces modified content that includes a layer of protection to combat dynamically generated malicious code.  *Id*. at 9:13-16.

**Defendant's Statement of Facts**

The '154 Patent, titled "System and Method for Inspecting Dynamically Generated Executable Code," issued on March 20, 2012. It purports to provide "new behavioral analysis technology [that] affords protection against dynamically generated malicious code," which are computer viruses that are generated or known only at runtime. '154 Patent at 3:31-33 and 4:31-33. According to the '154 Patent, conventional virus-inspection processes had significant drawbacks. For example, conventional gateway inspection processes occurring before runtime could not know a dynamically generated input, which could contain malicious content. *Id*. at 3:65-4:4. Meanwhile, client-based inspection processes involve software installed on the client computer, and hackers can easily obtain copies of the software, reverse engineer it, and discover and exploit vulnerabilities. *Id*. at 4:15-22.

In this context, the '154 Patent proposes a solution to better protect a client computer from dynamically generated viruses. Specifically, embodiments utilize "[t]hree major components," a gateway computer, a client computer, and a security computer. *Id*. at 8:41-47.  The '154 Patent discloses that a gateway computer receives content, including a call to an original function and an

3

input, from the internet. *Id*. at 5:26-32. Having received content from the internet, the gateway computer modifies the received content by replacing the call to the original function with a corresponding call to a substitute function. *Id*. at 5:32-35. The substitute function, executed by the client computer, instructs that the input be sent to a security computer, which determines whether or not it is safe for the client computer to invoke the original function to process the input. *Id*. at 5:35-43.

The '154 Patent makes clear that modification of the internet content replaces the call to the original function with a call to the substitute function. *Id*. at 9:16-28. "[T]he present invention operates by replacing the original function calls with substitute function calls within the content, at a gateway computer, prior to the content being received at the client computer." *Id*. at 4:57-60. When the client computer invokes the substitute call, the input is dynamically generated and ready for inspection. *Id*. at 12:7-11. When the substitute function is called, the input is sent to the security computer for inspection. *Id*. at 9:36-37 and 9:55-57. The security computer analyzes the input and, if it is determined to be safe, signals the client computer can process the input with the original function. *Id*. at 11:1-4.

The '154 Patent has four independent claims: 1, 4, 6, and 10. Claim 1 is representative of the independent claims and describes the processing after an original function (the "second function" in claim 1) with some input has already been replaced at a network gateway with a substitute function (called the "first function" in claim 1) that takes the same input. Claim 1, which Finjan admits is representative, recites that once the substitute (i.e., the "first") function is received by the client computer (which houses the "content processor"), the client computer invokes the substitute ("first") function, causing it to transmit the input to the security computer, which analyzes it an returns to the client computer an indication of whether it is safe to execute the

4

original ("second") function with the input.

## I.     <u>Representative Claim[4]</u>

Independent claim 1 recites:

> 1. A system for protecting a computer from dynamically generated malicious content, comprising:
>
> a *content processor* (i) for processing content received over a network, the content including a call to a *first function*, and the call including an *input*, and (ii) for invoking a *second function* with the *input*, only if a security computer indicates that such invocation is safe;
>
> a *transmitter* for transmitting the *input* to the security computer for inspection, when the first function is invoked; and
>
> a *receiver* for receiving an indicator from the security computer whether it is safe *to invoke the second function with the input*.

## II.     <u>Agreed-upon Constructions</u>

The Parties agree that "a call to first function," which appears in claims 1, 4, 6, and 10, should be construed as "a statement or instruction in the content, the execution of which causes the function to provide a service."  The Parties do not agree to any other constructions.

## III.     <u>Disputed Constructions</u>

### A.     <u>"content processor" / "process content" ('154 Patent, Claims 1-4, 6-7, 10)</u>

| Finjan's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| no construction necessary—plain and ordinary meaning | "***a processor that processes modified content*** on a client/user computer" / "***process modified content*** on a client/user computer" |

---

[4] Trustwave agrees that claim 1 is a representative claim but notes that disputed terms should be italicized pursuant to D.I. 83, n. 1.

### 1.     Plaintiff's Opening Position

The term "content processor" should be given its plain and ordinary meaning: a processor that processes content.  The words "processor" and "content" are straightforward computing terms that have well-known meanings, both now and in 2005, when the '154 Patent claims priority.  The '154 Patent uses "content processor" consistently with those plain and ordinary meanings.  For example, "content processor" is described in the '154 Patent as a processor that processes received content.  Ex. A at 2:64-67, 10:61-62.

On that basis, numerous courts have held that the term "content processor" does not require any construction.  *See, e.g.*, Ex. N-2 at 12–13, *Finjan, Inc. v. Rapid7, Inc., et al.*, No. 1:18-cv-01519-CJB, Dkt. No. 123 (D. Del. Feb. 5, 2020) (rejecting an attempt to construe "content processor" to include the term "modified"); Ex. N-3 at 18, *Finjan, Inc. v. Proofpoint, Inc.*, No. 4:13-cv-05808-HSG, Dkt. No. 267 (N.D. Cal. Dec. 3, 2015) ("the term [content processor] does not require any construction beyond its plain and ordinary meaning"); Ex. N-4 at 18, *Finjan, Inc. v. Symantec Corp.*, No. 4:14-cv-02998-HSG, Dkt. No. 170 (N.D. Cal. Feb. 10, 2017) ("Accordingly, the Court finds that 'content processor' should be given its plain and ordinary meaning."); Ex. N-5 at 21, *Finjan, Inc. v. Bitdefender Inc.*, No. 4:17-cv-04790-HSG, Dkt. No. 101 (N.D. Cal. Feb. 14, 2019) ("In turn, the Court again finds that no construction is necessary for this term and that 'content processor' has sufficiently specific structure based on the claim language and specification.").

Defendant's proposed construction goes against this plain and ordinary meaning by reading in multiple limitations—that the content must be (i) modified and (ii) on a client computer—not actually found anywhere in the '154 Patent.

Not only is Defendant's proposed construction not supported by the claim language and intrinsic record, but both of its proposed limitations have been rejected by courts.  Construing the

same term, *Finjan, Inc. v. Juniper Networks, Inc.*, 387 F. Supp. 3d 1004 (N.D. Cal. 2019), *aff'd* 825 F. App'x 922 (Fed. Cir. 2020)—which Defendant asserts is "binding in this action" (D.I. 131 at 4)[5]—explicitly declined to include the "on a client/user computer" limitation that Defendant now seeks to impose. Ex. L at 1010–1013. Nonetheless, departing from the holding it claims binds this Court, Defendant now proposes to add that same limitation. It is further evidence that Defendant's constructions are merely self-serving attempts to narrow the scope of the claims and are not meant to help a jury better understand them. Such constructions are unhelpful and improper. *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[P]atent coverage is not necessarily limited to inventions that look like the ones in the figures . . . . To hold otherwise would be to import limitations onto the claim from the specification, which is fraught with 'danger.'"); *Transcenic, Inc. v. Google Inc.*, 7 F. Supp. 3d 405, 412 (D. Del. 2013) (similar); *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001) ("It is critical for trial courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis of the jury instructions, should the case go to trial.").

Judge Noreika also rejected an almost identical attempt to include the term "modified" in the term's construction. Ex. N-2 at 12–13. As Judge Noreika found in *Finjan v. Rapid7*, since the term "modified" is expressly included in claims under related patents, it should not be read into

---

[5] Defendant incorrectly asserts that *Juniper* is "binding." As the Federal Circuit Operating Procedures make clear, "Rule 36 judgments shall not be employed as binding precedent by this court, except in relation to a claim of res judicata, collateral estoppel, or law of the case." Fed. Cir. Internal Operating Procedure No. 9 ¶ 8 (Nov. 14, 2008). As this case concerns different issues, and different Accused Products, than those in *Juniper*, it does not bind the Court. *See Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1379–80 (Fed. Cir. 2008).

claims under the '154 Patent that otherwise do not include it.  *Id.*; *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed. Cir. 2007).  So too here.

Defendant's proposal to read unsupported limitations into the claims should be rejected, and the term should be afforded its plain and ordinary meaning.

## 2.   <u>Defendant's Answering Position</u>

Trustwave's construction for this term clarifies that the content processing recited in the independent claims occurs on a client computer. This is consistent with the patent specification and the rest of the intrinsic record, including Finjan's statements during *inter partes* review. First, the specification expressly describes the content processor of "the present invention" as residing on a client computer. '154 Patent at 4:35-37 ("***The present invention*** operates through a security computer that is preferably remote from ***a client computer*** that is being shielded while processing network content"); 4:57-60 ("***the present invention*** operates by replacing original function calls with substitute function calls within the content, at a gateway computer, prior to ***the content being received at the client computer***"). "When a patent thus describes the features of the '***present invention***' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).

The '154 Patent describes the content processor ***exclusively*** as existing on a client or user computer. Each and every reference to a client processor in the context of the purported invention indicates that it processes modified content and is on a client computer. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). When a patent "consistently refer[s] to the 'present invention'" as teaching a particular feature, it is "improper for [the] Court to broaden the inventors' use of the disputed phrases and construe them" as broadly as

a strict dictionary reading might provide. *Cephalon, Inc. v. Barr Labs., Inc.*, 389 F. Supp. 2d 602, 606 (D. Del. 2005).

Finjan asks the Court to buck Federal Circuit precedent and consistent approaches taken by this Court. "This is a case where 'the specification read as a whole suggests that the very character of the invention requires the limitations to be a part of every embodiment.'" *Id.* (quoting *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1369 (Fed. Cir. 2003)). Although Finjan argues that Trustwave's proposed construction adds limitations "not actually found anywhere in the '154 Patent," it provides no examples of how the term is used. Finjan's statement is simply wrong.

The content processor does process modified content—and the '154 Patent never contemplates other possibilities. *See, e.g.,* '154 Patent at 4:35-54 (describing that the "present invention" operates by having the client computer "pass[] the input to the function to the security computer for inspection," which occurs only after the content is modified to add the substitute function to cause the client computer to pass the input to the security computer); 5:4-25 ("a preferred embodiment of the present invention . . . receiving at a gateway computer content being sent to a client computer for processing . . . modifying the content at the gateway computer . . . processing the modified content at the client computer . . . and invoking the original function at the client computer with the input . . ."); 10:60-62 ("Content processor 270 processes the modified content generated by content modifier 265. Content processor may be a web browser running on client computer 210."); 12:7-23 (". . . the input has already been dynamically generated by content processor 270 and can thus be readily analyzed. Referring to the example above, when client computer 210 invokes the substitute call . . ."); 13:64-14:4 ("At step 328 the client computer begins to continuously process the modified content; i.e., the client computer runs an application, such as a web browser or a Java virtual machine, that processes the modified content. At step 332, while

processing the modified content, the client computer encounters a call (2) to a substitute function, such as the substitute function listed in TABLE I."); 15:61-64 ("After receiving the inspection results, client computer 410 resumes processing the modified content and invokes or does not invoke the original function call, based on the inspection results.").

Similarly, the '154 Patent makes clear through numerous examples that the content processor is located on the client computer—and never provides any other location for the content processor. *See, e.g., id.* at 4:35-54 ("The present invention operates through a security computer that is preferably remote from a client computer that is being shielded while processing network content. During run-time, while processing the network content, but before the client computer invokes a function call that may potentially dynamically generate malicious code, the client computer passes the input to the function to the security computer for inspection . . ."); 5:4-25 ("a preferred embodiment of the present invention . . . processing the modified content at the client computer . . ."); 9:6-12 ("client computer 210 includes a content processor . . ."); 10:60-62 ("Content processor may be a web browser running on client computer 210."); 12:7-23 (". . . the input has already been dynamically generated by content processor 270 and can thus be readily analyzed. Referring to the example above, when client computer 210 invokes the substitute call . . ."); 12:60-64 ("However, security computer 215 returns the modified input to client computer 210. As such, when content processor 270 resumes processing, it adds the modified input into the HTML page."); 13:64-14:4 ("At step 328 the client computer begins to continuously process the modified content; i.e., the client computer runs an application, such as a web browser or a Java virtual machine, that processes the modified content."); 15:34-37 ("Client computer 410 includes a content processor 470"); 15:61-64 ("After receiving the inspection results, client computer 410 resumes processing the modified content and invokes or does not invoke the original function call,

based on the inspection results."); *see also* FIGs. 2-5 (each reflecting that the content processor is located on the client computer).

Finjan further argues—again, incorrectly—that Trustwave's proposed construction was in part rejected in *Finjan, Inc. v. Juniper Networks, Inc.*, 387 F. Supp. 3d 1004 (N.D. Cal. 2019), *aff'd* 825 F. App'x 922 (Fed. Cir. 2020). In the *Juniper Networks* case, the defendant proposed to construe "content processor" as "a processor on a client/user computer that processes modified content." *Juniper Networks*, 387 F. Supp. 3d at 1010. There, the court analyzed the intrinsic record in detail, beginning its analysis with whether the content being processed in the independent claims was "modified content"—which it definitively answered in the affirmative. *See id.* ("That the 'content' being processed in Claim 1 has been modified is made evident by the claim language and the specification."). The court did not "explicitly decline" to specify that the content processor was on the client computer. Rather, the court found that the claimed content processor was "a processor that processes modified content," and that this was sufficient to grant summary judgment against Finjan. *See id.* at 1013-14. The court simply did not analyze whether the content processor must also be on the client computer, as it was unnecessary to decide the case.

In fact, the *Juniper Networks* decision is binding on this Court for the claim-construction issues it decided. Claim construction is purely a legal issue. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996) ("The first is a question of law, to be determined by the court, construing the letters-patent, and the description of the invention and specification of claim annexed to them."). And Finjan knows this, as its briefing to the Federal Circuit in *Juniper Networks* demonstrates. *See, e.g,* Ex. P (Finjan Op. App. Br.) at 32 ("The district court's '154 error was ***pure claim construction error***, reviewable de novo and warranting reversal."). Finjan's citation to *Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1379-80 (Fed. Cir. 2008), and

argument that this case concerns different accused products than the *Juniper* case is inapposite. *Roche* discussed whether claim preclusion barred a second suit, so the accused products were relevant in that analysis. Here, the legal meaning of claim terms in a patent is at issue, and the Federal Circuit affirmed that the district court's analysis of why the "content processor" in the '154 Patent must process modified content is correct. *See, e.g., 01 Communique Lab., Inc. v. Citrix Sys., Inc.*, No. 1:06-cv-253, 2015 WL 3681065, at *12-14 (N.D. Ohio June 12, 2015) (collecting cases to explain that since claim construction is a matter of law, the Federal Circuit's construction is binding on district courts); *see also Markman*, 517 U.S. at 391 (explaining that "treating interpretive issues [like claim construction] as purely legal will promote . . . intrajurisdictional certainty through the application of *stare decisis* on those questions not yet subject to interjurisdictional uniformity under the authority of a single appeals court"). That the Federal Circuit found no error with the *Juniper Networks* court's analysis and affirmed the judgment without opinion does not matter. *See, e.g.,* Federal Circuit Rule of Practice 36.

As Trustwave's proposed construction reflects, the consistent usage of "content processor" in the '154 Patent, the Court should adopt it and hold that a content processor is "a processor that processes modified content on a client/user computer."

### 3.     Plaintiff's Reply Position

Defendant's proposed construction should be rejected, as it does not clarify the terms, which Defendant does not even attempt to do.  Nor does Defendant dispute, as Finjan set forth in its Opening Position, that many courts have adopted the plain and ordinary meaning of the terms— as Finjan proposes—while none have adopted Defendant's proposed construction.  *See, e.g.*, *supra* at Section III.A.1, pp. 8-9 ("Judge Noreika also rejected an almost identical attempt to include the term "modified" in the term's construction. Ex. N-2 at 12–13.").  Instead, Defendant attempts to obfuscate and narrow the terms by improperly importing two unsupported limitations—not found

12

in the claim language—from the specification, which it misconstrues in the process.  *See supra* at Section III.A.2, pp. 9-10.

First, there is no basis to look to the specification for a construction when, like here, a claim term is clear and well-understood.  *See Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1349 (Fed. Cir. 2001) (claims that are "clear on their face . . . do not require resort[ing] to the specification.").  The terms "content processor" and "process content" are clear on their face, as shown by Defendant's use of all four words in its proposed construction.  *See also Pragmatus AV, LLC v. Yahoo! Inc.*, No. CV 11-902-LPS-CJB, 2014 WL 1961980, at *13 (D. Del. May 15, 2014) ("rejecting the defendant's attempt to insert a limitation and determining that another part of the defendant's proposed construction simply 'rearrange[d] words from the disputed term itself'") (quoting *Astute Tech., LLC v. Learners Digest Int'l LLC*, Case No. 2:12–CV–689–JRG, 2014 WL 1385191, at *18–19 (E.D. Tex. Apr. 2, 2014)).

Defendant does not use the specification to clarify the claim language, the very purpose of claim construction.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (claim construction is used "to clarify and when necessary to explain what the patentee covered by the claims.").  Nor does it suggest that a location of the content processor is actually necessary to understand the claims, despite citing to the specification in an attempt to import a "on a client/user computer" limitation into the claims.

Rather, Defendant invokes the specification in an improper attempt to import limitations from the specification not present in the claim language.  *See Action Techs., Inc. v. Novell Sys., Inc.*, 155 F.3d 567 (Fed. Cir. 1998) ("[I]t is improper to import an extraneous limitation from the specification into the claim."); *Rothschild Connected Devices Innovations, LLC v. Coca-Cola Co.*, 813 F. App'x 557, 561 (Fed. Cir. 2020) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13

(Fed. Cir. 2005)) ("Although claim terms are interpreted in the context of the entire patent, it is improper to import limitations from the specification into the claims."); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words.").

Defendant's case law confirms that this is not an instance where the "character of the invention requires the limitations to be a part of every embodiment." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1369 (Fed. Cir. 2003). In *Alloc, Inc.*, the Federal Circuit imported claim limitations from the specification ***only*** when applying 35 U.S.C. § 112 ¶ 6. *Id.* ("The administrative judge construed the claim terms 'locking means,' 'locking element,' and 'locking member' in view of 35 U.S.C. § 112, ¶ 6."). That is because § 112 requires reading limitations into claims to provide the requisite structure. *See* 35 U.S.C. § 112 ¶ 6 ("[A] claim . . . expressed as a means or step . . . claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."). Because the claims here are not expressed as a means or step, that provision is inapplicable and Defendant's argument fails.

Second, since none of Defendant's citations to the "present invention" in the specification mention a content processor or processing content, they cannot be used to read limitations into the terms. *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (finding "present invention" introduces a limitation only when it refers to "the very claim term that is at issue"). The examples Defendant cites as the "present invention" are "a security computer that is preferably remote"[6] and one that "operates by replacing original function calls" within the

---

[6] The term "preferably" suggests a preferred embodiment. *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008). A preferred embodiment should not be read

"content" (not any "modified" content).  Section III.A.2, at 9; '154 Patent at 4:35-37, 4:57-60.
Neither "present invention" relates to the two limitations Defendant seeks to impose.

Third, the use of "present invention" is not definitive.  Even *Verizon Services*, cited by
Defendant, only permits limiting the scope of the claimed invention when the patent "describes
the features of the 'present invention' ***as a whole***."  503 F.3d at 1308 (emphasis added).  And
*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, cited by *Verizon Services*, indicates
only that "'present invention' is strong evidence that the claims should not be read to encompass
the opposite structure."  242 F.3d 1337, 1343 (Fed. Cir. 2001).

Neither situation exists here.  The patent does not describe the features of the "present
invention" as a whole—Defendant merely makes piecemeal citations to sections of the
specification, ignoring other elements and failing to discuss other embodiments.  *Supra* at Section
III.A.2, p. 9.  And Defendant does not offer the term "present invention" to argue that the claims
should not encompass an opposite structure: it uses it to import a limitation from the specification.
*Id.* at 3–4.  Since Defendant admits that a content processor processes content, it is clearly not an
"opposite structure."

Moreover, Defendant's reliance on *Cephalon, Inc. v. Barr Labs., Inc.*, 389 F. Supp. 2d 602,
606 (D. Del. 2005) is also misplaced.  *Supra* at Section III.A.2, pp. 9-10.  There, it was the plaintiff
that, like Defendant here, asked the court to import language into the claims.  The specification

---

to limit the claims.  *See NeoMagic Corp. v. Trident Microsystems, Inc.*, 98 F. Supp. 2d 538, 548
(D. Del. 2000) (citing *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303 (Fed. Cir. 1997))
("Although the Federal Circuit has held that claims should be read in view of the specification, . .
. the court has repeatedly cautioned against limiting the scope of a claim to the preferred
embodiment or specific examples disclosed in the specification.").

was used to confirm that the patent applicant did not use "free liquids" in relation to three terms clearly referencing solids: "substantially powdered form," "mixing the drug and the carbohydrate material" and "solid integral mass." *Cephalon, Inc.*, 389 F. Supp. 2d at 606. The specification's description of "formation . . . through the compression of 'dry' and 'solid' powders" only served to further that understanding. *Id.* The *Cephalon* court's refusal "to broaden the inventors' use of the disputed phrases" is reminiscent of Defendant's attempt to read in limitations not found in the claims. *See id.*

Fourth, Defendant conflates the fact that the content processor can process modified content with the idea that it must do so in its attempt to import a limitation that the content must be "modified." *Supra* at Section III.A.2, pp. 9–11. Defendant incorrectly asserts that "the '154 Patent never contemplates other possibilities." *Id.* at 9. The '154 Patent does in fact contain multiple descriptions of a content processor processing unmodified content (also known simply as "content"). *See, e.g.*, '154 Patent at 2:64–66 ("a content processor 170, such as a conventional web browser, which processes Internet content"); 7:23–24 ("content processor (i) for processing content received over a network"); 11:32–33("content processor 270 while processing content"); 15:35–37 ("a content processor 470, such as a web browser, which processes content received from the network"). Given the disclosure of these embodiments, Defendant's construction cannot be correct.

Fifth, Defendant's reliance on *Juniper Networks* undermines its proposed construction because the Federal Circuit's construction of "content processor" does not include the "client/user computer" limitation Defendant now seeks to impose. *See Finjan, Inc. v. Juniper Networks, Inc.*, 387 F. Supp. 3d 1004, 1013 (N.D. Cal. 2019), *aff'd*, 825 F. App'x 922 (Fed. Cir. 2020). Defendant attempts to circumvent that construction by asserting that "the *Juniper Networks* decision is

binding on this Court for the claim-construction issues it decided" and arguing that the court there "did not analyze whether the content processor must also be on the client computer." *Supra* at Section III.A.2, p. 12.  However, Defendant's case law undercuts that argument since it makes clear that *entire* constructions are binding.  *See Communique Lab'y, Inc. v. Citrix Sys., Inc*., No. 1:06-CV-253, 2015 WL 3681065, at *12 (N.D. Ohio June 12, 2015) (citing *Eolas Tech., Inc. v. Adobe Sys., Inc.*, Case No. 6:09–CV–446, 2011 WL 11070303, at *2 (E.D. Tex. Sept. 23, 2011)) ("[W]hen the Federal Circuit construes a term, it does so as a matter of law and its holding is binding.").

The *Juniper Networks* decision construed the term as "a processor that processes modified content," despite a request from the defendant in that case to include the "client/user computer" limitation Defendant now proposes. Defendant cannot accept part of the Federal Circuit's construction while rejecting the rest.  If, as Defendant insists, *Juniper Networks* is binding, then "content processor" cannot be construed to include the "client/user computer" limitation, and Defendant's proposed construction must be rejected.

Ultimately, Defendant's shotgun approach fails.  Defendant's construction improperly imports limitations from the specification into the claims, and by Defendant's own admission, contradicts allegedly binding Federal Circuit precedent.  It should therefore be rejected, and the terms should be afforded their plain and ordinary meaning.

### 4. Defendant's Sur-Reply Position

Finjan sets forth four reasons why Trustwave's construction is supposedly wrong, without ever shedding light on what it thinks "content processor" and "process content" mean. Each argument is without merit.

17

*First*, Finjan claims that there is "no basis to look to the specification for a construction." *Supra* at Section III.A.3, p. 13. That argument violates fundamental claim construction law. As the en banc Federal Circuit held in the seminal *Phillips* case:

> The claims, of course, do not stand alone. Rather, they are part of "a fully integrated written instrument," consisting principally of a specification that concludes with the claims. For that reason, claims "must be read in view of the specification, of which they are a part." As we stated in *Vitronics*, the specification "is *always* highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."

*Phillips v. AWH Corp.*¸ 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (citations omitted). The claims cannot exceed what is disclosed in the specification. "In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims." *Id*. at 1316. In fact, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. at 1313.

To advance its incorrect legal framework, Finjan misstates the law. Finjan purports to quote the *Interactive Gift* case for the proposition that "claims that are 'clear on their face . . . do not require resort[ing] to the specification." Section III.A.3, p.13. But that was an argument that the Federal Circuit emphatically rejected, saying that "resort to the specification is always necessary." The full quote is as follows:

> The first category consists of IGE's alleged arguments that the terms "point of sale location," "material object," "information manufacturing machine," and "authorization code" are clear on their face and do not require resort to the specification. Because resort to the specification is always necessary, at least to determine if the patentee has redefined the claim terms, we consider this category of IGE's arguments to clearly lack legal merit and we have neither agreed with nor relied on them.

*Interactive Gift Exp. v. Compuserve Inc*., 256 F.3d 1323, 1349 (Fed. Cir. 2001).

While Finjan's proposed (non-)construction should be rejected on this basis alone, its alternative arguments fail on their merits.

**Second**, Finjan argues that Trustwave is seeking to import limitations into the claims. Section III.A.3, p.14. Not so. Trustwave provided myriad citations to the specification to show that in the '154 patent, the content processor is part and parcel of the client or user computer. Moreover, Finjan's argument that *Alloc* involved "importing" limitations is incorrect, as is its argument that *Alloc* applies only in the context of means-plus-function claim limitations. Again, Finjan misstates the law.  The *Alloc* court expressly stated:

> In this case, the outcome does not hinge on whether or not the claims are interpreted under 35 U.S.C. § 112, ¶ 6, as the critical factor, play, applies to claims of either flavor. . . . Whether those claims fall under the § 112, ¶ 6 regime or not, the patent applicant tethered the displacement and disassembly features of the claims to the play feature.

*Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1369 (Fed. Cir. 2003).

Finjan also argues that "none of [Trustwave's] citations to the 'present invention' in the specification mention a content processor or processing content" (*supra* at Section III.A.3 p. 14), but this is wrong. Trustwave quoted directly from the specification numerous times where the "client computer" was receiving and processing "content" in "the present invention." *Supra* at Section III.A.2 at pp. 8-10. Finjan cannot point to a single instance in the entire specification where content is processed or a content processor exists anywhere other than at a client computer.

**Third**, Finjan inappropriately relies on the specification's discussion of the prior art to suggest that the claimed "content processor" processes unmodified content and further assumes, without explanation" that "content" and "unmodified content" are synonymous. For example, Finjan cites to the '154 patent at 2:64-66, which describes FIG. 1, "which is a simplified block diagram of prior art systems" and thus does not describe the purportedly inventive claims. Finjan also cites to 7:23-24, which simply parrots the language of claim 1 verbatim. This completely fails

19

to demonstrate the point Finjan tries to make. Finjan's citation to 11:32-33 is generic, follows extensive description where the content processor processed modified content (e.g., 10:31-11:10), and fails to provide a concrete example of unmodified content being processed. Similarly, Finjan's citation to 15:35-37 fails to support its position. There, the specification says that the "client computer 410 includes a content processor 470, such as a web browser, which processes content received from the network."[7] However, the specification goes on to describe the embodiment in more detail, setting forth that the content becomes modified and then (and only then) is processed by the content processor. '154 patent at 15:34-64. This portion of the specification never describes the content processor processing unmodified content. Finjan's argument fails.

**Fourth**, Finjan argues that the *Juniper Networks* decision somehow undermines Trustwave's argument. Finjan is wrong again. Trustwave explained at length the posture of the *Juniper Networks* case: the district court granted summary judgment based on the fact that the content processor processes modified content, which sufficed to decide the case. There was no analysis of whether the content processor necessarily resides on the client computer, as that was unnecessary to the decision. The *Juniper Networks* case confirms that Finjan's argument makes no sense. *Juniper Networks* is binding, and the claimed "content processor" is also resident on the client or user computer. None of Finjan's legal citations compel a contrary decision. In fact, other courts confirmed that the content processor is on a client computer. *E.g., Finjan, Inc. v. Cisco Sys. Inc.*, No. 17-cv-00072-BLF, 2020 WL 1506278, at *3 (N.D. Cal. Mar. 30, 2020) ("The basic setup of the '154 Patent involves three components . . . (2) client computer including a content processor . . .").

---

[7] Again, Finjan quoted out-of-context by omitting the fact that the specification described the content processor as being located on the client computer.

### B. "first function" / "second function" ('154 Patent, Claims 1, 4, 6, 10)

| Finjan's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| no construction necessary—plain and ordinary meaning | "**substitute function**" / "original function, which is different than the first function" |

### 1. Plaintiff's Opening Position

The Court should construe these terms in accordance with their plain and ordinary meaning since, as used in the claims and the specification, they would be well understood by a person of ordinary skill in the art at the time of the invention without further construction. There is no reason to depart from their plain and ordinary meanings. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365–66 (Fed. Cir. 2012).

Courts in this District have already rejected Defendant's proposed constructions as an improper attempt to read a non-existent limitation into the claims. As Judge Noreika held in *Finjan v. Rapid7*, "[t]here is nothing in the claims of the '154 Patent that requires the two functions to be different - or precludes the two from using the same function." Ex. N-2 at 11. While "other related patents use the terms 'original' and 'substitute' in the claims[,] the '154 Patent does not." *Id.* Because, as Judge Noreika found, Defendant's proposed construction is not supported by the claim language or intrinsic record, it must be rejected. *Andersen Corp*, 474 F.3d at 1369 ("different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope."); *see also* Ex. N-5 at 23 (holding that "[t]he Court's prior decision not to read 'original' and 'substitute' into the claim terms also applies here").

In addition to misconstruing the claim language, Defendant also improperly asks the Court to read out a preferred embodiment in the '154 Patent. While Defendant's construction would require the first and second function to be different, the '154 Patent includes a preferred embodiment where the first and second functions are the *same function*. Table II specifically

21

identifies a first function as "Document.write" (with an argument "('<h1>hello</h1>')") and the second function as the same "Document.write" function (with argument "('text')"), which is invoked if the security computer indicates that it is safe.  Ex. A at 10:15-59.

Defendant's proposal to read out this preferred embodiment is yet another unsupported attempt to narrow the scope of a claim and should therefore be rejected.  *See Rsch. Found. of State Univ. of N.Y. v. Mylan Pharms., L.P.*, No. C.A.09-184JFFLPS, 2010 WL 1911589, at *6 (D. Del. May 12, 2010), report and recommendation adopted, No. C.A.09-184 GMS-LPS, 2010 WL 2553512 (D. Del. June 24, 2010) ("While [i]t is often the case that different claims are directed to and cover different disclosed embodiments, Federal Circuit case law generally counsels against interpreting a claim term in a way that excludes the preferred embodiment from the scope of the invention.") (citation omitted); *MAZ Encryption Techs., LLC v. Lenovo (United States) Inc.*, No. CV 13-303-LPS, 2015 WL 4035049, at *5 (D. Del. June 30, 2015) ("The Court will not import additional limitations from the specification into these terms and will not read out of the claims an embodiment disclosed in the specification."); *On-Line Techs., Inc., v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004) (similar).

## 2.   <u>Defendant's Answering Position</u>

Finjan attempts to maximize the flexibility it has—and correspondingly the ambiguity that these claim terms have—by proposing no construction at all. Indeed, despite claiming two distinct functions (a "first function" and a "second function"), Finjan argues that they can be the same function. *Supra* at Section III.B.1. Finjan's arguments contradict the plain language of the claims, the teachings of the specification, and Finjan's statements to the PTAB during *inter partes* review to preserve the validity of the '154 Patent.

***First***, the plain language of the claims specifies two different functions—a "first" and a "second." If the two functions could be the same, there would have been no reason for designating

them "first" and "second." *See, e.g., 3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("the use of the terms 'first . . . pattern' and 'second . . . pattern' is equivalent to a reference to 'pattern A' and 'pattern B'"). Finjan asks that the Court render the express "first" and "second" limitations superfluous. *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) ("In *Phillips*, this court reinforced the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered superfluous.").

Indeed, if the "first function" and the "second function" could be the same function, claim 1 of the '154 Patent, for example, would be nonsensical. Claim 1 requires "a transmitter for transmitting the input to the security computer for inspection, when the first function is invoked," and also "invoking a second function with the input, **only if** a security computer indicates that such invocation is safe." '154 Patent, cl. 1. The "only if" requirement cannot be met if the "first function" is the same as the "second function." If the first function and the second function were the same, then the second function would have already been invoked when the first function was invoked (given that it was the same function). Thus, it is impossible to invoke the second function "only if" a security computer indicates such invocation is safe, because the function would have already been invoked to transmit the input to the security computer for inspection in the first place.

Finjan's proposal allowing the "first function" and the "second function" to be the same function would also frustrate the security-enhancing purpose of the '154 Patent because the function would always been invoked, regardless of whether or not it is safe to do so. Thus, the only logical interpretation of the claims is that the first function and the second function are different functions. And when read in context with the specification (discussed in more detail below), it becomes clear that the "second function" is the original function, while the "first function" is the

substitute function that was substituted into the received content at the gateway computer.

**Second**, the specification confirms that the "first function" and the "second function" are different functions. The specification of the '154 Patent explains, "Content modifier 256 preferably modifies original content received by gateway computer 205, and produces modified content, which includes a layer of protection to combat dynamically generated malicious code." '154 Patent at 9:13-16. The content modifier "scans the original content and identifies function calls of the form Function(input)," and "modifies selected ones of the function calls [] to corresponding function calls Substitute_function(input, *), . . . whereby the call to Function() has been replaced with a call to Substitute [f]unction()." *Id*. at 9:16-26. When the call to "Substitute_function(input, *)" is made, "the substitute function sends the input to security computer 215 for inspection." *Id*. at 9:36-37. In claim 1, the input is transmitted to the security computer for inspection "when the first function is invoked." Thus, the "first function" is the "substitute function" described throughout the specification.

The specification continues to explain that the "security computer 215 returns its inspection results to client computer 210," which "invokes the original function call" if safe. *Id*. at 10:64-11:4. In claim 1, for example, the "second function" is invoked "only if a security computer indicates that such invocation is safe." *Id*. at cl. 1. Thus, the "second function" is the original function, which is executed if it is determined to be safe.

The "first function" and the "second function" are thus different from each other, the "first function" is the "substitute function," and the "second function" is the original function. Finjan has not identified anything in the specification to the contrary.

**Third**, the prosecution history confirms that Trustwave's proposed construction is correct, removing any doubt about the correct interpretation of the claims. During an *inter partes* review,

Finjan argued Trustwave's exact proposal to the PTAB to preserve the validity of the '154 Patent, expressly disclaiming the position it seeks to revive here. For example, Finjan argued to the PTAB that "[t]he '154 talks about a call to a first function, and that's a call to a substitute function." Ex. G at A181. And Finjan explained why the first function must be the substitute function: "And there is a reason for that: it makes it safer. If you call a substitute or you call a first function, you don't have the opportunity to call an original function which may harm your computer." *Id*. Finjan thus equated the first function to the substitute function and distinguished the first function from the original function when arguing for the validity of the '154 Patent.

But Finjan did not stop there. It continued its argument to the PTAB, confirming that the claimed first function and second function are different, stating, "The claims say that you have a call including an input, a call to a first function, and then you invoke a second function if it is safe, ***those are different***, because Ross [the prior art] is about calling original functions." Ex. G at A209. Finjan's statements interpreting the claims before the PTAB are binding here. *Aylus Networks, Inc. v. Apple, Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017) ("we hold that statements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can be considered for claim construction and relied upon to support a finding of prosecution disclaimer").

***Fourth***, Finjan's argument citing to functions in the Tables in the specification is wrong. Finjan's characterization that Table II identifies a first function and a second function as the same function is incorrect. Finjan actually refers to both Table II and Table III ("Document.write(text)" appears only in Table III, not Table II), and the specification clarifies that Finjan misinterprets its own patent. The specification illustratively states that "suppose a portion of the original content is of the form shown in TABLE II," labels TABLE II as "Example original content" and recites a function "Document.write()" having an input "<h1>hello<h1>." '154 Patent at 10:15-29. The

specification continues, indicating that "content modifier 265 alters the original content in TABLE II to the modified form in TABLE III. Specifically, content modifier 265 substitutes the call to the standard function Document.write(), with a call to the substitute function Substitute_document.write(), and inserts the function definition for the substitute function into the content." *Id*.at 10:31-36. TABLE III continues to provide an example of the different substitute function having been inserted in place of the original function. To be clear, there is no illustration of a same "'Document.write' function (with argument "('text')") in the Tables, as Finjan incorrectly states. Rather, Table III recites the different "Substitute_document.write(text)" function. The recitation of "Document.write(text)" in TABLE III is part of the function definition of the substitute function "Substitute_document.write(text)," as explained in the specification. *Id*. at 10:31-39.

The original function (i.e., the claimed "second function") is the "Document.write() function illustrated by example in TABLE II. The substitute function (i.e., the claimed "first function") is the "Substitute_document.write()" function inserted and called in TABLE III. Indeed, the specification confirms this: "content modifier 256 alters the original content in TABLE II to the modified form in TABLE III" by "substitut[ing] the call to the standard function Document.write(), with a call to the substituted function Substitute_document.write()." *Id*. at 10:31-35. The specification continues to explain that "[w]hen content processor invokes the substitute function call (2), the input is passed to security computer 215 for inspection." *Id*. at 10:62-64. The original function is involved only if the security computer indicates that it is safe. *Id*. at 10:64-11:4.

***Fifth***, the Federal Circuit has already explained that each of the four independent claims of the '154 Patent "recit[es] a system or software program that executes a substitute function" that

"inspects the input to an original function to determine if executing the original function with the input" is safe. *Palo Alto Networks, Inc. v. Finjan, Inc.*, 752 Fed. App'x 1017, 1018 (Fed. Cir. 2018). The Federal Circuit confirmed Trustwave's understanding of the claims, stating that "[i]n the language of the '154 Patent, the 'first function' is the inspection step in which the content is assessed for safety, and the 'second function' is when, having been deemed safe, the content is actually run." *Id.* at 1019.

Finjan's arguments are incorrect, contradict the specification, and depart from specific findings of the Federal Circuit. In short, Finjan's proposal is rife with error, and the Court should adopt Trustwave's constructions.

### 3.   Plaintiff's Reply Position

Defendant's arguments and caselaw confirm that the terms have well-understood meanings and do not need construction.

First, Defendant's argument is contradictory.  The crux of its argument—that the two functions must be different because they are labeled "first" and "second"—inherently depends on the plain language meaning of each word.  *Supra* at Section III.B.2, pp. 24-25.  If, as Defendant implies, "first" and "second" are so clearly understood on their face, there is no need to construe the terms or look to the specification.  *See Interactive Gift Exp., Inc.*, 256 F.3d at 1349. Defendant's construction is therefore entirely unnecessary and should be rejected.

Moreover, Defendant misstates the plain meaning of the terms, as shown by its own case law.  There is no requirement that the terms be different.  As Judge Noreika observed, "[t]here is nothing in the claims of the '154 Patent that requires the two functions to be different - or precludes the two from using the same function."  *Finjan, Inc. v. Rapid7, Inc., et al.*, No. 1:18-cv-01519-CJB, Dkt. No. 123, 11 (D. Del. Feb. 5, 2020).  The Federal Circuit has further explained that "first" and "second" is a commonly-used naming convention in claim drafting to encompass two items

27

that can be different or the same.  *See 3M Innovative Props. Co. v. Avery Dennison Corp*., 350 F.3d 1365, 1371 (Fed. Cir. 2003) (The "use of the terms 'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation."). Defendant's reliance on *3M Innovative* is perplexing since the Federal Circuit held there that the use of "first" and "second" "should not in and of itself impose a serial or temporal limitation."[8] *Id*.  And *3M Innovative* did not hold that "first" and "second" required different patterns—the question at issue was whether patterns had to be created sequentially.  *See id*.

The claim would not, as Defendant asserts, be nonsensical if the "first function" and "second function" were the same.  *Supra* at Section III.B.2, pp. 25.  That argument highlights Defendant's misunderstanding of the patented technology.  Invocation of the second function is performed "with the input," whereas there is no such requirement imposed on the first invocation. There is nothing "nonsensical" about invoking the same function with different circumstances.

And Defendant is incorrect that allowing the functions to be the same would frustrate the "purpose" of the '154 Patent.  *Supra*. at Section III.B.2, p. 25.  The functions can be the same and still provide protection for the content processor.  Nor is there a requirement that every interpretation of the claims must avoid potentially frustrating any alleged purpose of a patent. Defendant appears to be alluding to evidence against combining prior art references for obviousness purposes.  *See Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017)

---

[8]   While Defendant argues that *Palo Alto Networks, Inc. v. Finjan, Inc.*, 752 F. App'x 1017, 1019 (Fed. Cir. 2018), "confirmed" its understanding, the meaning and construction of these terms were not at issue there.  The Federal Circuit did not construe "first function" or "second function."  *Id*.  And as Finjan established in its Opening Position, numerous courts in this District have rejected Defendant's proposed construction as an improper attempt to import limitations into the claims.  *Supra* at 22-23.  Moreover, as Judge Noreika noted, "[a]lthough [the Palo Alto Court] does use the terms "substitute" and "original," I do not read those statements as requiring that the first and second function[s] be different."  *Finjan, Inc. v. Rapid7, Inc., et al*., No. 1:18-cv-01519-CJB, Dkt. No. 123, 11 (D. Del. Feb. 5, 2020).

("Obviousness may be defeated if the prior art indicates that the invention would not have worked for its intended purpose . . . ."). That type of evidence, however, is not relevant here.

Second, Defendant misconstrues Finjan's statements before the PTAB. *Supra* at Section III.B.2, pp. 27.[9] Finjan did not, as Defendant contends, "expressly disclaim[]" its current position. *Supra* at 27. Finjan only specified that the use of a substitute function is an example, not the sole embodiment. *See* Exhibit G, A199 (using substitute function "as an example"). Defendant must meet a significant burden in order to overcome the "heavy presumption" that Finjan did not expressly relinquish claim scope, and Defendant's citation to an example used at an oral hearing falls well below the required showing. *See Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) ("A heavy presumption exists that claim terms carry their full ordinary and customary meaning, unless it can be shown the patentee expressly relinquished claim scope.").

Third, while Defendant complains that "Finjan actually refers to both Table II and Table III ('Document.write(text)' appears only in Table III, not Table II)," (*supra* at Section III.B.2, p. 27), the substance behind Defendant's argument rings hollow. To the extent the specification is considered, it refers to a first function as "Document.write" (with an example of "('<h1>hello</h1>')") and the second function as the same "Document.write" function (with an example of "('text')"), which is invoked if the security computer indicates that it is safe. Ex. A at 10:15-59; *supra* at Section III.B.2, pp. 27-28. In other words, the function "document.write" is the same.

---

[9]    Defendant also repeatedly provides inaccurate citations to Exhibit G. For example, Defendant cites to page A181, but the quoted passage is on page A170. *Supra* at Section III.B.2, p. 27. And Defendant cites to page A209, but the quoted passage is on page A198. *Id*.

Defendant misconstrues the facts of the case and legal standards.  The Court should reject Defendant's attempt to import claim limitations and ascribe "first function" and "second function" their plain and ordinary meaning.

### 4.    Defendant's Sur-Reply Position

There is no contradiction, as Finjan suggests, in Trustwave's proposed constructions of "first function" and "second function."

*First*, Finjan relies on a plainly incorrect legal framework, citing again to *Interactive Gift* to support its position that the Court need not look to the specification. Trustwave provided legal support for its reading that the recitations of a "first" and a "second" function refer to two different functions. *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("the use of the terms 'first . . . pattern' and 'second . . . pattern' is equivalent to a reference to 'pattern A' and 'pattern B'"). Finjan misreads this case. Its quote that "use of the terms 'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation" does not mean that the first element and the second element are or can be one and the same. Rather, the court was explaining that the convention is used to distinguish different elements that are called the same thing and do not require a serial or temporal limitation. *3M*, 350 F.3d at 1371-72; *see also Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1373-74 (Fed. Cir. 2005) (references to "first," "second," and "third" razor blades do not preclude additional blades and do not require the three blades to be in a particular arrangement but still refer to three distinct razor blades).

Finjan's proposal would render the express "first" and "second" limitations superfluous. The terms refer to different functions. If, as Finjan suggests, the same function could be invoked under different circumstances, those circumstances should be spelled out—and distinguishing between "first" and "second" functions would be pointless. Nothing in the claims or the

specification suggests what Finjan argues. Trustwave's construction is based on the claim language, the specification, and Finjan's own statements before the Patent Office, not a purported "misunderstanding of the patented technology." *Supra* at Section III.B.3, p. 28. Finjan's counter is merely unsupported attorney argument, not evidence, without even a citation to the specification.

Second, Finjan did disclaim its current broad position to the Patent Office when arguing that the claims should be found to be valid. Finjan claims that it "only specified that the use of a substitute function is as an example," but its citation has no support whatsoever for its position. *Supra* at Section III.B.3, p. 29 (citing Ex. G at A199, which discusses proving the date of conception and invention). And even if Finjan's citation supported its claim, that has no bearing on whether the first and second functions are different functions. Rather, as Trustwave's brief makes clear, Finjan also made clear multiple times that the first function was the substitute function and was not just one possible example, as well as that the first and second functions were different functions. *Supra* at Section III.B.2, at pp. 24-25 (directly quoting from Ex. G at A181 and A209).

Third, Finjan's argument about what the specification teaches is incorrect. Trustwave's brief carefully walks through the specification and explains why Trustwave's construction must be correct based on the specification. *Supra* at Section III.B.2, at pp. 23-25 and 26. The specification never refers to "Document.write" as the first function and the second function, and Finjan ignores the presence of the separate "Substitute_document.write()" that is clearly described and depicted in the specification. *Supra* at Section III.B.2, at pp. 25-26 (discussing the specification at 10:15-11:4). But more fundamentally, claim 1 requires that "a transmitter for transmitting the input to the security computer for inspection, when the first function is invoked." The specification never discloses Finjan's purported first function, Document.write('<h>hello<h>'), to transmit the input of the first function to the security computer for inspection—but does describe this occurring

when invoking the substitute function ("substitute_document.write()"). '154 patent at 10:62-64. Moreover, Finjan's reasoning is circular: its conclusion that the first function and second function can be the same function must also be the premise, and Finjan twists the specification to try to find such an example. At bottom, Finjan's arguments rest on an incorrect interpretation of the law and its own specification. They do not hold water.

**C.** **"receiver" ('154 Patent, Claims 1, 2, 6, 7)/ "transmitter" ('154 Patent, Claims 1–3, 6–8)**

| Finjan's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| no construction necessary—plain and ordinary meaning | These terms are governed by 35 U.S.C. § 112 ¶ 6 but do not have a corresponding structure disclosed in the specification and are thus indefinite and lack sufficient written description.<br><br>If held not to be means-plus-function terms, then receiver means "a hardware component separate from the content processor and transmitter"<br><br>and transmitter means "a hardware component separate from the content processor and receiver" |

**1.**   **Plaintiff's Opening Position**

The Court should construe these terms in accordance with their plain and ordinary meanings since, as used in the claims and the specification, they would be well understood by a person of ordinary skill in the art at the time of the invention without further construction. The patentee did not act as a lexicographer or disclaim any embodiments. *Thorner*, 669 F.3d at 1365–66. As such, there is no reason to depart from the terms' plain and ordinary meaning. *Id.*

"Receiver" and "transmitter" are both well-known terms that would have been recognizable to one of ordinary skill in the art at the time of the invention. And none of the multiple courts construing terms in the '154 Patent have seen fit to construe "receiver" or "transmitter."

*See, e.g.*, Ex. N-6 at 26–29, *Finjan, Inc. v. Qualys Inc*, No. 4:18-CV-07229-YGR, 2020 WL 3101040 (N.D. Cal. June 11, 2020) (declining to construe "receiver" and "transmitter" in the '154 Patent); Ex. N-3 at 13–18 (construing the '154 Patent); Ex. N-5 at 19–25 (same). The Federal Circuit has even gone so far as to recognize that a person of ordinary skill in the art would understand the meaning of "receiver." *See EnOcean GmbH v. Face Intern. Corp.*, 742 F.3d 955, 961 (Fed. Cir. 2114) ("[A] person of ordinary skill in the art could understand the bounds of the invention merely by reading the term 'receiver.'").

Defendant's construction goes against these plain and ordinary meanings by reading in a limitation requiring that the receiver and transmitter be comprised of a hardware component separate from both each other and the content processor. There is no support in the intrinsic record for that proposed limitation. *See, e.g.*, Ex. A at 6:53-65 (describing "a receiver (i) for receiving content . . . and (ii) for receiving the input . . . and a transmitter (i) for transmitting . . . content . . . and (ii) for transmitting an indicator").

Indeed, these claim terms require no clarification, and Defendant does not offer one. Defendant does not suggest that either the transmitting and receiving functions or the structures of the transmitter and receiver are unclear. In fact, Defendant's proposed construction fails to even mention the function or structure of a receiver and/or transmitter. Instead, it only serves to obfuscate the meaning of the terms, stripping them of their structure and function by describing them only as "hardware components." And adding "separate" to the construction would only further confuse the terms. *See Indivior Inc. v. Mylan Techs. Inc.*, 232 F. Supp. 3d 650, 654 (D. Del. 2017) ("Defendants' proposed construction is unnecessary and introduces terminology, such as 'separate and distinct,' which is more confusing than helpful.")

Defendant's attempts to read unsupported limitations into the claims should be rejected, and the terms "transmitter" and "receiver" should be afforded their plain and ordinary meanings.

## 2.    **Defendant's Answering Position**

When a claim element invokes purely functional terms without the additional recital of specific structures or materials for performing that function, then the claim element is construed under the legal standards for "means-plus-function" terms under 35 U.S.C. § 112 ¶ 6 (which, with immaterial differences, is now 35 U.S.C. § 112(f)). *See Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999). One category of claim terms that fall under § 112 ¶ 6 are "nonce" terms. A nonce term is a generic term "reflect[ing] nothing more than verbal constructs . . . [and] typically do not connote sufficiently definite structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015). When a claim term falls under § 112 ¶ 6, it must be construed to identify both the claimed function and the corresponding structure. *Al-Site*, 174 F.3d at 1320 ("These claim limitations 'shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.'"). But if the patent fails to disclose adequate corresponding structure for the term, then the patent claim is invalid as indefinite under § 112 ¶ 2. *Williamson*, 792 F.3d at 1352. To qualify as corresponding structure, the specification must "clearly link[] or associate[] that structure to the function recited in the claim." *Id*.

Here, the terms "transmitter" and "receiver" are "black box" terms reflecting no particular structure and are recited only with reference to their claimed functions ("for transmitting the input to the security computer for inspection" and "for receiving an indicator from the security computer whether it is safe to invoke the second function with the input," respectively). *See Williamson*, 792 F.3d at 1350 (noting that the word "module" "does not provide any indication of structure because it sets forth the same black box recitation of structure for providing the same specified function as

34

if the term 'means' had been used"). For example, an antenna or an electrical bus could be a structure that functions as a "transmitter" or "receiver," but there is no disclosure of these structures (or any other structure) as performing the claimed "transmitting" or "receiving" functions. For example, the specification merely repeats the claim language without providing an actual structure. *See, e.g.,* '154 Patent at 6:60-65 ("a transmitter (i) for transmitting the modified content to the client computer"), 8:54-60 ("Gateway computer 205 receives data at gateway receiver 235, and transmits data at gateway transmitter 240."), 15:26-29 ("Gateway computer 405 receives data at gateway receiver 435, and transmits data at gateway transmitter 440."). Notably, the gateway receivers 235, 435 and gateway transmitters 240 and 440 are depicted literally as "black boxes" in the figures. For example, Figure 2 is replicated below, illustrating transmitters and receivers as labeled rectangles devoid of structure:



Although Finjan argues that "transmitter" and "receiver" are well-known terms, it fails to point to any structure that performs the claimed transmitting and receiving functions. Not a single

one. And Finjan's citation to the *EnOcean* case is inapposite—the patent at *EnOcean* had different claims and a different specification, was decided before the *Williamson* case, and the patentee "provided extensive evidence" that persons of ordinary skill in the art would understand the term as used in that patent. *See EnOcean GmbH v. Face Int'l Corp.*, 742 F.3d 955, 959-60 (Fed. Cir. 2014). The lack of any evidence here stands in stark contrast to the "extensive" evidence that was marshalled in *EnOcean*. We have here no declarations from persons of ordinary skill, no scientific literature, and—fatally—no citations to the specification of the '154 Patent. Accordingly, the terms "transmitter" and "receiver" ***as used in the claims of the '154 Patent*** are means-plus-function terms, and the '154 Patent is utterly devoid of any corresponding structure capable of performing the claimed "transmitting" and "receiving" functions. Therefore, the claims reciting the terms "transmitter" and "receiver" are indefinite as a matter of law.

But to the extent the Court holds that "transmitter" and "receiver" are not means-plus-function terms, it should hold that the "transmitter" is a hardware component separate from the content processor and the receiver and that the "receiver" is a hardware component separate from the content processor and the transmitter. Notably, the court in *Finjan, Inc. v. Qualys Inc.*, Dkt. No. 74, Case No. 4:18-cv-07229-YGR (N.D. Cal. June 11, 2020), distinguished the accused infringer's argument that the terms "transmitter" and "receiver" were indefinite under a means-plus-function analysis centered on a line of cases specific to computer software, noting that the computer software cases required a special purpose computer carrying out an algorithm to avoid purely functional claiming, but that those cases did not limit a patentee's ability to claim generic hardware. The court then held that the claimed receivers were hardware components separate from the content processor, and similarly that the claims transmitters were hardware components separate from the content processor.

The problem with Finjan's position here is that it seeks to avoid the restrictions on "pure functional claiming" present in case law centered around computer software (*see, e.g., Aristocrat Techs. Australia Pty. Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008)) but also avoid characterizing its claim elements as hardware components. Finjan is attempting a delicate dance to result, effectively, in pure functional claiming. *See id.* ("The point of the requirement that the patentee disclose particular structure in the specification and that the scope of the patent claims be limited to that structure and its equivalents is to avoid pure functional claiming."); *see also Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) ("If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid the price but is attempting to claim in functional terms unbounded by any reference to structure in the specification.").

As U.S. patent law does not allow pure functional claiming, the claimed transmitter and receiver must be hardware components separate from the processor, or there must be some disclosed structure for these elements corresponding to the claimed "transmitting" and "receiving" functions. As discussed, the specification discloses no specific structure, merely illustrating these components as rectangles in the figures, and Finjan goes to great lengths that the Court should not limit them to hardware components. *See, e.g., supra* at Section III.C.1, p. 33.

With respect to Finjan's argument that Trustwave's "proposed construction fails to even mention the function or structure of a receiver and/or transmitter," Trustwave does not propose a function because the function is separately and expressly claimed, and Trustwave does not propose a structure because it cannot discern one from the specification (as, apparently, neither can Finjan).

Accordingly, as a matter of law, the terms "transmitter" and "receiver," as specifically claimed in the '154 Patent are indefinite, as no structure is specified to perform the claimed

functionality, and Finjan contends that the "transmitter" and "receiver" cannot be limited to hardware components.

### 3. Plaintiff's Reply Position

Defendant's proposed construction should be rejected because, as Finjan established in its Opening Postition, the claim terms are straightforward and have well-understood meanings. Defendant's arguments to the contrary depend on unsupported, conclusory assertions and improper attempts to shift its burden.

First, Defendant fails to meet its burden of showing that a person of ordinary skill in the art would not understand "receiver" and "transmitter" to have sufficiently definite meanings as the name for structure. *Supra* at Section III. C.2, pp. 37-40. Defendant bears the burden of proving that 35 U.S.C. § 112 ¶ 6 applies. *See Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1298 (Fed. Cir. 2018) ("When the claim drafter has not signaled his intent to invoke 35 U.S.C. § 112 ¶ 6 by using the term 'means,' we are unwilling to apply that provision without a showing that the limitation essentially is devoid of anything that can be construed as structure."); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (same) (quoting *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1374 (Fed. Cir. 2012)). Yet Defendant fails to present evidence suggesting that the words of the claim would not be understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.

Defendant's attempt to distinguish *EnOcean* is off-base. *EnOcean GmbH v. Face Int'l Corp.*, 742 F.3d 955 (Fed. Cir. 2014); *supra* at Section III. C.2, p. 39. *EnOcean*, which is dispositive, determined that "a person of ordinary skill in the art could understand the bounds of the invention merely by reading the term 'receiver.'" *EnOcean GmbH*, 742 F.3d at 961. Differences in the claims and specifications are irrelevant. Evidence that a person of ordinary skill in the art would understand the structural bounds of a receiver are equally applicable here, and

there is no need to present evidence when the Federal Circuit has already reached a conclusion based on substantially similar extrinsic evidence. *See id.*

Second, Defendant conflates the analysis for whether 35 U.S.C. § 112 ¶ 6 applies with its application. Disclosures within the specification are irrelevant to the determination of whether the provision applies. *See Diebold Nixdorf, Inc.*, 899 F.3d at 1297 ("The standard by which we determine whether § 112, para. 6 applies is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.") (internal quotations omitted).

Not only do the terms' well-understood meanings undo Defendant's argument that they are purportedly "black box" terms, but Defendant's reliance on *Williamson* to suggest the opposite is improper. 792 F.3d at 1339; *supra* at Section III. C.2, p. 38. *Williamson* determined that "module" performed the same function as "means." 792 F.3d at 1350. Because the '154 Patent claims do not recite a "module," *Williamson* is inapplicable.

And while Defendant analyzes the terms as if they are "nonce" terms under 35 U.S.C. § 112 ¶ 6, Defendant fails to establish, or even assert, that the terms are actually "nonce." *supra* at Section III. C.2, p. 37 ("One category of claim terms that fall under § 112 ¶ 6 are 'nonce' terms."). That is because they are not. *See Diebold Nixdorf, Inc.*, 899 F.3d at 1297–98 ("[W]e first look to whether the limitation uses the word 'means.' . . . [I]f not, there is a rebuttable presumption that the provision does not apply."). Defendant cannot sustain arguments based on an unsupported legal conclusion.

Third, Defendant's alternative construction should also be rejected because it obfuscates the terms in an attempt to import two limitations not included in the claims. Defendant seeks to impose a requirement that the receiver and transmitter be hardware components, and that they be

39

separate from each other and the content processor, by citing to *Finjan, Inc. v. Qualys Inc*., Case No. 4:18-cv-07229-YGR, Dkt. No. 74 (N.D. Cal. June 11, 2020) (Ex. N-6).  *Qualys* does not, however, support that proposition, as it explicitly declined to construe "receiver" and "transmitter" and held that these terms should be understood according to their plain and ordinary meaning.  *Id.* at 26–29.

The goal of claim construction is "to clarify and when necessary to explain what the patentee covered by the claims," *O2 Micro Int'l Ltd.*, 521 F.3d at 1362, yet Defendant declines to propose a function or structure.  *Supra* at Section III. C.2, p. 41.  Defendant's failure to do so makes its contention that Finjan "seeks to avoid the restrictions on 'pure functional claiming' present in case law centered around computer software," all the more ludicrous.  *Supra* at Section III. C.2, pp. 40-41.  Finjan merely proposes that well-understood terms be given those meanings. Defendant's premise rests on the application of 35 U.S.C. 112 ¶ 6.  *See Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech*., 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("In cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, this court has consistently required . . . that the patentee disclose particular structure in the specification and that the scope of the patent claims be limited to that structure and its equivalents is to avoid pure functional claiming.").  Defendant has failed to carry its burden of proving that 35 U.S.C. § 112 ¶ 6 applies.

Defendant's attempts to strip "receiver" and "transmitter" of their well-understood function and structure in order to make the unjustified argument that they have none should be rejected. "Receiver" and "transmitter" should be ascribed their well-understood plain and ordinary meanings.

### 4.   Defendant's Sur-Reply Position

That Finjan thought it necessary to describe the functions of the claimed "receiver" and

"transmitter" within the claims indicates that the terms in the context of the '154 patent are black-box, nonce terms with an uncertain structure to a person of ordinary skill in the art. Not only was it necessary also to claim the functions of the "receiver" and "transmitter," but there is no description whatsoever of what structure the claimed receiver or transmitter could take. Tellingly, Finjan's Reply Brief focuses on case law interpreting claim terms of different patents and, in response to Trustwave's explanation that the '154 Patent provides no structures capable of performing the claimed functions (but provides drawings depicting the "receiver" and "transmitter" literally as boxes), Finjan cites to nothing in the patent.

Finjan argues that the *EnOcean* case is dispositive, but that case did not interpret the patent at issue here. Differences in the patent specification and claims are relevant because who the person of ordinary skill in the art is differs between patents. Although Finjan hangs its hat on its circular conclusion that "a person of ordinary skill in the art would understand the structural bounds of a receiver," it fails to even attempt to show that the person of ordinary skill in the art in the context of the *EnOcean* patent would have the same skills, education, and experience as a person of ordinary skill in the art here.

Finjan criticizes Trustwave's position at length but fails to explain what the structures of the claimed receiver and transmitter are. As Trustwave explained, this is likely because the '154 patent provides no guidance whatsoever. Finjan argues that *Williamson* framework applies only to claims using the word module and that since the claims here do not use the word module, the framework is inapplicable here. *Williamson* itself belies Finjan's argument. In *Williamson*, the Federal Circuit held that the entire category of "nonce" words triggers the means-plus-function framework, and that "module" was an example of a nonce word. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350-51 (Fed. Cir. 2015). The claims use "receiver" and "transmitter" as similar

black-box words only to provide their claimed functions. The means-plus-function framework exists to provide for functional claiming, provided that the patentee provides structure capable of performing the claimed functions. The claims of the '154 patent take advantage of functional claiming but do not provide corresponding structure.

The problem with the '154 patent utilizing functional claiming but not providing any indication of structure is highlighted by Finjan's argument over Trustwave's alternative constructions—which simply and broadly provide that the transmitter and receiver are hardware components different from each other and different from the content processor. Finjan provides no sound basis to depart from the *Qualys* court's understanding that the transmitter and receiver are hardware components, to the extent not indefinite.

Finjan ironically criticizes Trustwave for "declin[ing] to propose a function or structure." *supra* at Section III.C.3, p. 40. But Finjan proposed non-constructions for each and every disputed term. Trustwave did not propose a function because the claim itself recites a function and did not propose a structure because it could not discern a structure from the specification. The most structure these terms are afforded in the specification are black boxes in the figures. *supra* at Section III.C.3, pp. 35-36.

### D. "input"/"input variable" ('154 Patent, Claims 1–11)

| Finjan's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| no construction necessary—plain and ordinary meaning | "Information processed by both the first function/substitute function and the second function/original function and distinct from the first function/substitute function and the second function/original function"<br><br>Indefinite under 35 U.S.C. § 112 ¶ 2. |

1.      **Plaintiff's Opening Position**

Finjan proposes that the Court construe the terms "input" and "input variable" in accordance with their plain and ordinary meanings since, as used in the claims and the specification, they would be well understood by a person of ordinary skill in the art at the time of the invention without further construction.  A layperson could do so simply from reading the claim.  There is thus no reason to depart from their plain and ordinary meanings.  *Thorner*, 669 F.3d at 1365–66.

The '154 Patent has been reviewed and analyzed by numerous courts.  Not one expressed any indication that "input" and "input variable" failed to inform, with reasonable certainty, a person of ordinary skill in the art of the scope of the patent.  *See Int'l Bus. Machs. Corp. v. Priceline Grp. Inc.*, 271 F. Supp. 3d 667, 678 (D. Del. 2017), *aff'd sub nom.*, 775 F. App'x 674 (Fed. Cir. 2019) ("A claim is invalid as indefinite if, read in light of the specification delineating the patent, and the prosecution history, [the claim] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.") (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014)) (internal quotations omitted).  Indeed, none of the multiple courts that have construed terms in the '154 Patent have seen fit to construe "input" or "input variable," much less have expressed any sentiment suggesting that the terms are unclear or indefinite.  *See, e.g.*, Ex. N-2 at 10–13 (construing the '154 Patent); Ex. N-3 at 13–18 (same); Ex. N-4 at 15–19 (same); Ex. N-5 at 19–25 (same); Ex. N-6 at 21–29 (same).  Nor has the Patent Trial and Appeals Board ("PTAB"), which has heard seven inter partes review challenges to the '154 Patent.  *See*, *e.g.*, Ex. O, IPR2016-00151, Paper 51 at 6 (noting that PTAB "did not construe expressly any claim terms").

Nonetheless, and in contravention of governing law, Defendant argues the terms are sufficiently ambiguous so as to render them indefinite.  However, patent claims are presumed valid, and Defendant bears the burden to prove that a claim term is indefinite.  *See Nautilus*, 572

U.S. at 901.   Only if the "claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention," will they be held indefinite.   *Id.*

Defendant has not, and cannot, meet that burden, as the terms "input" and "input variable" provide the requisite clarity to understand the bounds of the claim.   *See Xerox Corp. v. Google Inc.*, 801 F. Supp. 2d 293, 299 (D. Del. 2011) ("For a claim term to be found indefinite, the party asserting invalidity must show by clear and convincing evidence that a person of ordinary skill in the art, after reading the claims, specification, and prosecution history, would be unable to understand the bounds of the claim."); *Nautilus,* 572 U.S. at 899 ("The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable.").

And even if "input" and "input variable" were not sufficiently clear on their face, the specification provides plenty of support and context to their meaning.   "Input" is discussed in the specification at length, appearing in it 160 times, including several non-limiting examples of potential inputs within the meaning of the claims.   For instance, an input may refer to a "text string . . . passed to a security computer."   Ex. A at 12:49-53.   And while the term "input variable" does not appear in the specification, the specification makes it clear that an input variable is merely a variable used as an input.   *See* Ex. A at 9:55-57; 13:31-34 ("[Table 1] function call_security_computer_to_inspect() passes the input . . . to security computer 215 for inspection by inspector 275;" "the call to call_security_computer_to_inspect() may . . . pass a variable, say name_of_function, so that input inspector 275 can determine whether it is safe").

There is no basis for Defendant's position.   The terms "input"/"input variable" should be given their plain and ordinary meanings.

### 2.   __Defendant's Answering Position__

The '154 Patent uses the terms "input" and "input variable" to refer to information that is

processed by the substitute function and the original function and that is distinct from the substitute function and the original function. *See, e.g.,* '154 Patent at Abstract ("the content including a call to an original function, ***and*** the call including an input"), 9:16-57 (making clear that the original function includes an input on which the original function operates, and the original function is replaced with a substitute function retaining the input on which the substitute function operates); 10:62-64 (describing that when the substitute function is invoked, the input is passed to the security computer).   For its part, Finjan does not appear to disagree with Trustwave's proposed construction, which is well-supported by and consistently used in the specification. The lone argument that Finjan makes is that the terms apparently need no construction because "[a] layperson could [understand the terms] simply from reading the claim." *supra* at Section III.D.1, p. 43. While the meaning of these terms read by a layperson reading only the patent claims is not as clear as Finjan argues, Finjan does not refute the construction, dedicating its brief only to the indefiniteness position.

Trustwave's position is that a person of ordinary skill would understand that the terms "input" and "input variable" would mean "information processed by both the first function/substitute function and the second function/original function and distinct from the first function/substitute function and the second function/original function." However, to the extent that the terms do not have this meaning, it would be unclear what any other meaning could be, which would make the terms indefinite.

As Finjan does not contest Trustwave's construction, the Court should adopt it.

### 3.     Plaintiff's Reply Position

Once again, Defendant's proposed construction should be rejected because it does not help to clarify the terms and Defendant fails to meet its burden of establishing why the Court should depart from the terms' plain and ordinary meanings, which "is, as always, the default in claim

construction." *ID Image Sensing LLC v. OmniVision Techs., Inc*., No. CV 20-136-RGA, 2021 WL 5206262, at *3 (D. Del. Nov. 9, 2021) (citing *Phillips v. AWH Corp*., 415 F.3d 1303, 1316 (Fed. Cir. 2005)).

Defendant does not dispute that, as Finjan set forth in its Opening Position, a layperson would understand the terms simply from reading them. *Supra* at Section III. D.2, p. 50. It states only that "the patent claims [are] not as clear as Finjan argues," before misrepresenting that "Finjan does not refute the construction." *Supra* at Section III. D.2, pp. 49. Finjan does refute Defendant's construction. As Finjan previously explained, "input" and "input variable" are common terms that a layperson would understand and require no construction. Defendant bears the burden, which it has not met, of establishing that the terms require clarification *and* that its proposed construction furthers that goal. *See O2 Micro,* 521 F.3d at 1362 (Fed. Cir. 2008).

Defendant has not—and cannot—establish that its proposed 29-word construction will clarify the meaning of these straightforward terms. It provides no support for the proposition that a person of ordinary skill in the art would somehow understand the terms (which together total three words) to mean the 29-word construction it now proposes. *Supra* at Section III. D.2, p. 50. And Defendant's proposed construction imports limitations not present in the claim language, without any explanation as to why they are required. Its failure to do so, or to provide any evidence (outside of unsupported conclusory statements) showing that the terms are not, on their own, clear and well-understood, necessitates the rejection of its proposed construction.

Defendant also falls well short of meeting its burden of establishing that the terms are indefinite. *See Xerox Corp. v. Google Inc.,* 801 F. Supp. 2d 293, 299 (D. Del. 2011) ("For a claim term to be found indefinite, the party asserting invalidity must show by clear and convincing evidence that a person of ordinary skill in the art, after reading the claims, specification, and

prosecution history, would be unable to understand the bounds of the claim."). Defendant spends less than a sentence making that argument, asserting, in conclusory fashion, that "it would be unclear what any other meaning could be." *Supra* at Section III. D.2, p. 50. That is plainly insufficient.

Accordingly, both of Defendant's proposed constructions should be rejected and "input"/"input variable" should be ascribed their plain and ordinary meanings.

### 4.      Defendant's Sur-Reply Position

Trustwave stands on its arguments in its Answering Position.

### E.      "invoke [a/the] second function with the input" ('154 Patent, Claims 1, 4)

| Finjan's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| no construction necessary—plain and ordinary meaning | Indefinite under 35 U.S.C. § 112 ¶ 2. |

### 1.      Plaintiff's Opening Position

Finjan proposes that the Court construe this term in accordance with its plain and ordinary meaning since, as used in the claims and the specification, it would be well understood by a person of ordinary skill in the art at the time of the invention without further construction. While Defendant asserts that the term is indefinite, it cites no intrinsic or extrinsic evidence to support that argument except for claims 1 and 4 themselves.[10]  D.I. 131 at 9.

Defendant's failure to produce any meaningful evidence to support its construction precludes a finding that it satisfied its burden of showing indefiniteness by clear and convincing evidence. *See Xerox*, 801 F. Supp. 2d at 299 ("For a claim term to be found indefinite, the party

---

[10]   Defendant presents no argument, intrinsic evidence, or expert testimony to support its claim that the term is indefinite.

asserting invalidity must show by clear and convincing evidence that a person of ordinary skill in the art, after reading the claims, specification, and prosecution history, would be unable to understand the bounds of the claim.").

Nor is there any evidence that would allow Defendant to meet that burden.  As set forth above in Section III.B, while the parties differ on the construction of "second function," neither party suggests that a person of ordinary skill would be incapable of understanding its meaning. And for the reasons set forth in Section III.D.1, a person of ordinary skill at the time of the invention would understand the meaning of the term "input."  Finally, to "invoke a . . . function" is a known phrase that would be readily recognizable by a person of ordinary skill in the art.  Taken together, all of the components of the term merely describe the use of an input as part of the invocation of a function.

There is therefore no basis for Defendant's indefiniteness position.  The plain and ordinary meaning of the term adequately describes the bounds of the claims, and there is no need for the Court to construe it.

### 2.        Defendant's Answering Position

It is unclear how one would *invoke* the second function *with a/the input* as recited in claims 1 and 4. Claim 1 recites, in part, "a receiver for receiving an indicator from the security computer whether it is safe to invoke the second function with the input." This much is clear: an indicator is received from the security computer, and the indicator indicates the safety of executing a computer operation. What is unclear is how the input is used to invoke the second function, and this renders claims 1 and 4 indefinite. *See Nautilus, Inc. v. Biosig Instruments, Inc.,* 572 U.S. 898, 901 (2014) ("[A] patent is invalid for indefiniteness if its claims, read in light of the specification and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.").

48

As described in at pp. 3-4, *infra*, the '154 Patent describes a system for protecting a client computer from dynamically generated content. As the specification teaches, "the present invention operates by replacing the original function calls with substitute function calls within the content, at a gateway computer, prior to the content being received at the client computer." *Id*. at 4:57-60. The system looks for "function calls of the form Function(input)," replaces one or more original functions with a substitute function such that the substitute function call has the form "Substitute_function(input,*)," where there may be an optional additional input added (*). *Id*. at 9:16-28. The specification makes clear that the function acts on the input, as in the case of the substitute function, "the substitute function sends the input to security computer 215 for inspection." *Id*. at 9:36-37.

But having a function acting on an input is not what claims 1 and 4 say. Rather, the claims recite an input somehow invoking a function. *See, e.g., id*. at claim 1 ("a receiver for receiving an indicator from the security computer whether it is safe *to invoke the second function with the input*"). The public is left to guess as to how the claimed system would use the input to invoke the second function; the determination of whether a system does or does not infringe the limitation "to invoke the second function with the input" becomes a guess. *See Research Frontiers, Inc. v. E Ink Corp.*, C.A. No. 13-1231-LPS, 2016 WL 1169580, at *20 (D. Del. Mar. 24 2016) (citing *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002)).

As it is unclear how a system "invoke[s] the second function with the input," the terms as they appear in claims 1 and 4 are indefinite.

### 3.   Plaintiff's Reply Position

Defendant has failed to show "by clear and convincing evidence that a person of ordinary skill in the art, after reading the claims, specification, and prosecution history, would be unable to understand the bounds of the claim." *Xerox Corp.*, 801 F. Supp. 2d at 299.  While Defendant

49

argues that "[i]t is unclear how one would invoke the second function with a/the input" (*supra* at Section III. E.2, p. 54), it provides no evidence to support its claim that the term is unclear and relies only on attorney argument. That is insufficient to meet its burden. *See Rsch. Frontiers, Inc. v. E Ink Co*rp., No. CV 13-1231-LPS, 2016 WL 1169580, at *22 (D. Del. Mar. 24, 2016), report and recommendation adopted, No. CV 13-1231-LPS, 2016 WL 7217217 (D. Del. Dec. 13, 2016), *aff'd*, 706 F. App'x 685 (Fed. Cir. 2017) ("only attorney argument . . . is insufficient to establish indefiniteness"); *WesternGeco LLC v. ION Geophysical Corp*., 876 F. Supp. 2d 857, 875 (S.D. Tex. 2012) ("Defendant's unsupported attorney argument fails to prove indefiniteness by clear and convincing evidence."); *Cacace v. Meyer Mktg. Co., Ltd*., 812 F. Supp. 2d 547, 561 (S.D.N.Y. 2011) (explaining that "mere attorney argument is insufficient to establish invalidity based on indefiniteness").

In any event, Defendant's entire argument appears to be based on a misguided interpretation of the word "with." *Supra* at Section III. F.2, p. 54 (reading "with the input" to require that "an input somehow invoking a function."). Defendant's purported requirement that the input perform the action of invoking is inconsistent with the claims. The term "input," itself, clarifies the role it plays—it is information that is involved in the performance of the second function. "With" merely suggests inclusion.

The plain and ordinary meaning of the term adequately describes the bounds of the claims, and there is no need for the Court to construe it. Moreover, Defendant has the technology wrong and its indefiniteness argument is completely unsupported. Its position should therefore be rejected, leaving this term with its plain and ordinary meaning.

### 4.   Defendant's Sur-Reply Position

Trustwave stands on its arguments in its Answering Position.

**F.**   **"calling a function with the input variable" / "calling a second function with the modified input variable" ('154 Patent, Claims 6, 10)**

| Finjan's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| no construction necessary—plain and ordinary meaning | Indefinite under 35 U.S.C. § 112 ¶ 2. |

**1.**   **Plaintiff's Opening Position**

Finjan proposes that the Court construe this term in accordance with its plain and ordinary meaning since it would be well understood by a person of ordinary skill in the art at the time of the invention without further construction.  As with the preceding term, Defendant asserts that this term is indefinite but cites no intrinsic or extrinsic evidence, besides claims 6 and 10 themselves, to support that position.[11]  D.I. 131 at 9.

Again, Defendant's failure to produce any meaningful evidence to support its construction precludes a finding that Defendant showed indefiniteness by clear and convincing evidence.  *See Xerox*, 801 F. Supp. 2d at 299.

Nor is there any evidence that the term is indefinite.  The Parties agreed to construe "a call to [a] function" as "a statement or instruction in the content, the execution of which causes the function to provide a service," as Defendant proposed.  *See supra* Section II.  The fact that Defendant now seeks to construe this term as indefinite, despite the significant overlap with Defendant's proposed construction of the agreed-upon term, exemplifies the inconsistencies littered throughout Defendant's proposed constructions.  And, as set forth above (*supra* at Section III.D.1, pp. 47-49), a person of ordinary skill in the art at the time of the invention would understand the meaning of the term "input variable."  Taken together, the term's components merely describe the use of an input variable, or modified input variable, as part of a call to a

---

[11]   Defendant presents no argument, intrinsic evidence, or expert testimony to support its claim that the term is indefinite.

function.  *See* Ex. A at 9:55-57; 13:31-34.  A modified input variable refers simply to an input variable that has been modified.

There is therefore no basis for Defendant's indefiniteness position.  The plain and ordinary meaning of the term adequately describes the bounds of the claims, and there is no need for the Court to construe it.

### 2.    Defendant's Answering Position

It is unclear how one would *call* a function *with the input variable* as recited in claim 6 or *call* a second function *with the modified input variable* in claim 10.  Claim 6 recites, in part, "calling a second function with a modified input variable." Claim 10 similarly recites "calling a second function with the modified input variable." This much is clear: an indicator is received from the security computer, and the indicator indicates the safety of executing a computer operation. What is unclear is how the modified input variable is used to call the second function, and this renders claims 6 and 10 indefinite. *See Nautilus, Inc. v. Biosig Instruments, Inc.,* 572 U.S. 898, 901 (2014) ("[A] patent is invalid for indefiniteness if its claims, read in light of the specification and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.").

As described in *infra* at pp. 3-4, the '154 Patent describes a system for protecting a client computer from dynamically generated content. As the specification teaches, "the present invention operates by replacing the original function calls with substitute function calls within the content, at a gateway computer, prior to the content being received at the client computer." *Id*. at 4:57-60. The system looks for "function calls of the form Function(input)," replaces one or more original functions with a substitute function such that the substitute function call has the form "Substitute_function(input,*)," where there may be an optional additional input added (*). *Id*. at 9:16-28. The specification makes clear that the function acts on the input, as in the case of the

substitute function, "the substitute function sends the input to security computer 215 for inspection." *Id.* at 9:36-37.

But having a function acting on an input variable is not what claims 6 and 10 say. Rather, the claims recite an input variable somehow calling a function. The public is left to guess as to how the claimed system would use the input variable to call the second function; the determination of whether a system does or does not infringe the limitation "calling a second function with the modified input variable" becomes a guess. *See Research Frontiers, Inc. v. E Ink Corp.*, C.A. No. 13-1231-LPS, 2016 WL 1169580, at *20 (D. Del. Mar. 24 2016) (citing *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002)).

Accordingly, the terms "calling a second function with a modified input variable" and "calling a second function with the modified input variable" as they appear in claims 6 and 10 are indefinite.

### 3.    **Plaintiff's Reply Position**

As with the preceding term, Defendant has failed to show "by clear and convincing evidence that a person of ordinary skill in the art, after reading the claims, specification, and prosecution history, would be unable to understand the bounds of the claim." *Xerox Corp.*, 801 F. Supp. 2d at 299.  Defendant again provides no evidence to support its assertion that the terms are unclear, relying solely on attorney argument.  *Supra* at p. 50.  That is insufficient to meet its burden. *See Rsch. Frontiers, Inc.*, 2016 WL 1169580, at *22; *WesternGeco*, 876 F. Supp. 2d at 875; *Cacace*, 812 F. Supp. 2d at 561.

Defendant's argument again seems to turn on an incorrect interpretation of the word "with." *Supra* at Section III. F.2, p. 54 ("the claims recite an input somehow invoking a function"). For the same reasons as discussed in section V.5, Defendant is misguided. And Defendant's insistence that "[t]he public is left to guess as to how the claimed system would use the input to

invoke the second function," is also incorrect. *Supra* at Section III. F.2, p. 55. Finjan can take the guesswork out for the public—the input is used as an input. "Input" and "input variable" are indicators that are received along with the "second function."

Because Defendant fails to show that the term is indefinite, the plain and ordinary meaning of the term adequately describes the bounds of the claims, and there is no need for the Court to construe it.

### 4.    **Defendant's Sur-Reply Position**

Trustwave stands on its arguments in its Answering Position.

<div style="display: flex;">
<div>

*/s/ Andrew E. Russell*
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
*Attorneys for Plaintiff*

OF COUNSEL:

Bijal V. Vakil
Jeremy T. Elman
ALLEN & OVERY LLP
550 High Street
Palo Alto, CA  94301
(650) 388-1650

</div>
<div>

*/s/ Alexandra M. Cumings*
Jack B. Blumenfeld (No. 1014)
Alexandra M. Cumings (No. 6146)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
acumings@morrisnichols.com
*Attorneys for Defendant Trustwave Holdings, Inc.*

OF COUNSEL:

John S. Letchinger
BAKER & HOSTETLER LLP
191 North Wacker Drive, Suite 3100
Chicago, IL 60606-1901
(312) 416-6200
jletchinger@bakerlaw.com

Jared A. Brandyberry
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, CO 80202
(303) 764-4072
jbrandyberry@bakerlaw.com

</div>
</div>

Dated: March 31, 2022